**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| **TATYANA SIZYUK,** | ) |
| | ) |
| **Plaintiff.** | ) |
| **v.** | ) **CAUSE NO: 4:20-cv-00075-TLS** |
| | ) |
| **PURDUE UNIVERSITY;** | ) |
| **BOARD OF TRUSTEES OF** | ) |
| **PURDUE UNIVERSITY; and** | ) |
| **SEUNGJIN KIM and MAMORU** | ) |
| **ISHII, in their personal capacities;** | ) |
| | ) |
| **Defendants.** | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT**
**MAMORU ISHII'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Tatyana Sizyuk ("Dr. Sizyuk" or "Plaintiff"), by counsel, files her

Memorandum of Law in Opposition to Defendant Mamoru Ishii's ("Defendant" or "Dr.

Ishii") Motion for Summary Judgment.

**I.      Introduction**

Academia is not immune from the discriminatory biases and imperfections of

humanity.  Being of the right gender, race, or national origin can decisively impact how

one is viewed by those in academic power, including whether one is worthy of tenure.

Here, the record shows that if Dr. Sizyuk were an Asian male, as opposed to an Eastern

European female, and all other circumstances remained the same, then she would still be

working for Purdue University's School of Nuclear Engineering on her $750,000.00

DOE grant with tenure.  Dr. Sizyuk asks this Court to deny Defendant's motion for

summary judgment so she can have her day in Court.

## II.    Legal Standard

Litigants and courts often cite the familiar summary judgment standard of review, but the correct *application* of this standard is what is most important.  Recent guidance by Judge Hamilton on the Seventh Circuit explains, in great detail, how the summary judgment process should work in practice:

> The maxims of summary judgment are familiar – no weighing the evidence, no credibility determinations, draw all non-speculative inferences in favor of the non-movant- but they are more easily recited than applied . . . They define the outer limits of Jol's right to 'the commonsense judgment of [her] community . . . and to the generous latitude the court accords it.  We entrust a great deal to the jury's human experience . . . We allow a jury to infer a great deal without mathematical precision . . . In short, trials are stories, not syllogisms . . . Accordingly, the court must try to focus on the most persuasive story possible on the non-movant's behalf when asking whether a verdict in her favor would be reasonable or could result only from irrational speculation.

*Joll v. Valparaiso Comm. Schools*, 953 F.3d 923, 928 (7th Cir. 2020).  "Employment discrimination cases often center on parties' intent and credibility, which must go to a jury unless 'no rational factfinder could draw the contrary inference.'"  *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 633, (7th Cir. 2009).

Even with but-for causation under 42 U.S.C. § 1983, the Court must ask whether a jury could find for Dr. Sizyuk with her best and most persuasive case, acknowledging that the denial of tenure and resulting termination can have multiple but-for causes, yet still result in liability for Defendant. In *Bostock v. Clayton County, Georgia*, 140 S.Ct. 1731 (2020), the Supreme Court explained why events may have multiple but-for causes:

> In other words, a but-for test directs us to change one thing at a time and see if the outcome changes.  If it does, we

> have found a but-for cause.  This can be a sweeping
> standard.  *Often, events have multiple but-for causes* . . .
> When it comes to Title VII, the adoption of the traditional
> but-for causation standard means a defendant cannot avoid
> liability just by citing some *other* factor that contributed to
> its challenged employment decision.  So long as the
> plaintiff's sex was one but-for cause of that decision, that is
> enough to trigger the law.

*Id*. at 1739.  (emphasis added); *see also Malin v. Hospira, Inc.*, 762 F.3d 552, fn 3

(7th Cir. 2014) ("a single event can have multiple but-for causes . . . .").

In addition, unless the Plaintiff limits her methodology of proof to the indirect

*McDonnell Douglas* burden shifting framework, the Seventh Circuit no longer

distinguishes between "direct" and "indirect" evidence, but instead asks "simply whether

the evidence would permit a reasonable factfinder to conclude that the plaintiff's race,

ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse

employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Accordingly, following this standard, Dr. Sizyuk will simply lay out all of the

circumstantial evidence she contends will permit a reasonable jury to find in her favor.

Here, as is permissible under 42 U.S.C. § 1983, Dr. Sizyuk has sued Dr. Ishii in

his personal capacity.  To establish personal liability under § 1983, Dr. Sizyuk must

present enough evidence for a jury to find that Dr. Ishii was personally involved in the

deprivation of her constitutional rights.  *Lile v. Tippecanoe County Jail, 844 F.Supp.*

1301, 1308 (N.D. Ind. 1992).

**III.     Argument**

**A.     Dr. Ishii's Unlawful Bias**

Dr. Ishii does not contest that Dr. Sizyuk has a constitutional right to be free from

gender discrimination, race discrimination, and national origin discrimination when being

evaluated for tenure.  Dr. Ishii contends that he has no such bias and did not cause her denial of tenure and resulting termination.  The record shows otherwise.

Numerous witnesses have overheard Dr. Ishii, who is from Japan, openly state his bias against women and non-Asians.  Dr. Ishii approached Dr. Wharry and stated that "Purdue was only interested in hiring women at the time, so [her] advisor did not get the job because he was a male."  [Wharry Dep. pp. 39-40].  Subsequently, Dr. Ishii stated to Dr. Wharry and others on a search committee (before he was precluded from serving) "this was not a very diverse search committee because it was all Asian male" in jest of Purdue's practice of ensuring diversity.  [Wharry Dep. pp. 42].  During this same meeting, Dr. Ishii insisted that Dr. Wharry, the only female in the room, be the note-taker, in spite of Dr. Wharry suggesting they take turns.  *Id*.  Dr. Wharry reported these statements within two (2) weeks to Dr. Kim, who told her that she was there to "serve" senior faculty rather than complain.  [Kim Dep. pp. 69-70].

