## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## LAFAYETTE DIVISION

TATYANA SIZYUK,                          )
      Plaintiff,                       )
                     )
vs.                                      )
                     )     CAUSE NO: 4:20-cv-00075-TLS
PURDUE UNIVERSITY; BOARD OF              )
TRUSTEES OF PURDUE UNIVERSITY;           )
and SEUNGJIN KIM and MAMORU              )
ISHII, in their personal capacities,     )
      Defendants.                      )

### DEFENDANT THE TRUSTEES OF PURDUE UNIVERSITY'S
### REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant The Trustees of Purdue University ("Purdue University" or, simply, "Purdue") submits this Reply in Support of its Motion for Summary Judgment (ECF No. 61). Because Plaintiff's claims against Purdue fail as a matter of law, and because Plaintiff's Response (ECF No. 66) fails to establish any triable question as to her claims against Purdue, Purdue is entitled to summary judgment.

### MOTION TO STRIKE

As a preliminary matter, and pursuant to N.D. Ind. L.R. 56-1(f), Purdue moves to strike portions of Plaintiff's Responses to Statements of Material Facts.[1]

---

[1] Plaintiff's Responses to Statements of Material Facts are identical as to Purdue and Defendant Seungjin Kim. *Compare* ECF No. 66-1 *with* ECF No. 67-1. Likewise, Plaintiff's Statements of Additional Material Facts are identical as to all Defendants, though the paragraphs are numbered differently in the filing respective to Defendant Mamoru Ishii. *Compare* ECF No. 66-1 ¶¶ 97-228 *and* ECF No. 67-1 ¶¶ 97-228 *with* ECF No. 68-1 ¶¶ 4-135. Accordingly, Purdue moves to strike both as to the Response to Statement of Material Facts relative to Purdue's motion for summary judgment and as to the corresponding portions of the Responses to Statements of Material Facts relative to Defendant Kim's and Defendant Ishii's motions for summary judgment.

"The purpose of Rule 56-1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal statements." *1st Source Bank v. Vill. of Stevensville*, 947 F. Supp. 2d 934, 937 (N.D. Ind. 2013) (Springmann, J.) (citation omitted). However, Plaintiff's Response to Statement Material Facts raises only argument, legal conclusions, and misstatements or mischaracterizations of the record. Plaintiff does not point to any genuine dispute as to any fact contained in Purdue's Statement of Material Facts (ECF No. 61-2, "Purdue's SOF"). Accordingly, her Response to Purdue's Statement of Material Facts should be stricken. *See generally Anchor Health Sys. v. Radowski*, No. 2:16-CV-65-TLS, 2020 U.S. Dist. LEXIS 71273 (N.D. Ind. April 22, 2020) (Springmann, J.). In further support, Purdue incorporates the additional arguments and authorities found at pages 1-4 of its Reply to Plaintiff's Statement of Additional Material Facts.

Purdue also moves to strike paragraphs 101-102, 107, 109-148, 152, 154, 157-160, 165-171, 173, 177-178, 181, 183, 191-194, 198-200, 203-208, 209b-211, 213-214, 216, and 220-222 of Plaintiff's Statement of Additional Material Facts, as well as any reference to the stricken material as may be contained in Plaintiff's responsive briefings (ECF Nos. 66, 67, & 68). These assertions by Plaintiff are speculative, are not supported by the cited evidence, lack evidentiary foundation, or are otherwise improper and inadmissible. Purdue incorporates the specific arguments as set forth in response to these enumerated paragraphs in Purdue's Reply to Plaintiff's Statement of Additional Material Facts.

2

ARGUMENT

Plaintiff failed to convince Purdue to offer her tenured employment. Because of her subjective disagreement with this outcome, she has brought discrimination and retaliation claims against the university. The undisputed facts of this case demonstrate that Plaintiff's failure to convince Purdue to offer her tenured employment was due to nothing other than her own shortcomings as a candidate. Accordingly, Purdue is entitled to summary judgment.

## I. Dr. Sizyuk's failure to obtain tenure was not a result of intentional discrimination.

In her responsive brief, Plaintiff has eschewed the *McDonnell-Douglas* framework. *See* ECF No. 66, Plaintiff's Memorandum of Law in Opposition to Defendant Purdue University's Motion for Summary Judgment ("Pl.'s Response to Purdue") p. 3. Instead, Plaintiff has undertaken to "lay out all of the direct and circumstantial evidence she contends will permit a jury to find her favor." *Id.* This is largely all that Plaintiff has done: lay out dubious factual assertions, many of which are not supported by admissible evidence, with little effort put towards explaining *why* summary judgment should be denied. It is neither the Court's nor Purdue's duty to craft Plaintiff's arguments for her. That is Plaintiff's burden alone. Under even the most favorable reading of her brief, she has failed to meet that burden.

