**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | |
|---|---|
| TATYANA SIZYUK, | |
| Plaintiff, | |
| v. | CAUSE NO.: 4:20-CV-75-TLS |
| PURDUE UNIVERSITY, BOARD OF TRUSTEES OF PURDUE UNIVERSITY, and SEUNGJIN KIM and MAMORU ISHII, in their personal capacities, | |
| Defendants. | |

**OPINION AND ORDER**

This lawsuit stems from the decision by Defendant Purdue University not to award tenure to the Plaintiff—former Purdue Professor Tatyana Sizyuk, a decision she contends was based on intentional discrimination and in retaliation for her protected activity. The Plaintiff brings a Title VII discrimination claim against Defendants Purdue University and the Board of Trustees of Purdue University ("Purdue"), alleging that Purdue denied her tenure application because of her race, color, sex, and/or national origin (Count I); a Title VII retaliation claim against Purdue for denying her tenure application in retaliation for her protected activity (Count II); and individual claims against Defendants Dr. Seungjin Kim and Dr. Mamoru Ishii under 42 U.S.C. § 1983 for violating her constitutional right to equal protection by denying her tenure based on her race and/or gender (Count III). Am. Compl., ECF No. 27. This matter is now before the Court on the Defendants' motions for summary judgment. *See* ECF Nos. 58, 61, 62. For the reasons set forth below, the Court grants the motions for summary judgment on the Title VII retaliation claim against Purdue and the § 1983 claim against Dr. Kim. Remaining for trial are the Title VII discrimination claim against Purdue and the § 1983 claim against Dr. Ishii.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of [her] case on which [she] bears the burden of proof; if [she] fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). The court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**EVIDENTIARY OBJECTIONS**

The Material Facts are taken from Purdue's Statement of Material Facts [ECF No. 61-2], which are adopted by Dr. Kim, *see* ECF No. 62-1, p. 2; Dr. Ishii's Statement of Material Facts [ECF No. 63, § 1]; and the Plaintiff's Statements of Additional Material Facts [ECF Nos. 66-1,

67-1, 68-1].[1] Whether the subject of a party's objection or on the Court's own review, the Court disregards substantive arguments and characterization of evidence in the fact statements and considers the facts only as supported by the cited evidence of record. However, the Court addresses the parties' evidentiary objections. *See* Fed. R. Civ. P. 56(c)(2); *Steffek v. Client Servs., Inc.*, 948 F.3d 761, 769 (7th Cir. 2020).

The Court overrules Purdue's hearsay objection to the following paragraphs containing testimony of prior out-of-court statements by Dr. Ishii: Plaintiff's (Purdue) ¶¶ 109–10, 112, 114–116, 118, 119, 121, 122, 124–31, 136, 137. Under the cat's paw theory of liability asserted by the Plaintiff, which is based on Dr. Ishii's bias proximately causing Purdue to deny her tenure application, Dr. Ishii's statements are not hearsay as statements of a party opponent. *See* Fed. R. Evid. 801(d)(2); *see also Gardner v. Ill. Dep't of Child. & Fam. Servs.*, No. 04-3112, 2007 WL 897196, at *6 (C.D. Ill. Mar. 22, 2007) (concluding that statements of the individual who had significant influence over hiring decisions were admissible under Rule 801(d)(2)(D)). The Court also overrules the objections of speculation and/or lack of foundation to statements by Dr. Ishii about past employment decisions at Purdue in Plaintiff's (Purdue) ¶¶ 109, 114–17, 119, 128, 129, 136–38/(Ishii) ¶ 45. In each instance, the testimony is offered not to show the truth of why Purdue made the employment decision but rather, for purposes of the Plaintiff's cat's paw theory related to her own tenure application, Dr. Ishii's alleged discriminatory bias and willingness to influence employment decisions.

Purdue and Dr. Ishii object based on speculation to numerous deposition statements regarding Dr. Ishii's or others' subjective state of mind. "[A] plaintiff seeking to thwart summary judgment must comply with Federal Rule of Civil Procedure 56(e) and Federal Rule of Evidence

---

[1] Purdue's Exs. A, B, and F–U are at ECF No. 61; C–E are at ECF No. 64; and V–X are at ECF No. 74. Dr. Ishii's Exs. 1–10 are at ECF No. 63, and Ex. 11 is at ECF No. 76. Plaintiff's Exs. are at ECF No. 69.

602, both of which require that testimony be based on personal knowledge." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014). Although personal knowledge can include reasonable inferences, "it does not include speculating as to an employer's state of mind, or other intuitions, hunches, or rumors." *Id.* (citing *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003)); *see, e.g.*, *Afridi v. BNSF Ry. Co.*, No. 18-CV-8205, 2022 WL 16696265, at *2 (N.D. Ill. Nov. 3, 2022) (citing Fed. R. Evid. 602); *Gardner*, 2007 WL 897196, at *7. The Court overrules the speculation objection to the following paragraphs because the testimony is based on personal experience within the School of Nuclear Engineering: Plaintiff's (Ishii) ¶ 6; (Purdue) ¶ 111; (Purdue) ¶ 123/(Ishii) ¶ 30; (Purdue) ¶¶ 130–131; (Purdue) ¶ 133/(Ishii) ¶ 40; (Purdue) ¶ 138/(Ishii) ¶ 45; (Purdue) ¶ 139/(Ishii) ¶ 46; (Ishii) ¶ 65; (Purdue) ¶ 159/(Ishii) ¶ 66; (Ishii) ¶ 70; (Purdue) ¶ 192/(Ishii) ¶ 99; (Ishii) ¶ 102. However, the Court sustains the objection to the following paragraphs: Plaintiff's (Purdue) ¶ 116/(Ishii) ¶ 23 (Dr. Wharry testified about what Dr. Ishii "seemed" to say); (Purdue) ¶ 120/(Ishii) ¶ 27 (Dr. Garner's testimony shows the statement is speculation); (Purdue) ¶ 134/(Ishii) ¶ 41 (speculation by Dr. Wharry about who *Dr. Kim* views as influential in the department); (Purdue) ¶ 140/(Ishii) ¶ 47 (Dr. Brooks gives no facts to support personal knowledge of Dr. Ishii's influence on employment decisions); (Purdue) ¶ 143/(Ishii) ¶ 50 (second statement as Dr. Taleyarkhan testified based solely on rumor); (Purdue) ¶ 148/(Ishii) ¶ 55 (Dr. Garner's testimony based on what he heard from others).

Next, the Court sustains the objections to certain paragraphs as not supported by the cited evidence: Plaintiff's (Purdue) ¶¶ 113, 135, 144 opening clause, 152, 165–69, 170 to the extent the Plaintiff did not attach pages 64 and 65 of Dr. Kim's deposition, 171, 183, 191, 193, 206, last clause of 213, 214, 221; and Plaintiff's (Ishii) ¶¶ 20, 42, 51 opening clause, 59, 72–76, 77 to the extent the Plaintiff did not attach pages 64 and 65 of Dr. Kim's deposition, 78, 90, 98, 100, 113, last clause of 120, 121, 128.

The Court sustains the objections based on lack of foundation and relevance to the cited portions of Ms. Randler's declaration regarding Dr. Ishii's influence in the department, how women were treated in the department, and tenure decisions: Plaintiff's (Purdue) ¶¶ 141–43, 210, 211/(Ishii) ¶¶ 48–50, 117, 118. The Court also sustains the objections based on lack of foundation to Plaintiff's (Purdue) ¶ 194/(Ishii) ¶ 101 because Dr. Hassanein was not on the Plaintiff's tenure committee. Finally, Plaintiff's (Purdue) ¶¶ 144–47 and ¶¶ 203–05/(Ishii) ¶¶ 51–54 and ¶¶ 110–12 repeat facts already presented earlier in (Purdue) ¶¶ 114–17/(Ishii) ¶¶ 21–24.

## MATERIAL FACTS

### A.    The Plaintiff's Work History Prior to Applying for Tenure

The Plaintiff, Dr. Tatyana Sizyuk, is a Caucasian female born in Belarus who previously worked in the computer programming field in Minsk, Belarus. Pl. Ex. 17, Resp. 2; Ex. A, 6:18–7:15. Immigrating to the United States in 2002, she began work at the Argonne National Laboratory in 2003, where she worked exclusively in Dr. Ahmed Hassanein's research group, developing and expanding software initially developed by Dr. Hassanein called "HEIGHTS." Ex. A, 6:11–20, 9:17–10:22, 11:14–17; Am. Compl. ¶ 12. In 2007, Dr. Hassanein took a position at Purdue University, and the Plaintiff became an Associate Research Scientist as part of Dr. Hassanein's group in October 2007. Ex. A, 12:14–13:5; Purdue Ans. ¶ 13, ECF No. 30; Kim Ans. ¶ 13, ECF No. 31. Dr. Jeffrey N. Brooks, who was on the hiring committee, stated, "At the time [the Plaintiff] was viewed as a highly qualified applicant, and that judgement has been amply borne out." Pl. Ex. 4, ¶ 3. At Purdue, Dr. Hassanein's group formed the Center for Materials Under eXtreme Environment, or "CMUXE," where the Plaintiff continued the same work she performed at Argonne. Ex. A, 13:11–14:19, 19:15–20. In 2009, Dr. Hassanein became the Head of the School of Nuclear Engineering. Ishii Ex. 3, 21:14–17.

In 2013, the Plaintiff met Dr. Tralle from Poland when he came to Purdue to tour CMUXE, and she decided to pursue her Ph.D. through his university. Ishii Ex. 2, 20:11–21:8, 22:2–21. In 2014, the Plaintiff submitted a Ph.D. dissertation and obtained a doctorate credential from the University of Rzeszów in Poland. Ex. A, 44:11–46:19. All the research in the Plaintiff's doctoral thesis was conducted at Purdue, within CMUXE, and through funding obtained by Dr. Hassanein. Ex. B, 67:16–68:25. Dr. Hassanein was a co-author of all the research reported in the Plaintiff's Ph.D. thesis and was the research advisor for her Ph.D. *Id.* at 50:2–10, 68:7–12; Ex. A, 25:15–19, 100:8–101:5. The Plaintiff did not take any coursework in nuclear engineering. Ishii Ex. 2, 44:3–10. Dr. Hassanein testified that it is common practice for senior research scientists to get a Ph.D. based on their research and without being an enrolled student. Pl. Ex. 2, 52:14–53:13.

The Plaintiff then applied for and obtained a tenure-track Assistant Professor position in the School of Nuclear Engineering in 2014. Ex. A, 48:22–49:17, 54:23–24; Purdue Ans. ¶ 14; Kim Ans. ¶ 14. Dr. Ishii, as chair of the search committee, wrote on behalf of the committee that the Plaintiff was a "very excellent candidate." Ex. B, 41:8–23, 42:15–23. Dr. Hassanein accepted the committee's recommendation to hire the Plaintiff. *Id.* at 39:21–23, 44:3–20.

Dr. Allen Garner, a School of Nuclear Engineering faculty member also on the hiring committee, commented in an email to Dr. Hassanein at that time in 2014: "[S]he will want to be very careful to make sure that she develops projects that are independent of CMUXE . . . . This is mainly a consideration for when she would go up for tenure at the College level." Ex. H; *see also* Ex. C, 78:16–82:12. Dr. Garner testified that "the first rule in academia is that you do not publish with your advisor while you're on the tenure [track] because you're trying to demonstrate your independence, your ability to start up your own research group." Ex. C, 81:5–81:9. He explained that, at that time, the Plaintiff "had worked extensively with Dr. Hassanein for many years before she became a faculty member and the concern that [he] had would be if she remained at Purdue

would she be able to start enough new projects independent of Dr. Hassanein to show that she could do it on her own." *Id.* at 81:11–19, 81:25–82:7. Dr. Hassanein testified this was a good faith opinion that was "constructive." Ex. B, 162:20–165:9.

