```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF INDIANA
 2                         LAFAYETTE DIVISION

 3    TATYANA SIZYUK,                 )
                                      )
 4         Plaintiff,                 )
                                      )
 5       vs.                          ) Case No.
                                      ) 4:20-cv-00075-TLS
 6    PURDUE UNIVERSITY, BOARD OF     )
      TRUSTEES OF PURDUE             )
 7    UNIVERSITY, and MAMORU ISHII    )
      in his personal capacity        )
 8                                    )
           Defendants.                )
 9    _____ )

10

11                EXCERPT FROM DAY ONE OF JURY TRIAL
                 TESTIMONY OF JANELLE WHARRY, Ph.D.
12                        JANUARY 22, 2024
             BEFORE THE HONORABLE THERESA L. SPRINGMANN
13                  UNITED STATES DISTRICT COURT

14    APPEARANCES:

15

16    FOR THE PLAINTIFF:        RYAN P. SINK and RYAN C. FOX
                                Fox & Sink LLC
17                              6177 North College Avenue
                                Indianapolis, Indiana 46220
18                              317-254-8500
                                Fax: 317-226-9311
19                              Email: rsink@foxsinklaw.com

20

21    FOR DEFENDANT PURDUE:     WILLIAM P. KEALEY,
                                MATTHEW M. HUMBLE, and
22                              KIRSTIE E. KLUTZKE
                                Stuart & Branigin LLP
23                              300 Main Street, Suite 900
                                P.O. Box 1010
24                              Lafayette, Indiana 47902-1010
                                765-423-1561
25                              Email: wpk@stuartlaw.com
```

```
 1    APPEARANCES (Continued)

 2

 3    FOR DEFENDANT ISHII:      JOSEPH NEAL BOWLING and
                                JANELLE P. KILIES
 4                              Lewis Wagner LLP
                                1411 Roosevelt Ave Ste 102
 5                              Indianapolis, IN 46201
                                317-237-0500
 6                              Email: nbowling@lewiswagner.com

 7

 8    ALSO PRESENT:            Plaintiff, Tatyana Sizyuk;
                                Defendant Mamoru Ishii
 9
      OFFICIAL REPORTER:        Angela Phipps, RMR, CRR, FCRR
10                              5400 Federal Plaza
                                Hammond, Indiana 46320
11

12

13

14

15

16

17

18

19

20

21

22

23    Proceedings reported by stenotype.  Transcript produced by

24    computer-aided transcription.

25
```

```
 1          (WHEREUPON, proceedings were had and reported, but not
 2       made a part of this record.)
 3          THE COURT:  Is the Plaintiff ready to go forward in
 4   their case in chief?
 5          MR. SINK:  Yes.  The Plaintiff calls Janelle Wharry.
 6          THE COURT:  Ma'am, stop right where you're at,
 7   please, and please face my deputy.  He will give you the oath
 8   to testify.
 9          (The oath was duly administered.)
10          THE WITNESS:  Yes, I do.
11          THE COURT:  You may take the stand.
12          JANELLE WHARRY, Ph.D., PLAINTIFF'S WITNESS, SWORN
13                      DIRECT EXAMINATION
14   BY MR. SINK:
15   Q.   Okay.  Good afternoon.
16   A.   Hi.
17   Q.   Could you state your name for the record.
18   A.   Yes.  It's Janelle Wharry.
19   Q.   Dr. Wharry, can you provide a little bit of educational
20   background about yourself to the jury.
21   A.   Sure.  I grew up in Hawaii.  Went to high school there.
22   Went to the University of Michigan for my undergraduate.
23   Studied nuclear engineering there and decided to stay for a
24   master's degree.  It was, like, an extra one year that we could
25   do.  So I finished my master's degree.
```

1       After that, I went to work in the nuclear power industry

2   at Duke Energy.  Spent several years there in industry and then

3   decided to go back for my Ph.D. to graduate school, return to

4   University of Michigan for my Ph.D. in Nuclear Engineering, and

5   finished in 2012.

6       After that, I took a faculty position as an assistant

7   professor at Boise State University in Idaho and spent maybe

8   three-and-a-half years there before moving to Purdue as an

9   assistant professor in Nuclear Engineering in 2016.

10  Q.   Thank you for that very thorough explanation.

11      So in front of you, there are quite a few exhibit books,

12  but I want to point out the Plaintiff's exhibit book.  If you

13  could pull that up --

14  A.   Yeah.

15  Q.   -- and go to Exhibit P-11, which will be Tab 11 in the

16  book.  And I can help you if you need help.

17  A.   You said P as in "Peter," 11?

18  Q.   Yeah.  Go to Tab 11.

19  A.   Yeah.  Okay.  Okay.

20  Q.   Have you seen this document before?

21  A.   Yes.  This is my CV.

22  Q.   Does this appear to be a true and accurate copy of the one

23  you've seen before?

24  A.   Yes, it does appear to be true and accurate.

25          MR. SINK:  Your Honor, I move to admit P-11.

```
1              THE COURT:  Any objection, University?
2              MR. KEALEY:  No, Your Honor.
3              MS. KILIES:  No, Your Honor.
4              THE COURT:  It's admitted.
5    BY MR. SINK:
6    Q.   So you already testified to it, but I wanted to ask you a
7    little more about it, your Ph.D.
8    A.   Yes.
9    Q.   Which university is that from?
10   A.   University of Michigan-Ann Arbor.
11   Q.   And have you ever heard the term, a "peer institution"?
12   A.   Yes.
13   Q.   What does that mean?
14   A.   It's a term that's used very frequently in higher
15   education, where one university will compare itself to what's
16   called a "peer institution."
17        So I suppose, you know, a couple of examples of things
18   that would be, sort of, non-peer institutions.  Right?  On the
19   way driving up here, I saw a sign for Olivet Nazarene
20   University, which is a very small, liberal arts, religious
21   school.  Right?  That would not be considered a peer to
22   something like Purdue, which is a large, you know, 50,000
23   students.  We have majors that kind of span the gamut from
24   business to liberal arts to engineering.  Right?
25   Q.   And would the University of Michigan be considered a peer
```

1    institution of Purdue?

2    A.   **To Purdue, yes, I would say so.**

3    Q.   Does the University of Michigan have a school of nuclear

4    engineering?

5    A.   **Yes.**

6    Q.   Do you know the -- I'm sure it varies year to year.  But

7    do you know the approximate ranking of University of Michigan's

8    school of engineering?

9    A.   **Yes.  Yes.  University of Michigan's nuclear engineering**

10   **program, I would say, for the last maybe 15 or so years, has**

11   **been the number one ranked nuclear engineering program in the**

12   **country.**

13   Q.   Are you currently employed?

14   A.   **Yes.**

15   Q.   Who's your current employer?

16   A.   **At Purdue University.**

17   Q.   What's your current position?

18   A.   **I'm an associate professor in the School of Materials**

19   **Engineering at Purdue.**

20   Q.   Is materials engineering different than nuclear

21   engineering?

22   A.   **Yes, it is.**

23   Q.   Have you ever been employed in the School of Nuclear

24   Engineering at Purdue?

25   A.   **Yes.  When I first joined Purdue in 2016, I joined the**

WHARRY - DIRECT

1   School of Nuclear Engineering, and I was there until the end of

2   2019, after which I moved to materials school.

3   Q.   In what capacity were you employed in the School of

4   Nuclear Engineering?

5   A.   I was an assistant professor on the tenure track.

6   Q.   Can you explain to the jury what that means to be a tenure

7   track professor.

8   A.   Yeah.  So tenure, of course, means, essentially, a job for

9   life.  Right?  Most universities have very similar processes

10  for obtaining tenure.

11       Typically, a professor will join as an assistant professor

12  without tenure, but on the tenure track.  You typically have

13  anywhere between five and seven years.  Every university, like

14  I said, has slight variations in their specific expectations in

15  number of years.

16       But, at Purdue, I believe after six years, you were

17  required to go -- You can go earlier; but after six years,

18  that's the maximum you're allowed.