On October 8, 2018, the day Dr. Wharry's application for tenure was scheduled for a vote with the NEPC, she overheard Dr. Ishii having a conversation with Dr. Revankar wherein Dr. Ishii was "threatening Revankar to vote against my tenure case and the other tenure case that was going up at the same time, because me, the other case, who was Professor Garner, both of us and our students are all stupid, lazy Americans." [Wharry Dep. p. 50].  Dr. Ishii then "argued that in the past he has supported Revankar for promotion at Purdue . . . so now Revankar must vote with me."  [Wharry Dep. p. 73]. Dr. Ishii promised that he and Dr. Kim would help him somehow.  [Wharry Dep. p. 51]. The NEPC then voted to deny Dr. Wharry's application for tenure.  [Wharry Dep. pp. 52-53].

Dr. Brooks has heard Dr. Ishii "publicly express anti-female bias on numerous occasions (e.g, before and after faculty and search committee meetings, and at department social events), denigrating the role of women in faculty and dean positions. This includes him calling women 'stupid,' referring to them as 'doing much worse research work as men engineers,' and 'using the stupid US legal system to get faculty positions they do not deserve.'" [Dr. Brooks Decl. ¶ 7].

Dr. Garner has heard Dr. Ishii state, in an inappropriate manner, "Purdue likes it if we hire women." [Garner Dep. p. 48]. Dr. Ishii does not hold women in high esteem, and he gives off the vibe that he is not open to those that are different. [Garner Dep. pp. 54, 61].

Dr. Taleyarkhan has heard Dr. Ishii, on numerous occasions, make "statements about what people of different origin, white students, people of Caucasian race as being – as being lazy, inappropriate for the task . . . ." [Taleyarkhan Dep. p. 83]. Dr. Taleyarkhan has also heard Dr. Ishii make numerous statements against women, all of whom have left the SNE, that they are "not up to par in terms of ability, not having scientific backgrounds necessary for the job in relation to a faculty member . . . downplaying their abilities generally and deciding not to sort of support the case for promotion and tenure." [Taleyarkhan Dep. p. 85]. Based on Dr. Taleyarkhan's observations and experience, Dr. Ishii applies a different and more difficult standard to women versus men. [Taleyarkhan Dep. pp. 87-88].

Dr. Hassanein has heard, on several occasions, Dr. Ishii openly state that "whites are lazy." [Hassanein Dep. pp. 180-181]. Dr. Hassanein witnessed Dr. Ishii state that he just liked to hire Chinese students. [Hassanein Dep. p. 183]. Dr. Hassanein also

personally heard Dr. Ishii say that "women are stupid" on several occasions. [Hassanein Dep. p. 186]. He heard Dr. Ishii state that "[m]inorities have to be accommodated due to the U.S. laws." [Hassanein Dep. p. 189]. Dr. Ishii stated, in Dr. Hassanein's presence, that Dean Jamieson, a female, was hired because she's a woman - "she's a woman, she's not capable of thinking. She's stupid . . . ." [Hassanein Dep. p. 197]. Concerning Audeen Fentiman, another female in SNE at the time, "we've got a loser, she was hired because she's a woman . . . we should hire faculty that are capable of doing work, and look at what we hired." [Hassanein Dep. pp. 199-200].

Finally, Dr. Sizyuk has also heard Dr. Ishii openly disparage a female colleague because of her gender. [Sizyuk Dep. pp. 211-213]. Based on her first hand experience with Dr. Ishii in search committees, Dr. Ishii would say to Dr. Sizyuk and Dr. Fentiman (female) "you don't understand, you don't know, you don't understand this." [Sizyuk Dep. p. 214].

To sidestep this damning evidence, Dr. Ishii in a footnote claims these statements should be disregarded as stray remarks. However, these are not one-time innocent stray slips of the tongue by Dr. Ishii. Nor do they derive from a single witness. "A court considering stray remark[s] argument at the summary judgment stage must be mindful of its duty to consider the evidence as a whole and construe it in the light most favorable to the non-moving party . . . '[a] remark or action by a decision-maker reflecting unlawful animus may be evidence of his or her attitudes more generally.'" *Collins v. American Federation of State*, 2021 WL 3140763, * 4 (S.D. Ind. July 26, 2021). The Seventh Circuit, when denying summary judgment, has repeatedly cautioned courts not to ignore these types of statements when ruling on summary judgment.

In *Collins*, statements by a decision-maker about a policy, even though not directly tied to the Plaintiff and his specific adverse action, were sufficient for a reasonable jury to conclude that he was denied a transfer and terminated because of his medical leave for mental health disabilities.  *Id*.

As explained by Judge Hamilton in *Joll v. Calparaiso Comm. Schools,* 953 F.3d 923 (7th Cir. 2020), "[s]ome ambiguity inheres in all employer remarks that fall short of admitting discrimination while still supporting an inference of it.  This ambiguity is the very reason the jury must be called."  *Id.* at 932.  Statements showing bias directly from the cat's paw bad actor are not stray remarks.  *Id*. at 934.  In *Joll*, the Seventh Circuit reversed summary judgment in part, because the district court improperly used the stray remark doctrine to neuter the decision-maker's sexist and racist comments.  *Id*. at 935.

In *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627 (7th Cir. 1996), repeated biased statements concerning women in upper management, and actions based on those biased statements, were sufficient along with other evidence to sustain the verdict for plaintiff, including punitive damages against defendant.  *Id*. at 632-33.

In *Perez v. Thorntons, Inc*., 731 F.3d 699 (7th Cir. 2013), the Seventh Circuit held that the jury "should be able to consider that [the supervisor] expressed bias against women and Hispanics in the workplace a year before he became a witness in the investigation into [the plaintiff's] conduct and provided information to [the decisionmaker] that led to her firing."  *Id*. at 710.