Plaintiff has admitted that Purdue as the corporate employer is not biased. ECF No. 61-4, Purdue's Ex. A, Sizyuk Dep. 179:14-16 (Q. "Your contention is that Purdue University is biased against wom[e]n and non-Asians. Correct?"; A. "Not Purdue University, no."). She underscores this admission by spotlighting Purdue's

3

decision to hire her in the first place, as well as by repeatedly pointing to Purdue's policy to affirmatively increase female scientific faculty.

Plaintiff has also admitted that Defendant Seungjin Kim "evaluates employees in an honest and truthful manner." ECF No. 66-1, Plaintiff's Response to Statement of Material Facts ("Pl.'s SOF") ¶ 161. Thus, Dr. Kim's evaluation of Plaintiff as part of the tenure decision process was also "honest and truthful," and Dr. Kim cannot be the source of any alleged discrimination.

With neither evidentiary support nor citation to authority, Plaintiff makes the conclusory assertion that Vice Provost Peter Hollenbeck "was not the ultimate decision-maker." ECF No. 67, Plaintiff's Memorandum of Law in Opposition to Defendant Seungjin Kim's Motion for Summary Judgment ("Pl.'s Response to Kim") p. 9. Yet she does not dispute the fact that Dr. Hollenbeck could have moved her case forward to the EAPC. Nor does she contest the fact that Dr. Hollenbeck chose to deny her appeal. Plaintiff has admitted that Dr. Hollenbeck's decision was non-discriminatory, and so Dr. Hollenbeck cannot be the source of any alleged discrimination either. Plaintiff is therefore left with nothing other than a "cat's paw" argument with Defendant Mamoru Ishii as the unlawfully motivated subordinate and Purdue as the hapless cat. Plaintiff has abandoned any other theory, both through her admissions and by failing to address them in her responsive brief.

For her "cat's paw" argument, Plaintiff's burden at this stage of litigation was as follows:

> To survive summary judgment on such a theory, the plaintiff must provide "evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action."

*Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017) (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)). Plaintiff has failed at both steps.

### A. There is no evidence that Dr. Ishii actually harbored any discriminatory animus against Plaintiff.

As predicted, Plaintiff's argument opens by pointing to a series of stray remarks allegedly made by Dr. Ishii, as this is as close as Plaintiff can come to providing evidence of any alleged animus. *See* Pl.'s Resp. to Purdue pp. 3-5. Plaintiff calls these stray remarks "direct evidence," but even the case she cites disagrees with her. *See Harper v. Fulton County*, 748 F.3d 761, 765 (7th Cir. 2014) (Direct evidence "essentially 'requires an admission by the decision-maker that [the decision-maker's] actions were based upon the prohibited animus.'"). None of the alleged statements by Dr. Ishii reference his vote on Plaintiff's tenure candidacy. None of these alleged comments are "direct evidence" of any animus. Dr. Ishii has, however, testified that his vote "was based solely on [his] own independent evaluation of [Plaintiff's] academic credentials and of her promise and potential as a tenured professor" and that his vote "was not made on the basis of [Plaintiff's] race, color, national origin or ancestry, sex, gender identity, or gender expression." *See*

ECF No. 63-2, Ishii's Ex. 1, Ishii Dec. ¶¶ 8 & 10. Plaintiff has proffered no evidence that contradicts this testimony.

Even if Dr. Ishii made the statements as alleged by Plaintiff, they fall within the category of "stray remarks" and cannot support an inference of discrimination here. "Racial epithets or stray remarks *may* be direct or circumstantial evidence of intentional discrimination *if they are sufficiently connected to the employment decision*[.]" *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004), *quoted in Taylor v. Ways*, 999 F.3d 478, 489 (7th Cir. 2021). Plaintiff does not point to any such remark. Instead, in the context of the tenure vote, Plaintiff points only to the fact that Dr. Ishii raised concerns regarding Plaintiff's academic credentials and pre-Purdue employment history. *See* Pl.'s Resp. to Purdue p. 10. Such concerns are not connected in any way to Plaintiff's membership in any protected class.