As a faculty member, the Plaintiff's research plan was to continue to work in CMUXE. Ex. A, 77:9–20. From the time she became a faculty member in 2014 through 2019, the Plaintiff did not use any research space outside CMUXE. *Id.* at 18:23–19:5.

## B.   The School of Nuclear Engineering, Dr. Ishii, and Dr. Kim

Defendant Dr. Mamoru Ishii, a male, was born in Japan. Pl. Ex. 1, 8:21–22. He obtained his Ph.D. in 1971, was granted tenure in Purdue's School of Nuclear Engineering in 1988, and is the Walter H. Zinn Distinguished Professor of Nuclear Engineering. Ishii Ex. 1, ¶¶ 3–5. At all times relevant to this litigation, Dr. Ishii has been a tenured faculty member who serves on the school's tenure committee. Ishii Ans. ¶ 17, ECF No. 32. Purdue required its employees to complete unconscious bias training to serve on a search committee, but the training was not required to serve on the tenure committee. Pl. Ex. 6, 29:13–30:14, 33:18–34:7. During the time in question, Dr. Ishii did not complete the training and chose not to serve on any search committee in order to care for his ill wife. *Id.* at 29:21–30:14; Ishii Ex. 11, ¶ 5(a).

Defendant Dr. Seungjin Kim is a male of Asian descent. Kim Ans. ¶ 16. Dr. Ishii was Dr. Kim's professor and research advisor. Pl. Ex. 2, 205:10–15; Pl. Ex. 6, 34:20–21. In June 2017, Dr. Kim was hired as a tenured professor and the Head of the School of Nuclear Engineering. Ex. E, 9:19–10:8; Kim Ans. ¶ 16.

Dr. Janelle P. Wharry testified that, while she was a professor with the School of Nuclear Engineering, the vast majority of faculty were men, and she believed that close to half the faculty were Asian. Pl. Ex. 8, 86:12–22. When Dr. Wharry was first hired, Dr. Ishii told her that, about ten or fifteen years earlier, Dr. Wharry's Ph.D. advisor did not get the engineering dean position

because "Purdue was only interested in hiring women at the time, so [her] advisor did not get the job because he was a male." *Id.* at 39:7–40:2. She testified that the tone in which Dr. Ishii made that statement showed that "[h]e was not happy that Purdue had hired someone else for that dean position, and he thought that the person who did get hired was hired only because they were a female." *Id.* at 40:16–23. Dr. Ishii denies that he made this statement. Ishii Ex. 11, ¶ 5(b).

When Dr. Wharry and Dr. Ishii served together for a time on a search committee, Dr. Ishii "jok[ed] that this was not a very diverse search committee because it was all Asian males." Pl. Ex. 8, 41:10–42:3. Dr. Ishii denies that he made this statement. Ishii Ex. 11, ¶ 5(c). Dr. Wharry testified that, during the meeting, Dr. Ishii "suggested that I be the note-taker. I later suggested that we share note-taking responsibilities across the committee members . . . so each person is able to participate in discussions equally amongst all the candidates. But Ishii insisted that I be the note-taker, and that was my role on this committee." Pl. Ex. 8, 42:6–18. Dr. Wharry was the only woman in the room and the only nontenured professor on the committee. *Id.* at 43:14–18. Dr. Wharry testified that, when she brought this comment to Dr. Kim's attention, Dr. Kim responded that, "as a junior professor [she] should serve [her] senior faculty." Ex. V, 69:13–70:2. Dr. Ishii states he suggested Dr. Wharry take notes in order to gain insight into how the search committee works. Ishii Ex. 11, ¶ 5(d).

In 2017, when Dr. Kim became the Head of the School of Nuclear Engineering, the Plaintiff's name came up in a conversation and Dr. Kim told Dr. Wharry not to worry about the Plaintiff "because she will never get tenure in this department." Pl. Ex. 8, 16:16–17:9. Dr. Kim does not recall making such a statement. Pl. Ex. 6, 19:8–20.

Dr. Wharry testified that, on October 2, 2018, the day her own application for tenure was scheduled for a vote of the NEPC, she overheard Dr. Ishii talking with Dr. Revankar and "threatening Revankar to vote against [her] tenure case and the other tenure case that was going

up at the same time, because [she], the other case, who was Professor Garner, both of us and our students are all stupid, lazy Americans." Pl. Ex. 8, 50:1–17. She heard Dr. Ishii then "argue[] that in the past he (Ishii) has supported Revankar for promotion at Purdue . . . so now Revankar must vote with [him]." *Id.* at 73:8–19. Dr. Ishii denies that he made these statements. Ishii Ex. 11, ¶¶ 5(e), (f). Dr. Garner testified that Dr. Ishii was not present for the primary meeting on Dr. Wharry's tenure application but once he returned from leave and learned of her application, Dr. Ishii told the committee, "No, she shouldn't go up." Pl. Ex. 9, 62:13–18. Dr. Wharry's application for tenure was denied. Pl. Ex. 8, 53:1–3.

Dr. Brooks, who worked as a Research Professor in the School of Nuclear Engineering from 2008 to 2016 and was employed by Purdue University as a Temporary Senior Research Scientist at the time of his December 2020 declaration, states that he has heard Dr. Ishii

> publicly express anti-female bias on numerous occasions (e.g., before and after faculty and search committee meetings, and at department social events), denigrating the role of women in faculty and dean positions. This includes him calling women "stupid," referring to them as "doing much worse research work as men engineers," and "using the stupid US legal system to get faculty positions they do not deserve."

Pl. Ex. 4, ¶¶ 1, 7. Dr. Ishii denies making these statements. Ishii Ex. 11, ¶ 5(h).

Dr. Taleyarkhan, a professor in the School of Nuclear Engineering, heard Dr. Ishii make "statements . . . about what people of different origin, white students, people of Caucasian race as being—as being lazy, inappropriate for the task." Pl. Ex. 7, 83:13–18. He heard Dr. Ishii make statements that women are "[n]ot up to par in terms of ability, not having scientific backgrounds necessary for the job in relation to a faculty member . . . . in the faculty deliberations and so on, downplaying their abilities generally and deciding not to sort of support the case for promotion and tenure." *Id.* at 85:4–13. Dr. Taleyarkhan testified that he observed Dr. Ishii apply a different and more "difficult to attain" standard to women applicants for tenure. *Id.* at 87:1–88:2. Dr. Ishii

denies making any such statements or applying "a different standard with respect to any candidate on the basis of race, national origin, or sex." Ishii Ex. 11, ¶¶ 5(k)–(m).

Dr. Hassanein, a professor in the School of Nuclear Engineering, testified that, on more than one occasion, he heard Dr. Ishii state in front of others that "whites are lazy." Pl. Ex. 2, 180:12–181:18, 182:23–183:1. He testified that Dr. Ishii "said just to hire like Chinese student[s] or so." *Id.* at 183:2–5. He heard Dr. Ishii state that "women are stupid" on several occasions and that "[m]inorities have to be accommodated due to the U.S. laws." *Id.* at 186:11–187:8, 189:9–18. In the context of a decision Dean Leah Jamieson had made, Dr. Ishii said to Dr. Hassanein that Dr. Jamieson is a woman, is not capable of thinking, and is "stupid." *Id.* at 196:9–21, 197:10–19. Dr. Ishii told Dr. Hassanein that Dr. Audeen Fentiman, a female professor, was hired because she's a woman and "we've got a loser." *Id.* at 199:7–200:19. Dr. Ishii denies making these statements. Ishii Ex. 11, ¶¶ 5(n)–(s).

At a dinner with faculty, the Plaintiff heard Dr. Ishii openly disparage the Dean, a woman, because of her gender. Pl. Ex. 16, 211:18–213:5. Dr. Ishii avers this is false and he "never criticized a colleague based upon the person's race, national origin, or sex." Ishii Ex. 11, ¶ 5(t). During a research committee meeting, Dr. Ishii said to the Plaintiff and to Dr. Fentiman, who were the only two women on the committee: "you don't understand this." Pl. Ex. 16, 214:1–19. Dr. Ishii avers that, if he made any such comment, it "would have been wholly unrelated to their race, national origin, or sex." Ishii Ex. 11, ¶ 5(u).

Dr. Garner, an associate professor in the School of Nuclear Engineering, testified that, a number of years earlier, he heard Dr. Ishii "comment at one of our search committee meetings about how Purdue likes it if we hire women and the way he said it and the context that he said it seemed a bit off and a bit inappropriate." Pl. Ex. 9, 48:17–25. Dr. Ishii denies making that statement. Ishii Ex. 11, ¶ 5(i). Dr. Garner testified that Dr. Ishii "give[s] off the vibe that [he] is

not open to those that are different." Pl. Ex. 9, 54:14–55:7. Dr. Ishii strongly disputes this characterization and avers he "hold[s] no bias against any person with respect to race, religion, national origin, or sex." Ishii Ex. 11, ¶ 5(j).

Dr. Garner testified that, while he was on Dr. Kim's hiring committee, Dr. Ishii came to his office and "said good things about Dr. Kim, how he was a good person, he tried to do the right thing, and [Dr. Ishii] also said that if [Dr. Kim] got hired that my tenure case would be in very good shape." Pl. Ex. 9, 19:11–19. Dr. Garner testified that Dr. Ishii's statement could be interpreted as a quid pro quo and that he did not think it was an appropriate statement. *Id.* at 19:20–24. Dr. Ishii denies making this statement and objects to the suggestion regarding any promise as to Dr. Garner's own application for tenure. Ishii Ex. 11, ¶ 5(v). Dr. Garner testified that he felt that "once Purdue hired the student of the most powerful person as the head, the balance changed" in the department, referring to Dr. Kim, who had been Dr. Ishii's student, being hired as Head. Pl. Ex. 9, 51:16–52:3. "It essentially felt like Dr. Ishii and Dr. Choi felt more emboldened and that made things a little bit more challenging particularly initially. I had various responsibilities that got removed. My teaching schedule got changed around." *Id.* at 52:6–11. Dr. Garner testified, "And gradually things have sort of returned to a more equilibrium status as Dr. Kim has exerted his independence from Dr. Ishii and Dr. Choi." *Id.* at 52:11–14.

Regarding the School of Nuclear Engineering, Dr. Garner testified that "there seem to be two major divisions within our school," describing "[o]ne side is more related I would say to Dr. Ishii and then you have the other side which, in one sense, is basically everyone else." *Id.* at 14:21–15:3. From his perspective, "[a] lot of the more senior—experienced, I should say, folks are on one side and the newer folks tend to be on the other side." *Id.* at 15:3–8. He referred to Dr. Ishii, Dr. Choi, Dr. Revankar, and Dr. Lopez-De-Bertodano as being on one side. *Id.* at 16:24–17:1, 20:4–10. He testified that Dr. Hassanein, Dr. Kim, and Dr. Taleyarkhan are on the other

11

side and that Dr. Kim "is more or less independent." *Id.* at 17:6–9, 17:20–18:15, 20:11–14. He

was unsure about Dr. Tsoukalas, *id.* at 20:15–23, and said that Dr. Abdel-Khalik did not fall on

either side, *id.* at 16:8–15. Dr. Garner testified that Dr. Ishii is well respected and has "a lot of

influence" in the department. *Id.* at 18:18–24.

**C.      The General Tenure Process**

Tenure is a "status of continuous appointment granted" by Purdue as the employer. Ex. F,

Resp. No. 3. The three basic criteria for tenure are (1) discovery (research, publications,

funding), (2) learning (teaching, mentoring, advising students), and (3) engagement

(conferences, leadership, service to university or public). Pl. Ex. 6, 54:6–56:25; Pl. Ex. 7, 46:3–

49:12; Pl. Ex. 25. A candidate's "impact" is also considered. Pl. Ex. 6, 57:1–11; Pl. Ex. 7, 48:3–

8, 49:13–50:2.