19       At that point, when you go up for tenure, you put together

20  a complete dossier of everything you've done, courses that you

21  have taught and developed, research that you have conducted and

22  published, presented at conferences, students that you have

23  advised, awards you've received for that, that sort of thing.

24       And you also are required to get external letters from

25  other professors.  Typically, these are people who are more

1    senior individuals, you know, somebody at, sort of, the full

2    professor or distinguished professor type of level; like I

3    said, senior in their careers, and always from one of these

4    peer institutions.

5         So I don't know if I've answered the question at this

6    point.

7    Q.   Yeah, you've answered it.

8    A.   **Okay.**

9    Q.   I appreciate that.

10   A.   **Yeah.**

11   Q.   While you were at the School of Nuclear Engineering, did

12   you ever work with a Dr. Ishii?

13   A.   **Yes, I did.**

14   Q.   And do you recognize Dr. Ishii in the courtroom today?

15   A.   **Yes.**

16   Q.   Did you ever serve on any committees with Dr. Ishii?

17   A.   **Yes, I did.**

18   Q.   Tell the jury about that.

19   A.   **I was on a search committee.  So this was a committee to**

20   **find and hire another assistant professor -- or a new faculty**

21   **member.  And Dr. Ishii was the chair of that search committee.**

22   **I was a member of the committee, as were maybe four or five**

23   **other faculty members, and as it -- Yes.  That -- that -- Yeah.**

24   Q.   Okay.  And you indicated it's called a "search committee"?

25   A.   **Yes.**

1   Q.   What is the purpose of a search committee?

2   A.   **It was to find a new assistant professor that we wanted to**

3   **hire.  So the committee was tasked with coming up with the job**

4   **ad, the job description that got posted online, figure out**

5   **where we were going to post it online, screen the initial**

6   **applicants, conduct phone interviews, you know, plan out the**

7   **on-campus interviews, that sort of thing.**

8   Q.   And would a search committee be involved in hiring a

9   tenure track professor?

10  A.   **Yes.**

11  Q.   What kind of information would be reviewed by that search

12  committee about the candidate?

13  A.   **(No immediate answer.)**

14  Q.   I could provide an example if you want.

15  A.   **Yeah, the -- Go ahead.**

16  Q.   For example, we looked at your CV --

17  A.   **Yes.**

18  Q.   -- which is, essentially, more detailed than a resume.

19  Would that be reviewed by the search committee?

20  A.   **Yeah.  Yeah.  So the search committee will always review**

21  **the complete CV or, you know, extended resume of the**

22  **applicants.**

23     **At Purdue, all of the applicants are also required to**

24  **write several different documents; one of them being a cover**

25  **letter, second one being a research plan.  So this is typically**

1    **a three- to five-page description of their previous research**

2    **experiences and what they plan to do in research when they come**

3    **to Purdue.**

4            **THE COURT:**  If I could interject, because I don't see

5    a date or year that we're talking about with regard to this

6    search committee.  When did it occur?

7            **MR. SINK:**  Sure.

8    Q.   When did you serve on the search committee with Dr. Ishii?

9    A.   **Either 2017, maybe into 2018.  Potentially 2018 to '19**

10   **academic year.  I believe it was '17 to '18 academic year.**

11   Q.   To follow up on the CV or resume of an applicant, would

12   that typically show the prior job titles and work history of

13   the applicant?

14   A.   **Yes, absolutely.**

15   Q.   What about where the applicant received his or her prior

16   educational degrees?

17   A.   **Yes, absolutely.**

18       **And I would add to that that, if those pieces of**

19   **information were not included on a person's CV, it would**

20   **generally raise red flags, and the search committee would sort**

21   **of question this applicant and essentially toss them out or**

22   **discard the applicant just because they didn't provide complete**

23   **information.**

24   Q.   What were the educational degree requirements to be a

25   tenure track professor in the School of Nuclear Engineering?

1  A.   Yeah.  A Ph.D. or equivalent degree.  And I say

2  "equivalent" because some universities -- For example, MIT,

3  Massachusetts Institute of Technology, they don't award Ph.D.,

4  which is Doctor of Philosophy, but they award what's called SD

5  or something like that.  It's a different -- some sort of Latin

6  acronym, but it's essentially a Ph.D.

7  Q.   The search committee, while you served on it, could the

8  search committee hire on their own, or do they make a

9  recommendation?

10 A.   The search committee always makes a recommendation to the

11 department head, and the department head is the only person who

12 has the authority to extend an offer to someone.

13 Q.   Thank you.

14     Dr. Wharry, do you know if Dr. Ishii was ever removed or

15 disqualified from serving on this search committee that you sat

16 on with him?

17 A.   Yes.  He was initially supposed to be the chair of the

18 search committee.  The chair is, of course, the person who

19 convenes meetings of the committee and sort of gives us a plan

20 to move forward.  Right?

21     But one of the requirements at Purdue was that everyone on

22 a search committee needed to complete some sort of in-person

23 unconscious bias training.  And he did not complete that

24 training to its full extent and was, therefore, disqualified

25 from serving on the search committee.

1  Q.   How do you know he did not complete that training?

2  A.   **First of all, we were all informed as search committee**

3  **members that that was the reason that he was being removed from**

4  **the committee and there was going to be a new committee chair.**

5      **But I was also at the training session.  I had to attend**

6  **it too.  And so I was at the one that he was also at, and he**

7  **left soon after it began.  So he did not receive credit for**

8  **attending the complete training.**

9  Q.   And I believe you indicated earlier you were at the School

10  of Nuclear Engineering until 2019?

11  A.   **Correct, December of 2019.**

12  Q.   So after that incident, where you witnessed him leave,

13  until your employment ended, did Dr. Ishii ever return to that

14  search committee?

15  A.   **No.  He -- He may have been on other search committees**

16  **subsequently that I was not on, but certainly the one that -- I**

17  **think I was on two total search committees while I was in the**

18  **School of Nuclear Engineering, and he was -- ended up**

19  **ultimately not being on either of them.**

20  Q.   Do you know a Dr. Revankar?

21  A.   **Yes.**

22  Q.   Who is he?

23  A.   **He is another professor in the department, or in the**

24  **School of Nuclear Engineering.**

25  Q.   Is he a tenured professor?

1   A.   **Yes, he is.**

2   Q.   Did you ever hear Dr. Revankar make any statement to you

3   about what he had heard Dr. Ishii state pertaining to him

4   leaving this unconscious bias training?

5           **MR. BOWLING:**  Objection; hearsay.

6           **THE COURT:**  Sustained.  Let's take it up at sidebar.

7       (Bench conference had as follows:)

8           **MR. SINK:**  The rules of evidence allow you to examine

9   each layer of the statement.  Each layer qualifies as an

10  802(d)(2) admission.  So Dr. Revankar was an NEPC voting

11  member.  Under Rule 801(d)(2), what he said to her qualifies as

12  an exception.  And then obviously Defendant Ishii is a party

13  opponent.  So each layer meets the exception to the hearsay

14  doctrine.

15          **MR. BOWLING:**  In that particular context, it's clear

16  that Dr. Revankar was not speaking for the NEPC.  He was not

17  speaking as a representative of any party.  Even if you accept

18  the truth of the statement that this witness would be about to

19  make, it was a statement entirely as an individual by

20  Dr. Revankar, not as a representative of Purdue.  Therefore,

21  it's still totally hearsay.

22          **MR. SINK:**  I would dispute that.  It's general agency

23  principles.  I mean, I do a lot of employment law.  He's in the

24  employment context.  He makes a statement.  He's a constituent

25  of Purdue University.  Whether or not he, you know, wants to --

WHARRY - DIRECT

1    He doesn't need to say, "I represent Purdue," when he's making

2    that statement.  That still qualifies -- Under general agency

3    principles, he still qualifies as an admission by a party

4    opponent.

5            **MR. BOWLING:**  He still has to be somehow within the

6    course of what he's doing, the course of his responsibility.

7    It can't just be his own personal opinion and then somehow

8    become a statement by a party opponent.