In *Applewhite v. Deere & Co., Inc*., 2020 WL 7029889 (C.D. Ill. Nov. 30, 2020), the District Court did not apply the stray remark doctrine and instead held that emails reflecting unlawful bias and animus months before the termination could permit a jury to

find for the Plaintiff.  *Id*. at * 22 ("the Court disagrees that the comments are only relevant if they are made in reference to the decision to terminate Applewhite.").

Here, the numerous biased statements are made by the cat's paw bad actor, Dr. Ishii, and they directly relate to women and non-Asians in higher education.  According to Dr. Ishii, women and non-Asians are stupid, lazy, they only get jobs at Purdue because Purdue is only interested in hiring women, they perform much worse research and work, they use the stupid U.S. legal system to get faculty positions they do not deserve, they are not up to par in terms of ability or background, and they are not capable of doing the work.  As corroborated by multiple individuals, this is how Dr. Ishii views women and non-Asians in the School of Nuclear Engineering.

To make matters worse, Dr. Ishii *acts* on these biases and yields considerable power.  He refuses to complete unconscious bias training, thereby disqualifying him from serving on search committees.  And he has shown a pattern of behavior of actively influencing others to vote his way.  Dr. Ishii pressured Dr. Revankar to vote to deny Dr. Wharry's application for tenure because Dr. Garner and Dr. Wharry were "all stupid, lazy Americans."  [Wharry Dep. p. 50].  The NEPC then voted to deny Dr. Wharry's application for tenure.  [Wharry Dep. pp. 52-53].  Once Dr. Ishii issues his opinion, his faction follows.  [Garner Dep. pp. 62-63].  Dr. Ishii also pressured Dr. Garner to hire Dr. Kim as the Head, promising in return that his "tenure case would be in very good shape." [Garner Dep. p. 19].  Subsequently, Dr. Kim became the Head and Dr. Garner obtained tenure.  [Kim Dep. pp. 9-10; Garner Dep. p. 9].

**B.      Cat's Paw and Power of Dr. Ishii**

The Seventh Circuit has held that personal liability under 42 U.S.C. § 1983 is

permissible under a cat's paw theory for the bad actor.  *Taylor v. Ways*, 999 F.3d 478,

488 (7th Cir. 2021).  Accordingly, the declarations of Dr. Bertodano, Dr. Revankar, Dr.

Tsoukalas, and Dr. Ishii are irrelevant.  When someone who is not the sole final decision-

maker causes an adverse employment action for an unlawful motive by manipulating the

final decision, this is known as cat's paw.  *Taylor v. Ways*, 999 F.3d 478, 489 (7th Cir.

2021).  A cat's paw theory of liability requires evidence that the bad actor "harbored

discriminatory animus against [her] and that the subordinate's scheme proximately

caused the adverse employment action."  *Sinha v. Bradley University*, 995 F.3d 568, 574

(7th Cir. 2021).

Regarding discriminatory animus, "[u]nmistakable evidence of racial animus,

such as defendant's use of racial epithets or slurs, makes for a 'simple analysis.'"  *Taylor*,

999 F.3d at 489.  Statements beyond the statute of limitations can still be used to

demonstrate unlawful bias and animus.  *Kellogg v. Ball State Univ.*, 984 F.3d 525, 529-30

(7th Cir. 2021).  As stated above, Dr. Ishii has uttered numerous unmistakable statements

providing a view into his discriminatory and biased views against women and non-

Asians.

With respect to proximate causation, this "requires only some direct relation

between the injury asserted and the injurious conduct alleged . . . ."  *Id*.  Relying upon

facts provided by the biased supervisor is enough to show proximate causation.  *Sinha*,

995 F.3d at 574; *see also Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 462 (7th Cir.

2021)(explaining that the Supreme Court rejected the Seventh Circuit's *Staub* causation

standard, and finding that "if the investigation 'relies on facts provided by the biased supervisor,'" then proximate causation is established.).  Here, Dr. Ishii provided objections outside of the actual criteria for tenure that significantly influenced the vote on Dr. Sizyuk's tenure.

The SNE is split into factions, with Dr. Ishii and his group on one side, and everybody else on the other side.  [Garner Dep. pp. 14-15, 17, 20, 22].  Per Dr. Garner, "Dr. Ishii has a lot of influence . . . he's very well respected.  So he has a fair amount of influence and he has influence on certain faculty, the ones that we use the term 'faction' for.  He has a lot of influence on those particular faculty."  [Garner Dep. p. 18].  Per Dr. Wharry, Dr. Kim views Dr. Ishii and Dr. Choi as the most influential people in the department and feels that everyone needs to have their blessing.  [Wharry Dep. p. 65].  Once Purdue hired the student (Dr. Kim) of the most powerful person (Dr. Ishii) as the Head, the balance changed.  [Garner Dep. pp. 51-52].  Dr. Ishii and Dr. Choi became more emboldened, and the balance of power shifted in their favor.  [Garner Dep. pp. 52, 67].

Dr. Brooks has observed that Dr. Ishii "has a strong, outsized, influence on employment decisions at Purdue Nuclear Engineering."  [Dr. Brooks Decl. ¶ 7].  Per Ms. Randler, "Dr. Ishii controls and runs the School of Nuclear Engineering:"

> Dr. Ishii has a great amount of power and influence in that
> school.  For example, even though Dr. Ishii does not attend
> meetings as frequently as other faculty members because he
> only had to show up to work 3 days out of the week, his
> decisions seemed to supersede everyone else's regardless
> of evidence, rationale, etc.  Faculty seemed to be hesitant, if
> not outright scared, to make a decision without Dr. Ishii's
> presence or known preferences.  Events had to be
> scheduled around his availability . . . . His fame
> surrounding the subject is highly revered at SNE and

therefore, Dr. Ishii has been granted powers that no one
else can obtain.