The cases relied upon by Plaintiff are readily distinguishable. For instance, in *Kellogg v. Ball State Univ.*, 984 F.3d 525, 528-29 (7th Cir. 2021), the court declined to apply the stray remarks doctrine where the employer's comments were "a straightforward explanation by the [employer's] director, who had control over setting salaries, during salary negotiations that [the plaintiff] did not need any more money 'because' her husband worked at the University." In *Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627, 632 (7th Cir. 1996), the plaintiff pointed to remarks "from the top policymakers in the company . . . who [were] ultimately responsible for the company's employment practices" and that "directly address[ed] the policy at

issue[.]" Conversely, there is neither allegation nor evidence that Dr. Ishii is a "top policymaker" at Purdue or that he set *any* policies.

Plaintiff argues that "[s]tatements showing bias directly from the cat's paw bad actor are not stray remarks." Pl.'s Resp. to Purdue p. 6. Ostensibly in support of this proposition, Plaintiff cites solely to *Joll v. Valparaiso Comm. Schools*, 953 F.3d 923, 934 (7th Cir. 2020). *Joll* is not a "cat's paw" case, and the "cat's paw" theory is not discussed to any degree in the cited opinion. Instead, at the page cited by Plaintiff, Judge Hamilton pointed out that "[t]he 'stray remarks' rationale can be applied only to remarks that are not part of the decision-making process itself." *Id.* (citations omitted). Such is the case here: None of the remarks Plaintiff has attempted to attribute to Dr. Ishii were even allegedly made as part of the decision-making process. Only one such remark has *any* connection to a tenure decision— that decision involved other candidates, not Plaintiff, and that remark was allegedly made nearly a year before anyone voted on Plaintiff's bid for tenure.

Thus, the alleged statements by Dr. Ishii amount to nothing more than "stray remarks" that cannot support an inference of animus here. Plaintiff offers no other evidence in support of this element. Her "cat's paw" theory fails as a matter of law.

### B. There is no evidence that any "biased subordinate's scheme" proximately caused Plaintiff's failure to obtain tenure.

Even if Plaintiff could show that Dr. Ishii actually harbored some discriminatory animus against her, she has no evidence of a causal link between Dr. Ishii's alleged animus and Purdue's decision relative to Plaintiff's tenure application. Plaintiff asserts that Dr. Ishii "has shown a pattern of behavior of

7

actively influencing others to vote his way," Pl.'s Resp. to Purdue p. 7, but she has no evidence that Dr. Ishii *ever* actually influenced *anyone*. She offers pure speculation—none of which relates to her tenure application and all of which should be stricken—before baldly stating that "Dr. Ishii proximately caused the denial of tenure, and ultimate termination of employment, of Dr. Sizyuk." *Id.* Plaintiff must do more to show causation under her "cat's paw" theory.

Plaintiff's theory boils down to nothing more than the allegation that Dr. Ishii raised concerns about her credentials. *Id.* pp. 10-12. Plaintiff designates no evidence showing that Dr. Ishii communicated with any other NEPC member about how anyone would vote on Plaintiff's candidacy, that any other NEPC member received or adopted any opinion of Dr. Ishii on that topic, that Dr. Ishii discussed Plaintiff's candidacy with Dr. Kim or otherwise influenced Dr. Kim's concurrence with that vote, or that Dr. Ishii influenced Dr. Hollenbeck's decision regarding Plaintiff's appeal. To the contrary, Plaintiff incorrectly dismisses testimony from other NEPC voters as "irrelevant" and admits that Dr. Kim "categorically" informed the NEPC "that it was the provost's opinion that [Plaintiff's] degree . . . was valid." *Id.* p. 11. Plaintiff has no evidence that Dr. Ishii caused anything more than his own single negative vote. Independent of Dr. Ishii's singular vote, Dr. Kim concurred with the NEPC's decision and rationale, and Dr. Hollenbeck upheld the decision on appeal. There is no evidence that Dr. Kim or Dr. Hollenbeck conducted anything less than a thorough review of the underlying facts: namely, of the information contained within Plaintiff's tenure dossier.

Even if Plaintiff had designated evidence that Dr. Ishii opined to others about her tenure candidacy, the alleged conduct of Dr. Ishii by itself fails to show that he proximately caused the ultimate decision of the employer, Purdue. In the context of employee discipline, "the mere fact that an employee's wrongdoing was reported by a biased supervisor with retaliatory or discriminatory motive does not establish liability under a cat's paw theory." *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 462 (7th Cir. 2021). "[I]f an employer's decision to take an adverse employment action did not rely on the credibility of a biased supervisor—that is, the employer believed it had independently sufficient reasons, such as corroboration of the allegations, to take the adverse action—then the employee's cat's paw theory will fail for lack of proximate cause." *Vesey*, 999 F.3d at 462 (citations omitted). Under a "cat's paw" theory, the employer cannot be liable if "the decisionmaker is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision." *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2020) (citation omitted). In other words, "the chain of causation can be broken if the unbiased decision-maker conducts a meaningful and independent investigation of the information being supplied by the biased employee." *Woods v. City of Berwyn*, 803 F.3d 865, 870 (7th Cir. 2015). Here, the chain of causation is broken at (at least) two links: First, by virtue of Dr. Kim's evaluation of Plaintiff, at which point Dr. Kim concurred with the NEPC vote; and second, through Dr. Hollenbeck's independent review of Plaintiff's appeal.