At the West Lafayette campus of Purdue University, tenure is first considered by a

Primary Committee. Pl. Ex. 24, ¶ II.C ("Procedures for Granting Academic Tenure and

Promotion"). In the School of Nuclear Engineering, this is the Nuclear Engineering Primary

Committee ("NEPC"), which is comprised of tenured faculty within the school who are required

to be familiar with and follow the procedures and criteria for tenure. Ex. D, 10:19–11:12; Pl. Ex.

7, 11:4–6, 14:1–15:4. A candidate who receives a majority vote from the Primary Committee is

reviewed by the relevant Area Committee, and a majority vote of the Area Committee results in

review by the Promotions Committee. Pl. Ex. 24, ¶¶ II.D, E. At both the Primary and Area

Committee levels, the committee chair may endorse a candidate who does not receive a majority

vote. *Id.* A majority vote of the Promotions Committee advances the application to the Provost,

who reviews the candidate and forwards a recommendation to the University President. *Id.* at

¶ II.F. The President and Board of Trustees make the final determination. *Id.* at ¶ II.G.

A candidate who believes a negative tenure decision was based on "evidence of grossly inadequate consideration of professional competence" or "evidence of judgments based on erroneous or misinterpreted information" may submit a written request for reconsideration to the Vice Provost for Faculty Affairs. *Id.* at ¶¶ VI.B, C. This is a separate procedure from the grievance procedures for complaints of procedural unfairness or discrimination. *See id.* at ¶ VII.

**D.     The Plaintiff's Tenure Application Process**

When the Plaintiff became a tenure-track faculty member in 2014, her mentor was Dr. Hibiki, and, as of March 2016, she had conversations with Dr. Hibiki and with Dr. Kokini regarding her performance. Ex. A, 126:12–17, 128:6–7, 129:18–131:3. On March 2, 2016, a meeting of the NEPC was held regarding the Plaintiff's tenure. Ex. I. Notes from that meeting list approximately fourteen areas in need of improvement, three of which were: "Who was her advisor for grad degree?", "Needs to show independence in research and publications," and "Needs publications without Dr. Hassanein." *Id.* at 2. The Plaintiff does not recall specifically talking with Dr. Kokini or Dr. Hibiki about these points but does recall talking to Dr. Kokini about her research, her progress, and expectations. Ex. A, 130:8–133:6.

On February 8, 2017, the NEPC met to conduct an annual review of faculty, including the Plaintiff. Ex. J. The Plaintiff's written review included the statements: "Need to show that she can stand on her own for proposals and submissions. Independence" and "Dr. Kokini talked to [the Plaintiff] last year regarding independence." *Id*. at 2. The review also included the question: "For [the Plaintiff's] PhD, need to list advisor on papers, what came out of that work. What kind of thesis did she do? Can we see the thesis? Who was her advisor on the thesis?" *Id*.

In February 2018, the Plaintiff had a review meeting with Dr. Kim, the new Head, who presented her annual review document. Ex. A, 142:4–23; Ex. K. One of the recommendations was to, "[i]f possible, minimize having Dr. Hassanein as [co-principal investigator] considering

that he was a former supervisor." Ex. K, p. 3. The Plaintiff agreed that this was a fair recommendation, which she followed, and that it was the same recommendation made by Dr. Kokini and Dr. Hibiki. Ex. A, 144:1–20. The document also recommended: "Do NOT co-author with Dr. Hassanein considering that he was a former supervisor." Ex. K, p. 3. The Plaintiff confirmed that this was not a new recommendation and testified that she followed it by publishing four papers without Dr. Hassanein after 2018. Ex. A, 145:5–12. In his deposition, Dr. Hassanein, as former Head, confirmed that these were good faith issues. Ex. B, 171:18–174:10. The document indicated the Plaintiff should continue to build a graduate student pipeline as sole Chair, obtain external research funding, and increase journal publications. Ex. K, p. 3.

Dr. Kim testified that he was honest and truthful in his evaluation of employees. Pl. Ex. 6, 11:12–15. On April 22, 2019, Dr. Kim completed the Plaintiff's annual review and rated her for that year as "excellent" in learning, "very good" in leadership, and "satisfactory" in engagement. *Id.* at 84:1–85:21; Pl. Ex. 20.

## E.  Evidence Regarding the Plaintiff's Qualifications for Tenure

Once a tenure-track professor, the Plaintiff began writing proposals for grants, advising students, and teaching. Pl. Ex. 16, 76:2–22. In approximately 2014, she became the Associate Director of CMUXE, taking on projects independently and searching for funding, and she remained in that position until her employment ended. *Id.* at 79:9–80:8.

The Plaintiff notes the following aspects of her dossier in the areas of consideration for tenure. For "discovery," her dossier shows that she had 62 journal and conference publications, eight of which were independent of Dr. Hassanein, four of which she was the sole author, and eighteen of which she was the first author. Pl. Ex. 3, §§ C8–C12; *see also* Ex. G, Resp. 3(c); Ex. M, p. 4. For "learning," the Plaintiff developed and taught new courses and taught numerous undergraduate courses. Pl. Ex. 3, § C.2. She chaired, co-chaired, and mentored numerous

graduate level students. *Id.* at § C.3. For "engagement," the Plaintiff was a Session Organizer, Chair, and Scientific Secretary at conferences and workshops (IEEE ICOPS and EUVL Intl. Expert Workshop). *Id.* at § B.1. She was a panelist of National Science Foundation's Review Panel, *id.* at § C.21, was an elected member of the PSAC Executive Committee of IEEE Nuclear and Plasma Science Society, *id.*, has given five invited talks at international conferences and workshops, *id.* at § C.13, and was a senior member of two large engineering societies (IEEE and SPIE), *id.* at § C.21. In addition to other grants as the co-principal investigator, the Plaintiff was the principal investigator for a $750,000 Department of Energy (DOE) grant with funding from September 2018 through August 31, 2022, that she obtained without using CMUXE facilities. *Id.* at § C.16; Pl. Ex. 16, 89:2–91:6. The Plaintiff understands that her independence was to be evaluated, in part, by looking at publications not coauthored by Dr. Hassanein. Ex. A, 141:1–4. In the area of nanolithography, her specialty, Dr. Hassanein was the coauthor of all but two refereed papers. Ishii. Ex. 2, 42:2–7.

Dr. Taleyarkhan, who was on the NEPC and voted in favor of granting the Plaintiff tenure, testified that the Plaintiff met the standards for tenure and exceeded those metrics in some areas. Pl. Ex. 7, 79:6–25. He testified that the Plaintiff had additional accomplishments from the time of her application to her vote, namely publications in prestigious journals and obtaining funding as a principal investigator, all of which Dr. Kim communicated to the members of the NEPC. *Id.* at 39:21–40:19. Dr. Hassanein and Dr. Brooks, who were not on the Plaintiff's NEPC, state that, by any objective and reasonable review, the Plaintiff "easily met" the three criteria for tenure at Purdue, each giving detailed examples of her qualifications, achievements, and international reputation. Pl. Ex. 4, ¶ 4; Pl. Ex. 5, ¶ 4.

**F.      The NEPC Decision on the Plaintiff's Application for Tenure**

The NEPC met on April 30, 2019, September 6, 2019, and September 27, 2019,

regarding the Plaintiff's tenure application. Pl. Ex. 7, 53:4–10, 56:8–23, 73:24–74:24. At the

April 30, 2019 meeting, the NEPC reviewed the Plaintiff's nomination package. *Id.* at 53:11–

54:8. Dr. Ishii raised a concern about the Plaintiff's Ph.D. degree. *Id.* at 54:16–19. Dr. Ishii

testified that the Plaintiff's degree is "not [a] proper Ph.D. required [for] Purdue . . . tenure-track

faculty . . . ." Pl. Ex. 1, 99:9–10. Concerns were also raised about Dr. Hassanein serving both as

the Plaintiff's mentor and a voting member of the NEPC. Pl. Ex. 7, 54:13–15. Due to the

conflict-of-interest policy, Dr. Hassanein recused himself from the NEPC. Pl. Ex. 6, 66:2–12,

67:3–14; Ex. G, Resp. 3(c); Exs. W, X. Thus, Dr. Taleyarkhan took over the role as mentor for

purposes of presenting the Plaintiff's tenure case to the NEPC. Pl. Ex. 6, 67:18–68:6; Ex. G,

Resp. 3(c).

Subsequently, the Provost's Office confirmed with Dr. Kim the validity of the Plaintiff's

Ph.D. and confirmed that Dr. Hassanein was her research advisor for her Ph.D. Pl. Ex. 6, 58:8–

60:8. In an August 5, 2019 email to Dr. Kim, Vice Provost for Faculty Affairs Dr. Peter

Hollenbeck wrote, regarding the Plaintiff's Ph.D. from the University of Rzeszów,

> We have learned nothing that the primary committee could not have found out for
> themselves if they were concerned – using a web search, Google translation and a
> conversation with [the Plaintiff]. Any idea why they have not pursued their own
> questions? If their intention was to wait and then play "gotcha," in an effort to
> sabotage her promotion proceedings, then you've got a fire to put out, no?

Pl. Ex. 23; *see also* Pl. Ex. 6, 94:1–96:7.

On August 9, 2019, Dr. Hollenbeck asked the Plaintiff to revise her tenure dossier to

identify Dr. Hassanein as her Ph.D. advisor, which the Plaintiff did. Ex. A, 151:16–24; Ex. N.

Previously, the Plaintiff's dossier identified only Dr. Tralle of the University of Rzeszów as her

thesis advisor because Dr. Tralle was the chair of her thesis committee. Ex. A, 151:16–153:20; *see also* Ex. N, p. 1–2.

Leading up to the review of the Plaintiff's application, Dr. Hassanein recommended that Dr. John Paul Allain serve as an external reviewer because of Dr. Allain's familiarity with the Plaintiff's work at CMUXE. Ex. B, 119:17–121:17. Dr. Kim's letter to Dr. Allain requesting the review did not include information regarding the $750,000 DOE grant the Plaintiff had obtained. Pl. Ex. 2, 142:11–18; Pl. Ex. 7, 40:20–41:14. In his review letter, Dr. Allain estimated that the Plaintiff had a "low" likelihood of being granted tenure at two peer institutions. Ex. M at 4. Under the heading "National and international visibility in research and education," Dr. Allain stated that there was "not a very solid demonstration of visibility and independence in her field." *Id.* at 3. He also stated that "only about 9% of [the Plaintiff's] publication record is without her PhD advisor. Unfortunately this does not provide a good indication of . . . independence." *Id.* at 4. He stated that "she may not be establishing an independent program that is recognized outside of the influence or guidance of her former PhD advisor, which for tenure-track should be understandably avoided." *Id.* The Plaintiff agrees that Dr. Allain considered appropriate tenure criteria; however, the Plaintiff disagrees with his opinion. Ex. A, 196:11–197:10.[2]

Dr. Taleyarkhan testified that the opinions of external reviewers are given "very significant" weight by the NEPC because those external reviewers "are stalwarts in the field that know what the standards are in academia and in industry" as well as the "similar standards they may hold at their own institutions, especially of higher learning academia research universities." Ex. D, 36:2–13. Dr. Brooks, Dr. Hassanein, Dr. Kim, and Dr. Taleyarkhan testified that a single

---

[2] Dr. Brooks' declaration statements regarding alleged bias by Dr. Allain against the Plaintiff are not material because Dr. Brooks was not on the Plaintiff's NEPC and there is no evidence that anyone on the NEPC knew of the alleged bias. *See* Pl. Ex. 4, ¶¶ 5, 6.

negative reference letter does not disqualify one for tenure. Pl. Ex. 4, ¶ 6; Pl. Ex. 5, ¶ 5; Pl. Ex. 6, 87:5–8; Pl. Ex. 7, 36:23–37:3. Dr. Hassanein, who was not on the Plaintiff's NEPC, has seen negative reference letters with other applicants who were nevertheless granted tenure, but gave no details regarding those applicants. Pl. Ex. 5, ¶ 5.