9            **MR. SINK:**  But he's at work during the training

10   session, so --

11           **MR. BOWLING:**  Just offering.  Has nothing to do with

12   his job.

13           **THE COURT:**  Anything else?

14           **MR. SINK:**  No.

15           **THE COURT:**  All right.  The objection is overruled at

16   this time, as I understand.  Overruled.  She can answer.

17       (End of private conference.)

18           **THE COURT:**  Do you want it read back?

19       Would you please read back that last question.

20       (Last question read.)

21   A.   **Yes.  He said something to the effect that Dr. Ishii did**

22   **not find the unconscious bias training worthwhile.  It's been a**

23   **while, so I don't fully recall all the specifics.**

24   **BY MR. SINK:**

25   Q.   Do you recall testifying earlier in this case under oath?

1    A.    **Yes.  I did a deposition.  Yes.**

2    Q.    Would reviewing that testimony help refresh your memory as

3    to what you had heard Dr. Revankar state?

4    A.    **Sure.**

5          MR. BOWLING:  Objection, Your Honor.  She's not

6    testified to any lack of memory.

7          THE COURT:  Sustained.

8          MR. SINK:  I believe her answer, Your Honor, she did

9    just say, "I don't remember."

10         THE COURT:  Would you read that back, please.

11         (Answer read.)

12         MR. SINK:  It was the answer before.

13         THE COURT:  Restate your question to her.

14   BY MR. SINK:

15   Q.    Do you remember exactly what Dr. Revankar said?

16   A.    **I don't remember exactly.  I remember he said something to**

17   **that effect, but it's -- This has been five or so years.**

18   Q.    Would reviewing your deposition taken on June 4th, 2021,

19   help refresh your memory?

20   A.    **Yes, I'm sure.**

21         MR. SINK:  Your Honor, I would ask to approach the

22   witness to refresh.

23         THE COURT:  You may do so.  Just advise what page and

24   line you're directing her to.

25         (Tendered to the witness.)

        WHARRY - DIRECT

1              **MR. SINK:**  Can I put this on the screen, but only for

2    the witness.

3              **THE COURT:**  Don't you have a page number to get her

4    there?

5              **MR. SINK:**  Yes.

6    Q.    So look at page 37, and go to line 21.  If you could read

7    that answer.  Don't read out loud.  And let me know if that

8    refreshes your memory.

9    A.    **Okay.**

10   Q.    Does that refresh your memory?

11   A.    **Yeah.**

12   Q.    And what do you recall Dr. Revankar saying?

13             **MR. BOWLING:**  Same objection, Your Honor; hearsay.

14             **THE COURT:**  Overruled.

15   A.    **So Dr. Revankar relayed that Dr. Ishii did not -- or left**

16   **this unconscious bias training because he did not like the idea**

17   **of having to listen to antiracist information.**

18   BY MR. SINK:

19   Q.    Thank you.

20         You mentioned earlier a rule that the university had to be

21   on a search committee to complete this training; do you recall

22   that testimony?

23   A.    **Yes.**

24   Q.    Are you familiar with the NEPC?

25   A.    **Yes.**

WHARRY - DIRECT

1  Q.   Was there any rule by the NEPC that those members complete

2  this unconscious bias training?

3  A.   **I was never a member of the NEPC.  I do not know if there**

4  **was a rule for that committee membership to have taken the**

5  **training.**

6  **     All I know is that, definitely on any search committee at**

7  **Purdue -- And this goes for, not just hiring faculty, but for**

8  **other positions, if we're hiring administrative assistants or**

9  **anyone who's hired at Purdue:  If there's a search committee**

10 **formed, you need to take this training.**

11 Q.   While you were at the School of Nuclear Engineering, was

12 Dr. Ishii on the NEPC?

13 A.   **Yes, he was.**

14 Q.   Do you know if he was ever disqualified from the NEPC?

15 A.   **I don't know.**

16 Q.   Have you ever heard Dr. Ishii make any statements that

17 would reflect his bias against women and/or non-Asians?

18 A.   **Yes.**

19 Q.   What have you heard?

20 A.   **Directly, I will testify only to things that I have heard**

21 **directly him saying.**

22 **     The day that I personally was going up for tenure and**

23 **promotion in Nuclear Engineering, I overheard Dr. Ishii talking**

24 **to Dr. Revankar, telling him to vote against me and the other**

25 **person who was also up for tenure at that same time.  His name**

1  was Allen Garner.

2      Ishii told Revankar to vote against both me and

3  Revankar -- I'm sorry -- vote against me and Garner because we

4  were both stupid, lazy Americans and our students were all also

5  stupid, lazy, white Americans.

6      And he was saying this to Revankar before the NEPC was to

7  convene and meet and vote, decide basically, take by vote, on

8  me and Allen Garner's tenure and promotion.

9  Q.   Can you explain where you were physically to the point how

10 you could hear this.

11 A.   **Yeah.  Sure.  So at that time, my office and Revankar's'**

12 **office were right next door to each other.  Our offices were in**

13 **sort of a small suite off of the main hallway.**

14     **So I was essentially on my way out of my office, probably**

15 **to the bathroom or wherever I was going.  And being in that**

16 **suite, it's just kind of a small area, so sounds reverberate.**

17 Q.   What did Dr. Revankar say, if anything, in response to

18 Dr. Ishii making those statements?

19          **MR. BOWLING:**  Objection; calls for hearsay.

20          **THE COURT:**  Sustained.

21          **MR. SINK:**  Can I approach?

22          **THE COURT:**  Sure.

23     (Bench conference had as follows:)

24          **MR. SINK:**  Again, Dr. Revankar is an NEPC voting

25 member.  What he says is an admission by a party opponent in a

1  Rule 801(d)(2), so it's not hearsay.  It's an exception to

2  hearsay.

3          **THE COURT:**  Response.

4          **MR. BOWLING:**  Yes.  From the context, it's not at all

5  clear-- it hasn't been established --that Dr. Revankar would

6  have been speaking with them about the scope of his agency as a

7  member of the NEPC.  Therefore, it's just a statement by

8  Dr. Revankar, not a statement by a party.

9          **MR. SINK:**  They're discussing how to vote on her

10  application for tenure.  It's absolutely within the employment

11  context.

12          **THE COURT:**  Anything else?

13          **MR. BOWLING:**  No, Your Honor.

14          **THE COURT:**  Okay.  All right.  I am going to go back

15  and see if the objection is overruled.  I will allow her to

16  respond.

17          **THE COURT:**  Go ahead, Counsel.  You may ask the

18  question.  Listen to it again, and you can respond.

19          **MR. SINK:**  Sure.

20  Q.   I believe the question was:  What, if anything, did you

21  hear Dr. Revankar state in response to Dr. Ishii's statements?

22  A.   **I don't recall him stating much.  I just remember just**

23  **feeling -- First of all, knowing that my career and future was**

24  **being talked about this way, it was just a shock.  Right?  You**

25  **know.  Plus, I also didn't want them to know that I was**

1  listening, either.  So I was just trying to just leave as

2  quickly and as quietly as I could without, kind of, alerting

3  them.  So I don't recall Revankar really saying anything in

4  response.

5  Q.  Do you recall if Dr. Ishii made any other statements

6  during that interaction?

7  A.  The only other thing was Dr. Ishii telling Revankar

8  something to the effect that, "We have supported you," or, "We

9  have helped you"; you know, "we" meaning, I guess, Ishii and --

10         MR. BOWLING:  Objection, Your Honor, to what is guess

11  or speculation.

12  BY MR. SINK:

13  Q.  Can I help you out here.  Please do not --

14         THE COURT:  Sustained.  Rephrase.  Go ahead.

15  BY MR. SINK:

16  Q.  Just testify as to what you heard.

17  A.  Okay.

18  Q.  Okay?

19  A.  Yeah.  So yes.  "We have helped you" -- "We have supported

20  you in the past," something to that effect.

21         THE COURT:  So I get this clear, who are you talking

22  to?  Who is making that statement?