[Randler Decl. ¶ 4].  Dr. Ishii does not even type his own emails or hold his own

umbrella.  [Randler Decl. ¶ 4].  "If he does not want someone to advance on the tenure

track, he will ensure that outcome.  All Dr. Ishii has to do is say no.  His following will

do as he bids." *Id*.  Dr. Ishii has a long tenure with Purdue, and he has amassed

information that he uses to his benefit.  [Taleyarkhan Dep. p. 85].

### C.      Dr. Ishii Caused the Denial of Tenure

 Dr. Ishii used his power and influence to poison the NEPC deliberations

concerning Dr. Sizyuk's tenure.  "An employer's unusual deviation from standard

procedures can serve as circumstantial evidence of discrimination." *Baines v. Walgreen

Co*., 863 F.3d 656, 664 (7th Cir. 2017).  The NEPC held three (3) meetings to discuss Dr.

Sizyuk's application for tenure, but the criteria of discovery, learning, engagement, and

impact were never discussed at any of these meetings due to Dr. Ishii.  [Taleyarkhan Dep.

pp. 77-78].  No questions were raised as to her discovery, learning, engagement, or

impact.  [Taleyarkhan Dep. pp. 78-79].  During all three (3) meetings, no questions were

raised about Dr. Sizyuk's independence from Dr. Hassanein.  [Taleyarkhan Dep. p. 97].

Instead, the first meeting on April 30, 2019, centered on the issue of whether Dr.

Hassanein could serve as a mentor/presenter, as well as a voting NEPC member of Dr.

Sizyuk's application for tenure.  [Taleyarkhan Dep. p. 54].  At this initial meeting, Dr.

Ishii raised objections about Dr. Hassanein having a conflict of interest with Dr. Sizyuk

and serving as her mentor/presenter, as well as voting on her tenure.  *Id*.  In response, Dr.

Kim successfully forced Dr. Hassanein to recuse himself in spite of an email from the

Provost Office on April 17, 2019, which stated "[b]eing a former Ph.D. advisor or former

supervisor of a nominee being considered for P and T does not disqualify a senior faculty member from either voting on the P and T case or presenting it or being the mentor for the nominee."  [Kim Dep. pp. 64-65, 67; Email Chain April 17, 2019].

At the second NEPC meeting held on September 6, 2019, Dr. Sizyuk's qualifications in terms of discovery, learning, engagement, and impact were never discussed.  [Taleyarkhan Dep. pp. 77-79].  Instead, Dr. Ishii raised concerns about Dr. Sizyuk's Ph.D. and prior work at Argonne.  [Taleyarkhan Dep. pp. 55, 61-62; Garner Dep. p. 32].  Dr. Ishii really wanted to emphasize two (2) issues – the legitimacy of Dr. Sizyuk's Ph.D. and her title at Argonne must have been inaccurate because she did not have a Ph.D. when she worked at Argonne, so she allegedly could not have been a staff scientist.  [Garner Dep. p. 33; Taleyarkhan Dep. pp. 55, 61-62, 64-65].  Dr. Ishii's assertion is verifiably false.  [Taleyarkhan Dep. pp. 64-65].

It is common practice for research scientists, such as Dr. Sizyuk, to obtain degrees based on research in the industry and outside of academia.  [Hassanein Dep. pp. 52-53].  Dr. Sizyuk earned her Ph.D. from the University of Rzeszow, Poland, in May of 2014.  [Dr. Sizyuk's Interr. Resp. ¶ 1 to Kim].  Purdue's Provost Office confirmed the validity of Dr. Sizyuk's Ph.D. and also confirmed that Dr. Hassanein was her research advisor.  [Kim Dep. pp. 59-60].  Purdue's Provost Office was so concerned about the NEPC using this Ph.D. issue, which is outside of the criteria for tenure, to deny tenure to Dr. Sizyuk that it sent an email to Dr. Kim which stated "[w]e have learned nothing that the primary committee could not have found out for themselves, if they were concerned, using a Webb search, Google translation and a conversation with Tatyana.  Any idea why they have not pursued their own questions?  If their intention was to wait and then play

'gotcha' in an effort to sabotage her promotion proceedings, then you've got a fire to put out, no?"  [Kim Dep. pp. 94-96; Email Chain Aug. 5, 2019].

The NEPC is supposed to remain blind as to where one earned a Ph.D. [Taleyarkhan Dep. p. 104].  The tenure deliberation process is not the appropriate time and place to address issues with a candidates Ph.D.  [Garner Dep. pp. 36-37].  The written policies for tenure contain no reference to one's Ph.D. or employment history before Purdue.  [Procedures for Granting Academic Tenure and Promotion; West Lafayette Campus Promotion and Tenure Policy].  The NEPC is required to judge a candidate on how he or she performs as faculty members, not on where they received their Ph.D. or worked prior to Purdue.  [Garner Dep. p. 37].  Discovery, learning, and engagement are completely independent from where one received a Ph.D.  *Id*.  In spite of the Ph.D. being irrelevant to the criteria of discovery, learning, engagement, and impact, Dr. Ishii openly questions whether Dr. Sizyuk is a good applicant because of her Ph.D. [Ishii Dep. p. 76].

Further, at this meeting Dr. Kim conveyed "categorically to the committee members that it was the provost's opinion that her degree – her granted degree was valid."  [Taleyarkhan Dep. p. 62].  Dr. Ishii's argument that one needs a Ph.D. to be a staff scientist at Argonne is factually wrong.  [Taleyarkhan Dep. pp. 64-65].