Plaintiff has admitted that Dr. Kim, as the Head of the School, "evaluates employees in an honest and truthful manner." Pl.'s SOF ¶ 161. That admission must mean that Dr. Kim's evaluation of Plaintiff in the context of the tenure decision was also done in an "honest and truthful manner." That is, Dr. Kim honestly and truthfully evaluated Plaintiff's dossier and, when he concurred with the NEPC's vote, it was because he had honestly and truthfully evaluated Plaintiff as not having shown enough independence and promise to justify the award of tenure. Because Dr. Kim's declination to overrule the NEPC vote was based on his own honest and truthful evaluation of the underlying facts, he breaks any causal chain between Dr. Ishii's singular vote and Plaintiff's failure to obtain tenure.[2]

Furthermore, Dr. Hollenbeck was the final decisionmaker relative to Plaintiff's tenure bid. It is undisputed that Dr. Hollenbeck could have moved Plaintiff's case forward to the EAPC. This was, in fact, the relief that Plaintiff sought through her appeal. It is equally undisputed that Dr. Hollenbeck "reviewed [Plaintiff's] promotion dossier and the college's reasoning for the NEPC decision in [her] case" and that, following that review, Dr. Hollenbeck upheld the NEPC's decision and rationale. *See* ECF No. 61-1, Purdue's Brief in Support of its Motion for Summary Judgment ("Purdue's Br.") pp. 8-9. Thus, Dr. Hollenbeck "conducted his

---

[2] This same rationale demonstrates why testimony from the other NEPC voters s both relevant and fatal to Plaintiff's claim. Dr. Bertodano, Dr. Revankar, and Dr. Tsoukalas each testified that they voted against Plaintiff's tenure candidacy based on their own independent evaluations. *See* Purdue's SOF ¶¶ 73-76. They each carry the same decision-making authority as does Dr. Ishii (i.e., each has but one vote). Plaintiff has not cited to a single case finding a triable question—let alone actual liability—under a "cat's paw" theory where the alleged bad actor was merely one of several voters on a tenure committee.

own investigation into the facts relevant to the decision," any chain of causation is broken, and Plaintiff's "cat's paw" theory fails. *Sinha*, *supra*.

### C. Plaintiff has pointed to no appropriate comparators.

Plaintiff attempts to point to two comparators: One, Dr. Yunlin Xu, who was hired as an incoming tenure-track faculty; the other, Dr. Kim, who was hired as the incoming Head of the School of Nuclear Engineering. *See* Pl.'s Resp. to Purdue pp. 22-24. Neither are "similarly situated" in the sense that would make for a meaningful comparison here.

For comparator evidence to support an inference of discrimination, the plaintiff must first "eliminate other possible explanatory variables, such as different roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (citation and alterations omitted). The plaintiff "must at least show that the comparator (1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [her] conduct or the employer's treatment of [her]." *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) (internal quotations and alterations omitted).

Dr. Xu was a new hire to Purdue and came in as a tenure-track professor. *See* Pl.'s Resp. to Purdue p. 22. This is the same position that Plaintiff obtained in 2014. *See* Pl.'s SOF ¶ 100. Plaintiff admits that "Dr. Xu has not yet been reviewed for tenure[.]" Pl.'s Resp. to Purdue p. 23. There is neither allegation nor evidence that an incoming tenure-track professor is subject to the same standards as is a

professor who is being evaluated for permanent tenure. Moreover, all Plaintiff offers as "evidence" regarding Dr. Xu is the subjective opinion of one faculty member and the fact that he was given the Zmola Award. *Id.* Dr. Wharry's opinion regarding Dr. Xu shows nothing more than a difference of opinion and is not indicative of any bias. Likewise, no inference of bias can be drawn regarding the Zmola Award: just as Dr. Xu obtained that award as a new tenure-track faculty, so, too, did Plaintiff obtain *the same award* in 2014, i.e., as a new tenure-track faculty. *See* ECF No. 69-3, Pl.'s Ex. 3, Sizyuk Dossier p. 9 § C.1 (listing the Zmola Award for 2014-2018).