At the September 6, 2019 NEPC meeting, Dr. Taleyarkhan presented the Plaintiff's case and "[brought] up her achievements in her line of work, and the productivity in terms of publications, recognitions, impact of her work, her efforts at becoming an independent investigator herself." Pl. Ex. 7, 77:20–78:11. Dr. Taleyarkhan testified that Dr. Ishii raised concerns about the validity of the Plaintiff's tenure package based on questioning whether her Ph.D. was genuine and whether or not she was a "staff scientist" at Argonne National Laboratory as she reported even though she did not have a Ph.D. at the time. *Id.* at 54:20–55:14, 61:1–11, 63:19–25; *see also* Pl. Ex. 9, 32:19–25, 33:6–11. At that meeting, Dr. Kim "conveyed categorically to the [NEPC] committee members that it was the provost's opinion that her degree—her granted degree was valid." Pl. Ex. 7, 62:12–18. Dr. Taleyarkhan testified that, in his opinion, "once they are into the system, . . . we usually remain blind to where the . . . Ph.D. is from. You look at the record of achievements." *Id.* at 104:2–5. Dr. Garner testified that the tenure deliberation process is not the appropriate time and place to address issues with a candidate's Ph.D.; to his knowledge, the NEPC does not look at where the candidate got the Ph.D.; and the considerations of discovery, learning, and engagement are independent of where the candidate received the Ph.D. Pl. Ex. 9, 36:18–37:23. The written policies for tenure evaluation contain no reference to one's Ph.D. or employment history before Purdue. *See* Pl. Ex. 6, 57:1–16; Pl. Ex. 9, 36:16–37:23; Pl. Ex. 24.

The Plaintiff's letters of recommendation were also discussed, including the negative letter from Dr. Allain. Pl. Ex 7, 61:12–22. In response to the negative letter's "main complaint"

about the lack of evidence for sponsored research, Dr. Taleyarkhan explained to the NEPC that Dr. Kim had not conveyed in the cover letter the information regarding the Plaintiff's recent $750,000 DOE grant award. *Id.* at 61:18–62:1.

At the last meeting on September 27, 2019, Dr. Taleyarkhan reported that Dr. Kim had clarified that the Provost's Office advised there was no concern about the appropriateness of the Plaintiff's Ph.D., and Dr. Taleyarkhan explained, based on his research and knowledge, why the job title at Argonne was correct. *Id.* at 74:6–75:22, 76:15–20. However, Dr. Ishii continued to question the validity of the Plaintiff's Ph.D. and her job title at Argonne. *Id.* at 106:2–107:24. Dr. Taleyarkhan testified that Dr. Ishii's argument that one needs a Ph.D. to be a "staff scientist" at Argonne is factually wrong. *Id.* at 64:1–65:14. Dr. Taleyarkhan testified that, in his opinion, Dr. Ishii influenced the final NEPC vote "[b]y effectively poisoning the well, by fundamentally challenging the validity or the right of [the Plaintiff] to even be considered as a valid person for consideration of tenure." *Id.* at 81:20–82:3, 106:7–13. At that point, there was minimal discussion, with Dr. Tsoukalas, as a prior Head, affirming that it was not the NEPC's job to consider HR matters, and Dr. Kim then opened the floor to votes. *Id.* at 76:21–77:15.

Regarding the Plaintiff's independence from Dr. Hassanein, the issue was discussed but no NEPC member asked Dr. Taleyarkhan about it. *Id.* at 96:25–97:8; Pl. Ex. 9, 33:14–34:4. At no time during the three meetings did any member of the NEPC ask Dr. Taleyarkhan about the Plaintiff's "discovery" other than the questions about the validity of her Ph.D. and her job title at Argonne, nor did they ask him about or raise any objections to the categories of "learning" and "engagement." Pl. Ex. 7, 77:20–79:5. During the deliberations, no NEPC member made any statement to Dr. Taleyarkhan reflecting a view that the Plaintiff had failed to emerge from her former research and Ph.D. advisor, Dr. Hassanein. *Id.* at 97:9–13.

The NEPC voted six to two against forwarding the Plaintiff's application for tenure to the EAPC. Ex. E, 52:24–53:8, 77:11–12; Ex. R. When voting on a tenure bid, each NEPC member casts an anonymous ballot and is not supposed to disclose how they voted. Ex. E, 75:9–77:2, 77:8–10; Ex. F, Resp. 3; *see also* Ex. D, 18:1–21. Dr. Garner and Dr. Taleyarkhan testified that they voted to award tenure, leaving Dr. Abdel-Khalik, Dr. Choi, Dr. Ishii, Dr. Lopez-de-Bertodano, Dr. Revankar, and Dr. Tsoukalas as the remaining members to have voted to deny tenure. Pl. Ex. 7, 79:6–9; Pl. Ex. 9, 39:22–23; *see also* Pl. Ex. 6, 61:3–25; Ex. F, Resp. No. 3.

The stated rationale for the negative tenure decision on the Nomination for Promotion form ("Form 36"), which is signed by Dr. Kim, provides:

> The majority of the Primary Committee members felt that [the Plaintiff's] record in all three areas of discovery, learning, and scholarly engagement activities was weak, and that [the Plaintiff] did not show strong evidence in demonstrating independence from her former research advisor in developing research programs as well as in scholarly publications.

Ex. R; Pl. Ex. 21.

Dr. Garner, who was on the NEPC, noted the Plaintiff had publications independent from Dr. Hassanein, graduated at least one Ph.D. student, and earned a large and significant DOE grant independent from Dr. Hassanein. Pl. Ex. 9, 34:5–7, 11–17, 39:25–40:12. Dr. Hassanein, who was not on the NEPC, stated in his declaration that he believes that the NEPC's explanation "is undermined by objective facts." Pl. Ex. 5, ¶ 6. For example, he opined that the Plaintiff "has more high-impact publications than many tenured professors at the [School of Nuclear Engineering]," "wrote many proposals . . . as the principal investigator (PI) that also exceeded tenured professors," and "has several funded, independent proposals where she is the PI." *Id.*

As Head, one of Dr. Kim's responsibilities is to moderate the NEPC meetings; the Head does not vote on tenure decisions. Ex. E, 11:19–12:2; Ex. G, Resps. 3(a), 3(c), 5, 7. At that time, Dr. Kim did not know how each member voted. Ex. E, 77:3–5. In the event of a negative vote,

Dr. Kim had the discretionary authority to endorse a candidate for review with the EAPC, but he testified that this discretion should not be exercised "unless you have a very strong disagreement with the NEPC's vote." *Id.* at 44:21–45:19, 52:6–53:24. As a former school Head, Dr. Hassanein agreed that it is not the Head's role to overrule a decision made by faculty committees as "otherwise the school would be in chaos." Ex. B, 44:3–45:7, 123:22–124:7. Regarding the Plaintiff, Dr. Kim concurred with the NEPC's decision and the "strong negative vote by the . . . significant majority of the primary committee members" and explained that "I do not want to, you know, . . . move forward against NEPC's recommendation because I trust their judgment." Ex. E, 78:12–79:4, 81:10–24; *see also* Ex. F, Resp. 7; Ex. G, Resp. 3(c); Ex. R. Dr. Kim testified: "You should demonstrate, as primary committee suggested, there should be . . . strong evidence in demonstrating independence from her former research advisor in developing research program and as well as in scholarly publications." Ishii Ex. 5, 79:11–80:9.

Soon after the NEPC vote, Dr. Kim met with the Plaintiff to inform her that her tenure application would not be forwarded to the EAPC. Ex. F, Resp. No. 3. On December 6, 2019, the Plaintiff submitted an appeal to Vice Provost Dr. Hollenbeck, requesting that her case be submitted to the EAPC. Ex. S. On December 16, 2019, Dr. Hollenbeck denied the appeal. Ex. T, pp. 3–4. In the email, he explained that, "[a]lthough [her] appeal letter was broad and included issues outside the scope of [the appeal] policy," he understood her appeal to be based on Procedure ¶ C.1: "Evidence of grossly inadequate consideration of professional competence." *Id.* at 3. He gave the following explanation for his decision:

> The major issue that affected the committee's judgement of your impact as a member of their faculty was the establishment of your independence in research and engagement over these past 5 years. This is an important criterion for most primary committees, including NEPC, and one that they have applied consistently in the past. . . . I have reviewed your promotion dossier and the department and college's reasoning for the NEPC decision in your case, and I cannot see evidence that this was a 'grossly inadequate consideration,' or that the judgement was mis-

applied here. Thus, I cannot accept your appeal, will not overturn the judgement of
the NEPC, and will not advance your case to the college Area Committee.

*Id.* at 3–4; *see also* Ex. F, Resp. No. 3. Because she was not granted tenure, the Plaintiff's

employment with Purdue terminated at the end of the 2020–2021 academic year. Pl. Ex. 16,

197:23–198:8; Purdue Ans. ¶ 24; Kim Ans. ¶ 24.

When asked about the deference given by the EAPC to the NEPC's vote, Dr.

Taleyarkhan testified, "It is considered as an obvious red flag if a majority [of the primary

committee] did not vote for that particular individual." Ex. D, 25:3–26:7. Dr. Garner was asked

whether, in his opinion, the Plaintiff would have been granted tenure if her application had gone

before the EAPC; Dr. Garner testified,

It comes down to perspective and some of that unfortunately is subjective. It really
comes down to evaluating her package . . . and there could be the perception that
she did not establish enough independence from Dr. Hassanein. That was always
gonna be one of the more challenging aspects for [the Plaintiff] to overcome at
Purdue given Dr. Hassanein's stature and the sort of politics in our department. So
I cannot say yes or no at the EAPC but I think it would have been competitive.

Ex. C, 42:7–21.

Dr. Kim has never heard or witnessed Dr. Ishii trying to influence other NEPC members'

votes. Ex. E, 37:5–9. Dr. Kim testified the NEPC reviews a tenure "candidate with [a] holistic

point of view. They don't go by each category and count or whatnot." Pl. Ex. 6, 82:16–19.

Dr. Lopez-de-Bertodano, Dr. Revankar, and Dr. Tsoukalas each state in a separate

declaration that he voted against the Plaintiff's tenure candidacy based on an "independent

evaluation of [her] academic credentials and of her promise and potential as a tenured . . .

professor in the [School of Nuclear Engineering];" that his vote was not controlled, coerced, or

improperly influenced by Dr. Ishii, Dr. Choi, Dr. Kim, or any other person; and that his vote was

not based upon the Plaintiff's race, color, national origin or ancestry, sex, gender identity, or

gender expression. Ex. O, ¶¶ 6–10; Ex. P, ¶¶ 6–10; Ex. Q, ¶¶ 6–10. Similarly, Dr. Ishii states in

22

his declaration that his vote "was based solely on [his] own independent evaluation of [the Plaintiff's] academic credentials and of her promise and potential as a tenured . . . professor in the [School of Nuclear Engineering]" and that his vote was not based of the Plaintiff's race, color, national origin or ancestry, sex, gender identity, or gender expression. Ishii Ex. 1, ¶¶ 8, 10.