23  A.  Ishii telling Revankar, after telling him that he should

24  vote against me and Allen Garner because we're white and lazy

25  and stupid and our students are as well, the justification for

WHARRY - DIRECT

1   him saying that was, he also made the comment, "We've supported

2   you.  We've helped you in the past."

3   BY MR. SINK:

4   Q.   Okay.  Do you recall anybody else making any statement

5   during that specific interaction?

6   A.   **No.**

7   Q.   Okay.  Have you heard Dr. Ishii make any other statements

8   that would reflect his bias against women and/or non-Asians?

9   A.   **Yes.**

10  Q.   What have you heard?

11  A.   **While we were on the search committee, before Dr. Ishii**

12  **was disqualified from the search committee, there was a search**

13  **committee meeting; and as it turned out, all of the other**

14  **search committee members besides me were Asian males.**

15      **And Dr. Ishii, just before the committee was started -- or**

16  **the meeting was to start, Dr. Ishii was sort of making some**

17  **joking-type remarks that, "Oh, how wonderful is this.  The**

18  **whole search committee is all Asian males," even though I**

19  **was -- I was also there.**

20  Q.   And did anything else happen during that meeting that is

21  notable?

22  A.   **Yeah.  So as the meeting began or after the meeting began,**

23  **someone -- or the topic came up that someone on the committee**

24  **needed to be responsible for taking notes throughout the**

25  **meetings.  And Ishii immediately volunteered me to be the**

1    person taking notes.

2         And I think, during the meeting, I think I agreed to it,

3    just not really wanting to make a scene.  But then afterwards,

4    it just didn't really sit well with me; and I sent an email, I

5    believe, to the search committee, suggesting could we share and

6    rotate the note-taking responsibilities, which is a typical

7    thing when you're working on review panels and review boards

8    and things like that.

9         We typically rotate so that everyone can fully participate

10   in as much of the conversation and discussion as possible

11   because people who are taking notes tend to just take notes and

12   not be as engaged in the conversation.

13        And after that email, I was told that I should not have

14   done that.

15   Q.   Who told you that?

16   A.   Seungjin Kim.

17   Q.   And who is he?

18   A.   He is the head of the department of Nuclear Engineering

19   and one of Dr. Ishii's former Ph.D. students.

20   Q.   So I want to back up just a second, back up to that

21   meeting with Dr. Ishii where, I believe, you testified he

22   suggested you be the notetaker.

23        Were you the only female in the room?

24   A.   Yes.

25   Q.   And how did that make you feel, being the only female in

    WHARRY - DIRECT

1    the room, being suggested to take notes?

2              **MR. BOWLING:**  Objection, Your Honor.  That's not

3    relevant to any issue before the Court.

4              **MR. SINK:**  Can I approach?

5              **THE COURT:**  Yes.

6         (Bench conference had as follows:)

7              **MR. SINK:**  Okay.  So in my view, that's absolutely

8    permissible under Rule 701 as opinion testimony of a lay

9    witness; and on top of that, she's a potential "me, too"

10   comparator.  So I will be asking her her opinions, and that's

11   permissible, and it's opinion lay testimony.

12             **MR. BOWLING:**  Your Honor, even if it is opinion

13   testimony, it's not an opinion about anything that's relevant

14   to the case.  Just how she felt is not an opinion about some

15   dispositive fact.

16             **MR. KEALEY:**  I would add, Your Honor, even a

17   comparator doesn't change the analysis, because the comparator

18   is not about her emotional harm claim or impact on her.  A

19   comparator is just a comparator for circumstantial purposes.

20             **MR. SINK:**  Here's why it's relevant.  She was so

21   upset about it, she complained to Dr. Ishii, which we're about

22   to get into and which you heard, and I'm going to ask her what

23   Dr. Ishii's responses were to that complaint.  So it is

24   relevant, and it goes to show why she escalated a complaint.

25             **MR. BOWLING:**  She can certainly talk about what she

```
1   said to Dr. Ishii and what his response was.  But, again, her
2   emotional state is not relevant.
3       Furthermore, it may have a tendency to inflame the jury.
4   It could be potentially something that could inappropriately
5   invoke sympathy rather than focus on the facts that are
6   relevant to the case.
7           THE COURT:  This case.
8           MR. BOWLING:  This case.
9           MR. KEALEY:  She's not a claimant, so it doesn't
10  matter how she feels about anything.
11          MR. SINK:  Well, I mean, the bias argument has to be
12  substantial -- You know, if you're going to argue that, that
13  has to substantially outweigh anything.  Just asking the
14  witness how she feels about something, that doesn't indicate
15  it's going to be so biased that it's going to substantially
16  outweigh the relevance.  I just want to ask her if she was
17  upset about it and what that led to, which was the complaint to
18  Dr. Kim.
19          MR. BOWLING:  Why don't we just go straight to the
20  complaint and start with that.
21          THE COURT:  Do that.  So it's sustained.
22      (Private conference concluded.)
23  BY MR. SINK:
24  Q.  We're going to move on.
25      So did you ever complain to Dr. Kim about this interaction
```

1    with Dr. Ishii?

2    A.    **I did, yes.  I told him that -- this was relatively soon**

3    **after he started the position as department head or school head**

4    **of Nuclear Engineering.  And I told him that it was**

5    **inappropriate to, sort of, push off the note-taking**

6    **responsibilities to the only female, especially -- and the only**

7    **untenured person on the committee.  That's a very classic,**

8    **almost textbook example --**

9            MR. BOWLING:  Objection, Your Honor.

10           THE COURT:  Sustained.

11   BY MR. SINK:

12   Q.    Were you just now testifying as to what you told Dr. Kim?

13   A.    **Yes.**

14   Q.    Okay.

15   A.    **Yes.**

16           MR. SINK:  Your Honor, to the extent she can testify

17   as to what she complained to Dr. Kim about.

18           MR. BOWLING:  Your Honor, it's still containing her

19   speculation characterization.

20           THE COURT:  Correct.  Rephrase so that it doesn't

21   draw that type of response to which Defense has just presented.

22   BY MR. SINK:

23   Q.    So my specific question, Dr. Wharry, is:  Tell the jury

24   what you explicitly told Dr. Kim.

25   A.    **I mean, this has been five years, so I don't know exactly**

1    word for word what I told Dr. Kim.  But what I told him was

2    something to the effect of, it was inappropriate for Dr. Ishii

3    to push the note-taking responsibilities on to me, as the only

4    female in -- on the committee because this is textbook --

5           MR. BOWLING:  Your Honor, again, same objection.

6           MR. SINK:  Your Honor, she's testifying as to what

7    she said to Dr. Kim.

8           THE COURT:  And that was her response.  But now she's

9    speculating, so I'm going to -- Next question.

10   BY MR. SINK:

11   Q.   Okay.  How did Dr. Kim respond to your complaint?

12   A.   He told me that I should just accept it, be quiet, and

13   respect my elders.

14   Q.   Did he say anything about whether he would talk to

15   Dr. Ishii?

16   A.   No.  He -- I asked him if he would talk to Dr. Ishii about

17   this, but he said that he would not.

18   Q.   Did he say why?

19   A.   He did give me some reason why.  I think it was something

20   to the effect of, I should respect my elders and maybe -- there

21   may be in the future some time and place where it would be

22   appropriate for him to bring it up with Dr. Ishii.

23          THE COURT:  At this time, it's 3:00, and we're going

24   to take a break for the jurors.  We'll be in recess for

25   15 minutes, and then we'll be back on the record, and we'll go

```
1    forward until 4:00.  All right?
2         With that, again, the clerk will make sure that, if you
3    need to use the facilities on one of the other floors, then
4    that's what we have time to to do.  So 15 minutes.  Let's try
5    and get back by 3:15-ish.  All right?
6         (Jury out at 3:03 p.m.)
7              THE COURT:  Fifteen minutes, Counsel.
8         (Recess taken 3:03 p.m. to 3:18 p.m.)
9              COURTROOM DEPUTY:  All rise.
10             THE COURT:  Go ahead and be seated, please.
11        Any matters that developed over that brief break?
12   Plaintiff?
13             MR. SINK:  None for the Plaintiff.
14             THE COURT:  For Defendants?  Either?  Any?
15             MR. KEALEY:  No, Your Honor.
16             MS. KILIES:  No, Your Honor.
17             THE COURT:  All right.  Please bring the jury
18   back in.
19        The good news, the water situation has been fixed so far
20   for the rest of the 45 minutes we're in the courthouse.
21        And just a reminder, we're only going until 4:00 tonight
22   or where there's ever an appropriate break.
23        (Jury in at 3:19 p.m.)
24             THE COURT:  Go ahead and be seated, ladies and
25   gentlemen.  When you come in, you can always sit down.
```

1          All right.  We're continuing on to the direct examination

2     of this witness.