At the third NEPC meeting held on September 27, 2019, Dr. Ishii continued to raise objections to Dr. Sizyuk's Ph.D. and title at Argonne, in spite of the Provost Office unequivocally resolving the matter.  [Taleyarkhan Dep. pp. 75, 106-107].  In response, Dr. Taleyarkhan referenced Dr. Kim's prior statement at the last NEPC meeting that Purdue administration had already verified the legitimacy of her Ph.D.  [Taleyarkhan

Dep. p. 75]. Additionally, Dr. Taleyarkhan provided evidence that one does not need to have a Ph.D. to be a staff scientist at Argonne national laboratory. [Taleyarkhan Dep. pp. 75-76].

A vote was then taken, with six (6) NEPC members voting to deny tenure versus two (2) voting to award tenure. [Kim Dep. pp. 72, 77; Taleyarkhan Dep. pp. 79-80]. Dr. Taleyarkhan and Dr. Garner voted to award tenure, leaving Dr. Ishii, Dr. Choi, Dr. Khalik, Dr. Lopez-de-Bertodano, Dr. Revankar, and Dr. Tsoukalas who voted to deny tenure. [Kim Dep. p. 61; Garner Dep. p. 39; Taleyarkhan Dep. pp. 79-80]. During all three (3) NEPC meetings, there were no statements or questions about Dr. Sizyuk pertaining to the actual criteria for tenure, but instead only meritless objections raised by Dr. Ishii and his faction. [Taleyarkhan Dep. pp. 65, 77-79, 97]. Per Dr. Taleyarkhan, Dr. Ishii influenced the vote and "poison[ed] the well, by fundamentally challenging the validity or the right of Dr. Tatyana Sizyuk to even be considered as a valid person for consideration of tenure." [Taleyarkhan Dep. pp. 81-82]. These actions by Dr. Ishii, along with his discriminatory comments pattern and practice of discriminatory behavior, permit a jury to find that he caused the denial of tenure to invoke personal liability.

### D.     Dr. Sizyuk was Qualified for Tenure

On this particular element (qualification), at the summary judgment stage Dr. Sizyuk need only provide enough evidence for a jury to reasonably conclude that she was qualified for tenure. *Elghanmi v. Franklin College of Indiana, Inc*., 2000 WL 1707934, * 9 (S.D. Ind. Oct. 2, 2000). There is no heightened pleading standard for tenure cases. *Id*. ("although the Seventh Circuit has acknowledged the difficulty of evaluating tenure cases, the Seventh Circuit, unlike the First and Second Circuits, has not imposed different

requirements on plaintiffs who seek to establish a prima facie case of discrimination based on a denial of tenure . . . *Namenwirth* demonstrates that the plaintiff's initial burden on the issue of qualification for tenure is not a heavy one."). Here, Dr. Sizyuk not only met, but she exceeded reasonable expectations for tenure.

The basic criteria for tenure includes: (1) discovery (research, publications, funding), (2) learning (teaching, mentoring, advising students), (3) engagement (conferences, leadership, service to university or public), and (4) impact. [Kim Dep. pp. 54-57; Taleyarkhan Dep. pp. 46, 48-50]. Dr. Sizyuk earned her two positive votes for tenure by Dr. Garner and Dr. Taleyharkan, as well as strong external letters of recommendation. [Kim Dep. pp. 72, 77; Dossier]. Dr. Sizyuk's dossier reflects the following:

- Discovery: Dr. Sizyuk had sixty-four (64) publications (including journals and conference publications), eight (8) of which were completely independent of her former advisor, four (4) of which she was the sole author, and eighteen (18) publications as the first author. [Dossier].

- Learning: Dr. Sizyuk developed and taught new courses, including teaching numerous undergraduate courses. [Dossier]. Dr. Sizyuk also chaired, co-chaired, and mentored numerous graduate level students. [Dossier]. In particular, Dr. Sizyuk served as the mentor to three (3) graduated PhD students, one (1) graduated master's student, and a fourth PhD student who graduated in the spring of 2021. [Dossier].

- Engagement: Dr. Sizyuk was a Session Organizer, Chair, and Scientific Secretary at conferences and workshops (IEEE ICOPS and EUVL Intl. Expert Workshop). Dr. Sizyuk was a panelist of National Science Foundation's Review Panel, she was an elected member of the PSAC Executive Committee of IEEE Nuclear and Plasma Science Society, she has given five (5) invited talks at international conferences and workshops, and she was a senior member of two large engineering societies (IEEE and SPIE). [Dossier].

- Grants: In addition to other grants as the Co-PI, Dr. Sizyuk was the Principal Investigator for a $750,000.00 DOE grant with funding from September of 2019 through August 31, 2022. [Dossier; Sizyuk Dep. pp.

89-91].

Once Dr. Sizyuk became a tenure-track professor, she began writing proposals for grants, advising students, and teaching.  [Sizyuk Dep. P. 76].  She also became the Associate Director of CMUXE in or around 2014-2015, which entailed taking on projects independently and searching for funding.  [Sizyuk Dep. pp. 79-80].

According to Dr. Hassanein, "[a]ny objective and reasonable review of Dr. Sizyuk's application for tenure would show that she easily met these three (3) criteria to grant tenure at Purdue University."  [Dr. Hassanein Decl. ¶ 4].  For example:

> [S]he graduated several graduate students as Chair and Co-Chair of their Ph.D. (3 students + one more …) . . . she also served as member of Ph.D. and M.Sc. committees of other students within SNE and other engineering departments within Purdue.  This record exceeded several of the full tenured professors at the SNE.  She has an impressive record of high-quality journal publications, invited talks, and conference presentations that also far exceeded many tenured professors at the SNE.  She is recognized as an expert in nuclear fusion and nanolithography worldwide.  She also has a very good record of funding from several US federal agencies (NRC, DOE) and international industrial companies (Samsung, KLA), again far exceed[ing] many tenured professors in SNE.