As to Dr. Kim, he was hired in as an established professor to be the Head of the School of Nuclear Engineering. *Id.* There is neither allegation nor evidence that Dr. Kim and Plaintiff—who were being evaluated for two markedly different positions—were subject to the same standards. Indeed, Plaintiff admits that "their situations are different[.]" *Id.* Thus, neither Dr. Xu nor Dr. Kim is similarly situated to Plaintiff in such a way that would allow for a meaningful comparison here.

Plaintiff's attempt to point to alleged "me-too" comparators is equally without merit. Other than herself, Plaintiff identifies four individuals who she contends "failed to obtain a majority vote in favor of tenure at the NEPC[.]" *Id.* p. 20. Plaintiff offers no evidence of how the alleged comparators show differential treatment by protected class status. There is no designated evidence showing how the specific votes were tallied for these four individuals: How many in favor, how many against, which NEPC member voted which way. Likewise, Plaintiff offers no evidence of what was in anyone's dossier or of what the NEPC's stated rationale was behind

any of these tenure decisions. Of these four purported comparators, two—Dr. Garner (a non-Asian male) and Dr. Wharry (a female)—obtained tenure at Purdue University. *See* Purdue's Reply to Plaintiff's Statement of Additional Material Facts ¶ 202. None of the comparators is offered as an example of someone outside of Plaintiff's protected class(es) who shared her inability to establish independence and who was nevertheless offered tenure. Plaintiff points to no evidence at all for the contention that *any* Asian male similarly situated to her has received tenure.

Presumably, Plaintiff intended to point to "behavior toward or comments directed at other employees in [her] protected group[.]" *See* Pl.'s Resp. to Purdue p. 20 (quoting *Hasan v. Foley & Lardner, LLP*, 552 F.3d 520, 529 (7th Cir. 2008)). Yet the only comment or behavior "directed at" any of these purported comparators is that Dr. Wharry was allegedly asked to take notes at a committee meeting.[3] Plaintiff points to speculative and unsupported testimony from Chrystal Randler, an otherwise unidentified former employee within the School, but there is no evidence that Ms. Randler was a faculty member, scholar, or researcher of any kind, let alone involved in any tenure decisions. Ms. Randler says nothing whatsoever

---

[3] Plaintiff misrepresents the record here, alleging that "Dr. Wharry was told to take notes for her male colleagues" (when no such statement was even allegedly uttered) and that Dr. Kim told her she "was there to serve senior faculty" (which is not contained in the materials cited by Plaintiff). For the former statement, Dr. Wharry testified that Dr. Ishii "suggested that [she] be the note-taker" and that she was the only nontenured professor on that particular committee. *See* ECF No. 69-8, Pl.'s Ex. 8, Wharry Dep. 42:6-18 & 43:16-18. For the latter statement, Plaintiff may have been attempting to cite Dr. Wharry's (rather than Dr. Kim's) deposition, wherein she alleges that Dr. Kim stated that "*as a junior professor* [Dr. Wharry] should serve [the] senior faculty[.]" *See* Ex. V, Wharry Dep. 69:13-70:2. No inference of bias can be drawn from these alleged statements.

about Dr. Garner, or Dr. Wharry, or any other alleged comparator. Indeed, Ms. Randler says nothing at all about Plaintiff. The rest of the "evidence" cited by Plaintiff is of the same variety: conclusive or speculative statements, and broad generalities unsupported by specific facts. This is not sufficient to avoid summary judgment. *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) ("Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough to stave off summary judgment.") (citation omitted); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 requires something more specific than bald assertion of the general truth of a particular matter, rather it requires . . . specific concrete facts establishing the existence of the truth of the matter asserted.") (citation omitted).

### D. Plaintiff has no evidence of pretext.

As stated in Purdue's opening brief, demonstrating pretext in the context of tenure decisions is "an extremely difficult burden to carry due to the layered and subjective nature of the tenure process, and the court's recognition that such decisions are based on the fine distinction between competent and superior achievement." *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 814 (7th Cir. 2007) (citations and internal alterations omitted). Plaintiff spends much of her responsive brief pointing to her own alleged qualifications. Pl.'s Resp. to Purdue pp. 14-20. With no appropriate comparators, she points to her qualifications in a vacuum. She has not offered any comparison as between her own qualifications and those of any other candidate for tenure. "[P]laintiff's qualifications alone do not establish evidence of pretext." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002)

(citation omitted). Further, even if Plaintiff were qualified as she claims, "it does not follow that she ought to have been awarded tenure." *Namenwirth v. Bd. of Regents*, 769 F.2d 1235, 1242 (7th Cir. 1985).