Dr. Garner voted in favor of granting tenure, in part, because the Plaintiff had demonstrated independence from Dr. Hassanein. Ex. C, 39:22–40:12, 86:24–87:5. For the vote on the Plaintiff's tenure, Dr. Garner testified that neither Dr. Ishii nor Dr. Choi talked to him about the vote, nor did either try to influence his vote. *Id.* at 38:19–21, 41:15–18, 43:3–13.

## G.   Potential Comparators

Since Dr. Kim has been the Head of the School of Nuclear Engineering, five candidates have failed to obtain a majority vote in favor of tenure from the NEPC: the Plaintiff (female, non-Asian), Dr. Garner (non-Asian), Dr. Wharry (female); Dr. Miloshevsky (non-Asian), and Dr. Bean (non-Asian). Pl. Ex. 6, 52:7–54:2. For Dr. Garner, the NEPC vote was tied, so his application was advanced, and he obtained tenure following a vote of the EAPC. Pl. Ex. 9, 14:1–3, 28:1–4. Dr. Wharry obtained tenure in the School of Materials Engineering, Pl. Ex. 8, 94:5–95:10.

Dr. Kim hired Yunlin Xu as a tenure-track professor in the Fall of 2018 on the recommendation of the search committee and awarded him the Zmola Award shortly thereafter. Pl. Ex. 6, 25:12–19, 26:24–27:3. Dr. Wharry, who was on the search committee, recommended against hiring Dr. Xu "because it was one of the worst interviews [she] had ever seen." Pl. Ex. 8, at 33:20–34:20. She did not think Dr. Xu had earned the Zmola Award because it was too early in his career. *Id.* at 35:12–36:9. The Plaintiff, who became a tenure-track faculty member in 2014, received the Zmola Award each year in 2014 through 2018. Pl. Ex. 3, § C.1.

**H.      The No-Confidence Letter**

On January 14, 2019, some School of Nuclear Engineering faculty submitted a letter

titled "Vote of No-Confidence in Current Head of School of Nuclear Engineering" to Dean

Mung Chiang and Provost Jay Akridge. Ex. L. The letter was signed by the Plaintiff and eight

other professors. *Id.* On February 20, 2019, the Plaintiff and others met with the Human

Resources Department and conveyed further complaints of race and gender discrimination. Pl.

Ex. 13. A survey was submitted to faculty, with Dr. Kim being advised of the results in May

2019. *Id.* On April 20, 2019, the Plaintiff filed a formal complaint of gender and race

discrimination with Purdue's Office of Institutional Equity, which was dismissed on May 22,

2019. Pl. Exs. 14, 15. Dr. Kim testified that, at the time of the Plaintiff's tenure candidacy, he did

not know the Plaintiff was a signatory to the "no confidence" letter. Ex. E, 103:24–104:15.

ANALYSIS

**A.      Title VII Claims Against Purdue University for Denial of Tenure**

*1.      Title VII Discrimination Based on Sex, Race, and National Origin*

Under Title VII, it is "unlawful . . . for an employer . . . to discriminate against any

individual with respect to . . . compensation, terms, conditions, or privileges of employment,

because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-

2(a)(1). Considering the relevant evidence as a whole on summary judgment, the question before

the Court is "whether the evidence would permit a reasonable factfinder to conclude that" the

Plaintiff's sex, race, or national origin caused the denial of her tenure application. *See Ortiz v.*

*Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).[3] In other words, has the Plaintiff

---

[3] The Plaintiff does not rely on the *McDonnell Douglas* burden-shifting framework in support of any
claim on the pending motions for summary judgment. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988
F.3d 948, 957–58 (7th Cir. 2021).

24

"produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (citation omitted).

The Plaintiff brings her Title VII discrimination claim against Purdue under a cat's paw theory of liability, arguing that Purdue's decision not to award her tenure was the result of Dr. Ishii's discriminatory bias against women and non-Asians and his influence on the tenure decision-making process in the School of Nuclear Engineering. The cat's paw theory applies "when a biased supervisor, or a biased subordinate, 'who lacks decision-making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Sinha v. Bradley Univ.*, 995 F.3d 568, 573–74 (7th Cir. 2021) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011); quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)); *see Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017) (quoting *Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015)). This means "the ultimate decisionmaker issued an adverse employment action based on the discriminatory animus of another." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019) (citation omitted).

To survive summary judgment on a cat's paw theory, "the plaintiff must provide 'evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action.'" *Milligan-Grimstad*, 877 F.3d at 711 (quoting *Johnson*, 726 F.3d at 914). Thus, the Plaintiff must offer evidence both that Dr. Ishii actually harbored discriminatory animus against her and that Dr. Ishii's scheme was the proximate cause of Purdue's decision not to grant her tenure. Because the Plaintiff offers sufficient evidence on both prongs, the claim survives summary judgment.

a.      Discriminatory Animus

With the facts viewed in the light most favorable to the nonmoving party, the Plaintiff has offered sufficient evidence to create a genuine dispute of fact as to whether Dr. Ishii "actually harbored discriminatory animus" against her as a woman and non-Asian. The Plaintiff has offered the testimony of five faculty members, in addition to her own testimony, that Dr. Ishii made derogatory statements about women and/or non-Asians in the context of the faculty in the School of Nuclear Engineering or in the engineering profession. Although Dr. Ishii denies making the statements, the issue of witness credibility is for the jury.

Dr. Wharry testified that, when she was first hired as a professor in the School of Nuclear Engineering, Dr. Ishii commented that her former advisor did not get a dean position because "Purdue was only interested in hiring women at the time" and "he was a male." Dr. Wharry understood Dr. Ishii's tone to mean he was not happy someone else was hired and the person was hired only because she was a female. On another occasion, Dr. Ishii joked that the committee they were serving on was "not very diverse" "because it was all Asian males." During the committee meeting, Dr. Ishii insisted Dr. Wharry be the note-taker, despite her suggestion the committee members take turns. Dr. Wharry was the only nontenured professor and the only woman on the committee. On its face, the comment is neutral, but in light of Dr. Ishii's other statements, one reasonable inference is that she was tasked with note-taking because she was the only woman present. On the day Dr. Wharry's own tenure application was scheduled for a vote in October 2018, Dr. Wharry overheard Dr. Ishii attempting to influence Dr. Revankar to vote against her tenure application and heard Dr. Ishii say that Dr. Wharry and Dr. Garner (who was also up for tenure), as well as their students, were "all stupid, lazy Americans."

Dr. Brooks, who worked as both a Research Professor in the School of Nuclear Engineering and as a Temporary Senior Research Scientist, testified that Dr. Ishii publicly

expressed anti-female bias on numerous occasions, denigrating the role of women in faculty and dean positions. The comments were made before and after faculty and search committee meetings as well as at department social events. Dr. Ishii called women "stupid," referring to them as "doing much worse research work as men engineers" and "using the stupid US legal system to get faculty positions they do not deserve."

Dr. Taleyarkhan, a professor in the School of Nuclear Engineering, heard Dr. Ishii make "statements . . . about what people of different origin, white students, people of Caucasian race as being – as being lazy, inappropriate for the task" and that women are "[n]ot up to par in terms of ability, not having scientific backgrounds necessary for the job in relation to a faculty member . . . . [I]n the faculty deliberations and so on, downplaying their abilities generally and deciding not to sort of support the case for promotion and tenure." Dr. Taleyarkhan observed Dr. Ishii apply a more difficult standard to women applying for tenure.

Dr. Garner, an associate professor in the School of Nuclear Engineering, testified that, a number of years earlier, he heard Dr. Ishii "comment at one of our search committee meetings about how Purdue likes it if we hire women and the way he said it and the context that he said it seemed a bit off and a bit inappropriate." He also stated that Dr. Ishii "gives off the vibe that he is not open to those that are different."

Dr. Hassanein, a professor in the School of Nuclear Engineering, heard Dr. Ishii state, on more than one occasion and in front of others, that "whites are lazy." Dr. Ishii said to just hire Chinese students, "women are stupid," and minorities have to be accommodated due to U.S. laws. In the context of a decision the Dean made, Dr. Ishii commented to Dr. Hassanein that Dr. Jamieson is a woman, is not capable of thinking, and is "stupid." Dr. Ishii told Dr. Hassanein that Dr. Fentiman, a female professor, was hired because she is a woman and "we've got a loser."

The Plaintiff also heard Dr. Ishii openly disparage the Dean because of her gender. During a research committee meeting, Dr. Ishii said to the Plaintiff and to Dr. Fentiman, who were the only two women on the committee: "you don't understand this." As with the note-taking comment to Dr. Wharry, although this statement does not specifically reference their sex, in the context of Dr. Ishii's other comments, one reasonable inference is that he made the comment based on their sex.

Purdue contends that any such statements by Dr. Ishii amount to nothing more than "stray remarks that are neither proximate nor related to the employment decision" and, thus, are "insufficient to defeat summary judgment." *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 813 (7th Cir. 2007) (citing *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997)). "Standing alone, biased comments do not establish discriminatory motive unless they were by the decision maker and can be connected to the decision." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 709–10 (7th Cir. 2013) (citing cases). Nevertheless, "statements of a person who lacks the final decision-making authority may be probative of intentional discrimination if that individual exercised a significant degree of influence over the contested decision." *Sun*, 473 F.3d at 813. In the context of a defendant asserting the stray remark doctrine, "a court deciding a summary judgment motion must keep in mind its duty to consider the evidence as a whole and to do so in the light reasonably most favorable to the non-moving party." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 934–35 (7th Cir. 2020); *see Hunt v. City of Markham*, 219 F.3d 649, 652–53 (7th Cir. 2000) ("All that these cases hold—all that they could hold and still make any sense—is that the fact that someone who is not involved in the employment decision . . . expressed discriminatory feelings is not evidence that the decision had a discriminatory motivation.").[4]

---

[4] Although not discussed by the parties, the Court recognizes that Dr. Ishii was the chair of the committee that recommended hiring the Plaintiff as a tenure-track faculty in 2014 and said the Plaintiff was a "very

In this case, six different professors within the School of Nuclear Engineering testified to Dr. Ishii's biased comments made over a period of years leading up to the NEPC vote on the Plaintiff's tenure application. *See Perez*, 731 F.3d at 708 n.2, 709–10 (in considering remarks made by the cat's paw bad actor a year before the plaintiff's termination, the court explained that "[t]he time difference might lessen their evidentiary punch, but the passage of time does not make them inadmissible"). This includes the comment a year earlier, the day of Dr. Wharry's tenure vote, describing Dr. Wharry, Dr. Garner, and their students as "stupid, lazy Americans."

Dr. Ishii's statements about women and non-Asians are not ambiguous but rather demonstrate discriminatory biases against both protected classes. *Taylor v. Ways*, 999 F.3d 478, 489 (7th Cir. 2021) ("'Unmistakable evidence of racial animus,' such as a defendant's use of racial epithets or slurs, makes for a 'simple analysis.'" (quoting *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019))). Courts also "consider the context in which the remark was made." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 885–86 (7th Cir. 2016) (recognizing that comments made outside of work, in social settings, are less likely to be evidence of workplace discrimination). Here, Dr. Ishii's comments were made in the workplace, to fellow faculty, and about fellow faculty and students within the School of Nuclear Engineering and the engineering profession.

And, although Dr. Ishii was not the "final decisionmaker" on tenure decisions, he was a decisionmaker. His comments are "connected to the decision" on the Plaintiff's tenure application because he was on the NEPC, participated in all three NEPC discussions, raised the issue of the validity of her Ph.D. and job at Argonne, and voted against advancing her

---

excellent candidate." However, courts "do not presume lack of bias when the same person has both hired and fired the plaintiff, but we allow the jury to hear such evidence and weigh it for what it is worth. We do so even though the hiring may be distant in time from the firing decision." *Perez*, 731 F.3d at 709–10 (discussing the intersection of the "same actor" inference and the stray remark doctrine).

application. As discussed in the context of proximate cause below, Dr. Ishii had some influence in the department and had demonstrated a willingness on two prior occasions to assert influence over other voting members regarding faculty employment decisions. *See Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) ("Racial epithets or stray remarks may be direct or circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision, i.e., made by the decisionmaker, or those who influence the decisionmaker, and made close in time to the adverse employment decision.").