3          You may proceed, Counsel.

4              **MR. SINK:**  Yes, Your Honor.

5     Q.   Dr. Wharry, have you ever heard any other statements made

6     by Dr. Ishii that would reflect his bias against women and/or

7     non-Asians?

8              **MR. KEALEY:**  Objection, Your Honor; leading.

9              **THE COURT:**  Overruled.

10    **BY MR. SINK:**

11    Q.   Go ahead.

12    A.   **The one --**

13             **THE COURT:**  Use the mic.  You're hard to hear.

14             **THE WITNESS:**  Is this a little better?

15             **THE COURT:**  Yes.

16             **THE WITNESS:**  Okay.  Great.

17    A.   **The last statement that I directly heard Dr. Ishii making**

18    **was with regard to my Ph.D. adviser, who, unbeknownst before to**

19    **me, apparently was a candidate for the Purdue engineering dean**

20    **position some number of years back.**

21         **And when I first met Dr. Ishii, he mentioned this to me,**

22    **which I said I didn't realize before.  But he said -- After**

23    **telling me that, he told me that he would have liked for Purdue**

24    **to have hired my adviser as their dean because he would have**

25    **supported the nuclear engineering program; but at the time,**

1    **Purdue was only interested in hiring women.  So instead of**

2    **hiring my adviser, who was a male, they hired a female to be**

3    **the dean.**

4    Q.   Thank you.

5         Earlier, you testified about overhearing a conversation on

6    the day of your vote.  Do you recall that?

7    A.   **Yes.**

8    Q.   What day was the vote on your tenure application?

9    A.   **I have no idea.  Sometime in September or October of 2018.**

10   Q.   And what was the outcome of that vote?

11   A.   **The NEPC voted against me.  I don't know what the numbers**

12   **were or how that shook out.  And if a tenure case fails at the**

13   **department or NEPC level, the department head is not obligated**

14   **to take your case to the next -- or the College of Engineering**

15   **level Tenure and Promotions Committee.  So the outcome was that**

16   **I failed at the department level, and the department head was**

17   **not willing to take my case any further.**

18   Q.   Was there any reason given for the denial of your tenure?

19   A.   **No.**

20             **THE COURT:**  Who was the department head at the time?

21             **THE WITNESS:  Seungjin Kim.**

22   BY MR. SINK:

23   Q.   Did Dr. Kim provide you with an explanation as to why you

24   were denied tenure?

25   A.   **No.**

WHARRY - DIRECT

1    Q.   Do you recall testifying earlier in this case?

2    A.   **I'm sorry?**

3    Q.   You recall giving a deposition earlier in this case?

4    A.   **Oh, yes, yes.  Yeah.**

5    Q.   And would reviewing that testimony help refresh your

6    memory as to whether or not you were given an explanation?

7            **MR. KEALEY:**  Your Honor, the witness answered the

8    question no.  She didn't say she had no recollection.

9            **THE COURT:**  Response.

10           **MR. SINK:**  Well, we haven't heard her answer here.  I

11   think she's about to explain.

12           **MR. KEALEY:**  The question was, "Did Dr. Kim provide

13   you with an explanation," and she said, "No."

14           **THE COURT:**  That's sustained.

15   **BY MR. SINK:**

16   Q.   Did the NEPC provide you with an explanation?

17   A.   **I cannot recall what the reasoning was.  No.**

18   Q.   Would reviewing your deposition testimony help you recall

19   that?

20   A.   **Sure.**

21   Q.   Okay.  You have your deposition in front of you still;

22   correct?

23   A.   **Yes.**

24   Q.   Can you turn to page 63.

25   A.   **Okay.**

1   Q.   Actually, page 62, lines 23 through 25.  Can you read that

2   to yourself.

3   A.   **Okay.**

4           **MR. SINK:**  Do you see it, Your Honor?

5           **THE WITNESS:**  Yes.

6           **THE COURT:**  It's all right.

7   **BY MR. SINK:**

8   Q.   Does that help refresh your memory?

9   A.   **Yes.**

10  Q.   And what's your response now?

11  A.   **So there's nothing that was a weakness, a technical**

12  **weakness, in my tenure and promotion case; and that's why they**

13  **had no reason other than to say that I hadn't been there for**

14  **very long.**

15  Q.   So my question was a bad question.

16       Now that you've refreshed your memory, what was the reason

17  given to you as to why you were denied tenure?

18  A.   **So the reason I'm being a little bit -- I don't want to**

19  **say "cagey," but a little bit weird with this answer, is that**

20  **there -- Dr. Kim told me that the reason my tenure was denied**

21  **was -- He never really gave me a reason.  He sort of waffled**

22  **around this idea that I hadn't been at Purdue for very long,**

23  **but he never really gave me a concrete reason for why my tenure**

24  **got denied.**

25  Q.   And what's your opinion of the plausibility of this

1  waffling around the idea that you had not been at Purdue very

2  long?

3          **MR. KEALEY:**  Your Honor, objection; calls for

4  speculation, lack of foundation.

5          **MR. BOWLING:**  Same objection, Your Honor.

6          **THE COURT:**  I think it does.

7          **MR. SINK:**  Can I approach?

8          **THE COURT:**  Pardon?  Or you can rephrase.

9  **BY MR. SINK:**

10 Q.   Are you aware of any facts, Dr. Wharry, that would

11 undermine any contention that you were denied tenure because

12 you had not been there long enough?

13 A.   **Yes.  There is no rule at Purdue that one needs to be**

14 **there "X" number of years before being qualified to get tenure.**

15 **So that, to me -- not just to me, but the fact that the only**

16 **reason he could come up with was waffling around, that I hadn't**

17 **been there long enough.  There is no policy at Purdue written**

18 **down that says that someone needs to be there a certain amount**

19 **of time.**

20 Q.   Prior to going up for tenure, did you have any

21 conversations with either Dr. Kim or the NEPC on going up early

22 for tenure?

23 A.   **I did.**

24 Q.   And what was the outcome of those conversations?

25 A.   **I was encouraged to go up for tenure when I did.**

WHARRY - DIRECT

1    Q.    By who?

2    A.    **By the NEPC in May of 2018, when I -- And then I**

3    **subsequently went up for tenure six -- four or five months**

4    **after that.**

5    Q.    Have you ever heard of the NSF award?

6    A.    **Yes.**

7    Q.    What is that?

8    A.    **So the NSF is the National Science Foundation.**

9    Q.    Did you win an award, an NSF award?

10   A.    **I did, yes.**

11   Q.    Did that play any role in you going up early for tenure?

12   A.    **Yes.  The year that -- when Dr. Kim first joined Purdue as**

13   **the department head, I had a discussion with him soon after he**

14   **joined -- soon after he came to Purdue about my tenure**

15   **situation; and I asked him what his thoughts were about me**

16   **going up for tenure early.  And he told me that he would**

17   **support me only if I won an NSF career award.**

18   **    This is a national award given to promising young faculty**

19   **members.  Pretty competitive to get it.**

20   **    So it was a little bit of a challenge.  Right?  To sort of**

21   **be told:  Okay.  I'll only support you if you get this sort of**

22   **way-out-of-reach award.**

23   **    So subsequently, I wrote the proposal for it, and I got**

24   **the award.  So when I then got that, I essentially told him,**

25   **"Okay.  You put your money where your mouth is."  I got the**

WHARRY - DIRECT

1    **award, I believe it was, 2018, maybe January.  So then, that**

2    **May, I put my case forward to the NEPC, and they supported me**

3    **going up early.**

4    Q.   That's fine.  I believe you've answered the question.

5    Thank you.

6        So do not speculate here.  But do you know -- Just first

7    answer:  Do you know what role, if any, Dr. Ishii played in the

8    deliberations leading up to the vote on your tenure?