[Dr. Hassanein Decl. ¶ 4].

Per Dr. Brooks, any reasonable and objective review of her dossier would show that Dr. Sizyuk easily met the criteria for tenure, especially in light of Purdue's stated policy to affirmatively increase female scientific faculty.  [Dr. Brooks Decl. ¶ 4].  Per his testimony:

> Dr. Sizyuk developed and is using the ITMC-DYN computer code package to analyze plasma facing material evolution and response.  This code package is considered a world leading analysis tool for this important engineering subject . . . She has an impressive publication record, both

> in terms of number of high-quality publications, in leading
> journals, and in numerous conference presentations.  She
> has vigorously and independently written proposals and
> obtained significant research funding at Purdue, and her
> prospects for continued and increased funding are very
> good.  She has developed an outstanding national and
> international scientific research reputation and has
> established good collaborations with universities, national
> laboratories, and industry.  Dr. Sizyuk's teaching has
> likewise been strong . . . In summary, Dr. Sizyuk's
> qualifications for tenure are outstanding.

[Dr. Brooks Decl. ¶ 4].

The Head, at all times relevant here Dr. Kim, evaluates employees in an honest and truthful manner.  [Kim Dep. P. 11].  On April 22, 2019, just eight (8) days before the first NEPC meeting for Dr. Sizyuk's application for tenure, Dr. Kim evaluated[1] Dr. Sizyuk as "excellent" in learning, "very good" in leadership, and "satisfactory" in engagement.  [Kim Dep. pp. 84-85; April 22, 2019 Annual Review].  Per Dr. Taleyarkhan, Dr. Sizyuk met the standards for tenure and exceeded those metrics in some areas.  [Taleyarkhan Dep. p. 79].

### E.    Defendant's Basis for Denial of Tenure is Pretextual

Pretext comes down to identifying "such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence."  *Chism v. Conway Freight,* 2009 U.S. Dist. Lexis 88202, * 54 (N.D. Ind. Sept. 24, 2009).  Pretext is shown by demonstrating that (1) the proffered reason is factually baseless, (2) the proffered reason is not the actual motivation for the adverse employment action, and/or (3) the proffered reason is insufficient to motivate the

---

[1] Since 2014, and at the time of this positive evaluation (just days before the first NEPC meeting to discuss Dr. Sizyuk's potential tenure) everyone had known of Dr. Sizyuk's Ph.D. and prior employment.  Exploitation of a known issue can provide grounds for pretext.  *Vance v. Ball State Univ.*, 646 F.3d 461, 474 (7th Cir. 2011).

adverse action. *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). Thus, evidence that calls the Defendant's truthfulness into question precludes summary judgment. *Perdomo v. Browner,* 67 F.3d 140, 145 (7th Cir. 1995). The Court should not abandon common sense and good reason when evaluating Defendant's alleged non-discriminatory reasons. *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013).

The flimsiness of an employer's alleged reason can be grounds for pretext. *Stepp v. Covance Central Laboratory Services, Inc.,* 931 F.3d 632, 636 (7th Cir. 2019). Here, Dr. Sizyuk's best and most persuasive case, with the facts viewed in a light most favorable to her, shows that she did emerge fully and demonstrate independence from Dr. Hassanein. Most notably, Dr. Sizyuk was the Principal Investigator for a $750,000.00 DOE grant with funding from September of 2019 through August 31, 2022. [Dossier; Sizyuk Dep. pp. 89-91]. She also had numerous publications independent from Dr. Hassanein. [Dossier]. These two facts, alone, combined with the fact that the NEPC never actually discussed its alleged reason for the denial of tenure but instead fielded improper objections from Dr. Ishii, is enough for a jury to find pretext.

Per Dr. Hassanein, this alleged non-discriminatory reason for the denial of tenure "is not accurate and is undermined by objective facts." [Dr. Hassanein Decl. ¶ 6]. For example "Dr. Sizyuk has more high-impact publications than many tenured professors at the SNE. She also wrote many proposals on her own as the principal investigator (PI) that also exceeded tenured professors. She has several funded, independent proposals where she is the PI." *Id*. Dr. Sizyuk had publications independent from Dr. Hassanein, she had graduated at least one Ph.D. student, and she earned a large and significant DOE grant independent from Dr. Hassanein. [Garner Dep. pp. 34, 39].

Failing to fully emerge and show independence can also be an amorphous and subjective standard for candidates.  Such subjective criteria often mask unlawful motives. *Giacoletto v. Amax Zinc Co*., 954 F.2d 424, 427 (7th Cir. 1992); *see also Namenwirth v. Bd. of Regents of Univ. of Wisc. System*, 769 F.2d 1235, 1243 (7th Cir. 1985) (subjective assessments more readily may be used to "camouflage" discrimination); *see also Vatel v. All. Of Auto. Mfrs*., 627 F.3d 1245, 1246-47 (D.C. Cir. 2011)("This is a highly subjective explanation, which makes it difficult for Vatel to produce evidence casting doubt on it. We thus treat McCurdy's explanation 'with caution.'").  For example, in *Barron v. University of Notre Dame Du Lac*, 93 F.Supp.3d 906 (N.D. Ind. 2015), the District Court denied summary judgment and held that a jury could find that the alleged reason behind the denial of tenure, that the quality of teaching did not meet the standard of excellence, could be viewed as pretextual.  *Id*. at 914.  Here, the Court (and the jury in the future) should view Defendant's alleged rationale with skepticism and caution, as this is not an objective standard nor was it ever discussed during the NEPC deliberations.