Plaintiff's primary focus is on certain objective measures. Pl.'s Resp. to Purdue pp. 14-16. This is not enough to prove pretext in a tenure decision:

> Mere qualification depends on objective measures—the terminal degree, the number of publications, and so on. Tenure requires something more; it requires that the department believe that the candidate have a certain amount of promise.

*Namenwirth*, 769 F.2d at 1242. Plaintiff cannot hope to prevail by pointing at how many publications she had as compared to Dr. Kim (or anyone else). *See Blasdel v. Northwestern Univ.*, 687 F.3d 813, 816 (7th Cir. 2012) (Posner, J.) (discussing the impracticability of relying on a comparison of publication numbers in a discrimination case because "[a] disappointed candidate for tenure at a college or university may well be the best possible candidate along one dimension but not others"). Even in cases where there is a "similar research output of two candidates, an experienced faculty committee might—quite rightly—come to different conclusions about the potential of the candidates." *Namenwirth*, 769 F.2d at 1242. "It is not [the court's] place to question the significance or validity of such conclusions." *Id.*; *see also*, *e.g.*, *Haynes v. Ind. Univ.*, 902 F.3d 724, 734 (7th Cir. 2018) (The Court "do[es] not sit as an academic review board and second-guess the expert decisions of faculty committees.") (citation omitted).

Plaintiff asserts that an employer's use of subjective criteria is "often" used to camouflage discrimination, yet the cases that she cites say nothing of the sort. For instance, Plaintiff incorrectly points to the *Namenwirth* opinion for the proposition that "subjective assessments more readily may be used to 'camouflage' discrimination[.]" Pl.'s Resp. to Purdue p. 18. Yet the court in *Namewirth* stated only that "faculty votes *should not be permitted to* camouflage discrimination," 769 F.2d at 1243, not that faculty votes (or any other subjective assessment) may "more readily be used" to such an end. Likewise, Plaintiff incorrectly points to *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424 (7th Cir. 1992), for the proposition that "subjective criteria often mask unlawful motives." Pl.'s Resp. to Purdue p. 18. Yet the court in that case stated only that "relying on subjective factors is not *per se* illegal" and that "the jury *may*, *under some circumstances*, reasonably consider subjective reasons as pretext for discrimination." 954 F.2d at 427-28. No such circumstances exist here.

Plaintiff also cites to *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1246-47 (D.C. Cir. 2011), which is not a denial of tenure case, and wherein it is stated that a "highly subjective explanation" would be treated "with caution." *See* Pl.'s Resp. to Purdue p. 18. This Court is not bound by opinions the D.C. Circuit. Further, the Seventh Circuit has not expressed similar "caution" towards the use of subjective criteria—indeed, our Circuit has acknowledged that tenure decisions by their very nature *require* the use of subjective criteria. *See Sun*, 473 F.3d at 814 (recognizing the "subjective nature of the tenure process"); *Blasdel*, 687 F.3d at 815 (recognizing "the absence of fixed, objective criteria for tenure at [the college or university]

level"); *Namenwirth*, 769 F.2d at 1243 ("Tenure decisions have always relied primarily on judgments about academic potential, and there is no algorithm for producing those judgments."); *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 968 (7th Cir. 1998) (recognizing that tenure decisions "necessarily rely on subjective judgments about academic potential"). Plaintiff's reliance on *Vatel* is wholly misplaced.

Even assuming that Plaintiff has established that she was qualified, that would not mean that Purdue was "precluded from sincerely (even if incorrectly) viewing her job performance . . . to have been unsatisfactory." *Rheams v. Marquette Univ.*, 989 F. Supp. 991, 1005 n.3 (E.D. Wis. 1997). Plaintiff has asserted that her "best and most persuasive case" is that she successfully demonstrated independence from Dr. Hassanein. Pl.'s Resp. to Purdue p. 17. Accepting that as true—and leaving aside that Plaintiff's hypothetical finding of independence represents an opinion rather than an objective fact—all this would show is that Purdue's decision was incorrect. This is not enough to show pretext, and it is not enough to survive summary judgment. "The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual." *Rheams*, 989 F. Supp. at 1007 (citations omitted). "[T]he Seventh Circuit has noted that employers may act for many reasons, good and bad; they may err in evaluating employee's strengths; unless they act for forbidden reasons, these errors (more properly, differences in assessment) do not matter." *Id.* at 1008 (citing *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir.

1996)). An employer's "decisions may be objectively wrongheaded, so long as they are not unlawfully discriminatory." *Emmel*, 95 F.3d at 633.