Purdue and Dr. Ishii are correct that none of the biased statements specifically reference the Plaintiff personally or the vote on her tenure, but the comments are relevant because of Dr. Ishii's role as a decisionmaker on the NEPC. *See Joll*, 953 F.3d at 935 ("A remark or action by a decision-maker reflecting unlawful animus may be evidence of his or her attitudes more generally." (citing *Emmel v. Coca-Cola Bottling Co. of Chi.*, 95 F.3d 627, 632 (7th Cir. 1996))); *see also Watkins v. City of Chicago*, No. 20-1750, 2023 WL 155450, at *2 (7th Cir. Jan. 11, 2023) (citing *Joll*, 953 F.3d at 935); *Applewhite v. Deere & Co.*, No. 4:18-CV-04106, 2020 WL 7029889, at *22 (C.D. Ill. Nov. 30, 2020) (disagreeing "that the comments are only relevant if they are made in reference to the decision to terminate" the plaintiff (citing *Hunt*, 219 F.3d at 652–53; *Joll*, 953 F.3d at 935)).[5] On the instant motion, the Court finds the stray remark doctrine inapplicable, and the question of Dr. Ishii's discriminatory bias is for the jury.

b.      Proximate Cause

Under the cat's paw theory, the Plaintiff must also prove that Dr. Ishii's discriminatory animus proximately caused Purdue's decision to deny her tenure application. *See McDaniel*, 940

---

[5] Purdue argues the only comments by Dr. Ishii about the Plaintiff's tenure application were regarding the validity of her Ph.D. and pre-Purdue employment, which are unrelated to any protected class. As set forth below, because those topics are not normally considered at this stage of the process, it is a reasonable inference that Dr. Ishii raised the concerns due to his bias in order to prevent her from obtaining tenure.

F.3d at 370; *Turner v. Hirschbach Motor Lines*, 854 F.3d 926, 928–29 (7th Cir. 2017). A biased employee's influence "can be exercised by supplying misinformation or failing to provide relevant information to the person making the employment decision." *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 917 (7th Cir. 2007). However, proximate cause exists only if the decisionmaker took the biased employee's input "'into account without determining that the adverse action was, apart from the [employee's] recommendation, entirely justified' or if the investigation 'relies on facts provided by the biased [employee].'" *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461–62 (7th Cir.), *cert. denied*, 142 S. Ct. 401 (2021) (quoting *Staub*, 562 U.S. at 421). Thus, "the chain of causation can be broken if the unbiased decision-maker conducts a meaningful and independent investigation of the information being supplied by the biased employee." *Woods*, 803 F.3d at 870 (quoting *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 383 (7th Cir. 2011)). Here, the Plaintiff has offered evidence sufficient to create a genuine dispute of fact on proximate cause.

The Plaintiff's theory is that Dr. Ishii impermissibly used his influence in the School of Nuclear Engineering to sway the NEPC's vote on her tenure application by repeatedly disputing the legitimacy of her Ph.D. and her job title at Argonne, which were not appropriate objections to raise at the NEPC stage of the tenure decision process. *See Ammerman v. Singleton*, No. 17-CV-193, 2019 WL 5864762, at *9 (W.D. Wis. Nov. 8, 2019) (finding a cat's paw theory facially plausible where the decision-making committee considered the allegedly falsified conduct reports). In other words, Dr. Ishii "poisoned" the deliberations by raising objections outside the actual criteria for tenure. *See Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 754 (7th Cir. 2000) (recognizing an adverse employment action can be caused by an employee with a discriminatory motive who conceals information from or feeds false information to the decisionmaker).

The evidence of record is that the issues of where a candidate obtained her Ph.D. and her prior work are not part of the tenure decision at the NEPC stage, and the three stated criteria for tenure are (1) discovery (research, publications, funding), (2) learning (teaching, mentoring, advising students), and (3) engagement (conferences, leadership, service to university or public). The written policies for tenure contain no reference to one's Ph.D. or employment history before Purdue. The "NEPC usually remain[s] blind to where" the candidate received the Ph.D. In August 2019, Vice Provost Dr. Hollenbeck confirmed the validity of the Plaintiff's Ph.D., noting in his email to Dr. Kim that, if the NEPC's "intention was to wait and then play 'gotcha,' in an effort to sabotage her promotion proceedings, then you've got a fire to put out, no?"

Nevertheless, Dr. Ishii raised concerns about the validity of the Plaintiff's tenure package by questioning whether her Ph.D. was genuine and whether she had really been a "staff scientist" at Argonne National Laboratory when she did not have a Ph.D. at the time. He did so at the second and third NEPC meetings even though Dr. Kim "categorically conveyed to the NEPC" that Dr. Hollenbeck felt her degree was valid. Indeed, Dr. Taleyarkhan believed that Dr. Ishii influenced the vote by "poisoning the well, by fundamentally challenging the validity or the right of [the Plaintiff] to even be considered as a valid person for consideration of tenure." Dr. Taleyarkhan, who presented the Plaintiff's dossier, fielded no questions from the NEPC on the three criteria of discovery, learning, and scholarly engagement other than the questions related to her Ph.D. and job title at Argonne. The Plaintiff argues that Dr. Ishii raising the validity of her Ph.D. and title at Argonne caused the NEPC not only to rely on those issues but also prevented the NEPC from properly considering the legitimate tenure factors untainted by those topics. *See Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017) ("An employer's unusual deviation from standard procedures can serve as circumstantial evidence of discrimination.").

The Plaintiff further cites Dr. Ishii's seniority and influence in the School of Nuclear Engineering as well as his willingness on two prior occasions to influence an employment decision. When Dr. Garner was on Dr. Kim's hiring committee, Dr. Ishii went to Dr. Garner's office and "said good things about Dr. Kim, how he was a good person, he tried to do the right thing," and Dr. Ishii told Dr. Garner that, if Dr. Kim was hired, his "tenure case would be in very good shape." Dr. Garner felt this could be interpreted as an inappropriate quid pro quo. Similarly, the day of her NEPC tenure vote, Dr. Wharry overheard Dr. Ishii "threatening" Dr. Revankar to vote against her and Dr. Garner's tenure cases, arguing that Dr. Revankar had to vote with him because he had previously supported Dr. Revankar for promotion at Purdue.

It is also true that "the decisionmaker need not be 'a paragon of independence.'" *Sinha*, 995 F.3d at 574 (quoting *McDaniel*, 940 F.3d at 370). "It is enough that the decisionmaker is not wholly dependent on a single source of information and conducts [its] own investigation into the facts relevant to the decision." *McDaniel*, 940 F.3d at 370 (quoting *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 453 (7th Cir. 2009)). In this vein, Purdue argues that six of the eight members of the NEPC voted against advancing the Plaintiff's tenure application and that their independent academic judgments break any causation between Dr. Ishii's influence and the denial of tenure. Purdue is correct that the Plaintiff has designated no evidence that Dr. Ishii communicated directly with anyone about her tenure application, and Dr. Ishii has averred that he did not. Dr. Lopez-de-Bertodano, Dr. Revankar, and Dr. Tsoukalas state their votes against tenure were based on an independent evaluation of the Plaintiff's academic credentials and her promise and potential as a tenured professor and were not controlled or improperly influenced by Dr. Ishii, Dr. Choi, Dr. Kim, or any other person. Each member of the NEPC had an opportunity to review the Plaintiff's dossier and form an independent opinion.

Yet, "[t]he Supreme Court has made clear that 'proximate cause requires only some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect.'" *Sinha*, 995 F.3d at 574 (quoting *Staub*, 562 U.S. at 419). Given Dr. Ishii's insertion of the validity of the Plaintiff's Ph.D. and job title at Argonne into the NEPC's discussions, his seniority and influence in the department, and his prior willingness to affect employment decisions, a reasonable jury could infer that he was attempting to influence the NEPC's vote on the Plaintiff's tenure. In other words, there is a reasonable inference that there was no "meaningful independent investigation" within the NEPC to break causation. *See Bostwick v. Watertown Unified Sch. Dist.*, No. 13-C-1036, 2015 WL 520701, at *9 (E.D. Wis. Feb. 9, 2015) (finding that a board hearing did not "purify the biased investigation that informed the hearing in the first instance").

Finally, Purdue argues that, even if Dr. Ishii influenced the NEPC vote based on discriminatory bias, the chain of causation is broken at two subsequent links—Dr. Kim's opportunity as Head to override the NEPC vote and Dr. Hollenbeck's subsequent review of the Plaintiff's appeal. *See Woods*, 803 F.3d at 870. On the evidence before the Court, neither Dr. Kim nor Dr. Hollenbeck was a "bias-free" layer of independent analysis because of the narrow, deferential scope of their reviews of the NEPC vote. *See, e.g.*, *Taylor v. Cook Cnty. Sheriff's Off.*, 442 F. Supp. 3d 1031, 1045–46 (N.D. Ill. 2020) (finding that, despite a full Merit Board hearing, the plaintiff "provided evidence from which a reasonable jury could find that the Merit Board relied" on the biased investigator's fact-finding because he was a senior, lead investigator, he drafted the report for the complaint, and he testified against the plaintiff at the hearing), *aff'd in part, rev'd in part on other grounds and remanded sub nom. Taylor*, 999 F.3d at 478; *cf. Watkins*, 2023 WL 155450, at *3 (finding the chain of causation broken by an independent

investigation); *Martino*, 574 F.3d at 453 (finding that there were "*two* layers of bias-free analysis"). The Court considers each in turn.

Purdue contends that Dr. Kim conducted his own evaluation and concurred with the NEPC based on the Plaintiff's lack of independence from Dr. Hassanein, choosing not to exercise his discretionary authority as the Head to override the vote. However, contrary to Purdue's assertion that the NEPC vote is essentially advisory, the Head routinely gave the NEPC vote great deference. Dr. Kim said he would only exercise his discretion if he had a "very strong disagreement with the NEPC's vote." Dr. Hassanein, as a former Head, similarly testified it is not the Head's role to overrule a decision made by faculty committees as "otherwise the school would be in chaos." While Dr. Kim testified that he "evaluates employees in an honest and truthful manner," it is nevertheless a reasonable inference he was also swayed by Dr. Ishii's arguments at the NEPC meetings. Dr. Kim's review was not "completely independent" of Dr. Ishii's influence and does not break the chain of causation.

Dr. Hollenbeck's scope of review of the Plaintiff's appeal of the NEPC decision was even more narrow and deferential. Although the Plaintiff raised several issues, Dr. Hollenbeck limited his review to whether there was "evidence of grossly inadequate consideration of professional competence" as provided in the ¶ VI.C of the procedures manual. Under that standard, Dr. Hollenbeck only "reviewed [the Plaintiff's] promotion dossier and the college's reasoning for the NEPC decision in [her] case" and could not "see evidence that this was a 'grossly inadequate consideration,' or that the judgement was mis-applied here." Thus, if the NEPC's decision and the resulting explanation on the Nomination for Promotion form were influenced by Dr. Ishii, then Dr. Hollenbeck's deference to that explanation was also tainted by Dr. Ishii's discriminatory bias. As a result, the causal chain is not broken.

c.      Pretext

In the context of an employment discrimination claim, "an employer's dishonest explanation of a decision can support an inference that its real reason was unlawful." *Joll*, 953 F.3d at 932. "If the jury does not believe the employer's explanation for its decisions, it may infer that the employer is trying to cover up . . . discrimination, . . . particularly if disbelief is accompanied by a suspicion of mendacity." *Id.* at 932 (internal quotation marks and citations omitted). But pretext "is not just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389–90 (7th Cir. 2020) (internal quotation marks and citation omitted).