9    A.   **I have no idea.**

10   Q.   Thank you.

11       Are you aware of any kind of power and influence that

12   Dr. Ishii has in the School of Nuclear Engineering?

13           **MR. BOWLING:**  Objection; calls for speculation.

14           **THE COURT:**  Does she have any facts as opposed to

15   awareness of any kind of power and influence.  Sustained.

16   Rephrase.

17           **MR. SINK:**  Sure.

18   Q.   I believe you testified you worked with Dr. Ishii for

19   approximately three years; is that correct?

20   A.   **Yes.**

21   Q.   And during that time, were you on at least one search

22   committee with him?  Right?

23   A.   **Yes.**

24   Q.   And did you ever collaborate with him in any other matter

25   outside of that search committee?

1    A.    **No.**

2    Q.    Did you ever witness him interact with any other NEPC or

3    Nuclear Engineering faculty?

4    A.    **I mean, you know, the situation with Revankar that I**

5    **overheard which I testified to.**

6    Q.    What about lunches, dinners, social gatherings?

7    A.    **Yes.   There were several of those sorts of alumni or**

8    **whatever type recognition things.   I -- I don't recall, you**

9    **know, Dr. Ishii really interacting much with me.**

10         **And, frankly, you know, I don't remember him coming to a**

11    **lot of faculty meetings or -- you know, certainly not ones that**

12    **I was at or the dinners and stuff like that.   I just --**

13    Q.    Fair enough.

14    A.    **There certainly were not meaningful or -- you know, things**

15    **that I remember --**

16    Q.    Fair enough.   I'm going to move on.

17         During the time you did serve on the search committee with

18    Dr. Ishii, did you have the opportunity to observe how he

19    handled applicants of different genders and/or races?

20    A.    **No.   We never got to that point because he was**

21    **disqualified from serving on the committee before we could even**

22    **get applicants and begin looking at them.   So that's one of the**

23    **intentions of this unconscious bias training, is that --**

24         MR. BOWLING:   Objection, Your Honor.   We're far

25    afield now from the original question.

1          **THE COURT:**  Sustained.

2          **MR. SINK:**  Sure.  That's fine.

3    Q.    I'm going to change topics a little bit.

4          When you first started in the School of Nuclear

5    Engineering, was Dr. Kim there at the School of Nuclear

6    Engineering?

7    A.    **No, he was not.**

8    Q.    Do you recall when he came?

9    A.    **Maybe a year after I started.**

10   Q.    Would that have been 2017?

11   A.    **That sounds about right, yeah.**

12   Q.    Around the time Dr. Kim started, did Dr. Kim ever make any

13   statements to you about Dr. Sizyuk?

14   A.    **Yes, he did.**

15   Q.    What did he say?

16   A.    **He said that she would never get tenure in Nuclear**

17   **Engineering.**

18   Q.    Did he say why?

19   A.    **No.**

20   Q.    Can you provide some context of that statement to the

21   jury?

22   A.    **Sure.  The first week that Dr. Kim was at Purdue, I met**

23   **with him to discuss -- He wanted to meet with me, I believe, to**

24   **discuss long-term course teaching plans, basically designating**

25   **what I would be teaching for the next few years or so.**

WHARRY - CROSS BY MR. KEALEY

```
1          And at that meeting, I told him that I thought Dr. Sizyuk
2     should be involved in that meeting because the courses, the set
3     of courses he was wanting to discuss with me, were maybe two or
4     three courses that she and I had been teaching, you know, off
5     and on over the last few years.
6          And we were the only faculty in the department at that
7     time who had experience teaching those courses and had the
8     expertise to really be deep-knowledge experts in the topic of
9     the course, which is beneficial to the students taking the
10    course.  Right?
11         So when I expressed to him that she, Dr. Sizyuk, should be
12    involved in this conversation because she has basically been
13    doing as much with these courses as I have, he told me, "Well,
14    don't worry about including her because she'll never get tenure
15    in this department."
16    Q.   In 2019, was the makeup of the NEPC all men?
17    A.   Yes.
18    Q.   Are you aware, have any women ever served on the NEPC?
19    A.   If anyone -- There may have been a faculty member maybe
20    around 2010 who came to Purdue already with tenure but then is
21    no longer -- was no longer in the department by the time I and
22    Dr. Sizyuk were up for tenure.
23              MR. SINK:  Thank you, Dr. Wharry.  I have no more.
24              THE COURT:  Cross-examination.  Cross.
25              MR. KEALEY:  Thank you, Your Honor.
```

1                          <u>**CROSS-EXAMINATION**</u>

2    **BY MR. KEALEY:**

3    Q.    Good afternoon, Dr. Wharry.

4          Prior to 2016, you were at Boise State University;

5    correct?

6    A.    **Yes.**

7    Q.    You would not consider Boise State University to be a peer

8    institution to Purdue University or University of Michigan,

9    would you?

10   A.    **Very much depends how -- specifically what you're**

11   **looking -- or how you're comparing peer institutions.**

12         **There's a lot of different criteria.  So if you're looking**

13   **for peer expectations in certain departments to get tenure, I**

14   **would say that you need to look at specifics of departments**

15   **more so than looking at the university as a whole.**

16   Q.    Earlier, you referred to the University of Michigan and

17   its peer institutions, not peer departments; right?

18   A.    **Mm-hmm.**

19         **THE COURT:**  Is that "yes"?  She can't record if you

20   say "mm-hmm."  You have to answer with words.

21   A.    **Yes, I did testify that Michigan was a peer to Purdue.**

22   **BY MR. KEALEY:**

23   Q.    University of Michigan is an R1 institution; correct?

24   A.    **Yes, yes.**

25   Q.    And you know what an R1 institution is?

1    A.    **Yes.**

2    Q.    Purdue University is an R1 institution; correct?

3    A.    **Yes.**

4    Q.    Is Boise State an R1 institution?

5    A.    **It is an R2 institution.**

6    Q.    So one of the reasons you came from Boise State to Purdue

7    University was to go from an R2 institution to an R1

8    institution; right?

9    A.    **That was not actually the reason I came to Purdue.**

10   Q.    And when you came up first for -- as you put it, up for

11   tenure early, about two years after you came to Purdue

12   University, you had only worked as a professor at an

13   R1 institution for two years; right?

14   A.    **True.**

15   Q.    Who hired you to Purdue in 2016?

16   A.    **Klod Kokini.  He was the interim department head of**

17   **Nuclear Engineering at the time.**

18   Q.    Did you meet with the search committee?

19   A.    **No, I did not.**

20   Q.    How did it come that you were hired to Purdue University's

21   School of Nuclear Engineering without going through a search

22   committee?

23   A.    **I actually don't quite know.  I had reached out to the**

24   **department head, the previous department head, before Klod**

25   **Kokini, who was Ahmed Hassanein.  And I reached out to him,**

1    just generally asking if there would be positions open in the

2    department over the next year or two because I was trying to

3    move back to the Midwest for personal reasons.

4         After sending that email, Professor Hassanein responded to

5    me, saying they would be really interested in recruiting me to

6    Purdue, would I be open to coming for a visit.

7         So I visited, I believe, two different times over the

8    course of a few months.  And I was recruited as what's called

9    an "opportunity hire," which is when you see an opportunity to

10   hire someone with great potential and typically someone who has

11   a diverse background.  So, you know, typically a gender/ethnic

12   diversity.

13        And through this is opportunity hire process, the College

14   of Engineering was able to give the School of Nuclear

15   Engineering funding for my position, I guess.

16   Q.   So if I can summarize.  Purdue University made an effort

17   to offer you a position because you were a diverse candidate to

18   come into the School of Nuclear Engineering; correct?