**F.      Me-Too Comparators and Hostilities toward Women**

Me-too evidence can also be used to demonstrate an employer's discriminatory motive or intent. *See Sprint United Management Co. v. Mendelsohn,* 128 S.Ct. 1140, 1147 (2007) (explaining that admissibility of me-too evidence is fact based and depends on many factors); *Johnson v. United Cerebral Palsy,* 173 Cal. App. 4th 740, 762 (Cal. Ct. App. 2009). The Seventh Circuit, in *Hasan v. Foley & Lardner, LLP*, 552 F.3d 520 (7th Cir. 2008), stated "[o]ur precedents establish, however, that 'behavior toward or comments directed at other employees in the protected group is one type of circumstantial evidence that can support an inference of discrimination.'" *Id*. at 529.

Since Dr. Kim has been the Head of the School of Nuclear Engineering, five (5) candidates have failed to obtain a majority vote in favor of tenure at the NEPC:

1.  Dr. Garner (Non-Asian);
2.  Dr. Sizyuk (female Non-Asian);
3.  Dr. Wharry (female);
4.  Dr. Miloshevsky (Non-Asian); and
5.  Dr. Bean (Non-Asian).

[Kim Dep. pp. 52-54; Garner Dep. p. 9].  Of these, Dr. Wharry's situation is particularly illustrative in the discriminatory manner in which tenure is denied.  On October 8, 2018, the day Dr. Wharry's application for tenure was scheduled for a vote with the NEPC, she overheard Dr. Ishii having a conversation with Dr. Revankar wherein Dr. Ishii was "threatening Revankar to vote against my tenure case and the other tenure case that was going up at the same time, because me, the other case, who was Professor Garner, both of us and our students are all stupid, lazy Americans."  [Wharry Dep. p. 50].  Dr. Ishii then "argued that in the past he has supported Revankar for promotion at Purdue . . . so now Revankar must vote with me."  [Wharry Dep. p. 73].  Dr. Ishii promised that he and Dr. Kim would help him somehow.  [Wharry Dep. p. 51].  The NEPC then voted to deny Dr. Wharry's application for tenure.  [Wharry Dep. pp. 52-53].

Like Dr. Sizyuk's situation, Dr. Kim did not endorse Dr. Wharry for EAPC review, despite knowing the above improper influence and biased statements of Dr. Ishii. [Wharry Dep. pp. 53, 62].  And like Dr. Sizyuk, per Dr. Wharry the NEPC gave implausible explanations behind the denial of tenure.  [Wharry Dep. pp. 63-64, 70-71]. Similarly, Dr. Garner agrees that the NEPC gave unauthentic rationales for the denial of his tenure and the tenure of Dr. Wharry.  [Garner Dep. pp. 71-72].

The record shows that women are treated as second-class citizens in the School of Nuclear Engineering.  Chrystal Randler, a non-Asian female, worked for Purdue for nearly a decade and contends that "all women were treated as 'secretaries' in the School of Nuclear Engineering, even though there was only one dedicated person to fill the receptionist role."  [Randler Decl. ¶ 2].  Ms. Randler was expected to make copies for the faculty (who were almost exclusively male), take notes at every meeting even though she was actively contributing to the conversation, and she was often second-guessed or completely ignored.  *Id*.  Dr. Wharry was told to take notes for her male colleagues, and when she objected, Dr. Kim told her she was there to *serve* senior faculty.  [Kim Dep. pp. 69-70].  Dr. Ishii referred to Audeen Fentiman, a female dean, as a "loser" who was only hired because she was a woman.  [Hassanein Dep. pp. 199-200].  In search committees, before he was disqualified, Dr. Ishii would say to Dr. Sizyuk and Dr. Fentiman "you don't understand, you don't know, you don't understand this."  [Sizyuk Dep. p. 214].

### G.      Similarly Situated Comparators

The Court is required to adopt a flexible and common sense approach to the similarly situated element as mandated by *Coleman v. Donahoe*, 667 F.3d 835, 846-47 (7th Cir. 2012)*, Eaton v. Indiana Dept of Corrections*, 657 F.3d 551 (7th Cir. 2011), *Baker v. Macon Resources, Inc*., 750 F.3d 674 (7th Cir. 2014), and *Perez v. Thorntons*, Inc., 731 F.3d 699 (7th Cir. 2013).  These cases significantly loosened what had become a rigid and mechanical comparator standard.  These cases also stressed that when a situation is close, the jury should decide if an inference of discrimination is proper, not the Court. *Coleman,* 667 F.3d at 841; *Eaton*, 657 F.3d at 558; *Baker*, 750 F.3d at * 676-77; *Perez*, 731 F.3d at 705.  A similarly situated employee "need not be identical."  *Amrhein v. Health Care*

*Service Corp.*, 2008 U.S. App. Lexis 21828, *12 (7th Cir. 2008).  A "similarly situated coworker inquiry is a search for a substantially similar employee, *not for a clone.*" *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010) (emphasis added).