Notably, in his role as an external reviewer, Dr. Allain opined that Plaintiff had a low likelihood of being granted tenure and repeatedly referenced a lack of independence. *See* Purdue's Br. pp. 23-24. If Plaintiff's "best and most persuasive case" is to be accepted—i.e., if she did adequately establish her independence—then Purdue's decision is no more incorrect than is Dr. Allain's opinion. Plaintiff has admitted that Dr. Allain employed appropriate criteria, that he is not biased against women or non-Asians, and that she simply disagrees with his opinion. *Id.* Under Plaintiff's hypothetical "best and most persuasive case," the same must be true of Purdue. Even under Plaintiff's hypothetical, being wrong does not equate with being discriminatory.

As Judge Easterbrook has instructed, "[s]atisfactory performance as an assistant professor does not entitle anyone to promotion." *Kuhn*, 78 F.3d at 331. To show pretext, Plaintiff was required "to come forward with evidence to suggest, not that the University was mistaken in failing to promote [her], but that it was lying in order to cover up the true reason," i.e., due to her membership in some protected class. *Id.* at 333. Plaintiff has failed to meet this burden. Her "evidence does not move far toward suggesting mistake; it does nothing to suggest that the explanation [she] received was disingenuous." *Id.* Furthermore, this Court is required to "closely scrutinize discrimination claims in [the tenure] context to be sure the dispute is not simply one of academic disagreement with the underlying decision to deny tenure."

*Haynes*, 902 F.3d at 734. Here, the evidence shows nothing more than that Plaintiff agrees with the evaluations rendered by the two positive voters, and that she disagrees with the evaluations rendered by Dr. Allain, Dr. Hollenbeck, Dr. Kim, and the six negative voters. Plaintiff's case is nothing more than the sort of "academic disagreement" that cannot survive summary judgment.

## II. Purdue did not retaliate against Plaintiff.

Plaintiff has failed to "produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) [Purdue] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018) (quoting *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017)). Accordingly, Plaintiff's retaliation claim fails.

In her Amended Complaint, the only protected activity pointed to by Plaintiff was her involvement in the "no confidence" letter alleging discrimination and bias, *see* ECF No. 27, Am. Compl. ¶¶ 18-19, that was addressed solely to Dean Mung Chiang and Provost Jay Akridge, *see* Purdue's SOF ¶ 94. Thus, Plaintiff's retaliation claim requires Plaintiff to come forward with evidence that the employer, Purdue, responded to her statutorily protected activity by deciding not to offer her tenured employment. Plaintiff fails to do so.

To establish a causal connection Plaintiff was first required to establish that the decisionmaker responsible for the adverse action was aware of the protected activity. *Cervantes v. Ardagh Group*, 914 F.3d 560, 566-67 (7th Cir. 2019) (citing *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017)). It is undisputed that, at

the time of the tenure decision, neither Dr. Ishii nor Dr. Kim nor Dr. Hollenbeck knew that Plaintiff was a signatory of this "no confidence" letter. *See* Purdue's Br. pp. 32-33. In the absence of such knowledge, "it [is] legally impossible for [the decisionmaker] to have retaliated." *Groves v. S. Bend Cmty. Sch. Corp.*, No. 3:18-CV-979 JD, 2021 U.S. Dist. LEXIS 224797, at *36-37 (N.D. Ind. Nov. 19, 2021). "To retaliate against a complainant, decisionmakers must be aware of the complaint." *Id.* (quoting *Hamer v. Neighborhood Housing Servs. of Chicago*, 897 F.3d 835, 841 (7th Cir. 2018)).

While there is no evidence to support the knowledge aspect of Plaintiff's retaliation claim, the record instead reflects that the *only* people who both knew that Plaintiff signed this "no confidence" letter *and* had some degree of involvement in the decision on Plaintiff's tenure bid were Dr. Garner and Dr. Taleyarkhan. *See* ECF Nos, 69-12 & -13, Pl.'s Ex. 12 & 13. These same individuals were also signatories, *see id.*, and both voted in favor of Plaintiff's tenure application, *see* Pl.'s Resp. to Purdue p. 13. Thus, there is no causal connection between Plaintiff's involvement in the "no confidence" letter and Plaintiff's failure to obtain tenure.

In response to this, Plaintiff asserts only that a jury might not believe Dr. Kim's sworn testimony. Pl.'s Resp. to Purdue p. 24. Setting aside the fact that Dr. Kim was not the final decisionmaker, Plaintiff's assertion here is insufficient to create a question of fact. "A properly supported motion for summary judgment cannot be defeated by simply arguing that a jury might not believe a witness's testimony." *Beatty v. Olin Corp.*, 693 F.3d 750, 754 (7th Cir. 2012). "Stated

20

differently, *argument* is insufficient to avoid summary judgment; the nonmoving party needs to come forward with *evidence.*" *Id.* (citations omitted; emphasis in original); *see also Emmel*, 95 F.3d at 634 n.3 ("[T]he argument that a jury might not believe the proffered legitimate business reason is not enough to defeat summary judgment.").