More specifically in the context of a tenure denial, showing pretext is "an extremely difficult burden to carry due to the layered and subjective nature of the tenure process . . . and . . . that such decisions are based on the fine distinction between competent and superior achievement." *Sun*, 473 F.3d at 814 (internal quotation marks and citation omitted); *see also Blasdel v. Nw. Univ.*, 687 F.3d 813, 815–16 (7th Cir. 2012) ("[P]ractical considerations make a challenge to the denial of tenure at the college or university level an uphill fight—notably the absence of fixed, objective criteria for tenure at that level." (citing cases)). Nevertheless, "[i]t is well-settled that Title VII is 'fully applicable' to tenure decisions." *Barron v. Univ. of Notre Dame Du Lac*, 93 F. Supp. 3d 906, 911 (N.D. Ind. 2015) (quoting *Blasdel*, 687 F.3d at 815). And "tenure decisions 'should not be permitted to camouflage discrimination, even the unconscious discrimination of well-meaning and established scholars.'" *Id.* (quoting *Namenwirth v. Bd. of Regents*, 769 F.2d 1235, 1243 (7th Cir. 1985)).

Here, the reasons given by the NEPC on the Nomination for Promotion form for not advancing the Plaintiff's application for tenure were that she was "weak" in all three areas of discovery, learning, and scholarly engagement activities and had not shown independence from

Dr. Hassanein in developing research programs and in scholarly publications. The Plaintiff has offered evidence that these stated reasons were a pretext for discrimination.

First, regarding the areas of discovery, learning, and scholarly engagement, the Plaintiff argues that ample evidence exists for a fact-finder to conclude that she is qualified for tenure based on all three criteria. As discussed in detail in the background section, the Plaintiff highlights the achievements in her dossier, noting her extensive publications, new courses taught, chair/co-chairing graduate students, mentoring, participating in workshops and conferences as a panelist, and funding, including the $750,000 DOE grant for which she was the principal investigator and independent of Dr Hassanein. Dr. Taleyarkhan, who was on the NEPC, testified that the Plaintiff meets the criteria and exceeds the metrics in some areas. Dr. Garner, who was also on the NEPC, noted the Plaintiff's publications independent of Dr. Hassanein, that she had graduated at least one Ph.D. student, and the large and significant DOE grant. Although they were not on the NEPC, Dr. Hassanein and Dr. Brooks believe that the Plaintiff easily satisfied the criteria for tenure and offer detailed examples of her qualifications, achievements, and international reputation. In April 2019, just weeks before the first NEPC meeting on her application, Dr. Kim rated the Plaintiff as "excellent" in learning, "very good" in leadership, and "satisfactory" in engagement. Although this was only an annual review, it appears contradictory to a finding that she was "weak" in all three areas.

Purdue is correct that the Plaintiff's qualifications alone do not establish evidence of pretext. *See Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002). And, even if the Plaintiff is as qualified as she contends, it does not automatically "follow that she ought to have been awarded tenure." *Namenwirth*, 769 F.2d at 1242. Purdue argues that, at most, the Plaintiff's qualifications could show that Purdue was incorrect; and it is possible that will be the jury's conclusion. However, the tenure decision cannot have been made "for forbidden reasons."

*Rheams v. Marquette Univ.*, 989 F. Supp. 991, 1008 (E.D. Wis. 1997) (citing *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996)). And there is evidence from which a reasonable jury could come to this conclusion as well. *See, e.g.*, *Joll*, 953 F.3d at 924, 932 ("A reasonable jury might also find no sex discrimination, but on this record, the decision belongs to a jury."); *see also Elghanmi v. Franklin Coll. of Ind., Inc.*, No. IP 99-879-C H/G, 2000 WL 1707934, at *9 (S.D. Ind. Oct. 2, 2000) (concluding a jury could reasonably find the plaintiff was sufficiently qualified for tenure).

Second, the Plaintiff argues the explanation that she had not established her independence from Dr. Hassanein was pretextual because she had, in fact, established that independence. Purdue responds that the evidence supports the NEPC finding, noting the history of concerns regarding her independence from Dr. Hassanein stemming from when she was first hired as a tenure-track professor in 2014. It is true that Dr. Hassanein brought the Plaintiff to Purdue to serve on his research team, advised her doctoral thesis while she worked as a Purdue employee in CMUXE, and co-authored the overwhelming majority of her publications. Dr. Garner first raised the issue when she was hired as a tenure-track professor, although he found that by 2019 the Plaintiff had fully emerged from Dr. Hassanein and shown her independence. Over the years, the Plaintiff was repeatedly instructed in her annual reviews and by her mentors on the need to establish her independence, beginning no later than 2016. Purdue cites Dr. Garner's opinion that the Plaintiff had demonstrated independence "towards the tail end" of being a tenure-track professor and external reviewer Dr. Allain's opinion that the Plaintiff had a "low" likelihood of gaining tenure based on the lack of evidence of her independence. In addition, Dr. Garner stated that "there could be the perception that [the Plaintiff] did not establish enough independence."

However, whether there is some evidence to support this reason does not answer the question of whether it was honestly believed by the NEPC, and the Plaintiff has offered evidence

that her lack of independence from Hassanein was not the real reason for the NEPC vote. First, during the deliberations, no NEPC member made any statement to Dr. Taleyarkhan reflecting a view that the Plaintiff had failed to emerge from her work with Dr. Hassanein. Second, at no time during the three meetings did any member of the NEPC ask Dr. Taleyarkhan about the Plaintiff's "discovery" other than the questions about the validity of her Ph.D. and her job title at Argonne, nor did they ask about or raise any objections to the other two categories of "learning" and "engagement." Third, the Plaintiff offers evidence that she had asserted her independence from Dr. Hassanein, noting the four publications independent of Dr. Hassanein after 2018 and eight where she was principal investigator. In addition, she obtained the $750,000 DOE grant for September 2019 through August 31, 2022, separate from Dr. Hassanein and CMUXE. Notably, Dr. Kim did not inform Dr. Allain of this grant when asking for the review. Finally, Dr. Garner voted in favor of granting tenure, in part, because the Plaintiff had demonstrated her independence from Dr. Hassanein on this record.

In other words, although concerns were raised over the years, the Plaintiff heeded the concerns and worked to establish her independence from Dr. Hassanein. As discussed above, she has offered evidence that the NEPC was influenced by Dr. Ishii raising concerns about her Ph.D. and her title at Argonne. The Plaintiff has done more than ask the Court to question the academic judgment of the NEPC, and there are sufficient questions of fact on the issue of pretext for the jury. *See, e.g.*, *Barron*, 93 F. Supp. 3d at 914 (finding that a reasonable jury could determine that the alleged reason behind the denial of tenure—the quality of the plaintiff's teaching—was a pretext); *cf. Haynes v. Ind. Univ.*, 902 F.3d 724, 734–35 (7th Cir. 2018).

d.      Similarly Situated and Me-Too Comparators

As a final matter, the Plaintiff attempts to offer evidence of similarly situated coworkers who were treated more favorably and me-too comparators who also did not obtain a favorable

vote with the NEPC. A similarly situated comparator must be "someone who is directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). The Plaintiff identifies Dr. Xu and Dr. Kim, both Asian males. Dr. Xu, a newly hired tenure-track professor in 2018, has not yet been reviewed for tenure; thus, he is not similarly situated for purposes of the Plaintiff's claim.[6] Dr. Kim is not a proper comparator because he was hired by Purdue directly as a tenured professor to be the Head of the School of Nuclear Engineering. The Plaintiff has offered no evidence or argument that the standards for hiring a tenured Head of the School of Nuclear Engineering and awarding tenure to a tenure-track professor are comparable.

"Me-too" evidence can be used to demonstrate an employer's discriminatory motive or intent. *See Hasan v. Foley & Lardner, LLP*, 552 F.3d 520, 529 (7th Cir. 2008). Indeed, "'behavior toward or comments directed at other employees in the protected group' is one type of circumstantial evidence that can support an inference of discrimination." *Id.* (citation omitted). The Plaintiff identifies four individuals—Dr. Garner (non-Asian), Dr. Wharry (female), Dr. Miloshevsky (non-Asian), and Dr. Bean (non-Asian)—whom she contends, like her, failed to obtain a majority vote from the NEPC since Dr. Kim became Head. However, she has offered no evidence regarding any of their tenure dossiers to suggest that their race or gender, rather than their qualifications, were the reason for the vote. *See Hasan*, 552 F.3d at 529. The Court finds that the Plaintiff has not offered sufficient evidence to support either argument. However, such proof is not necessary when the evidence is viewed as a whole, and the lack of evidence does not undermine the finding of a genuine fact dispute on her Title VII discrimination claim.

---

[6] No inference of bias can be drawn from Dr. Xu receiving the Zmola Award shortly after becoming a tenure-track professor; the Plaintiff also received the Zmola Award in 2014 as a new tenure-track faculty.

e.     Conclusion

Courts are directed to "closely scrutinize discrimination claims in [the tenure] context to be sure the dispute is not simply one of academic disagreement with the underlying decision to deny tenure." *Haynes*, 902 F.3d at 734. This is because "[s]cholars, not courts, 'are in the best position to make the highly subjective judgments related with the review of scholarship and university service.'" *Id.* (quoting *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005)). In this case, the Plaintiff has offered sufficient evidence, when considered as a whole, to show that Dr. Ishii impermissibly influenced the NEPC vote based on his bias against women and non-Asians by introducing into the tenure deliberation process the issues of the validity of the Plaintiff's Ph.D. and her title at Argonne. Accordingly, the Court denies Purdue's Motion for Summary Judgment on the Plaintiff's Title VII discrimination claim.

*2.     Title VII Retaliation*

Under Title VII, an employer is prohibited "from retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) (citing 42 U.S.C. § 2000e-3(a)). To survive summary judgment on this claim, the Plaintiff must show (1) she engaged in a statutorily protected activity under Title VII, (2) she suffered a materially adverse action taken by the employer, and (3) a causal connection between the two. *Runkel v. City of Springfield*, 51 F.4th 736, 746 (7th Cir. 2022). As for causation, the Plaintiff must establish that the decisionmaker responsible for the adverse action was aware of the protected activity. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123–24 (7th Cir. 2021).

In her pleadings, the Plaintiff alleges that her tenure application was not granted in September 2019 in retaliation for having signed a "no confidence" letter regarding Dr Kim's leadership that was submitted to Dean Mung Chiang and Provost Jay Akridge in January 2019.

As a result of the letter, a survey was submitted to faculty, with Dr. Kim being advised of the survey results in May 2019. In support of the instant motion, Purdue offered unrefuted evidence that Dr. Kim did not know the Plaintiff had signed the letter. In her response brief, the Plaintiff cites as a second protected activity the formal discrimination complaint she filed with Purdue's Office of Institutional Equity in April 2019. However, the Plaintiff offers no evidence that Dr. Kim or any other decisionmaker was aware that she had made either complaint at any time prior to the decision on her tenure application. Instead, she reasons that, because Dr. Kim was made aware of the results of the survey, a reasonable jury could infer that Dr. Kim knew she signed the letter. This is pure speculation, and the Plaintiff has offered no facts or evidence to support such an inference. *See Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014) ("Speculation is no substitute for evidence at the summary judgment stage."). Accordingly, the Court grants summary judgment in favor of Purdue on the Plaintiff's Title VII retaliation claim.