19   A.   I have busted my ass to not be considered a diverse

20   candidate and to be seen as more than just a woman in

21   engineering.  So I would strongly object to classifying my

22   hiring as because I'm a woman, but because I was very good at

23   my job at Boise State University, and I outperformed

24   expectations there.

25   Q.   My question was about Purdue University's intention.

1        You understood that Purdue University was using its

2   opportunity hire initiative to make it happen that you could

3   come to Purdue University without having to go through a search

4   committee; right?

5   A.   **Right.**

6   Q.   Do you have Asian ancestry?

7   A.   **Yes, I'm half Japanese.**

8   Q.   Are you currently tenured at Purdue University?

9   A.   **Yes.**

10  Q.   In the College of Engineering?

11  A.   **Yes.**

12  Q.   You testified a little while ago about Dr. Allen Garner?

13  A.   **Yes.**

14  Q.   Do you recall that testimony?

15  A.   **Yes.**

16  Q.   Is Dr. Allen Garner tenured at Purdue University?

17  A.   **Yes.**

18  Q.   And at what school is he tenured?

19  A.   **Nuclear Engineering.**

20  Q.   You mentioned you earned a Ph.D. at the University of

21  Michigan?

22  A.   **Yes.**

23  Q.   And at the University of Michigan, you mentioned, without

24  a name, your doctoral adviser.  Who was he?

25  A.   **He want a name?**

1    Q.    Yes, please.

2    A.    **Okay.  Gary Was.**

3    Q.    And Dr. Was is shown in your CV that's already in evidence

4    as Plaintiff's 11 as the chair of your Ph.D. committee; right?

5    A.    **Yes.**

6    Q.    So, in effect, he was your senior doctoral adviser; right?

7    A.    **Yes.**

8    Q.    And in your CV, which we'll put up on screen for

9    convenience of reference -- This is Plaintiff's Exhibit 11,

10   already in evidence.

11             **THE COURT:**  Plaintiff's 11?

12             **MR. KEALEY:**  Yes.

13   Q.    On the first page of Plaintiff's 11 in kind of small

14   print, there's a section that has a header to the left,

15   "Education."  Do you see that?

16   A.    **Yes.**

17   Q.    And so where it says Ph.D., University of Michigan, you

18   listed out your thesis, and as the chair, you listed Dr. Was;

19   right?

20   A.    **Correct.**

21   Q.    And if we go to page 6 of your CV, still Plaintiff's 11,

22   there's a section of your CV entitled "Publications."  Do you

23   see that?

24   A.    **Yes.**

25   Q.    And in your list of publications in your CV, you have a

WHARRY - CROSS BY MR. KEALEY

1    total of 41 publications between pages 6 and 9; and if you

2    would like, we would be happy to jump forward to page 9 so you

3    can verify that there are 41 of them listed.

4    A.    **Mm-hmm.  Okay.  I have a copy of it here.  So you want me**

5    **to fast-forward.  Yeah.**

6    Q.    Dr. Wharry, after you earned your Ph.D. in 2012 and

7    published some of the research you had done with Dr. Was at the

8    University of Michigan, you stopped publishing with him,

9    didn't you?

10   A.    **Yes.**

11   Q.    And so I just ask you to take a look at the 41

12   publications, which, I'm sure, you're well familiar with, and

13   verify for the record how many of those 41 publications are

14   with Dr. Was.

15   A.    **Well, with him, it looks like six.**

16   Q.    Six out of 41?

17   A.    **Looks like it.  Maybe seven.  Did I miss one?**

18   Q.    It sounds right to me.

19   A.    **I think it's six.**

20   Q.    Dr. Wharry, when you put together your tenure dossier at

21   Purdue, did you aspire to ensure that your tenure dossier was

22   100 percent truthful and accurate?

23   A.    **Yes.**

24   Q.    Was it important to you to be entirely truthful in your

25   tenure dossier?

1   A.   **Absolutely.**

2          **MR. KEALEY:**   Thank you.

3                        **CROSS-EXAMINATION**

4   BY MR. BOWLING:

5   Q.   Good afternoon, Dr. Wharry.

6   A.   **Hi.**

7   Q.   I just have a few questions.

8   A.   **Okay.**

9   Q.   I want to back up a little bit to your testimony from

10  earlier today, when you said that you were in a session

11  involving unconscious bias training with Dr. Ishii; correct?

12  A.   **Correct.**

13  Q.   And you stated, I believe, that he left the session early;

14  correct?

15  A.   **Yes.**

16  Q.   Dr. Ishii never told you why he left, did he?

17  A.   **No.**

18  Q.   So he may have a reason that he didn't share with you?

19  A.   **Of course.**

20  Q.   Okay.  Now, I want to go to another statement, actually

21  one you talked about a few minutes ago, where you said that

22  Dr. Ishii -- in the context of the fact that Purdue did not

23  hire Dr. Was, that Purdue was only interested in hiring women;

24  correct?

25  A.   **Yes.**

1    Q.    That exchange happened around 2016; correct?

2    A.    **I believe it was, yes, fall of 2016.**

3    Q.    About eight years ago?

4    A.    **Yes.**

5    Q.    And is it possible that you don't remember what Dr. Ishii

6    said exactly, correctly, verbatim?

7    A.    **Sure.**

8    Q.    So he may have -- He may have simply said Purdue was

9    interested in hiring women?

10   A.    **The reason it sticks in my mind, that memory, is because**

11   **he made it very clear that Purdue was only interested in the**

12   **other candidate besides Dr. Was because of their gender.**

13   Q.    Dr. Ishii never told you or never said to you that he

14   thought it was a bad thing that Purdue liked to hire women;

15   correct?

16   A.    **No, he didn't.**

17   Q.    Okay.  Now, I want to talk a little bit about this meeting

18   where you said that there were some other -- you were asked to

19   take notes.  Do you remember that?

20   A.    **Yes.**

21   Q.    Okay.  And at that meeting, you were the only faculty

22   member present who was not tenured; correct?

23   A.    **Yes.**

24   Q.    So it's fair to say you were the most junior person at the

25   meeting?

1   A.   **Sure.**

2   Q.   And I want to go to the conversation that you talked about

3   between Dr. Revankar and Dr. Ishii on the day that the NEPC

4   considered your tenure application.  I just want to make sure I

5   fully get the picture here.

6        This was a conversation that was happening in

7   Dr. Revankar's office?

8   A.   **Yes.**

9   Q.   And Dr. Ishii was in the office with him?

10  A.   **Yes.**

11  Q.   And you were not in the office; correct?

12  A.   **Correct.**

13  Q.   You were in the hallway?

14  A.   **No.  I was in the suite off the hallway, and our two**

15  **offices were off that suite.**

16  Q.   But you were not in Dr. Revankar's office?

17  A.   **I was not in his office, correct.**

18  Q.   And you were not a participant in that conversation?

19  A.   **No, I was not.**

20  Q.   Given that you weren't in the room and you weren't a

21  participant in the conversation, is it possible you

22  misunderstood what Dr. Ishii said?

23  A.   **I didn't mishear what I heard.  I didn't hear the context**

24  **before and after what I heard.**

25           **MR. BOWLING:**  May I have one second, Your Honor?

```
 1              THE COURT:  Certainly.
 2         (Brief pause.)
 3              MR. BOWLING:  That's all I have.  Thank you.
 4              THE COURT:  Any redirect?
 5              MR. SINK:  Yes, Your Honor.  I'll be very quick here.
 6                         REDIRECT EXAMINATION
 7    BY MR. SINK:
 8    Q.   Dr. Wharry, have any other NEPC members outside of
 9    Dr. Ishii ever suggested you be the notetaker?
10    A.   No.
11    Q.   You were asked some questions about Dr. Was.  Was Dr. Was
12    ever employed at the School of Nuclear Engineering at Purdue
13    University with you?
14    A.   No.
15    Q.   I believe you testified you are, in fact, tenured today;
16    is that correct?
17    A.   Yes.
18    Q.   Are you tenured in the School of Nuclear Engineering or
19    which school?
20    A.   I'm tenured in the School of Materials Engineering.
21    Q.   Can you briefly, very briefly, explain how that came
22    about.
23    A.   Yes.  After my tenure in Nuclear Engineering got denied, I
24    went to the Dean of Engineering.  I met with him a couple of
25    times in the fall of 2018.  I met with the vice provost once or
```

WHARRY - RECROSS BY MR. KEALEY

1    twice that same fall, and I also met with the Associate Dean of
2    Engineering maybe once that fall basically to express my
3    concerns as to my tenure being denied and a lot of the racial
4    and gender biases that I felt in the department.
5          And in January of 2019, the Associate Dean of Engineering
6    asked me if I would be okay with moving departments from
7    Nuclear Engineering to Materials Engineering and getting tenure
8    as I moved.  So the move would be with promotion and tenure.
9    Q.   And was there any committee outside of the NEPC that
10   reviewed your dossier at that time?
11   A.   **Yes.  So this --**
12   Q.   What committee was that?
13   A.   **The School of Materials Engineering has their primary**
14   **committee, so they're equivalent to NEPC.  That committee**
15   **reviewed my dossier.**
16   Q.   Can I stop you right there.  Was Dr. Ishii on that
17   committee?
18   A.   **No.**
19          **MR. SINK:**  Thank you.  I have no more.
20          **THE COURT:**  Anything else on Defense side?
21          **MR. KEALEY:**  Just one or two questions.
22                      RECROSS EXAMINATION
23   BY MR. KEALEY:
24   Q.   Dr. Wharry, you just listed some positions, and I'd just
25   like to put some names with those positions.

1      You said that you went to speak to some people in the Dean
2   of Engineering staff?
3   A.   **Yes.**
4   Q.   Can you identify them by name, please.
5   A.   **Yes.  The associate dean at that time that I spoke with**
6   **was Arvind Raman.  The dean at the time that I spoke with twice**
7   **was Mung Chiang, and the vice provost at that time that I met**
8   **with was Peter Hollenbeck.**
9   Q.   And how many times did you meet with Peter Hollenbeck?
10  A.   **I want to say once or twice.  I can't remember which**
11  **it was.**
12  Q.   Thank you.
13          **MR. BOWLING:**  No recross.
14          **THE COURT:**  Anything else?
15          **MR. SINK:**  No.
16          **THE COURT:**  Anything else?
17          **MR. BOWLING:**  No.
18          **THE COURT:**  Can this witness now be excused?
19          **MR. SINK:**  For the Plaintiff, yes.
20          **MR. KEALEY:**  Yes.
21          **MR. BOWLING:**  Yes.
22          **THE COURT:**  Now, before I let you step down, let me
23  ask the jurors.
24      Ladies and gentlemen of the jury, do any of you have any
25  questions for this witness?  If so, if you would take the

1 opportunity right now to write out any questions that you might

2 have for the Court to consider.

3     (Brief pause.)

4     I'm not sure if any of you are writing things out or not.

5 Is anyone interested in writing any questions for this witness?

6 Anyone?  Raise your hand if so.

7     (No response.)

8     All right.  No hands raised.

9     And so at this time, you are excused.

10        **THE WITNESS:**  Okay.  Thank you.

11        **THE COURT:**  Well, we have three minutes left in the

12 day.  I'd say we should let the jury go home early.  It's been

13 a long day for them, given all the circumstances going on in

14 the courthouse as well.

15     Ladies and gentlemen, I need to remind you that, during

16 this recess, you are not to discuss this case amongst

17 yourselves; you're not permitted to let anyone discuss it with

18 you or in your presence.  It's your duty not to form or express

19 any opinion on this case until it is finally submitted to you.

20     What I want to remind you of is that, when you leave

21 tonight, make sure you leave your notebooks in the jury room.

22 And we're going to go forward with the case tomorrow.  If you

23 can be here by -- We'll have some breakfast items for them.

24 Will we?

25        **COURTROOM DEPUTY:**  Yes.

1    **THE COURT:**  Okay.  Good.  So if you're here around

2    8:30 or so, you can have a nice breakfast.  If you're a little

3    bit late, that's fine.  But please be here, if you can, by a

4    quarter to 9:00, and we'll get started on the case again at

5    9:00 tomorrow.

6       Also, keep in mind the Court's admonition with regard to

7    avoiding allowing yourself being subject to any coverage that

8    there might be with regard to the case, and if there is such,

9    that you immediately shut that down or just walk away from it.

10      If there are any issues that come up with regard to you

11   serving as a juror in this case that you think need to be

12   brought to the attention of the Court, we'll deal with it

13   tomorrow morning.  Until then, unless any of you have any

14   questions, we'll see you tomorrow morning.  All right.

15      (Jury out at 3:59 p.m.)

16      Go ahead and be seated.

17      Are there any issues that we need to address in

18   anticipation of tomorrow's presentation or anything else for

19   Plaintiff this afternoon?

20      **MR. SINK:**  No, Your Honor.

21      **THE COURT:**  All right.  How about for the University?

22   Anything else we need to take up or anticipate for tomorrow

23   morning?

24      **MR. KEALEY:**  We would just like to confirm our

25   understanding of witness order that is upcoming in Plaintiff's

1  case.  My last understanding is that Dr. Taleyarkhan would

2  testify next, followed by the Plaintiff, followed by Dr. Kim

3  and then by Dr. Hassanein.  And it's helpful to us just to know

4  if that's still the working order.

5          **THE COURT:**  Who was the first witness?

6          **MR. SINK:**  Well, yeah.  I mean, that's an issue I was

7  going to talk to you off the record, but we can do it on the

8  record if you want.

9      So Dr. Taleyarkhan was supposed to testify this afternoon.

10 He's not available tomorrow.  So what I'm going to do, he has

11 agreed to come in Wednesday.  So I would like to call him after

12 Dr. Garner.  Actually, I think he wants to come in -- Yeah,

13 10:00 a.m. on Wednesday.

14         **THE COURT:**  So what's the lineup tomorrow for the

15 Plaintiff?  Let's make it easy.

16         **MR. SINK:**  Sure.  Tomorrow will be Dr. Brooks at

17 9:00 a.m., Dr. Hassanein at 10:00, Dr. Kim at 1:00, Dr. Ishii

18 at 2:00, roughly.  You know, of course, depending on how we go.

19         **MR. BOWLING:**  I'm sorry.  Did you say Dr. Ishii?

20         **MR. SINK:**  Yes.

21         **THE COURT:**  So Brooks, Hassanein, Kim, and Ishii;

22 correct?

23         **MR. SINK:**  Correct.  And then day three would be

24 Garner 9:00 a.m., Dr. Taleyarkhan 10:00 a.m., and then

25 Dr. Sizyuk whenever we finish with Dr. Taleyarkhan.

1    **THE COURT:**  What's the last one?

2    **MR. SINK:**  The Plaintiff.

3    **THE COURT:**  Gotcha.  All right.

4    Any other inquiries?  Anyone on Defense side?

5    (No response.)

6    Anything else for the Plaintiff, then, tonight?

7    **MR. SINK:**  No, Your Honor.

8    **THE COURT:**  Just remember what I indicated, that

9    whatever anyone will leave in the courtroom will not be

10   touched, looked at, or anything else if you want to do that.

11   If you want to just put them in the briefcases and put them

12   under the desks, that's fine too.  But the courtroom will be

13   locked until tomorrow morning, when we allow you in at 9:00.

14   All right.  Any other questions?  Defense?

15   All right.  We're done.  Thank you very much, Counsel.

16   We'll see you tomorrow morning.

17   (Court adjourned at 4:02 p.m.)

18                   CERTIFICATE OF REPORTER

19        I, Angela Phipps, RMR, CRR, FCRR, certify that the

20   foregoing is a true, complete, and accurate transcript of the

21   record of proceedings in the above-entitled matter before the

22   Honorable Theresa L. Springmann, on January 22, 2024.

23

24   January 22, 2024:              S/Angela Phipps, RMR, CRR, FCRR
                                    Official Court Reporter
25                                  for the U.S. District Court