  Here, both Yunlin Xu and Dr. Kim are proper similarly situated comparators from which a jury can view their comparable circumstances and infer preferential treatment due to one's race, national origin, and/or gender.  Dr. Kim hired Yunlin Xu as a tenure track professor in the fall of 2018, and awarded him the Zmola Award shortly thereafter.  [Kim Dep. pp. 25, 27].  Dr. Kim claims that the search committee had a good recommendation for this hire, but other evidence refutes this testimony.  [Kim Dep. p. 25].  Per Dr. Wharry, who served on the exact search committee that interviewed Dr. Xu, this search committee did not recommend hiring Dr. Xu, but Dr. Kim unilaterally took such action anyways.  [Wharry Dep. pp. 29, 32].  According to Dr. Wharry, this was one of the worst interviews she has ever seen – his seminar was extremely out of touch, no one understood his math, it went on for far too long, and he made a comment about not wanting to be involved in a professional society.  [Wharry Dep. pp. 33-34].  In terms of Dr. Kim awarding Dr. Xu the Zmola Award, per Dr. Wharry he absolutely did not earn that reward – "[t]he award was supposed to be for early career achievement at Purdue.  And I am not sure how someone can achieve very much in a month, even two months, of being employed.  He had not done anything at that point, not even hired a graduate student."  [Wharry Dep. pp. 35-36].  Although Dr. Xu has not yet been reviewed for tenure, his hiring by Dr. Kim in spite of negative recommendations and immediate Zmola

award show how male Asians are groomed for tenure, whereas Dr. Kim openly stated

that Dr. Sizyuk "she will never get tenure in this department."  [Wharry Dep. p. 17].

With the blessing of Dr. Ishii, Dr. Kim was hired and immediately granted tenure

as a Full Professor/Named Professor/Head of SNE.  In essence, the lack of independence

(in other words dependence on Dr. Ishii), aided Dr. Kim (an Asian male), whereas it was

used as a front to deny tenure to Dr. Sizyuk.  Dr. Sizyuk does not need to show that she

was clearly superior to Dr. Kim.  *Gupta v. Trustees of California State Univ.*, 40 Cal.

App. 5th 510, 520 (Cal. App. 2019).  And although their situations are different, the same

inferences of preferential treatment can be drawn.  Dr. Kim was a student of Dr. Ishii.

[Kim Dep. p. 34].  Dr. Ishii was Dr. Kim's research advisor.  [Hassanein Dep. p. 205].

At the time Dr. Kim was hired and immediately granted tenure compared to the time Dr.

Sizyuk was denied tenure, both of them had the same approximate number of

publications (64 publications of Dr. Sizyuk v. 51 of Dr. Kim).  [Dr. Sizyuk Interr. Resp. ¶

1 to Purdue; Hassanein Dep. pp. 204-205].  In Dr. Kim's first ten (10) years after

obtaining his PhD, he had more than 87% of publications with Dr. Ishii, his advisor.  *Id*.

Per Dr. Hassanein, Dr. Kim came in with a very low number of publications, with a

majority of those publications under Dr. Ishii.  [Hassanein Dep. pp. 204-205].  With the

blessing of Dr. Ishii, Dr. Kim was hired with tenure as a Full Professor, Named Professor,

and Head of SNE.  Yet with Dr. Sizyuk, this was used as a front to deny her tenure, even

though her qualifications are comparable to Dr. Kim and not even discussed by the

NEPC.

### H.     But-For Causation is Established

Finally, Dr. Ishii takes aim at but-for causation to avoid liability for his actions. As explained above, per *Bostock* events can have multiple but-for causes, so Dr. Sizyuk's only burden at this point is to see if her best and most persuasive case, with the facts and reasonable inferences drawn in her favor, can permit a jury to find that Dr. Ishii caused the denial of her tenure due to her gender, race, and/or national origin, even if other factors may have been in the mix such as independence from her advisor.

Dr. Ishii's argument that he was only a single voter ignores critical evidence in the case in support of Dr. Sizyuk's cat's paw theory of liability.  Dr. Ishii's EAPC argument ignores the fact that Dr. Kim, who is Dr. Ishii's student and mentor, refused to endorse Dr. Sizyuk for review at the EAPC, in spite of being fully aware of Dr. Ishii repeatedly attacking Dr. Sizyuk's Ph.D. and work history during the NEPC deliberations. Dr. Ishii's argument that ultimate authority rests with the President and Board of Trustees is factually inaccurate.  Dr. Garner testified that it would be "unusual" to have the primary college level's determination on tenure to be reversed by the University.  [Garner Dep. p. 28].  He is not aware of a single situation where the University reversed the primary college level's decision on tenure.  [*Id*.].  Dr. Taleyarkhan, who has served on both the NEPC and EAPC, testified that he was not aware of a single instance where the EAPC overturned or reversed the tenure decision of the NEPC.  [Taleyarkhan Dep. p. 30].  Nor has he ever heard of any higher level university review reversing the decision of the NEPC.  [Taleyarkhan Dep. pp. 31-33].  Instead, they take a "holistic 10,000 purview to see whether the various steps as per this regulation that you just got, appendix A, were followed and the absence of anything untoward to prevent this from being granted . . . ."

[Taleyarkhan Dep. p. 32].  Dr. Ishii's reliance on *Sun v. Board of Trustees of University of Illinois*, 473 F.3d 799 (7th Cir. 2007) is misplaced.  In *Sun*, the plaintiff had his application for tenure reviewed on by multiple appellate committees.  *Id*. at 815.  Here, Dr. Sizyuk's case was never reviewed by the EAPC to follow up the normal tenure approval process.  Like many other institutions, the primary college decision is by far and away the most crucial vote on tenure, followed by rubber stamps.

## IV.    Conclusion

Plaintiff respectfully requests the Court DENY Defendant's motion for summary judgment.

Respectfully submitted,

 s/ Ryan P. Sink
Ryan P. Sink (27350-29)
FOX & SINK, LLC
6177 North College Avenue
Indianapolis, IN 46220

rsink@foxsinklaw.com
Telephone:  317-254-8500

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing document was served this 22nd day of March, 2022, by the Court's electronic filing system to the following counsel of record:

William P. Kealey: wpk@stuartlaw.com
Matthew M. Humble: mmh@stuartlaw.com
J. Neal Bowling: nbowling@lewiswagner.com

*/s/ Ryan P. Sink*
Ryan P. Sink