Even if people with a say in the tenure decision aware that Plaintiff had signed this "no confidence" letter, Plaintiff would need to come forward with evidence to support a reasonable inference that those people improperly factored Plaintiff's opinion (as reflected in the letter) into their negative view of her tenure candidacy. Plaintiff designates no such evidence as to any NEPC voter or anyone else. Again, the only two NEPC voters who knew that Plaintiff signed this "no confidence" letter were the same two NEPC members who cast the only votes in favor of recommending Plaintiff for tenure.

Plaintiff also points to another possibility, alleging for the first time that she filed a formal complaint of discrimination in April of 2019. *See* Pl.'s Resp. to Purdue pp. 24-25. Curiously, nowhere in Plaintiff's Statement of Additional Facts is it asserted that Dr. Hollenbeck, Dr. Kim, or Dr. Ishii (or any other NEPC voter) knew about this complaint. As with the "no confidence" letter, this lack of knowledge makes Plaintiff's retaliation claim "legally impossible[.]" *Groves, supra.*

Even if Plaintiff had alleged such knowledge, she makes no meaningful effort to argue causation. Instead, she offered only a general reference to her "cat's paw" causation arguments with Dr. Ishii as the bad actor. *See* Pl.'s Resp. to Purdue p. 25.

A cat's-paw retaliation argument imputes the retaliatory intent to Dr. Ishii. This would require Plaintiff to come forward with evidence that Dr. Ishii knew of the April 2019 complaint and—spurred by that knowledge—caused Purdue to decide not to offer Plaintiff tenure. As stated in Section I, *supra*, Plaintiff has no evidence of causation under her "cat's paw" theory. Further, while Plaintiff argues (with no factual support) that "Purdue does *not* claim that Dr. Kim was unaware of [this] complaint[,]" *id.* p. 24, she makes no such argument about Dr. Ishii, nor does she argue that Dr. Ishii enlisted Dr. Kim, Dr. Hollenbeck, or anyone else in a retaliatory decision not to offer Plaintiff tenure.

Finally, even if Plaintiff had established a question as to whether any decisionmaker knew about her alleged complaint, she *still* fails at the causation stage. *See* Purdue's Br. pp. 33-36. Plaintiff offers nothing more than her argument that, because of her subjective disagreement with the tenure outcome, Purdue's decision must have been retaliatory. "That speculation is insufficient to raise a question of fact[.]" *Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017) (affirming the trial court's grant of summary judgment where, as here, the plaintiff failed to cite "any evidence, other than [her] own speculation, that might indicate [the employer] used the [proffered legitimate basis for the adverse employment action] as a cover for its retaliatory motive").

Plaintiff has no evidence of pretext and no appropriate comparators. "Assuming arguendo that [Plaintiff] could make out a prima facie case of retaliation, her inability to establish that Purdue's proffered reason for [the

negative tenure outcome] is pretextual is nevertheless fatal to her retaliation claim." *Tyler v. Trs. of Purdue Univ.*, 834 F. Supp. 2d 830, 844 (N.D. Ind. 2011).

Nor does she have evidence of any suspicious timing. An interval as short as seven weeks between complaint and adverse employment action, without more, is insufficient to support a finding of causation. *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008). The interval between Plaintiff's April 2019 complaint and the September 2019 tenure decision is more than twice that length. As a matter of law, Plaintiff's alleged complaint cannot have been the but-for cause of her failure to obtain tenure.

The undisputed evidence demonstrates that Dr. Sizyuk did not fail to obtain tenure because of any alleged retaliation. Accordingly, Purdue is entitled to summary judgment.

## CONCLUSION

For each and all of the foregoing reasons, and for all of the reasons stated in Purdue's opening brief, Defendant The Trustees of Purdue University respectfully requests that the Court grant its Motion for Summary Judgment as to all claims.

Dated: April 5, 2022                      Respectfully submitted,

                                          /s/ Matthew M. Humble
                                          William P. Kealey
                                          Matthew M. Humble
                                          STUART & BRANIGIN LLP
                                          300 Main Street, Suite 900
                                          P.O. Box 1010
                                          Lafayette, IN 47902-1010
                                          Phone:  765.423.1561

E-Mail: wpk@stuartlaw.com
       mmh@stuartlaw.com
       snd@stuartlaw.com
***Attorneys for Defendant The
Trustees of Purdue University***

1489234