**B.      Section 1983 Equal Protection Claim Against Dr. Ishii**

In Count III, the Plaintiff brings a § 1983 equal protection claim against Dr. Ishii, alleging that he violated her constitutional rights "by discriminating and denying her tenure based upon her" sex, race, or national origin. Section 1983 provides, in pertinent part:

> Every person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "The statute thus provides a remedy for violations of federal rights committed by persons acting under color of state law." *First Midwest Bank Guardian Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This clause guarantees "the right to be free

from invidious discrimination in statutory classifications and other governmental activity."
*Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996) (quoting *Harris v. McRae*, 448 U.S. 297,
322 (1980)).

"In a protected-class equal protection analysis, a plaintiff must show that 'defendant[]
acted with a nefarious discriminatory purpose and discriminated against [her] based on [her]
membership in a definable class.'" *Word v. City of Chicago*, 946 F.3d 391, 396 (7th Cir. 2020)
(quoting *Nabozny*, 92 F.3d at 453). On summary judgment, the standard for analyzing
discrimination claims under Title VII and § 1983 is the same, namely "whether the evidence
would permit a reasonable factfinder to conclude that . . . discrimination [based on sex, race, or
national origin] caused the adverse employment action—here, the [denial of tenure]." *Barnes*,
946 F.3d at 389 (citing *Ortiz*, 834 F.3d at 765).

The Seventh Circuit has recognized "that a cat's paw theory would support imposing
individual liability under § 1983 on subordinate government employees who act with unlawful
motives to cause the actual decision-makers to take action against another employee." *Taylor*,
999 F.3d at 488 (noting "that at least five other circuits had held or said as much" (citing *Smith v.
Bray*, 681 F.3d 888, 898–99 (7th Cir. 2012), *overruled on other grounds by Ortiz*, 834 F.3d at
764–66)). Thus, even though Dr. Ishii was not the final decisionmaker on the Plaintiff's tenure
application, he may still be liable under § 1983 if the Plaintiff can prove that Dr. Ishii's
"discriminatory motive was a factor in bringing about" the denial of her tenure application. *Id.*

Dr. Ishii seeks summary judgment on this claim, arguing that the evidence fails to show
his vote against advancing the Plaintiff's tenure application was in any way based upon her sex,
race, or national origin. Dr. Ishii makes many of the same arguments advanced by Purdue, and
the Court incorporates its analysis above on the instant motion. For the reasons set forth above
on Purdue's Title VII discrimination claim, the Court denies Dr. Ishii's motion. The Plaintiff has

offered sufficient evidence under a cat's paw theory of liability for her § 1983 claim to go to the

jury against Dr. Ishii because she has offered evidence of Dr. Ishii's discriminatory bias toward

women and non-Asians and of his role in the NEPC determination that brought about the denial

of the Plaintiff's tenure application. *See id.* at 488–89; *cf. Ammerman*, 2019 WL 5864762, at *9

(recognizing the individual § 1983 claim under the cat's paw theory of liability but finding that

the plaintiff had not established a retaliatory motive of the person allegedly influencing the

decisionmakers).

The analysis is not changed by the additional arguments raised by Dr. Ishii not already

addressed above. First, Dr. Ishii contends that the negative vote of the NEPC could have been

overcome by the EAPC, the Promotions Committee, or ultimately by the President and the Board

of Trustees. However, he does not explain how those layers of review could have occurred given

that her application did not advance. Also, Dr. Ishii, who did not acknowledge the cat's paw

theory of liability in either of his briefs, does not address the effect the tainted NEPC decision

had on the subsequent layers of review. Second, on the issue of the Plaintiff's independence from

Dr. Hassanein, Dr. Ishii gives a detailed explanation of why he believed that the Plaintiff did not

fully emerge from Dr. Hassanein, arguing that a reasonable factual basis exists for the conclusion

that she failed to demonstrate independence from Dr. Hassanein. However, in light of the

evidence of Dr. Ishii's bias and focus during the deliberations on the issues of the Plaintiff's

Ph.D. and job title at Argonne, whether Dr. Ishii influenced the NEPC vote based on

impermissible bias is a question for the jury. For all of these reasons, the Court denies Dr. Ishii's

Motion for Summary Judgment.

**C.      Section 1983 Equal Protection Claim Against Dr. Kim**

In Count III, the Plaintiff also brings a § 1983 equal protection claim against Dr. Kim,

alleging that he violated her constitutional rights "by discriminating and denying her tenure

based upon her" sex, race, or national origin. As set forth in the prior section, the Plaintiff must show that Dr. Kim "acted with a nefarious discriminatory purpose and discriminated against [her] based on [her] membership in a definable class." *See Word*, 946 F.3d at 396 (quoting *Nabozny*, 92 F.3d at 453). At the summary judgment stage, the question is "whether the evidence would permit a reasonable factfinder to conclude that . . . discrimination [based on sex, race, or national origin] caused the adverse employment action—here, the [denial of tenure]." *Barnes*, 946 F.3d at 389 (citing *Ortiz*, 834 F.3d at 765). This claim does not survive as the Plaintiff has failed to identify evidence that would support an inference of intentional discrimination in the tenure process by Dr. Kim based on the Plaintiff's sex, race, or national origin.

The Plaintiff premises the § 1983 claim against Dr. Kim on a theory of supervisory liability, which provides that a supervisor "could be held liable for the equal protection violation of a subordinate that occurred with [the supervisor's] knowledge and consent." *Sandra T.E. v. Grindle*, 599 F.3d 583, 587 (7th Cir. 2010) (citing *Nanda v. Moss*, 412 F.3d 836 (7th Cir. 2005)). The supervisor must be personally involved in the constitutional violation. *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (citing *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)). To be held liable, "the supervisor 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see.'" *Id.* (citing *Matthews*, 675 F.3d at 708). Thus, to succeed on the § 1983 claim against Dr. Kim individually, the Plaintiff must prove that Dr. Kim "intended to discriminate" against her on the basis of a protected class. *See Grindle*, 599 F.3d at 588 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009)).

Although the Plaintiff offers several arguments to try to show Dr. Kim knew about and facilitated, condoned, or turned a blind eye to Dr. Ishii's intentionally biased conduct and scheme, she has not designated any admissible evidence that would support such a theory and

offers nothing more than speculation. First, the Plaintiff points to Dr. Kim's statement to Dr. Wharry, made shortly after Dr. Kim was hired, that Dr. Wharry "shouldn't worry about [the Plaintiff] because she will never get tenure in this department." On its face, nothing in this statement is connected to the Plaintiff's sex, race, national origin, or any other protected class. In her brief, the Plaintiff speculates as to Dr. Kim's possible motivations for this comment but offers no evidence that the comment was motivated by discrimination on a prohibited basis.

The Plaintiff next notes that Dr. Kim hired Dr. Xu, an Asian male, as a tenure-track professor in the School of Nuclear Engineering in the Fall of 2018. But she offers no evidence to suggest how Dr. Xu's hiring constitutes discrimination against her. The fact that Dr. Wharry testified that she did not find Dr. Xu to be a compelling candidate is not evidence of discrimination by Dr. Kim.[7] And, the fact that Dr. Kim awarded Dr. Xu the Zmola Award in the first year of teaching as a tenure-track professor is not evidence of discrimination because the Plaintiff also received the Zmola Award in her first year of teaching as a tenure-track professor.

The Plaintiff also points to Dr. Kim's response when Dr. Wharry told him that Dr. Ishii had insisted she be the note-taker at a search committee meeting, despite her suggestion that the note-taking responsibilities be shared. Dr. Wharry testified Dr. Kim responded that, "as a *junior* professor [she] should serve [her] senior faculty."[8] Although Dr. Wharry was the only woman present, she was also the only nontenured faculty present. No inference of bias based on sex, race, or national origin can be drawn from Dr. Kim's statement. Nor is there an inference that Dr. Kim knowingly turned a blind eye to discrimination by Dr. Ishii.

---

[7] The Plaintiff represents that Dr. Wharry testified that the search committee did not recommend hiring Dr. Xu and that Dr. Kim unilaterally took that action anyway, ECF No. 67, p. 5; however, the cited evidence does not contain any such statement or inference.

[8] Plaintiff's presentation of this fact omits that Dr. Kim qualified the statement with the phrase "junior." *See* ECF No. 67, p. 5.

Next, the Plaintiff cites Dr. Garner's testimony that Dr. Ishii suggested to Dr. Garner, who was on Dr. Kim's hiring committee, that if Dr. Kim was hired, Dr. Garner's "tenure case would be in very good shape." Although this testimony goes to Dr. Ishii's willingness to influence hiring decisions, there is no evidence that Dr. Kim was aware of this statement. Similarly, the Plaintiff contends that Dr. Kim "turned a blind eye" to the numerous discriminatory comments Dr. Ishii made to other faculty members about women and Americans. Yet again, the Plaintiff has designated no evidence that Dr. Kim was aware of any of those comments.

Finally, the Plaintiff contends that Dr. Kim's unwillingness to overturn the NEPC vote and endorse her tenure application for EAPC review is evidence of Dr. Kim turning a blind eye to Dr. Ishii's bias and discrimination. The Plaintiff reasons that Dr. Kim knew that the validity of her Ph.D. and title at Argonne were not legitimate criteria for the tenure decision based on Vice Provost Hollenbeck's email and Dr. Taleyarkhan's explanation. The Plaintiff notes that in her April 22, 2019 annual review, Dr. Kim rated the Plaintiff as "excellent" in learning, "very good" in leadership, and "satisfactory" in engagement and argues that an objective review of her dossier "would have mandated that Dr. Kim endorse her for review at the EAPC." These are all issues of academic judgment that make up the "nuanced nature of tenure decisions." *Haynes*, 902 F.3d at 734. But there is nothing inherently discriminatory in Dr. Kim not overturning the NEPC vote, especially in light of the deference given to the NEPC by the Head when considering whether to advance a dossier notwithstanding a negative vote. Thus, the fact that Dr. Kim may have been influenced by Dr. Ishii in the same way the voting members of the NEPC may have been influenced is not evidence that Dr. Kim knew of Dr. Ishii's discriminatory scheme or that he did not honestly believe in his agreement with the NEPC vote at the time. The Plaintiff has not designated evidence from which an inference of discrimination could be drawn from Dr.

47

Kim's decision not to overturn the NEPC vote. *See, e.g.*, *Haynes*, 902 F.3d at 734 (refusing to find bias where a department chair "recommended critical and unqualified external reviewers," wrote a report suggesting only "tepid" support for the candidate, and "expressed animosity towards [the candidate] both in person and in correspondence with other faculty members").

Accordingly, the Court grants Dr. Kim's Motion for Summary Judgment and does not reach Dr. Kim's alternate arguments.

## CONCLUSION

For the reasons set forth above, the Court hereby DENIES Defendant Dr. Mamoru Ishii's Motion for Summary Judgment [ECF No. 58]; GRANTS in part and DENIES in part Defendant the Trustees of Purdue University's Motion for Summary Judgment [ECF No. 61], granting summary judgment in favor of the Purdue University Defendants on the Title VII retaliation claim in Count II and denying summary judgment on the Title VII discrimination claim in Count I; GRANTS Defendant Seungjin Kim's Motion for Summary Judgment [ECF No. 62], granting summary judgment in favor of Defendant Seungjin Kim on the § 1983 claim against in him Count III; and DENIES as moot Dr. Seungjin Kim's Renewed Motion for Judgment on the Pleadings [ECF No. 38].

Accordingly, the claims that remain for trial are (1) the Title VII discrimination claim against the Purdue University Defendants in Count I and (2) the § 1983 equal protection claim against Defendant Dr. Mamoru Ishii in Count III. This matter will be set for a scheduling conference by separate order.

SO ORDERED on February 15, 2023.

 s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT