1
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF INDIANA
2                            LAFAYETTE DIVISION

3      TATYANA SIZYUK,                    )
                                          )
4           Plaintiff,                    )
                                          ) Cause No.
5           vs.                           ) 4:20-cv-00075-TLS
                                          )
6      PURDUE UNIVERSITY; BOARD OF        )
       TRUSTEES OF PURDUE UNIVERSITY;     )
7      and MAMORU ISHII, in his           )
       personal capacity,                 )
8                                         )
            Defendants.                   )
9      _____      )

10                  **DAY 2 OF JURY TRIAL - A.M. SESSION**
                            **JANUARY 23, 2024**
11             **BEFORE THE HONORABLE THERESA L. SPRINGMANN**
                        **UNITED STATES DISTRICT JUDGE**
12
       APPEARANCES:
13
       For the Plaintiff:          **RYAN SINK and RYAN FOX**
14                                 FOX & SINK LLC
                                   6177 North College Avenue
15                                 Indianapolis, Indiana 46220
                                   (317) 254-8500
16                                 E-mail: rsink@foxsinklaw.com

17
       For Defendant, Purdue:      **WILLIAM P. KEALEY,**
18                                 **MATTHEW M. HUMBLE, and**
                                   **KIRSTIE E. KLUTZKE**
19                                 STUART & BRANIGIN LLP
                                   300 Main Street, Suite 900
20                                 P.O. Box 1010
                                   Lafayette, Indiana 47902-1010
21                                 (765) 423-1561
                                   E-mail: wpk@stuartlaw.com
22

23

24     Proceedings reported by stenotype.  Transcript produced by
       computer-aided transcription.
25

```
 1    APPEARANCES (Continued):

 2    For Defendant, Ishii:      JOSEPH NEAL BOWLING and
                                 JANELLE P. KILIES
 3                               LEWIS WAGNER LLP
                                 1411 Roosevelt Avenue, Suite 102
 4                               Indianapolis, Indiana 46201
                                 (317) 237-0500
 5                               E-mail: Nbowling@lewiswagner.com

 6

 7    Also Present:             Plaintiff, Tatyana Sizyuk;
                                Defendant, Mamoru Ishii
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              **I N D E X**

2                  * * *

3              **INDEX OF WITNESSES**

4   **FOR THE PLAINTIFF**                    **PAGE**

5   <u>**JEFFREY BROOKS**</u>
    Direct Examination by Mr. Fox            15
6   Cross-Examination by Mr. Kealey          39
    Cross-Examination by Mr. Bowling         44
7   Redirect Examination by Mr. Fox          47

8   <u>**AHMED HASSANEIN**</u>
    Direct Examination by Mr. Fox            48
9   Cross-Examination by Mr. Kealey          83
    Cross-Examination by Mr. Bowling         98
10  Redirect Examination by Mr. Fox          99

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (The following proceedings were held in open court
 2         commencing at 8:50 a.m., reported as follows:)
 3        (Call to Order of the Court.)
 4            THE COURT:  Good morning, Counsel, and good morning
 5    to the parties.  It's about five minutes to 9:00, and I think
 6    we're waiting on just one more juror to report in this morning.
 7        Let me just ask, have there been any developments over the
 8    evening recess or any matters that we can take up in the next
 9    five minutes or so before the jury's ready to come in and we
10    proceed in the plaintiff's case?
11        For the plaintiff, any issues to take up?
12            MR. SINK:  None for the plaintiff.
13            THE COURT:  By golly, I'll take that.
14        And how about for the University?
15            MR. KEALEY:  Yes, we have a couple of issues,
16    Your Honor.  One is informational.  It came to my attention
17    last evening that one of this morning's witnesses,
18    Dr. Taleyarkhan, was in the gallery yesterday afternoon during
19    the testimony of Ms. Wharry.  I don't know why that was.  I
20    didn't learn of it until after court was over yesterday.  And
21    he's not our witness, but I bring it to the Court's attention.
22            THE COURT:  How did that happen, Counsel?
23            MR. SINK:  Yeah, I told him not to be in here.  I
24    don't know why he was.  As soon as I discovered he was in here,
25    I immediately had him leave, so I don't know -- I don't know
```

1  why he was in here.

2  **THE COURT:**  Who was testifying at the time that

3  Dr. Taleyarkhan was in the courtroom?

4  **MR. SINK:**  Dr. Wharry.

5  **THE COURT:**  What's the defendant's position with

6  regard to that, if Dr. Taleyarkhan is -- I know he's listed as

7  a witness.  But if he's called, do you have an objection or an

8  issue in that regard?

9  **MR. KEALEY:**  We would have an objection, certainly,

10  to him testifying in any respect about Dr. Wharry.

11  **THE COURT:**  Okay.  We'll take that up then, but at

12  least it's presented now and you know that it's coming.  I

13  don't want to take the issue now because hopefully I've got my

14  last juror here.

15  Do we know?

16  **COURTROOM SECURITY OFFICER:**  One is coming up right

17  now, Your Honor.

18  **THE COURT:**  So in about five minutes or so we'll be

19  back with the jury.  So before Dr. Taleyarkhan testifies, we're

20  going to need to deal with that matter and the objection that's

21  anticipated.  Anything else on that issue?

22  **MR. KEALEY:**  Not on that issue.  I do have one other

23  issue, but not on the separation issue.

24  **THE COURT:**  Okay.  What's the second issue?

25  **MR. KEALEY:**  The second issue is just to preview for

1    the Court the first witness this morning, Dr. Brooks.  We

2    understand that he's be called as a fact witness, not an expert

3    witness, because he's not been disclosed as an expert in this

4    case and, therefore, couldn't be qualified on the stand as an

5    expert; and we will be objecting to any testimony that would be

6    expert testimony.

7         **THE COURT:**  From the defense viewpoint, what would

8    be the expert testimony that you would anticipate objecting to?

9         **MR. KEALEY:**  We anticipate that he's going to

10   testify about how universities grant tenure and what are the

11   qualifications for a university to grant tenure and whether

12   Dr. Sizyuk met those qualifications.

13      Dr. Brooks is not himself a tenured professor, has never

14   been, and doesn't have any personal knowledge that would be

15   material to how the Nuclear Engineering Primary Committee

16   decided her candidacy, and so he could only testify

17   hypothetically on those topics as a supposed expert.

18        **THE COURT:**  All right.  I don't want to take full

19   argument with regard to that issue at this time, but I just

20   wanted the highlight on it.

21      At this point any response other than argument on it?

22        **MR. SINK:**  Sure.  Factually, Judge, Dr. Brooks will

23   testify he has sat on tenure committees at the College of

24   Engineering, in particular, the EAPC.  To that extent, he can

25   testify as to the criteria for tenure.

1      **THE COURT:**  And were those on tenure board meetings

2  for Purdue or another institution?

3      **MR. SINK:**  For Purdue.

4      **MR. KEALEY:**  If I may respond to that?

5      **THE COURT:**  Go ahead.  This isn't argument yet, but

6  it's a preview for me.

7      **MR. KEALEY:**  Yes.  Thank you.  He would still be

8  offering simply an expert opinion because he would be opining

9  about a hypothetical which is what would have happened at the

10  so-called engineering area primary committee if Dr. Sizyuk's

11  candidacy had reached that committee.  That's a hypothetical

12  question, not a fact question, and he was not disclosed as an

13  expert witness on any question.

14      **THE COURT:**  But to the extent he can testify that he

15  did sit on a tenure committee at some point -- or maybe one or

16  two of them at some point during his employment at Purdue --

17      He's still there, isn't he?

18      **MR. KEALEY:**  He is still an adjunct professor.  He's

19  semiretired is my understanding.  The question, Your Honor, is

20  he could state that he served on such a committee, but what

21  would he say next?

22      **THE COURT:**  I don't know.

23      **MR. KEALEY:**  And is what he would say next that

24  would have to be both material and only percipient witness

25  knowledge, not an expert opinion.

 1            **THE COURT:**  Was he deposed?

 2            **MR. KEALEY:**  He was not.  He was not disclosed as an

 3    expert, and that is one reason he was not deposed.

 4            **THE COURT:**  Well, it may well be that at some --

 5    that before he testifies along those lines, in his testimony

 6    before the jury, that we allow the jury to leave the courtroom

 7    and you can, in effect, voir dire him as to what he's going to

 8    testify along those lines.

 9            **MR. SINK:**  Well, he submitted a declaration in the

10    case.

11            **THE COURT:**  I'm sorry.  Say that again.

12            **MR. SINK:**  He's already filed a declaration in the

13    case so --

14            **THE COURT:**  He wasn't indicated to be an expert.

15            **MR. SINK:**  Correct.  And in our -- what he'll

16    testify to is he's familiar with the criteria for tenure

17    because he sat on tenure committees and he worked with

18    Dr. Sizyuk, and he can testify as to her discovery, learning,

19    engagement, and impact.  That's not expert testimony.  That's

20    fact-based testimony.

21            **THE COURT:**  Purdue, what's your response?

22            **MR. KEALEY:**  Those are not the points of testimony

23    I'm concerned about.  He can certainly testified to what he

24    observed as her colleague, what he saw her do, what he saw in

25    her research, what he saw if he accompanied her to conferences,

1    those sorts of things.  That's not the point I'm spotlighting.

2       The point I'm spotlighting is that in his declaration he

3    has purported to hypothesize on whether she is somebody who

4    would typically be tenured.

5          **THE COURT:**  So you're saying that he cannot testify

6    with regard to evaluation with regard to the plaintiff?

7          **MR. KEALEY:**  Correct.

8          **THE COURT:**  And that's understood.

9       You're not going into that, would you, Counsel?

10         **MR. SINK:**  If I understand that point correctly, we

11   would not ask him, "If you were on the EAPC for Dr. Sizyuk,

12   would you have granted tenure?"  We can agree not to ask him

13   that.

14         **MR. BOWLING:**  If I may, Your Honor, just to add, for

15   Dr. Ishii, I think there's a finer -- we are joining in

16   Purdue's objection at this point.  I think what -- the concern

17   that we have is he's going to say something along the lines of,

18   "Do you believe that she met the criteria for tenure?"

19      That's where -- that's the rub I think that we have and I

20   think, if I am understanding correctly, that Purdue has as

21   well.  That would be expert opinion testimony for which he has

22   not been disclosed.

23         **THE COURT:**  All right.  Let's do this, because I

24   don't want to keep the jury waiting and the issue hadn't been

25   brought up previously, but before he is -- when it's time for

1   him to be called by the plaintiff, we may need to take, you

2   know, a sidebar to manage this, or at least I'll allow the jury

3   to go back into the jury room and wait until we get through

4   this process.  At least I understand what's coming.

5           **MR. KEALEY:**  Yes.  It's my understanding,

6   Your Honor, that he is plaintiff's first witness this morning.

7           **THE COURT:**  Is that right?

8           **MR. SINK:**  That is correct.

9           **THE COURT:**  Oh, I guess we have to do it now.  All

10  right.  Then at this time would you please check on the jury

11  and tell them that we're going to be delayed a little bit

12  before we can start proceedings.  And let me know if they're

13  all here too.

14      Are they all here already?  Okay.  So we know they're all

15  here.  That's a good thing.

16      Let me just give you the opportunity to add anything else

17  you wish with regard to -- is he Professor Taleyarkhan?  Is he

18  a professor?

19          **MR. SINK:**  Dr. Brooks.  Are you talking about

20  Dr. Brooks?

21          **THE COURT:**  Yes, Brooks.  Sorry.  Yes.  He's doctor,

22  isn't he?

23          **MR. SINK:**  Yes.

24          **THE COURT:**  All right.  Thank you.

25      So is there anything else plaintiff wants to present with

1    regard to Dr. Brooks?

2             **MR. SINK:**  Yes.  He'll testify as to statements he

3    heard by Dr. Ishii reflecting bias against women, so that will

4    come up, and he will testify about the power and influence of

5    Dr. Ishii in the SNE, School of Nuclear Engineering.

6             **THE COURT:**  Any other argument with regard to Purdue

7    and Dr. Brooks and what's anticipated?

8             **MR. KEALEY:**  Nothing else from Purdue, Your Honor.

9             **THE COURT:**  All right.  And for Dr. Ishii?

10            **MR. BOWLING:**  No, Your Honor.

11            **THE COURT:**  All right.  As we go through this

12   then -- at this time I'm going to just give notice to the

13   plaintiff that if you step into having Dr. Brooks testify

14   beyond the bounds of his status at the time during the process

15   for tenure review for the plaintiff, that I'll anticipate that

16   there will be a sidebar on an objection to deal with that.  We

17   might have to take the jury out while we go through that again.

18        But I think there is a way to go through the presentation

19   of Dr. Brooks' involvement, and I think it would be wise --

20   it's your case -- to determine what that might be without

21   drawing the objection and dealing with that because he is in a

22   different position than the other tendered doctors that were on

23   the committee that were dealing with the plaintiff as opposed

24   to the status that Dr. Brooks had at the time.

25        I think I understand your concern, and I'll hear

1  additional argument with regard to the same when an objection

2  is raised, if the objection is raised, and that's assuming that

3  plaintiff would go into that.

4      So is that agreeable?

5          **MR. SINK:**  Yes, Your Honor.

6          **THE COURT:**  Any other issues on the record at this

7  point?

8          **MR. KEALEY:**  No, Your Honor.

9          **THE COURT:**  All right.

10         **MR. SINK:**  Do you want me to bring the witness in

11  now?

12         **THE COURT:**  I think that would be a good idea, and

13  I'm going to have the jury come in as well.

14     Please bring the jury in.

15     Hello.  Would you please face my deputy, and he'll swear

16  you in.

17     Okay.  Have the jury come in.  Bring the jury in.

18     Sir, wait right here.  He's going to bring the jury in,

19  and then we'll have you sworn in.

20     Who is bringing in the jury?

21         **COURTROOM SECURITY OFFICER:**  Dan.

22         **THE COURT:**  Thank you.

23     (Jury in at 9:08 a.m.)

24         **THE COURT:**  Go ahead and be seated, please.

25     Good morning, ladies and gentlemen.  Thank you for your

1    efforts in being here at the time that I asked notwithstanding

2    the ice storm outside, and I do appreciate your efforts to be

3    here today.

4         We are ready now to continue on with the -- with day two

5    of the trial of this case, and we remain in the plaintiff's

6    case in chief.

7         With that, now the next witness that is being called is

8    Dr. Taleyarkhan.  Am I pronouncing it correctly?

9              **THE WITNESS:**  I'm Jeff Brooks.

10             **THE COURT:**  You're Brooks.  Thank you, Dr. Brooks.

11        Dr. Brooks, would you please face my deputy.  He will

12   swear you in to testify.

13        (The oath was duly administered.)

14             **THE WITNESS:**  I do.

15             **THE COURT:**  All right.  Sir, if you would come

16   around and take the stand up here.  I don't know why I confused

17   him with Taleyarkhan.

18        And one other question I have for the jury.  Ladies and

19   gentlemen, during the recess last evening were there any issues

20   that arose that you think are important that I be made aware

21   of?  Anything at all?  Just raise your hand and I'll take it

22   separately.

23             **JUROR:**  (Indicating.)

24        **THE COURT:**  Yes, Mr. Anderson.

25             **JUROR:**  I would like to apologize ahead of time, but

1    the five-day commitment for this trial is going to be very

2    difficult for me.  I actually found out I have a lot of school

3    work and events to go to this week near Thursday and Friday,

4    and missing that will put me back for the entire semester.

5              **THE COURT:**  And remind me where you're going.

6              **JUROR:**  Indiana State University.

7              **THE COURT:**  Well, I will tell you that -- and we

8    might want to go into this a little bit later -- generally

9    employers or colleges, schools, cannot take any adverse actions

10   against individuals that are selected for jury duty.  And what

11   that means is that if it's necessary for me to write a letter

12   or contact any of the individuals who are involved or are

13   presenting that kind of concern for you, I can do that.  It's a

14   matter of law that they must give you that opportunity to serve

15   as a juror.

16        So just know that that is the law, and that's what I will

17   do for you if that's necessary.  And you can advise the people

18   at the school that you have to be given time so you can serve

19   as a juror in this case.  That's what you can do.

20        So with that, I'll leave you to think it through and let

21   me know where or how I can help, but at this point since --

22   it's not going to be an issue until Friday, right?

23              **JUROR:**  (Nodding head.)

24              **THE COURT:**  Is that yes?

25              **JUROR:**  Yes.

1      **THE COURT:**  We have time now.  Let's see how things

2  develop.  You can give them that information, and we'll see how

3  far we can go.  Just know that that's the law.

4      **JUROR:**  Thank you.

5      **THE COURT:**  All right.  Any follow-up on that for

6  counsel for plaintiff?

7      **MR. SINK:**  None, Your Honor.

8      **THE COURT:**  For defendant, University?

9      **MR. KEALEY:**  No.

10      **THE COURT:**  Defendant Ishii?

11      **MS. KILIES:**  No, Your Honor.

12      **THE COURT:**  All right.

13      Dr. Brooks.  Counsel.

14      **JEFFREY BROOKS, PLAINTIFF'S WITNESS, SWORN**

15      **DIRECT EXAMINATION**

16  BY MR. FOX:

17  **Q.**  Good morning.  Can you please state your name for the

18  record.

19  **A.**  Jeffrey Brooks.

20  **Q.**  Are you currently employed?

21  **A.**  No.

22  **Q.**  Where were you last employed?

23  **A.**  I was at Purdue.  I was a temporary special research

24  scientist.

25  **Q.**  And for the jury, can you briefly provide an outline of

1    your job history?

2    **A.**    I obtained a Ph.D. in electrical engineering in 1972 at

3    NYU, New York University.  I worked two jobs in the U.S.

4    defense industry.  I came out to the Midwest in 1974, worked at

5    Argonne National Laboratory, and most of my career was at

6    Argonne.  I was a senior scientist at the lab.

7         I came to Purdue in 2008 -- I hope I have these dates

8    right -- and worked at Purdue.  I was a research professor in

9    the nuclear engineering school.  And then I retired from

10   Purdue, but I ended up coming back at this temporary scientist

11   position for about three and a half years, and that just ended,

12   actually, last year, December of last year.

13   **Q.**    Do you know an individual by the name of

14   Dr. Tatyana Sizyuk?

15   **A.**    I do.

16   **Q.**    And do you recall when you first met her?

17   **A.**    Yeah, I met her at Argonne, 2003.

18   **Q.**    Did you work with her at Argonne?

19   **A.**    I did.

20   **Q.**    How closely did you work with her?

21   **A.**    We worked off and on pretty closely.  We have a number of

22   joint publications.  For example -- and I worked also with

23   Tatyana at Purdue.

24   **Q.**    And do you recall what her position was at Argonne?

25   **A.**    Tatyana's position?

1    **Q.**  Yes.

2    **A.**  She started out in a research position.  I forget the exact

3    title, but it was a staff researcher.

4    **Q.**  And did you work closely with her while at your time with

5    Argonne while you were both there?

6    **A.**  Yes, I did.

7    **Q.**  Day-to-day basis?

8    **A.**  Pretty much, yeah.

9    **Q.**  You had an opportunity to view her work performance at

10   Argonne?

11   **A.**  Yeah, very much so.

12   **Q.**  And what was -- how did you view her work performance?

13   **A.**  Her work performance is outstanding.  It's virtually

14   incredible.  Both at the lab and Purdue, she's basically a

15   superstar.  She's made contributions to numerous fields, very

16   critical fields, for the U.S.

17   **Q.**  And you mentioned earlier that you also had some

18   publications with her?

19   **A.**  Yeah, we have a series of joint publications.

20   **Q.**  Do you recall briefly what some of those were?

21   **A.**  Yeah.  Well, we work in nuclear fusion.  This is a new

22   source of energy.  People may have heard of this.  It's been in

23   the news lately.  The biggest problem in fusion is you have an

24   extremely hot plasma.  It's like a miniature sun, but it has to

25   be contained by a material.  You don't want the material to be

1   destroyed by the hot plasma.  So Tatyana and I have worked and

2   tried to find a material that will stand up to the plasma.

3   That's one area.

4       We have worked in the semiconductor industry, microchips,

5   microchip fabrication.  You know, we're trying to get smaller

6   and smaller chips and faster chips, and they use a sort of a

7   photography process to create the chips.  It's call athography;

8   but instead of using light, they use very short wave length,

9   much more intense radiation.

10      Well, anyway, the key thing is to get sources of the

11  radiation, and Tatyana has done extensive work in coming up

12  with sources for the semiconductor industry.  Very important

13  field, in my opinion.

14      So that's just two of the things.  We've also done --

15  we're trying to explain experiments.  We don't want to just

16  have a computer code and results.  We like to calibrate it and

17  explain experiments, so we worked with, for example -- I don't

18  know how much detail you want, but --

19  **Q.**  Let me ask you this:  Do you recall how long you worked

20  with her at Argonne?

21  **A.**  Yeah, 2003.  And she left in 2007, but I still continued to

22  work with her.

23  **Q.**  And then did you also work with her at Purdue?

24  **A.**  I worked with her at Purdue from 2008 until basically the

25  present time.

1   **Q.**   During your time at Purdue -- what was your first position

2   at Purdue again?

3   **A.**   Sorry?

4   **Q.**   What was your first position at Purdue?

5   **A.**   Tatyana's first position?

6   **Q.**   Your first position.

7   **A.**   Oh, I was a senior research professor.

8   **Q.**   And do you know what Dr. Sizyuk's first position was?

9   **A.**   She had a research position.

10   **Q.**   During your time at Purdue, did you serve on any tenured

11   committees?

12   **A.**   Yeah.  I served on an extensive number of committees,

13   mostly the collegewide committees.

14   **Q.**   Could you identify for the jury some of the committees that

15   you served on while you were at Purdue?

16   **A.**   I served on various promotion committees, both for research

17   positions and academic positions, teaching.  I was called, for

18   example, by the electrical engineering school to serve on a

19   promotion committee.  I was on various search committees for

20   hiring.

21   **Q.**   Did you serve on any EAPC committees for Purdue?

22   **A.**   I did.  I served on quite a few.

23   **Q.**   And would those also involve tenure?

24   **A.**   Yeah.

25   **Q.**   So are you familiar with the tenure process at Purdue?

1   **A.**   I believe I'm very familiar with it.

2   **Q.**   Okay.  And are you familiar with the criteria within the

3   School of Nuclear Engineering that one looks at for tenure on

4   those committees?

5   **A.**   Yes, quite familiar.

6   **Q.**   And do you recall what that criteria is with regards to

7   tenure?

8   **A.**   Well, they basically are looking for competence and

9   achievement as a scientist, engineer; research publications; to

10  some extent funding, bringing in funding; and then, of course,

11  teaching.  How are you doing with your classes?  Graduate

12  students?  Undergraduate?  Also, it could involve, depending on

13  the field, your national reputation, international reputation,

14  things like that.

15  **Q.**   And do you recall -- you said you were aware of

16  Tatyana Sizyuk's first position at Purdue.  Did her position

17  change at some time while you were there?

18  **A.**   Yes.

19  **Q.**   And do you know what her second position was?

20  **A.**   Yeah, she was an assistant professor position.

21  **Q.**   Was that a tenure-track position?

22  **A.**   That was a tenure-track position, yes, starting at the

23  assistant professor level.

24  **Q.**   And I believe you said that you came to Purdue -- was it

25  after Dr. Sizyuk had already been there?

1    **A.**   Yes.

2    **Q.**   And so during that time, did you work with Dr. Sizyuk from

3    2008 until she became the -- in her associate tenure position?

4    Did you work close --

5    **A.**   Yes, yes.

6    **Q.**   And when I say, "did you work closely with her" --

7    **A.**   Yes.

8    **Q.**   Did you work with her on a day-to-day basis?

9    **A.**   Yes.

10   **Q.**   And did you continue to work with her after she became an

11   associate tenure-track professor?

12   **A.**   I did.

13   **Q.**   And did you continue to work for her at the time that she

14   went up for tenure within the School of Nuclear Engineering?

15   **A.**   Yes.

16   **Q.**   And during that time, were you able to view her work

17   performance on a day-to-day basis?

18   **A.**   I was.

19   **Q.**   Were you familiar with the type of publications that she

20   had authored?

21   **A.**   I was quite familiar.

22   **Q.**   Were you familiar with her seminar work within the school?

23   **A.**   Yes, definitely.

24   **Q.**   Were you familiar with her teaching within the school?

25   **A.**   Yes.

1    **Q.**  It sounds like you worked pretty closely with her.  Is that

2    fair?

3    **A.**  She was a very close colleague, yeah.

4    **Q.**  Okay.  And was there a familiar research group that you

5    worked with her on?

6    **A.**  Sorry?

7    **Q.**  Was there a particular research group that you worked

8    closely together while at Purdue together?

9    **A.**  Yes, yes.

10    **Q.**  What was that called?

11    **A.**  That was the CMUXE.

12    **Q.**  CMUXE?

13    **A.**  C-M -- C-M-U-X-E.  I hope I have that right.

14    **Q.**  I can't pronounce it very well either.

15     And, obviously, are you familiar with Dr. Sizyuk's

16    qualifications regarding the criteria for tenure?

17    **A.**  Yes, highly familiar.

18    **Q.**  And can you please explain to the jury what qualifications

19    for tenure that you believe Dr. Sizyuk had?

20          **MR. KEALEY:**  Your Honor, this is our concern.

21          **MR. BOWLING:**  Objection.

22          **THE COURT:**  Sidebar.

23    (Bench conference on the record.)

24          **THE COURT:**  Your objection.

25          **MR. KEALEY:**  Yes.  The objection is that he's asking

 1    about what qualifications she had for tenure, which is an

 2    expert opinion.

 3            **MR. BOWLING:**  We concur.

 4            **MR. KEALEY:**  And the witness is not disclosed as an

 5    expert.  No expert opinion was disclosed, and it's too late to

 6    even try to qualify this witness as an expert because he was

 7    never disclosed as such.  Therefore, the question is not

 8    procedurally eligible in this trial.

 9            **THE COURT:**  Anything else?

10            **MR. KEALEY:**  Not at this point.

11            **THE COURT:**  Anything else?

12            **MR. BOWLING:**  No, Your Honor, I concur with the

13    objection.

14            **THE COURT:**  Okay.  And is this witness being

15    presented or will be advised to the jury that he is an expert

16    in this area?

17            **MR. FOX:**  No, Your Honor.  We've established that he

18    has worked with her very closely for a period of, I think,

19    12 years.  He is well aware of all of her qualifications, and I

20    have gone through that and established that.  Under Rule 701,

21    lay witnesses may render opinions and conclusions if such

22    statements are rationally based on the perception of the

23    witness and helpful --

24            **THE COURT:**  She needs to record it.  Go slow.

25            **MR. FOX:**  Okay.

1          -- and helpful to a clear understanding or determination

2     of a fact at issue.  Lay witnesses can render opinions if they

3     have personal knowledge to support their perceptions and if

4     there's a rational basis for the conclusion.

5               **THE COURT:**  But not an expert opinion.

6               **MR. FOX:**  I'm not using the term "expert."

7               **THE COURT:**  You may not use it, but you may not

8     describe him in such a way going forward.

9               **MR. FOX:**  I will not use the term or describe him as

10    such.

11              **THE COURT:**  Response?

12              **MR. KEALEY:**  It is clearly an expert opinion whether

13    he calls it that or not.  It's an opinion based on a hypothesis

14    of what the University would view as her tenure qualifications,

15    so that is an opinion based on an expert determination because

16    granting tenure is, by definition, an expert determination.

17              **THE COURT:**  But he was on the committee, correct?

18              **MR. KEALEY:**  Not on the primary committee, number

19    one, and, number two, not on Tatyana Sizyuk's committee.  So

20    opining about what the committee in this case should have done

21    in her case is an expert opinion.

22              **MR. BOWLING:**  I would just add, Your Honor, the

23    issue of tenure is not a matter that is ordinarily within the

24    common knowledge.  Therefore, it's in section -- illustrates

25    this in Rule 702, not Rule 701, which merely pertains to things

1   like the speed of a car.  Whether somebody qualifies for tenure

2   is, as Purdue's counsel said, the very nature of an expert

3   opinion.

4           **THE COURT:**  As I'm understanding, he wasn't on this

5   tenure committee.  He wasn't involved with regard to the

6   plaintiff's --

7           **MR. KEALEY:**  That's correct.

8           **THE COURT:**  And he never served in that capacity for

9   Purdue?

10          **MR. FOX:**  He just testified that he served on

11  numerous tenure committees at Purdue, so he is aware of the

12  tenure process at Purdue.

13          **THE COURT:**  For the same position that your client

14  is going for?

15          **MR. FOX:**  I think he just testified that the EAPC

16  committee, which is the next tenure position up from the NEPC

17  committee, so he's aware of that.

18          **THE COURT:**  But he has never been on the NEPC?

19          **MR. FOX:**  I can ask him.

20          **MR. BOWLING:**  He has not.

21          **MR. KEALEY:**  He's ineligible because he's not a

22  tenured professor.  Only tenured professors can be on the NEPC.

23          **THE COURT:**  That's a problem.  That's a problem.  He

24  can testify as to his beliefs, but he can't testify or

25  represent that he knows what the committee is looking for in a

 1    candidate.  That's what I'm hearing so far.

 2         **MR. FOX:**  Well, I would like to ask him -- he's

 3    aware of the criteria for tenure.

 4         **THE COURT:**  How would he know?

 5         **MR. FOX:**  Because he's served on all these

 6    committees that look at the same criteria because he's looked

 7    at other tenure committees.

 8         **THE COURT:**  But has he ever been on one?

 9         **MR. FOX:**  Other ones, but he has not been this

10    specific NEPC --

11         **MR. KEALEY:**  He has never been on a primary

12    committee, Your Honor, because he is ineligible by University

13    policy.

14         **THE COURT:**  He would be able to testify to the

15    lesser ones, but I think there has to be disclosure that he has

16    never been on the NEPC.  And then I would assume that the

17    cross-examination will bring that out.

18         **MR. KEALEY:**  Yes.  And to our original objection, I

19    don't know he can give an opinion on what any committee should

20    have done.

21         **THE COURT:**  What about the NEPC committee because

22    that's what's at issue?

23         **MR. KEALEY:**  Any other committee, that's not

24    personal knowledge.  It's just an opinion about what's -- it's

25    like saying, "This is how I think some physician at the

1    hospital should have performed that surgery."

2            THE COURT:  He can testify with regard to his own

3    experience serving on tenure committees.  I would suggest

4    making sure that it's all -- that it was involved in this case

5    involving the plaintiff.

6        And you can certainly follow up and clarify that to the

7    jury through cross-examination, but that's as far as he gets.

8    He can't be presented as knowing how the NEPC works because

9    he's never been on one.

10           MR. FOX:  So let me -- I want to make sure --

11           THE COURT:  Just be specific.

12           MR. FOX:  So it's my understanding that all the

13   committees looked at basically discovery, learning, and

14   engagement.  So I can ask him what he knows about her

15   qualifications with each of those without mentioning the tenure

16   committee?

17           THE COURT:  Well, the setup is that it's always been

18   presented that those are matters that are considered by the

19   NEPC.  But the question is whether or not they look at it in

20   the same way, in the same way as the other committees that he

21   has served on.

22       It just seems to me that the jury needs to know the

23   limitations of his involvement on other tenured committees.

24   They're not the same as the NEPC and may not have the same

25   standards as NEPC did.  That's what I'm understanding the

1    objection is going to.

2        **MR. BOWLING:**  Your Honor, we also have to go back to

3    the fundamental problem, which is it's still an opinion.

4        **THE COURT:**  But he's not an expert in this specific

5    range, as I understand it.

6        **MR. BOWLING:**  Which is exactly why he shouldn't be

7    allowed to render an opinion as to whether she meets any

8    criteria.  That's still the nature of the Rule 702 opinion.

9        **MR. KEALEY:**  I think the distinction here is he can

10   certainly testify as to his personal opinion of how good a

11   scientist he is, how good a teacher she is.  But the word

12   "qualifications" means in this context tenure qualifications.

13   That's the distinction.

14       **MR. FOX:**  I can ask -- I just want to make it clear.

15   I don't want to violate your ruling, Your Honor.  I can ask him

16   what his personal knowledge is of her research, of her

17   publications, of her funding, of her teaching, of her

18   leadership, those are all on the table, correct?  I can ask him

19   does he have personal knowledge of that?

20       **THE COURT:**  I believe so.  He can't be a part of

21   indicating what the NEPC should have done or how they should

22   have or how --

23       **MR. KEALEY:**  In other words, they'll stay away from

24   the qualifications, I believe.

25       **THE COURT:**  Okay.  Let's go.

1      (End of bench conference.)

2   **BY MR. FOX:**

3   **Q.**   Sorry about that.

4   **A.**   I'm still here.

5   **Q.**   And thanks for being here.  You did not serve on

6   Dr. Sizyuk's NEPC committee for tenure, correct?

7   **A.**   No.

8   **Q.**   Okay.  But I believe that you have stated that you are

9   familiar with the work she did at Purdue?

10  **A.**   Correct.

11  **Q.**   Okay.  And based upon your personal knowledge of the work

12  that she did, could you explain, as best you can, some of the

13  research that you're aware that Dr. Sizyuk participated in?

14  **A.**   Yeah.  Well, she did very critical work in nuclear fusion,

15  development of materials that, as I say, will stand up to the

16  plasma.

17     She worked with explaining experiments in the U.S. and in

18  Europe and Russia, and that's very important to be able to

19  compute what's going on and provide an explanation.  She did

20  work, as I said, in the semiconductor industry.  She did some

21  very important work with lasers.  There's all sorts of

22  applications like identifying nuclear material.  There's a big

23  concern, as I think everyone knows about, people smuggling

24  material for atomic bomb or dirty bomb into the country, and

25  the detection of those materials involve -- there is laser

1    technology, so Tatyana made significant contributions to that

2    field.

3        She has developed absolutely world-leading computer codes,

4    computer packages, two major code packages.  So her work has

5    been extensive and extremely important in a number of fields.

6    **Q.**  Are you aware of any funding that Dr. Sizyuk brought in?

7    **A.**  She's brought in quite a bit of funding, yeah.

8    **Q.**  How important, in your experience at Purdue, is funding?

9    **A.**  To me, that's very important.  And you'll hear different

10   opinions that, "Oh, it's not unbelievably critical," but it is

11   quite important.

12   **Q.**  Why is it important to bring in funding?

13   **A.**  It supports undergraduate students and graduate students.

14   It supports development of laboratories, of equipment, of work

15   on supercomputers.

16   **Q.**  And are you -- I think -- are you also aware of any

17   teaching that Dr. Sizyuk did while she was at Purdue and you

18   were there?

19   **A.**  Yeah.  She developed, again, an extremely important course

20   in what's called computational science.  What that is, it's the

21   use of computers, particularly supercomputers, to basically

22   make -- simulate an experiment on the computer.  This is a very

23   important area worldwide, and this is a very innovative course.

24   To me, it's perfect for a school like nuclear engineering to

25   develop this course, so Tatyana developed this course and

1    taught it.  She also taught sort of a straightforward nuclear

2    engineering type courses.

3    **Q.**   And that would be to Purdue students?

4    **A.**   Sorry?

5    **Q.**   Was that to Purdue students?

6    **A.**   Purdue students, yeah.

7    **Q.**   And in the School of Nuclear Engineering, did you have to

8    attend different conferences and things of that nature --

9    **A.**   Right.

10    **Q.**   -- during your time there?

11    **A.**   Right.

12    **Q.**   What do you have personal knowledge of in terms of

13    Dr. Sizyuk attending conferences or doing presentations?

14    **A.**   She had a major record in attending conferences in these

15    fields, in fusion, in the semiconductor meetings in California

16    and elsewhere, San Jose, in the laser field.  She gave

17    numerous -- you almost couldn't count the number of

18    presentations she gave at conferences.

19    **Q.**   And who would attend these conferences?

20    **A.**   Sorry?

21    **Q.**   Who would normally attend these conferences?

22    **A.**   This would be researchers in the field from industry;

23    universities and national labs; international folks, the

24    Europeans, Japanese, in most cases; students.

25    **Q.**   And so she is giving -- or speaking on different topics to

1    her peers in the field?

2    **A.**   Yes.  She had invited talks, which is a big deal at a

3    university to be invited to talk at a conference.

4    **Q.**   Do you know an individual named Dr. John Paul Allain?

5    **A.**   I do.

6    **Q.**   And how well do you know him?

7    **A.**   I know him very well.  I was on his Ph.D. committee, for

8    example.

9    **Q.**   And how long have you known him?

10   **A.**   You know, roughly, order of 20, 25 years.

11   **Q.**   And have you worked closely with him through those years?

12   **A.**   I have in the past, yeah.

13   **Q.**   Where did you work with him?

14   **A.**   I worked with him at Argonne.  He was also at Purdue.  I

15   worked with him, to some extent, at Purdue.  We had joint

16   publications, for example.

17   **Q.**   Did you work with him and Dr. Sizyuk while you were at

18   Purdue?

19   **A.**   Yes.

20   **Q.**   And would that also be, at times, on a day-to-day basis?

21   **A.**   Yes, more or less.

22   **Q.**   Are you aware of any reason why Dr. Allain may be biased

23   against Dr. Sizyuk?

24            **MR. KEALEY:**  Objection, Your Honor.  Leading and

25   lack of foundation as to this witness's personal knowledge on

1    that topic.

2              **THE COURT:**  Sustained.

3    **BY MR. FOX:**

4    **Q.**  Have you witnessed any interactions between Dr. Allain and

5    Dr. Sizyuk?

6    **A.**  I'm sorry.  Witnessed?

7    **Q.**  Have you witnessed any interactions between Dr. Allain and

8    Dr. Sizyuk?

9    **A.**  Yes.

10   **Q.**  What kind of interactions stand out in your mind between

11   the two?

12   **A.**  I think it varied from reasonable friendly interactions to

13   interactions with a degree of friction.

14   **Q.**  Can you expand on that friction?

15   **A.**  I think Dr. Allain -- JP, we call him, John Paul -- had

16   some issues with competition for funding --

17             **MR. BOWLING:**  Objection, Your Honor.  That's going

18   into somebody else's state of mind.  That would be speculation.

19             **THE COURT:**  Sustained.  You can rephrase it so it

20   doesn't.

21   **BY MR. FOX:**

22   **Q.**  What did you personally witness in terms of this friction

23   between Dr. Sizyuk and Dr. Allain?

24   **A.**  I think JP was somewhat argumentative, had some degree of

25   hostility toward --

1          **MR. BOWLING:**  Objection, Your Honor.  Same problem.

2  Move to strike.

3          **THE COURT:**  I will.  That is stricken.  The jury is

4  to disregard the witness's last statement.

5       You can rephrase your question not to draw that.

6  **BY MR. FOX:**

7  **Q.**  I'm just interested in anything you personally witnessed

8  with regard to this friction --

9  **A.**  Yeah, I've seen --

10          **THE COURT:**  Sir, Professor, please wait until he's

11  done with his question and listen to that.  Then you can

12  answer.  Don't anticipate it.

13  **BY MR. FOX:**

14  **Q.**  So I'm just interested in things you personally witnessed

15  or heard between Dr. Allain and Dr. Sizyuk when you explained

16  that there was friction.  What did you personally hear or

17  witness between the two?

18  **A.**  I don't remember the exact words or dialogue.  I would

19  characterize it as friction and a degree of hostility.

20  **Q.**  Do you know where Dr. Allain is working today?

21  **A.**  He's working at the U.S. Department of Energy.

22  **Q.**  Do you know when Dr. Allain -- Dr. Allain did work at

23  Purdue, correct?

24  **A.**  Yes.

25  **Q.**  But he's no longer there, correct?

 1  **A.**  Correct.

 2  **Q.**  Do you know an individual by the name of Dr. Ishii?

 3  **A.**  I do.

 4  **Q.**  And how do you know Dr. Ishii?

 5  **A.**  I know Dr. Ishii from working at Purdue.  Dr. Ishii had a

 6  second home in the same town that I live in, Barrington,

 7  Illinois.

 8  **Q.**  And have you worked with Dr. Ishii on a professional basis

 9  at Purdue?

10  **A.**  No.

11  **Q.**  Have you served on any committee with Dr. Ishii while at

12  Purdue?

13  **A.**  Yes.

14  **Q.**  Do you recall what committees you have served with him?

15  **A.**  There were a number of hiring committees, search

16  committees.  Search committee for hiring the head of the

17  school; search committee for hiring faculty.

18  **Q.**  Have you observed Dr. Ishii working with other employees

19  within the School of Nuclear Engineering at Purdue?

20  **A.**  Yes.

21  **Q.**  Have you ever heard Dr. Ishii make any statements that

22  would reflect bias against women?

23  **A.**  I have heard extensive statements to that affect from

24  Dr. Ishii.

25  **Q.**  What statements that you --

1   **A.**   Antifemale statements.

2   **Q.**   What specific statements do you recall that you heard that

3   Dr. Ishii made that were anti -- that were biased against

4   women?

5   **A.**   He would call women stupid, lazy, incompetent; they're

6   taking advantage of the stupid U.S. legal system, the stupid

7   affirmative action system.  He would personally, severely

8   criticize various women faculty.  There were several deans at

9   the school that he would -- was very negative about in terms of

10  them being female.

11  **Q.**   Based on your observations and experience with Dr. Ishii

12  while at Purdue, are you aware of any power or influence he had

13  within the School of Nuclear Engineering?

14          **MR. BOWLING:**   Objection, Your Honor.  There is no

15  foundation for this person to offer an opinion as to that

16  matter.

17          **THE COURT:**   One moment.  I want to read it back.

18  Can you scroll back?

19      (The record was read as requested.)

20          **THE COURT:**   Thank you.

21      Objection overruled.  I'll allow him to testify from his

22  personal experience and knowledge.

23  **BY THE WITNESS:**

24  **A.**   Yeah.  Dr. Ishii was very, very persuasive in the various

25  meetings and conversations.  He seemed to have a substantial

1   influence, frankly, even on me in terms of the, like, search

2   committees.  And he's a very intelligent person.  He makes a

3   good argument; this is, when he's not denouncing females, okay?

4   He has good arguments, reasonable, so I think he has --

5           **MR. BOWLING:**  Objection, Your Honor.  We've gone far

6   beyond the answer to the question.

7           **THE COURT:**  Sustained.  Next question.

8   **BY MR. FOX:**

9   **Q.**  Who were some of the -- you mentioned CMUXE earlier in your

10  testimony.  Who were some of the people that worked with you on

11  the CMUXE project while at Purdue, like individuals.

12  **A.**  Well, Tatyana, of course; John Paul Allain, himself.

13          **THE COURT:**  What was that last name?

14          **THE WITNESS:**  A-L-L-A-I-N, Allain.

15  **A.**  There were various students, graduate students.  A number

16  of people, but those were my main collaborators.

17  **Q.**  Dr. Hassanein, did he also work --

18  **A.**  Oh, of course, yeah.  I'm sorry.  Yeah, Ahmed Hassanein.

19  Yeah, I worked with Ahmed.

20  **Q.**  And did you all work together on this CMUXE project?

21  **A.**  Depends on the particular project, but we -- yeah, not

22  in -- I mean, there was a lot of subprojects within the group.

23  **Q.**  And did sometimes individuals within CMUXE -- are you aware

24  whether they worked on projects independently?

25  **A.**  I'm sorry.  Repeat that, please.

1    **Q.**  Would individuals working on CMUXE at Purdue also work on

2    projects --

3    **A.**  Oh, yes, yes.

4    **Q.**  -- independently?

5    **A.**  Yeah, totally.

6    **Q.**  And did Dr. Sizyuk -- are you aware of her working on

7    projects independently?

8    **A.**  Yes, very much so.

9    **Q.**  And when you say "very much so," can you recall some of the

10   projects that she worked on while at Purdue on an independent

11   basis?

12   **A.**  Yeah.  Well, she worked with these codes that she developed

13   or improved, like I say, within the fusion research of the U.S.

14   Likewise, the semiconductor industry, computations, developing

15   of sources for the chip generations.  So, you know, sometimes

16   there's overlap; sometimes it's completely independent

17   research.

18   **Q.**  And sometimes you had to work together as a team, right?

19   **A.**  Uh-huh, yes.

20   **Q.**  Do you know something called HEIGHTS?

21   **A.**  The HEIGHTS computer code, yeah.

22   **Q.**  And what is HEIGHTS?

23   **A.**  This is a computer package that simulates the interaction

24   with a high power source of energy with a material.

25   **Q.**  And do you know anyone who developed HEIGHTS?

1   **A.**   Ahmed Hassanein worked on the original development.

2   Tatyana took it in her own direction.

3   **Q.**   From Dr. Hassanein?

4   **A.**   She took the original code but substantially expanded it,

5   tested it, calibrated it against experiments, and applied it to

6   numerous different areas.

7   **Q.**   And do you know whether she did that by herself?

8   **A.**   Yeah, she did -- yeah, that was done by herself by her own

9   efforts.

10          **MR. FOX:**   Thank you.

11          **THE WITNESS:**   Okay.

12                          **CROSS-EXAMINATION**

13   **BY MR. KEALEY:**

14   **Q.**   Good morning, Dr. Brooks.

15   **A.**   Hello.

16          **MR. KEALEY:**   Your Honor, we would like to show the

17   witness, for identification, Plaintiff's Exhibit 34, which is

18   not yet in evidence, which is Dr. Brooks's CV.

19   **BY MR. KEALEY:**

20   **Q.**   Dr. Brooks, please take a look at the screen in front of

21   you and verify the exhibit in front of you is your CV?

22   **A.**   Yes, it is.

23          **THE COURT:**   Are you moving for it to be entered at

24   this time?

25          **MR. KEALEY:**   Yes, just identifying it for the

1     record, and now I move it into evidence, Your Honor.

2               **THE COURT:**  And this is 34, did you say?  I'm sorry.

3     Any objection?

4               **MR. FOX:**  No, Your Honor.

5               **THE COURT:**  We'll show its admission.

6          Can the jury see it?

7               **THE JURORS:**  (Nodding head.)

8               **THE COURT:**  Okay.

9     **BY MR. KEALEY:**

10    **Q.**  Dr. Brooks, I would just like to look at a few things in

11    your CV.  You testified about your Ph.D. in 1972 and that there

12    came a time when you went to Argonne National Labs, I believe

13    you said, in the 1970s.  In your CV you show as going to

14    Argonne in 1974 and staying there until 2008.

15         When during that period, 1974 to 2008, did you start

16    working with Dr. Hassanein?

17    **A.**  I can only estimate it.  I think that was in the late --

18    somewhere around 1980.

19    **Q.**  And did you work with Dr. Hassanein continuously from 1980

20    until when you left Argonne in 2008 to come to Purdue?

21    **A.**  We were both there.  You know, we worked -- if we had a

22    particular project, we would work on it.  I wouldn't say every

23    month or even every year, but we did collaborate during that

24    period, yes.

25    **Q.**  Regularly?

1    **A.**   Yes.

2    **Q.**   So you collaborated regularly with Dr. Hassanein at Argonne

3    for approximately 28 years?

4    **A.**   Yeah, sounds about right.

5    **Q.**   And then when you came to Purdue in 2008, you came to

6    Purdue at the request of Dr. Hassanein, correct?

7    **A.**   Yes.

8    **Q.**   And you continued to work with Dr. Hassanein at Purdue,

9    correct?

10   **A.**   Yeah.

11   **Q.**   For another eight years until 2016?

12   **A.**   Yes.

13   **Q.**   And then after 2016 your position changed from research

14   professor to adjunct professor but you continued to work with

15   Dr. Hassanein, correct?

16   **A.**   Well, there was a period where I wasn't working with

17   anybody, but then I was -- we did get some funding in 2019 to

18   just last year; so I picked up again.  And I was glad to do

19   that after a period of retirement.  So, yes, then I did work

20   with Ahmed again.

21   **Q.**   So if we summarize, from 1980 to 2023, a period of

22   43 years, you worked regularly with Ahmed Hassanein throughout

23   that entire period, correct?

24   **A.**   Yeah, except for the gaps, the various gaps.

25   **Q.**   And at least some of those gaps were at times when the

1    funding ran out for your position, right?

2    **A.**   No, it didn't run out.  I just retired, basically.

3    **Q.**   You indicated a moment ago that "we got some more money"

4    and you were able to come back to work, right?

5    **A.**   Right.

6    **Q.**   So that meant that Ahmed Hassanein got some more money so

7    you could come back to work, right?

8    **A.**   Well, I mean, my name was on the proposal.

9    **Q.**   And his was too?

10   **A.**   Yeah.

11   **Q.**   You never served on the Nuclear Engineering Primary

12   Committee, correct?

13   **A.**   Correct.

14   **Q.**   You have never been tenured at Purdue, correct?

15   **A.**   Correct.

16   **Q.**   You have never been tenured at any university, correct?

17   **A.**   Correct.

18   **Q.**   Let's talk now about CMUXE for a moment.  CMUXE, the Center

19   for Materials Under eXtreme Environments, had a workspace in a

20   building at Purdue called Potter, right?

21   **A.**   Potter, yeah.

22   **Q.**   And the Potter building was different from where the School

23   of Nuclear Engineering was located?

24   **A.**   Right.  It was next door at the time.

25   **Q.**   And the CMUXE space and the Potter building had some

1    offices and some lab space, right?

2    **A.**   Right.

3    **Q.**   That's where you sat?

4    **A.**   Uh-huh.

5    **Q.**   Yes?

6              **THE COURT:**  Is that yes?

7              **THE WITNESS:**  I was on the third floor, yep, of

8    Potter.

9    **BY MR. KEALEY:**

10   **Q.**   And that's where Dr. Sizyuk had her office as well?

11   **A.**   Correct.

12   **Q.**   And Dr. Hassanein had an office in CMUXE, correct?

13   **A.**   Yes.

14   **Q.**   Dr. Brooks, when did Tatyana Sizyuk leave CMUXE?

15   **A.**   I don't have the exact date.  She was denied tenure, so

16   that was the end of her career at Purdue.

17   **Q.**   She left CMUXE when she left Purdue, right?

18   **A.**   Yeah.

19   **Q.**   In 2021?

20   **A.**   Okay.  That sounds right.

21   **Q.**   She was at CMUXE her entire Purdue career, wasn't she?

22   **A.**   At Purdue, yeah.

23   **Q.**   Just one final question, Dr. Brooks.  You testified about

24   Dr. J.P. Allain's current position at the Department of Energy.

25   He is currently the associate director of science for fusion

1   Energy Sciences at the Department of Energy, correct?

2   **A.**   Correct.

3               **MR. KEALEY:**   Thank you.

4                       **CROSS-EXAMINATION**

5   **BY MR. BOWLING:**

6   **Q.**   Good morning, Dr. Brooks.

7   **A.**   Hello.

8   **Q.**   Just have a few questions for you.  I believe you said a

9   few minutes ago that you found Dr. Ishii to be a very

10  persuasive man, correct?

11  **A.**   Yes.

12  **Q.**   Now, just to clarify, you've never had tenure at Purdue?

13  **A.**   I was hired as a research professor.  I didn't need --

14  **Q.**   Just yes or no --

15  **A.**   -- or want tenure.

16  **Q.**   Did you have tenure at Purdue?

17  **A.**   I'm sorry?

18  **Q.**   You've never had tenure --

19  **A.**   No.

20  **Q.**   -- at Purdue?

21  **A.**   No.

22              **THE COURT:**   Gentlemen, don't speak over each other.

23  We can't make a proper transcript.  Re-present your question to

24  him.

25              **MR. BOWLING:**   Okay.

1      **THE COURT:**  And listen carefully and wait until he's

2  done and then you can respond.

3      **THE WITNESS:**  Thank you.

4  **BY MR. BOWLING:**

5  **Q.**  Dr. Brooks, you have never had tenure anywhere, correct?

6  **A.**  That's correct.

7  **Q.**  Okay.  And you have never served on any primary committee

8  at Purdue, correct?

9  **A.**  Correct.

10  **Q.**  And you certainly have never served on the School of

11  Nuclear Engineering's primary committee, correct?

12  **A.**  Correct.

13  **Q.**  Now, I believe you said earlier that Dr. Ishii made some

14  derogatory remarks about women, correct?

15  **A.**  Yes.

16  **Q.**  I believe you said that he commented that women are stupid;

17  is that correct?

18  **A.**  Yes.

19  **Q.**  Did you make a report, a written report, to anyone about

20  those remarks?

21  **A.**  No.

22  **Q.**  Did you make any contemporaneous notes about those remarks?

23  **A.**  I don't think so.  I don't quite remember.

24  **Q.**  Did you send an e-mail to anybody saying, "Wow, I just

25  heard Dr. Ishii say something like this"?

1  **A.**  Well, I thought about all of those questions and he did not

2  affect anyone I knew directly so --

3  **Q.**  Dr. Brooks, I'm sorry.  Please, just answer the question.

4  **A.**  I'm sorry?

5  **Q.**  Please, the question calls for a yes-or-no answer.

6  **A.**  Okay.  I'm sorry.

7  **Q.**  Did you send an e-mail to anybody about the remarks that

8  you claim Dr. Ishii made about women?

9  **A.**  What was that last part?  Did I what?

10  **Q.**  Let me rephrase the question.  It's a bad question.  Let me

11  rephrase it.

12  With respect to these derogatory remarks that you claim

13  Dr. Ishii made about women, did you send anybody an e-mail

14  concerning those remarks?

15  **A.**  No, no e-mail.

16  **Q.**  Okay.  So, in fact, there's no written record that you're

17  aware of with respect to those remarks that you allege?

18  **A.**  Correct.

19  **Q.**  Okay.  Dr. Brooks, is it appropriate to comment on the

20  physical appearance of your female colleagues?

21  **A.**  Of what?  I'm sorry.

22  **Q.**  Would it be appropriate -- let me rephrase the question.

23  Would it be appropriate for you to comment on the physical

24  appearance of your female colleagues?

25  **A.**  I don't think so, no.

1    **Q.**   But you have done that, correct?

2    **A.**   No.

3    **Q.**   Okay.  Are you sure?

4    **A.**   The female -- the appearance of female --

5    **Q.**   Right.  You've done that, correct?

6    **A.**   At the school?  I don't think so.

7    **Q.**   Yes.

8    **A.**   I don't think so.

9    **Q.**   Okay.

10              **MR. BOWLING:**  No further questions.

11              **THE COURT:**  Redirect?

12                     **REDIRECT EXAMINATION**

13   **BY MR. FOX:**

14   **Q.**   I don't think you were finished with one of your answers,

15   so I'm going to give you the opportunity.

16        Why did you not make a report about Dr. Ishii's derogatory

17   remarks concerning women?

18   **A.**   Well, I thought about that, but at the time there was no

19   specific negative affect that was going on.  I'm not saying it

20   too well.  It didn't seem to matter that much at the time.

21   There was no one up for tenure.  There was no Tatyana Sizyuk up

22   for tenure.  He did cause some damage at a review --

23              **MR. BOWLING:**  Objection, Your Honor.  The witness is

24   now in a narrative fashion not responding to the question.

25              **MR. FOX:**  He's still answering the question,

1   Your Honor.

2           **THE COURT:**  Is it relevant to this issue in this

3   case?  Ask the next question.

4           **MR. FOX:**  I have no further questions.

5           **THE COURT:**  Recross?

6           **MR. BOWLING:**  No, Your Honor.

7           **THE COURT:**  Anything else from the University?

8           **MR. KEALEY:**  No.

9           **THE COURT:**  Can this witness now be excused?

10          **MR. FOX:**  Yes, Your Honor.

11          **THE COURT:**  You may step down.

12      Next witness.

13      Sir, would you please come up to the front of the court

14  and face my deputy.  He'll administer the oath for you to

15  testify.

16      (The oath was duly administered.)

17          **THE WITNESS:**  I do.

18          **THE COURT:**  Now you may take the stand.  And you can

19  move that microphone however is most comfortable for you.

20          **THE WITNESS:**  Thank you.

21          **AHMED HASSANEIN, PLAINTIFF'S WITNESS, SWORN**

22                    **DIRECT EXAMINATION**

23  **BY MR. FOX:**

24  **Q.**  Good morning.  Can you please state your name for the

25  record.

 1   **A.**   Ahmed Hassanein.

 2   **Q.**   Dr. Hassanein, can you briefly explain to the jury your

 3   educational background?

 4   **A.**   I went to school at the University of Wisconsin.  I get

 5   three degrees:  Master degree in physics, master degree in

 6   nuclear engineering, and Ph.D. in nuclear engineering.

 7   **Q.**   And can you briefly give a background to the jury of your

 8   employment history?

 9   **A.**   After graduation from University of Wisconsin, I joined

10   Argonne National Lab.  I stayed there for about 25 years; and

11   then I moved to Purdue in 2007, end of 2007, and till now I

12   still at Purdue.

13   **Q.**   And what is your current position at Purdue?

14   **A.**   I'm the Paul L. Wattelet & Distinguished Professor of

15   Nuclear Engineering.

16           **THE COURT REPORTER:**  Can you say that again, please?

17           **THE WITNESS:**  Paul L. Wattelet & Distinguished

18   Professor of Nuclear Engineering.

19   **BY MR. FOX:**

20   **Q.**   And at Argonne -- when did you leave Argonne?

21   **A.**   2007.

22   **Q.**   And when you came to Purdue, what was your job title?

23   **A.**   Was a professor, nuclear engineering.

24   **Q.**   Tenure professor or --

25   **A.**   Tenured, yes.  I was a director of the U.S. Fusion Power

1    Program at the Argonne National Lab, so has to be tenure.

2    **Q.**   And what school within Purdue did you work for?

3    **A.**   Nuclear engineering.

4    **Q.**   And you said you worked at Argonne for 25 years.  What was

5    your last position at Argonne?

6    **A.**   Was the director of the United States Department of Energy

7    Fusion Power Program and also group manager and leader.

8    **Q.**   Can you briefly explain the circumstances that led you to

9    work at Purdue.

10   **A.**   Well, actually, they came to recruit me.  It was our team.

11   The current -- you know, at that time the current department

12   head, acting, and dean -- the dean just send me a message, said

13   that she would be on travel, Dean Jamieson.  She would send her

14   associate there, associate dean, so we came and was recruiting

15   me to join them.

16   **Q.**   So were you recruited to come work at Purdue?

17   **A.**   Yes.

18   **Q.**   And do you know an individual by the name of Dr. Bralts?

19   **A.**   Yes.  He's Vince Bralts.  He was an interim.

20   **Q.**   Was he part of your recruitment?

21   **A.**   Yes, he came to Argonne.

22   **Q.**   And do you know an individual by the name of Dr. Kokini?

23   **A.**   Kokini.

24   **Q.**   Kokini?

25   **A.**   Yeah.  Dr. Kokini is the associate dean.  He also came.

 1   **Q.**   And was he involved in your recruitment to Purdue?

 2   **A.**   Yes, he came -- yes, together.

 3   **Q.**   And I believe you stated that you started Purdue with

 4   tenure; is that correct?

 5   **A.**   Oh, yes.  Yeah.  In fact, they ask -- they said if you --

 6   somebody said if I wanted to be a distinguished professor, to

 7   come to -- leave Argonne.  But I didn't.  I just accepted

 8   professor first.

 9   **Q.**   And do you know an individual by the name of

10   Tatyana Sizyuk?

11   **A.**   Yes.

12   **Q.**   Okay.  And when did you first meet Dr. Sizyuk?

13   **A.**   2002 or '03.

14   **Q.**   And where did you meet her?

15   **A.**   Her husband works in our -- you know, together in Argonne

16   National Lab at that time, and we had a position.  The group

17   was like 25 people in our group, 25, 26.  And given her

18   background -- she has master in mathematics -- we hired her to

19   help.

20   **Q.**   Okay.  And did you work closely with Dr. Sizyuk the

21   remaining years you were at Argonne?

22   **A.**   Yes.

23   **Q.**   And do you recall what Dr. Sizyuk's last position at

24   Argonne was?

25   **A.**   Research scientist.  Argonne does not have a lot of these

1    positions so -- like research scientist -- like after two years

2    we have research scientist, senior research, these kind of

3    things.

4    Q.   And how closely did you work with Dr. Sizyuk at Argonne?

5    A.   We have meetings every week, et cetera.  So we have, as I

6    said, 25, 26 people doing different projects.

7    Q.   Were you familiar with Dr. Sizyuk's job duties while she

8    was at Argonne with you?

9    A.   Yes.  She was doing some computer programming.  She's also

10   excellent in writing programs to simulate certain -- the

11   project that we working on.

12   Q.   Do you know whether or not she was the head of any programs

13   at Argonne?

14   A.   There is no head of programs.  It's only -- I was the only

15   head for the group.

16   Q.   Do you know whether or not Dr. Sizyuk had a Ph.D. while at

17   Argonne?

18   A.   No, she wasn't.

19   Q.   Was a Ph.D. necessary at Argonne to be a research

20   scientist?

21   A.   No, no.  We had a lot of scientist with bachelor degree and

22   master degree.

23   Q.   In your experience is that uncommon to not have a Ph.D.

24   while working as a scientist?

25   A.   No, not uncommon.  A lot of people prefer to work rather

1    than having Ph.D.

2    **Q.**   What are the other --

3    **A.**   May I add?

4    **Q.**   Sure.

5    **A.**   Argonne, they have a position, you know, like position

6    description for a job.  Everybody can apply.  They said, if you

7    have, like, a Ph.D, then they hire.  If you have a master

8    degree, then if you have three additional years of service,

9    this kind of things.  Bachelor may be eligible at three or

10   four years additional.

11   **Q.**   What are the educational requirements, if any, at Argonne

12   to be a research scientist, if you know?

13   **A.**   Just to have a degree, college degree.

14   **Q.**   When you were hired by Purdue, did any Argonne employees

15   come to Purdue with you?

16   **A.**   Argonne?  You mean --

17   **Q.**   When you were hired at Purdue, did any Argonne employees

18   come to Purdue with you?

19   **A.**   Yes, several.

20   **Q.**   Do you remember who those individuals where?

21   **A.**   Dr. Brooks, he is internationally known scientist;

22   Dr. Valeryi Sizyuk; Dr. Tatyana Sizyuk; also another person,

23   Dr. Harilal, who left Purdue; and there is Dr. Konkashbaev and

24   Dr. Insepov.

25              **THE COURT REPORTER:**  Can you repeat those names?

1        **THE WITNESS:**   Konkashbaev and Insepov.

2    **A.**   So they did not come to Purdue, but we gave them a position

3    for like consultant or so.

4    **BY MR. FOX:**

5    **Q.**   Do you know what position Dr. Sizyuk started with at

6    Purdue?

7    **A.**   Research scientist.

8    **Q.**   Was that a nontenure-track position?

9    **A.**   Yeah, nontenure.

10   **Q.**   And did your role at Purdue after you were hired -- did

11   that change at some point?  Did you have a new job title?

12   **A.**   Me?

13   **Q.**   Yes.

14   **A.**   Yeah.  I was professor first and then became head in 2009.

15   And then in 2000 -- I don't run for tenure, so I get the

16   distinguished professorship.  Before that, I also got the Paul

17   L. Wattelet professorship.

18   **Q.**   Okay.  So in 2009 you became the head of the School of

19   Nuclear Engineering?

20   **A.**   Yes.

21   **Q.**   And as the head of School of Nuclear Engineering, what were

22   your primary responsibilities?

23   **A.**   Promoting the department, you know, increase the

24   application.  The main thing is to increase the ranking of the

25   department, and that requires a lot of work.  Also, meet with

1   the faculty, the students, all this kind of things that we do

2   there.

3   **Q.**  Were you in charge of any research groups?

4   **A.**  Yes, research.  We have center.  There is center for

5   research that we -- we -- you know, Purdue has about, you know,

6   30 to 40 centers.  In order to have -- the idea for Purdue to

7   do this is to publicize the research, and having a center it's

8   actually promoting Purdue rankings.

9       So we have created a center called CMUXE, Center for

10  Materials Under eXtreme Environment, and that's -- you cannot

11  create it by your own.  You have to -- Dr. Bralts told me that

12  we should do that because we'll have a larger group, and this

13  we had to apply for the University to approve it.  It's not

14  simple to get a -- just create a center.  You can create a

15  group but not a center, center that promote research for

16  Purdue.

17  **Q.**  And this Center for Materials Under eXtreme Environment,

18  was that one of the things that was brought over from Argonne?

19  **A.**  Not necessarily.  We did not have that in Argonne.  This --

20  when we came here, we diversify all the researches from nuclear

21  engineering to high energy, physics to material science, to

22  defense, to nanolithography, so we diversify the research here.

23  **Q.**  Can any member of the School of Nuclear Engineering be

24  involved in CMUXE?

25  **A.**  Oh, they will not give you a center unless you have a team.

1   You have to make a proposition to the university, and you have

2   to have significant number of people working, a lot of funds to

3   do that.  You know, there are criterias to get a center

4   approved.

5   **Q.**   You mentioned funding with regards to a center.  How does

6   one go about getting funding for something such as CMUXE?

7   **A.**   We writing proposals.  The university does not give you any

8   funding, so --

9   **Q.**   Excuse me.  You said --

10  **A.**   The University do not give you any funding.

11  **Q.**   Purdue did not give you any funding?

12  **A.**   No, no.  Any university -- some universities do but not

13  Purdue.

14  **Q.**   So how did you fund it?

15  **A.**   Well, writing proposals.  And that's the reason why they

16  came to Argonne to recruit us.  We have a lot of funding, many

17  projects, many outstanding scientists, and that actually ended

18  up promoting Purdue to be top ten in the nuclear engineering,

19  top ten in the nation.  Actually, we're eight --

20  **Q.**   Sorry to interrupt, but you said that you write proposals.

21  Do you do that just yourself as -- or do you do it with other

22  members --

23  **A.**   Oh, with others.

24  **Q.**   -- of CMUXE?

25  **A.**   All of them.  Like, Dr. Brooks was writing.  Dr. Sizyuk,

 1   both of them writing proposal.  Dr. Atsushi Sunahara also part

 2   of the CMUXE.  Alum Dr. Gennady Miloshevsky also part --

 3            **THE COURT REPORTER:**  Can you say that name again?

 4            **THE WITNESS:**  Gennady.  Gennady Miloshevsky.

 5            **THE COURT REPORTER:**  Thank you.

 6   **BY MR. FOX:**

 7   **Q.**  And so without these proposals -- and without these

 8   proposals for funding to come in, CMUXE wouldn't be able to

 9   support itself?

10   **A.**  No.

11   **Q.**  And I just want to be -- in terms of laypersons, briefly

12   explain what CMUXE does, if you can?

13   **A.**  It's a research center that do a lot of work in nuclear

14   fusion, nanolithography, materials programs, defense research,

15   biomedical.  So not a single person can do that, or even a

16   group to do that.  That's a challenging task.

17   **Q.**  And was Dr. Sizyuk part of CMUXE?

18   **A.**  Yes.  All of -- Dr. Sizyuk, Dr. Brooks, Dr. Harilal, and

19   Dr. Miloshevsky all were part of that.

20   **Q.**  And were you able to view Dr. Sizyuk's work in this CMUXE

21   group?

22   **A.**  Yes.

23   **Q.**  And how did she do?

24   **A.**  Outstanding, of course.  We left some group at Argonne.  I

25   had 25 I did not take.  I just took the best.

1    **Q.**  And at the time that Dr. Sizyuk came over to Purdue, do you

2    know how her salary was funded?

3    **A.**  All the nontenure people, all of them has to bring the

4    funding, and that's why Purdue came to recruit us, because we

5    would bring a lot of funding for them.  And this is funding,

6    that extra funding that we get, pay for -- we paid 55 percent

7    of that funding to her too.  So, actually, Purdue benefit the

8    most of that.

9    **Q.**  And I take it with funding because -- I take it, does CMUXE

10   need equipment?

11   **A.**  Yes, equipment and also salaries.  You have to pay the

12   scientists like Dr. Brooks, Dr. Valeryi Sizyuk,

13   Dr. Tatyana Sizyuk, Dr. Harilal, all these that we have to pay

14   them.  The University does not pay any dollar.

15   **Q.**  Was there a particular individual in the CMUXE group that

16   had a large role in funding the laboratory equipment at CMUXE?

17   **A.**  No, no.  All of them write proposal, help with proposal,

18   and do the research.

19   **Q.**  So it somewhat had to be a team effort?

20   **A.**  All of them has to be a team effort.

21   **Q.**  Do you know how long Dr. Sizyuk was a research scientist at

22   Purdue?

23   **A.**  She was research scientist and then senior research

24   scientist; and after that, she applied for a position,

25   tenure-track position.

1    **Q.**  And while she was a research scientist at Purdue, were you

2    witness to any of her accomplishments?

3    **A.**  Oh, yeah.  Of course, yeah.  If somebody doesn't perform,

4    we do not continue to support because this is soft money.  It's

5    not, like, coming from the university.

6    **Q.**  Can you briefly outline some of those accomplishments of

7    Dr. Sizyuk that stood out in your mind?

8    **A.**  A lot.  I mean, significant number of application in

9    different areas.  Usually, the people have, like, one area.

10   Most professor has one area.  She has done a lot of thing for

11   material science, for nuclear fusion, and for nanolithography.

12   These are very important project worldwide.

13       For fusion, for example, we try to -- we still trying for

14   70, 60 years to build a fusion reactor.  That's meaning, like,

15   bring the sun to build it on earth.  One, if we successful in

16   that, then there is no energy crisis for a million years, a

17   lifetime.  So it's very challenging.

18       So Dr. Sizyuk contributed a lot of that.  You have to heat

19   a gas very hot and confine it in a container.  Like the sun,

20   you can -- the sun, you can -- if the sun was out in a

21   container.  So we have to build that here on earth, and that's

22   being built right now, the first reactor.  It's called Iter in

23   Cadarache, France.  So there is 2,000 scientists over there

24   working, and we lead the part of the plasma activity

25   interaction for this research.

1   **Q.**  Did you consider this research important?

2   **A.**  Oh, this is number one in the world, all that.  We trying

3   to -- if we successful, we won't have to worry about oil or

4   coal or sun.  That would be infinite energy, basically.

5   **Q.**  That does sound important.

6   **A.**  She also continued to do nanolithography.  She's actually

7   one of the world leaders in nanolithography, meaning in order

8   to speed up the current version of the computers, you have to

9   put many, many tiny transistors to do that.  And then -- this

10  is because the current progress of computers is being slowed

11  down.  You cannot increase it.  So the next generation is --

12  this is a $300 billion industry, and Dr. Sizyuk has developed

13  codes to do this and simulate how to generate this plasma in

14  this tiny photon beams to make tiny transistors.

15      And because of that, she actually got the -- there is

16  something called fellow.  If you are -- have 20 years or so

17  experience, the society grant you fellow.  And fellow status

18  means the utmost highest status in research, and she got that.

19  There is a few at the entire Purdue.  Most of them not only

20  full professor but distinguished professor.  And she was only,

21  I think, assistant professor to get that, that award.

22  **Q.**  And you viewed that as a great accomplishment?

23  **A.**  Oh, there is -- that time to get that, you have to be --

24  there is a huge number of scientists in the world that they

25  have this, so -- excuse me.  Is there some water here?

1      But they have to do that --

2           THE COURT:  Can you bring some water for the

3   witness, please.

4      We'll get you a glass and a bottle of water.

5           THE WITNESS:  Thank you.

6   A.  So in order to tell you how they chosen, there is, like,

7   membership for that society, and less than .4 percent become

8   fellows.  And that's internationally.  Like when she got

9   fellows, there was 64 fellows -- I think 100,000 of people and

10  from different 16 to 20 countries usually.  She was one from

11  United States in nanolithography.

12  Q.  And when Dr. Sizyuk -- I'll let you have some water.

13      When Dr. Sizyuk was hired at Purdue, did she have a Ph.D.?

14  A.  No.

15  Q.  In your experience, are laboratory researchers required to

16  have a Ph.D.?

17  A.  Laboratory?  No.  Even -- what do you mean, laboratory?

18  Q.  For CMUXE, they weren't required to have a Ph.D. --

19  A.  No, no.

20  Q.  And do you know if Dr. Sizyuk ever received her Ph.D.?

21  A.  Yes, I think in 2014, '15, she got -- there is a -- you

22  can -- because she is senior scientist, so it's not like

23  that -- like a student, so there is higher standard for that.

24      So she was giving seminars over the world.  She has a lot

25  of research from NSF and DOE, et cetera.  So when people said

1    -- that was a little bit funny story.  People said, "Oh, thank

2    you, Dr. Sizyuk," and she said, "I'm not a doctor," at that

3    time.

4        So they said, "Why are you not a doctor?"

5            **MR. KEALEY:**  Your Honor, not only is the witness not

6    answering the question anymore, there is no foundation that he

7    was a participant in these conversations.

8            **THE COURT:**  Sustained.  You can restate --

9    **A.**  I --

10   **Q.**  Did you hear someone --

11           **THE COURT:**  Wait.  Listen carefully to the next

12   question.

13           **MR. FOX:**  We'll try not to talk over each other.

14   **BY MR. FOX:**

15   **Q.**  Did you hear individuals -- I think you just said you heard

16   individuals refer to Dr. Sizyuk as a doctor when she was not a

17   doctor.  Is that --

18   **A.**  Yes.

19   **Q.**  Okay.  And would she correct them on that?

20   **A.**  Yes.

21           **MR. KEALEY:**  Same objection, Your Honor.  I don't

22   know --

23   **BY MR. FOX:**

24   **Q.**  What kind of --

25           **THE COURT:**  Wait.  Let him make his record.

1          **MR. FOX:**  Sorry.

2          **MR. KEALEY:**  We have no foundation as to what

3     conversation this is and whether the witness was a full

4     participant in the conversation.  He seems to be talking now

5     about things that Dr. Sizyuk said, other people said, which

6     would also be hearsay.

7          **THE COURT:**  That's all sustained.  Rephrase the next

8     question to avoid that.

9     **BY MR. FOX:**

10    **Q.**  Okay.  So you mentioned you had overheard someone --

11    **A.**  So --

12         **THE COURT:**  Wait.  Listen to the --

13    **Q.**  -- refer to --

14         **THE COURT:**  -- end of the question.

15    **Q.**  -- refer to Dr. Sizyuk as not having a Ph.D.

16         Can you give one example of someone you heard make that

17    comment in front of you?

18    **A.**  Dr. Kazushige Takaki from Osaka University and

19    Dr. Igor Tralle from Rzeszów University in Poland.  I don't

20    know how to spell it.

21    **Q.**  And Dr. Igor Tralle, who is that?

22    **A.**  He's the one that said that work should be a Ph.D. and

23    asked her if she can consider getting a Ph.D. in this

24    nanolithography, laser produced plasma.

25    **Q.**  And was he -- do you know whether or not he was involved at

1   all with regard to Dr. Sizyuk obtaining a Ph.D.?

2   **A.**   No, he is a -- in the physics department, and he was -- he

3   offered to oversee her.  It's a common procedure in Europe if

4   you have a lot of research you can go as a student.  Then you

5   can -- this is European -- then you can apply for Ph.D., but

6   you have to go through the whole exams and procedure to do

7   that.

8   **Q.**   Where did Dr. Sizyuk get her Ph.D.?

9   **A.**   In the University Rzeszów in Poland.  Rzeszów?  I don't

10  know how to pronounce that.

11  **Q.**   And based on your experience, when you get a Ph.D., at

12  times, in Europe, it's different from getting a Ph.D. here in

13  the United States?

14  **A.**   It's different -- no.  The Ph.D. is the same for the

15  student.  But for such high-level contributors -- like, for

16  example, this is common in many like MIT, which is number one.

17  They have a couple of these.  Texas, all, they do that.  They

18  offer you -- in fact, she was offered that in nanolithography.

19  But also from Osaka University, he ask her if she wanted a

20  Ph.D. in nuclear fusion.  And at that time she did ask me.  I

21  said, "Why you need two Ph.D.s?" And he offered to be her

22  advisor, Dr. Takaki.

23  **Q.**   What was your role, if any, in Dr. Sizyuk obtaining a

24  Ph.D.?

25  **A.**   To get?

1   **Q.**   Yes.

2   **A.**   I have no problem to get that.  She can get the Ph.D.

3   Anybody does that.  In fact, I have another student who was

4   going to do that, but he went to the Army for -- Navy, I don't

5   know, and then stayed seven, eight years there.  And he's

6   actually already also graduate of Purdue but only for a master

7   degree.

8   **Q.**   Do you know what Dr. Sizyuk's next position was after

9   senior research scientist at Purdue?

10  **A.**   Then it become, like, assistant professor tenure-track.

11  **Q.**   Do you know approximately when that was?

12  **A.**   2015, I think.

13  **Q.**   As the former head of the School of Nuclear Engineering,

14  are you familiar with the process of hiring someone as a

15  tenure-track professor?

16  **A.**   Yes.

17  **Q.**   And how did you become familiar with that process?

18  **A.**   While being at the head, because we would hire people --

19  the head cannot hire somebody without availability of a

20  position.  So it's College of Engineering give each department,

21  or each school, certain position.  They said, "You have this

22  one position this year, two position," depending on the size of

23  the school.

24       Then we advertise that position, and whoever apply,

25  applies.  There's a search committee looking at the application

 1    and choose, like, list comparing them.  And the head can start

 2    doing the -- you know, asking for letters, and they give a

 3    seminar.  And then the search committee prioritize a list for

 4    these individuals.  So they have, like, one, two, three

 5    individuals, and then they come for interview.  And then the

 6    interview, not only you meet with the search committee, but

 7    also the head ask many to comment, even the -- not -- the

 8    student can comment, but it's not taken into account as similar

 9    to like all the other professors because the search committee

10    is, like, limited four, five people.

11         But the seminar, anybody has to attend the seminar and

12    rank the seminar and give its opinion.  So we have the

13    administration, like the vice president for -- like Melba

14    Crawford, all of them, they give you feedback.  They give the

15    head feedback whether this is eligible or not eligible.

16    **Q.**   Okay.  And eventually Dr. Sizyuk was granted tenure-track,

17    correct?

18    **A.**   Yes.

19    **Q.**   And are you aware of -- when Dr. Sizyuk became a

20    tenure-track professor, are you aware of any changes in her job

21    duties?

22    **A.**   Yes.  She has to get her own funding.  She has to also

23    teach.  Before she cannot teach as a -- because now she will be

24    paid from the university.

25    **Q.**   And after she became and went on tenure-track, are you

1    aware whether or not she was able to obtain funding?

2    **A.**  Oh, yeah, she did obtain funding from Department of Energy.

3    That's a million-dollar contract.  Samsung, which is one of the

4    top selling conductor, they give her funding.  KLA, another

5    semiconductor funding her, and there's NRC, National Regulatory

6    Commission, also funded her, so she has support her own

7    student.

8    **Q.**  And at the time that Dr. Sizyuk became tenure-track

9    professor, did you know whether there were more men than women

10   in the School of Nuclear Engineering?

11   **A.**  Can you repeat that?

12   **Q.**  At the time she became tenure-track professor, were there

13   more men or women in teaching or faculty research positions

14   within the School of Nuclear Engineering?

15   **A.**  We had at that time Dean Fentiman, another professor, and

16   not any more.  I mean, there's one -- probably one before that.

17   **Q.**  Are you familiar with the tenure process at Purdue?

18   **A.**  The time?

19   **Q.**  The tenure process at Purdue, are you familiar with it?

20   **A.**  Yes.

21   **Q.**  Have you served on tenure committees while on the School of

22   Nuclear Engineering while at Purdue?

23   **A.**  The head does not serve on the committee, but I served on

24   the college committee.  It's called EAPC, Engineering Area

25   Promotion Committee.  So this is where the heads of all

1    departments and additional person from each department, like in

2    the order of 20 people, for, say, ten colleges review the

3    entire tenure-track positions every year one time in November.

4    And I was -- I also reviewed about 200 applications.

5    **Q.**   When did you stop being the head of the School of Nuclear

6    Engineering?

7    **A.**   End of 2015.

8    **Q.**   Okay.  And at that point your position changed to what?

9    **A.**   Regular faculty.

10   **Q.**   Tenured?

11   **A.**   Oh, yes.

12   **Q.**   And did you serve on -- are you familiar with what's called

13   the NEPC committee?

14   **A.**   Yes.

15   **Q.**   Okay.  Have you served on that committee before?

16   **A.**   Yes.

17   **Q.**   Have you served as a voting member on the NEPC for people

18   going up to tenure at Purdue?

19   **A.**   After being head and before being head, when I moved also

20   from Argonne from 2007 to 2009, I also served on the NEPC.

21   **Q.**   There is a book up there, and it's -- if we could just put

22   it on -- if you could look to Exhibit 9, turn to it.

23   **A.**   Is this it, the witness stand copy?

24           **MR. FOX:**  Can I approach the witness, Your Honor?

25           **THE COURT:**  Certainly.

```
 1          Do I have a binder with what you're showing?

 2              MR. FOX:  Yes.

 3              THE COURT:  I don't have a binder of that.  Is there

 4    another one for the bench?

 5              MR. SINK:  You should.  I left it up there

 6    yesterday.

 7              THE COURT:  I just have defendant's --

 8              MR. SINK:  Hmm.  I left it up there.

 9              MR. FOX:  You might be able to just borrow mine.

10              THE COURT:  We'll share, if you want to, in case you

11    can't find it.

12              THE WITNESS:  Is this page --

13              MR. FOX:  Let me see.  It's the bottom sticker.

14              THE COURT:  And to be precise --

15              MR. FOX:  It's Plaintiff's Exhibit 9, the bottom

16    sticker.

17              THE COURT:  Okay.  Thank you.

18    BY MR. FOX:

19    Q.  Do you recognize Plaintiff's Exhibit 9?

20    A.  I don't recognize it, but, I mean, this is coming from the

21    provost, Jay Akridge.

22    Q.  Do you have any reason to -- do you have any reason to

23    dispute that this is the general criteria for promotion for

24    tenure-track faculty at Purdue?

25    A.  It probably correct.  This is standard procedure.  That's
```

1  what -- it's usually coming from the College of Engineering,

2  and he's a provost.  Maybe he send it to all colleges.

3          **MR. FOX:**  Your Honor, I would like to move to admit

4  Exhibit 9.

5          **THE COURT:**  Let me just ask, because I may have

6  missed it as I was making notes.

7      To the witness, you have seen this exhibit, Plaintiff's

8  Exhibit 9, previously before today?

9          **THE WITNESS:**  No, I seen the College of Engineering.

10 I might have gotten this, but I have seen the college.  This is

11 2019, so it's way after I not being the head.

12         **THE COURT:**  So you have not seen this before today?

13         **THE WITNESS:**  No.  This is -- it's dated April 15,

14 2019.

15         **THE COURT:**  Any issue?

16         **MR. KEALEY:**  The issue is not so much with the

17 admissibility of the document as to rather whether this witness

18 can testify at all about it, so I don't understand the

19 materiality of this exhibit with this witness.

20         **MR. FOX:**  I thought we might have already stipulated

21 to it, but I wasn't sure.

22         **THE WITNESS:**  The procedure is--

23         **THE COURT:**  One moment.  Wait until you're asked a

24 question, sir.

25         **THE WITNESS:**  Okay.

1              **THE COURT:**  Is there a stipulation for this?  I know

2   we have stipulations.  Is this one of them?

3       Was this one of your stipulations by the parties?

4              **MR. KEALEY:**  I don't have the stipulation record in

5   front of me, Your Honor.  We can look that up.  I don't have an

6   objection to the admissibility.  My concern is the materiality

7   of this exhibit for this witness --

8              **THE COURT REPORTER:**  Can you move your microphone

9   closer?

10             **MR. KEALEY:**  Certainly.

11             **THE COURT:**  Was it included in the list of

12  stipulations that were presented to the Court --

13             **MR. SINK:**  Your Honor --

14             **THE COURT:**  -- in the pretrial order?

15             **MR. SINK:**  -- if I may?

16             **THE COURT:**  Go ahead.

17             **MR. SINK:**  This is one of the exhibits I was

18  actually asked by the defense to stipulate to.

19             **THE COURT:**  Whatever you discussed before coming

20  into the trial, I may not be aware of it because I'm relying on

21  the pretrial order and what's in front of me on the bench and

22  in any of the books, so that's what I'm asking.

23       Unless there can be an agreement now between the parties,

24  as the request is to have this admitted, and I don't see where

25  we have that stipulation yet -- and it is problematic for this

 1   plaintiff because he has not seen this before.

 2       Maybe we can take a recess --

 3           **MR. FOX:**  Your Honor, if I can approach the witness,

 4   I think your book might be up there.

 5           **THE COURT:**  Go ahead.  Are they different?

 6           **MR. KEALEY:**  Your Honor --

 7           **THE COURT:**  Are these different?

 8           **MR. FOX:**  No, we've got ours --

 9           **THE COURT:**  What do I look at?  Exhibit 9?  Okay.

10       Yes, sir.

11           **MR. KEALEY:**  We have looked up the stipulation

12   e-mails between the counsel and have verified that this

13   document was agreed by e-mail between counsel.

14           **THE COURT:**  Agreed.  Is that agreed that that was

15   done?

16           **MR. FOX:**  Yes.

17           **THE COURT:**  Is there any objection?

18           **MR. KEALEY:**  I have not asserted any objection to

19   the -- only to the materiality of examining this witness about

20   this document, so no objection to admissibility, Your Honor.

21           **THE COURT:**  For Mr. Ishii?

22           **MR. BOWLING:**  None.

23           **THE COURT:**  So it's admitted.

24           **MR. FOX:**  Thank you.

25

1    **BY MR. FOX:**

2    **Q.**   If you would take a look at Exhibit 9.

3    **A.**   Yes.

4    **Q.**   And it looks in the second paragraph, in the middle of that

5    second paragraph...

6    **A.**   So what was the question?

7    **Q.**   In the middle of the second paragraph, do you see where it

8    says:  "To be considered for promotion, a faculty member should

9    have demonstrated excellence in scholarly productivity in at

10   least one of these areas:  Discovery, learning, and/or

11   engagement"?

12        Do you see that?

13   **A.**   Yes.

14   **Q.**   Do you know what the criteria for tenure within the School

15   of Nuclear Engineering is?

16   **A.**   Just to address this -- like, for example, to have some

17   good publication, funding.

18   **Q.**   Do you know whether or not the criteria within the School

19   of Nuclear Engineering is to look at -- when you're looking at

20   tenure, where you look at discovery, learning, and engagement?

21   **A.**   Yeah.  There is no exactly hard criteria.  So just like you

22   look at the candidate, the search committee looked at that --

23   look at that and then recommend to the head whether is it to be

24   considered.  And then you choose a candidate from this list,

25   and then you actually go ahead with the procedure that -- to

1   see.  They have to write down what they have done in discovery,

2   research, even teaching, which is not critical for this

3   criteria.

4   **Q.**  Having served on other NEPC applicants for tenure within

5   the School of Nuclear Engineering, based on your experience,

6   what are some of the important factors that you're supposed to

7   look at?

8   **A.**  Yes.  Whether the candidate is able to, you know, attract

9   funding, attract it through the research, publication,

10  et cetera, awards.  You know, yeah, that's the main criteria.

11  Basically, you wanted to hire somebody who would continue to

12  bring funding, to help the student to publish.

13  **Q.**  And at some point Dr. Sizyuk went up for tenure at Purdue;

14  is that correct?

15  **A.**  Yes.

16  **Q.**  Is there anything -- based on your experience in the NEPC

17  meetings that you've been a part of, is there anything that is

18  important about where an individual received their Ph.D. with

19  regard to getting tenure?

20  **A.**  Yeah, we have to have -- like, I don't know what are the

21  procedure, but depend on the university.  So you don't have to

22  have a Ph.D. to become a professor; but in Purdue, probably

23  do -- they do that.

24  **Q.**  Does the NEPC normally have a chairman?  When someone is

25  going up for tenure, does that NEPC committee normally have a

1   chairman?

2   **A.**   No, there is no -- there is a search committee.  You have

3   the search committee chair.

4   **Q.**   Is there -- when someone goes up for tenure within the

5   School of Nuclear Engineering --

6   **A.**   Yeah.

7   **Q.**   -- is there a chairman on that committee?

8   **A.**   No, the head is the chair of it.

9   **Q.**   So you -- and when you were a head of the School of

10  Engineering, you served as the chairman of NEPC tenure

11  committees?

12  **A.**   Yes.  But despite that, you do not vote.  You're not

13  supposed to vote on the candidate.

14  **Q.**   You don't vote on the candidate?

15  **A.**   No.

16  **Q.**   Who normally votes on the candidates?

17  **A.**   All the tenure professor for the rank for assistant

18  professor, the associate professor, and full professor vote.

19  **Q.**   And that would be all the tenure professors within the

20  School of Nuclear Engineering?

21  **A.**   Yes.

22  **Q.**   But the chairman, I think you said, does not vote?

23  **A.**   No.

24  **Q.**   What is the -- based upon your past experience, what is the

25  chairman's role on the NEPC committee when looking at an

1  applicant for tenure?

2  **A.**   Supposed to, like, advise the committee like, you know, no

3  bias, this kind of thing, conflict of interest, for the

4  guideline of the procedure, this kind of thing.  But, yeah, the

5  search committee usually have another five people, four to five

6  people, to actually recommend the candidate to the head.

7  **Q.**   Do you know who the chairman of the NEPC committee was when

8  Dr. Sizyuk went up for tenure?

9  **A.**   Was Dr. Ishii.

10  **Q.**   The chairman was?

11  **A.**   Yes.

12  **Q.**   Could it have been Dr. Kim at that time?

13  **A.**   You mean the search -- he was the head of the search

14  committee.

15  **Q.**   No.  When --

16  **A.**   Oh, Dr. Kim, of course.

17  **Q.**   When Dr. Sizyuk went up for tenure, do you recall when that

18  was?

19  **A.**   Dr. Kim.

20  **Q.**   Okay.  Dr. Kim was the head.

21     And when Dr. Sizyuk went up for tenure, do you know

22  approximately when that was?

23  **A.**   I think 2018 or '19.

24  **Q.**   And at that time that Dr. Sizyuk went up for tenure, were

25  you aware of her overall performance while she had been at

1  Purdue?

2  **A.**   Yes.

3  **Q.**   And, in your opinion, how had she performed up to that

4  point of going up for tenure?

5  **A.**   Yeah, I hate to keep doing this.  In fact, she is

6  exceptional in that regard.  She is -- she was assistant

7  professor.  She far exceeded more than half of the full

8  professors -- not associate, the full -- in terms of bringing

9  funding, graduating student, getting awards, this kind of

10  thing.  She was exceptional.

11  **Q.**   And you talk about funding.  Do you remember any particular

12  funding she brought in from the Department of Energy?

13  **A.**   Yes.  Department of Energy looking into -- regarding a

14  tokamak, a fusion machine.

15  **Q.**   Do you recall the amount of funding she brought in for the

16  school?

17  **A.**   About one million.

18  **Q.**   About one million?

19  **A.**   Yeah.

20  **Q.**   And who was responsible for bringing in that funding?

21  **A.**   She, of course.

22  **Q.**   Was there anyone else responsible for it?

23  **A.**   No, the PI -- if you have a PI, when she was a principal

24  investigator, he or she is the one that apply for a project.

25  **Q.**   Principal investigator is what you're saying?

1  **A.**   Correct.

2  **Q.**   Briefly explain what a principal investigator is, for the

3  jury.

4  **A.**   The principal investigator, who, like, write the

5  proposal -- sometimes, like, for the faculty, he's the one that

6  would be responsible for the execution of the project, goals,

7  and the result.

8           **THE COURT:**  I'm going to ask that we take a brief

9  recess at this time.  We've been at it for about an hour and

10  45 minutes.

11      Ladies and gentlemen of the jury, it's 15 minutes 11:00.

12  Let's take a 15-minute break, and then we'll come back into the

13  courtroom and go forward in the direct examination of this

14  witness.

15      Keep in mind the Court's admonition that you not discuss

16  this case amongst you until it has been completed and it's

17  presented to you with the Court's instructions and direction on

18  coming to a verdict.  You cannot discuss things yet.  We'll

19  call you back in in 15 minutes.  Take your notes with you if

20  you are taking them.

21      (Jury out at 10:46 a.m.)

22           **THE COURT:**  Step down, sir.

23      15 minutes, Counsel.

24      (Recess at 10:46 a.m., and proceedings resumed in open

25       court commencing at 11:05 a.m., reported as follows:)

1     **THE COURT:**  Thank you for your patience.  Any issues

2   that arose over recess for plaintiff?

3     **MR. FOX:**  No, Your Honor.

4     **THE COURT:**  For the University?

5     **MR. KEALEY:**  No, Your Honor.

6     **THE COURT:**  For Mr. Ishii?

7     **MR. BOWLING:**  No, Your Honor.

8     **THE COURT:**  All right.  Are we ready to bring the

9   jury back in?  Yes?  Okay.

10     Please bring the jury back in.

11     (Jury in at 11:05 a.m.)

12     **THE COURT:**  All right.  You may all be seated,

13   please.  Counsel, you may go forward with your direct.

14   **BY MR. FOX:**

15   **Q.**  At the time Dr. Sizyuk went up for tenure, did she

16   establish independence from you?

17   **A.**  Can you repeat that?

18   **Q.**  At the time that Dr. Sizyuk went up for tenure, did she

19   establish independence from you?

20   **A.**  Oh, yes.

21   **Q.**  And not what you have heard from others but what you have

22   heard yourself.

23     Have you ever heard Dr. Ishii make any statements that

24   would reflect bias against women and/or non-Asians?

25   **A.**  Several times.

1    **Q.**  Can you tell the jury what those comments or statements

2    were.

3    **A.**  Yes.  This is uncomfortable.  Yeah, he stated several times

4    that women are stupid and white men are lazy and stupid too.

5    **Q.**  You mentioned that he said women are stupid; is that

6    correct?

7    **A.**  Yes.

8    **Q.**  Do you know on how many occasions he said that?

9    **A.**  Several times.

10   **Q.**  Do you recall any other statements that he made with

11   regards to women?

12   **A.**  He made a statement also regarding our dean that time,

13   Leah.  Her name is Leah; last name is Jamieson.

14   **Q.**  And what did he say?

15   **A.**  He said that she shouldn't be the dean, she's stupid woman,

16   and the only way she was hired is just because the U.S. require

17   women to be in positions.

18   **Q.**  Did you have any role in the hiring of Dr. Kim within the

19   School of Nuclear Engineering at Purdue?

20   **A.**  No, I didn't.

21   **Q.**  Were you familiar with Dr. Kim's qualifications before he

22   was hired?

23   **A.**  Yes.

24   **Q.**  How were you familiar with his qualifications?

25   **A.**  Again, difficult, but his performance was just about the

1    lowest among even assistant professor.

2             **MR. KEALEY:**  Your Honor, the question was how are

3    you familiar, and there has been no foundation laid that he

4    has, in fact, any familiarity.

5             **THE COURT:**  Response?

6             **MR. FOX:**  Can I ask the question again?

7             **THE COURT:**  Yes.  Rephrase.

8    **BY MR. FOX:**

9    **Q.**   Okay.  You said that you were familiar with his

10   qualifications.  How did you become familiar with his

11   qualifications?

12   **A.**   From his CV that he submitted to the nuclear engineering to

13   be considered for head.  We hiring a head.

14   **Q.**   And did you review the CV?

15   **A.**   I reviewed, yes.

16   **Q.**   And was that at the time that he was hired you reviewed the

17   CV?

18   **A.**   Yes.

19   **Q.**   And do you know whether or not -- was he hired in as a

20   tenured professor?

21   **A.**   Oh, yes.

22   **Q.**   Do you know whether or not he had a Ph.D. at the time he

23   was hired in?

24   **A.**   Yeah, he has Ph.D.

25   **Q.**   Do you know who that Ph.D. was under?

1   **A.**   Dr. Ishii.

2   **Q.**   Did Dr. Kim -- did he go through the NEPC committee to get

3   tenure?

4   **A.**   Yes.

5   **Q.**   But when Dr. Kim was hired, he was not tenure-track, he

6   came in and he was tenure?

7   **A.**   Yes, yes, tenure and the head at the same time.

8   **Q.**   When Dr. Kim was hired, are you aware of how many

9   publications Dr. Kim had with Dr. Ishii?

10  **A.**   Yes.  I reviewed that from his CV, his own CV that he

11  submitted.  He had publications, say, for the -- when he was

12  hired -- when he was a -- got his Ph.D., 1999, it was

13  Dr. Ishii, and he was a student in 1994.  And up to 2017 when

14  he applied, he has about 50-some publications.  Most of them, I

15  would say -- let us say ten years after, and after his

16  graduation, he had 31.  I looked at that, 31 journal

17  publication.  And it was Dr. Ishii jointly.  Out of these 31,

18  27 was Dr. Ishii, so 90 percent of the publication.

19  **Q.**   As a tenured professor within the School of Nuclear

20  Engineering, tenured professors vote on tenure at the NEPC

21  committee, correct?

22  **A.**   Yes, yes.

23  **Q.**   Did you vote for Dr. Sizyuk --

24  **A.**   No, no.  For Dr. Sizyuk, no, because it considered a

25  conflict of interest.  She work in the group.

1  **Q.**  You were a tenure professor at the time that Dr. Sizyuk

2  went up for tenure, correct?

3  **A.**  Yes.

4  **Q.**  And you did not vote on her tenure?

5  **A.**  No.

6  **Q.**  And the reason given to you was?

7  **A.**  Because she's -- I'm familiar with -- you know, like, she

8  work in the same center together.  They said, like, conflict of

9  interest and because her research was mainly -- that she got

10  for the Ph.D. -- from our center was me.

11  **Q.**  So they did not allow you to vote?

12  **A.**  No.

13          **MR. FOX:**  Thank you.

14                    **CROSS-EXAMINATION**

15  **BY MR. KEALEY:**

16  **Q.**  Good morning, Dr. Hassanein.

17  **A.**  Good morning.

18  **Q.**  I'm going to read you a statement and ask you whether the

19  statement is true.  The statement is, quote:  "Dr. Hassanein,

20  being the director of CMUXE, was the coauthor of all of the

21  research reported in Plaintiff's Ph.D. thesis," unquote.

22       Is that statement true?

23  **A.**  That's true.

24  **Q.**  When did you disclose that information to the NEPC?

25  **A.**  There is no requirement to do that.  They have her CV.

1    **Q.**  My question is to you when did you disclose --

2    **A.**  I don't disclose.  There is no reason for me to disclose.

3    **Q.**  You never disclosed it?

4    **A.**  No.  They review it.  They review the publications.  They

5    review the -- her funding, et cetera.  So there is no

6    requirement to disclose.  Everybody has many people on

7    collaborations.

8    **Q.**  In fact, in order to know what research was reported in

9    plaintiff's Ph.D. thesis, one would need to go look at the

10   Ph.D. thesis, correct?

11   **A.**  Yes.  Yeah, it's a normal procedure.

12   **Q.**  Not at the journal of publications in the public domain.

13   One would have to go look at the thesis, right?

14   **A.**  Yes, the thesis.

15   **Q.**  So in order to determine that you, as director of CMUXE,

16   were the coauthor of all of the research reported in

17   plaintiff's Ph.D. thesis, one way would be to ask you, right?

18   **A.**  You can read the publication list.

19   **Q.**  One way would be to ask you, right?

20   **A.**  Yeah.

21   **Q.**  Another way would be for you to volunteer that information,

22   right?

23   **A.**  There is no need to ask when I get a CV.  I reviewed about

24   200 cases.  You look at the names and the publication, the

25   impact of this, who is the first author, this kind of things.

1   **Q.**   Another way would be for Dr. Sizyuk to share her Ph.D.

2   thesis with the NEPC, correct?

3   **A.**   Yes, she has to send her CV.

4   **Q.**   And as you've mentioned now several times, another way for

5   the NEPC to learn that information would be if it had been

6   listed in Dr. Sizyuk's tenure dossier, correct?

7   **A.**   It's listed, yes.  Yeah.

8   **Q.**   But, in fact, it was not listed in the tenure dossier that

9   Dr. Sizyuk initially provided to the NEPC, was it?

10  **A.**   No, it was listed.

11  **Q.**   Your testimony under oath today --

12  **A.**   Yes.

13  **Q.**   -- is that you are certain that it was listed in the

14  initial dossier supplied to the NEPC that you, being the

15  director of CMUXE, were the coauthor of all of the research

16  reported in plaintiff's Ph.D. thesis?

17  **A.**   Yes, of course.  I mean, she has to list all her

18  publication in the CV, whether it is with me or somebody else.

19  **Q.**   Dr. Hassanein, you are aware -- I'm asking you a question,

20  not about her publications, about her thesis on deposit at a

21  Polish university.  You understand that?

22  **A.**   Yes.  Her CV is a collection of the work she did.  That's

23  the idea to getting a Ph.D.

24  **Q.**   So the only way to actually know what's in the thesis is to

25  take a step to obtain and read the thesis, right?

1   **A.**   Or the publication that she has.

2   **Q.**   Only way to see what's in the thesis itself --

3   **A.**   Yes.

4   **Q.**   -- is to get a copy of the thesis itself, right?

5   **A.**   Yes.

6   **Q.**   Yes?

7   **A.**   Yes.

8   **Q.**   And the thesis itself, on its very first page, describes

9   you as the advisor of the thesis, right?

10  **A.**   Yeah, the research advisor, yes.

11  **Q.**   Of all of the research reported in the thesis itself?

12  **A.**   Yes, she or any other student getting the Ph.D. with me or

13  with any other professor.

14  **Q.**   Well, for any other student getting a Ph.D. with you at

15  Purdue University, that student's thesis would be on deposit at

16  Purdue, right?

17  **A.**   Yes.

18  **Q.**   But Dr. Sizyuk didn't get a Ph.D. with you at Purdue

19  University, did she?

20  **A.**   No, the research she it.

21  **Q.**   The research was done at Purdue and the thesis reporting,

22  that research, was deposited at a Polish university?

23  **A.**   Right.  That's normal procedure.

24  **Q.**   So in order to get access to that thesis, somebody would

25  have to go to the Polish university --

1    **A.**  If they read the thesis, if they want to do that.

2    **Q.**  And one reason they would want to do that is to investigate

3    whether you were the coauthor of all that research in the

4    thesis?

5    **A.**  In the CV it is written the publication list and who is the

6    authors, who is the first author.  Every thesis students

7    submit, it has to be like that.

8    **Q.**  Dr. Hassanein, on the screen we're going to pull up

9    Plaintiff's Exhibit 9.

10            **MR. KEALEY:**  Which is in evidence, Your Honor.

11   **Q.**  Dr. Hassanein, you were shown Plaintiff's Exhibit 9 briefly

12   during your direct testimony.  Do you recall being shown this

13   document?  Yes?

14   **A.**  Yes.

15   **Q.**  And you testified that you didn't, in fact, recognize this

16   document as something you've read, right?

17   **A.**  Yes.  I think of this as like every year they send me this

18   or so.  We get it from the the College of Engineering, so I

19   read the College of Engineering guidelines.  It's probably the

20   same exactly.

21   **Q.**  You recognize this document, which has in the subject line

22   the description:  "West Lafayette Campus Promotion and Tenure

23   Policy 2019, 20 AY" -- meaning academic year -- "Policy."

24        You recognize this as a type of document you've seen

25   before?

1    **A.**   Yes.

2    **Q.**   I'm going to ask you to look at the third page of this

3    document.  On the third page of Plaintiff's Exhibit 9,

4    Dr. Hassanein, is a sentence that is highlighted on the screen

5    in yellow.

6    **A.**   Yes.

7    **Q.**   Please read that sentence out loud.

8    **A.**   "It is essential to obtain unbiased external evaluations so

9    the letters should come from distinguished scholars who are not

10   the candidates' thesis advisor or postdoctoral advisor or a

11   business or professional partner; family relation such as

12   spouse, sibling, parent, or relative; a collaborator on a

13   substantial project, book, article, paper, or report within the

14   last 24 months."

15   **Q.**   So being familiar with this policy and this type of

16   document at Purdue on the West Lafayette campus and being the

17   head of the School of Nuclear Engineering, you were well aware

18   that the fact that you were the candidate's thesis advisor for

19   her Ph.D. would have rendered you ineligible to provide a

20   letter of recommendation for her?

21   **A.**   Yes, sir.  I did not.  I did not recommend her.

22   **Q.**   And you could not?

23   **A.**   Uh-huh.

24   **Q.**   And you could not?

25   **A.**   I could not, yeah.

1  **Q.**  So the NEPC could not take into account your opinion

2  because you were her doctoral advisor?

3  **A.**  Right.  That's why I did not vote.

4  **Q.**  And the NEPC needed to track down whether you were her

5  doctoral advisor because under the University's policy, you

6  couldn't give a recommendation if you were?

7  **A.**  Yeah, and I didn't.  I don't understand your point.  I did

8  not.

9  **Q.**  In fact, Dr. Hassanein, you, yourself, never disclosed to

10  the NEPC that you were Dr. Sizyuk's thesis advisor?

11  **A.**  I don't attend the NEPC.  I don't attend the meetings.  In

12  any way, it is in her CV she submitted.  You don't go knocking

13  on everybody's door and say, "I did this, that."

14     I submit many, many NEPC applications.  In fact, there is

15  a policy in the University, even if you are the thesis advisor

16  and there is not enough people to vote, they can vote on that.

17  But I did not vote.

18  **Q.**  You don't remember ever disclosing to the NEPC that you

19  were Dr. --

20  **A.**  There is no need.

21          **THE COURT:**  Please let counsel finish his question.

22          **THE WITNESS:**  Okay.

23          **THE COURT:**  And then you can answer it.

24       Finish your question, Counsel.

25

1    **BY MR. KEALEY:**

2    **Q.**  -- that you were Dr. Sizyuk's thesis advisor?  You don't

3    ever remember disclosing that, do you?

4    **A.**  There is no need to do that.  It is already in her CV and

5    Ph.D. thesis.

6         **MR. KEALEY:**  I have some of the witness's deposition

7    testimony to show to refresh his recollection.

8         **THE COURT:**  This is from his deposition?

9         **MR. KEALEY:**  Yes.

10   **BY MR. KEALEY:**

11   **Q.**  Dr. Hassanein, I'm showing you some of your sworn

12   deposition testimony at page 153 beginning at line 6 through

13   the rest of this page.  Starting at line 22, I'd ask you to

14   read that testimony to yourself.

15        **THE COURT:**  One moment.  Is that in front of the

16   jury?

17        **MR. KEALEY:**  No.  Just for the witness to refresh

18   his recollection for a moment.

19        **THE COURT:**  Okay.  Thank you.

20   **A.**  Is that the ones, "I don't remember if we discussed that at

21   all.  I don't remember even if we discussed it."  That's what

22   you're referring to?

23   **BY MR. KEALEY:**

24   **Q.**  Your testimony, Dr. Hassanein, was -- and I quote from

25   lines 21 and 22 -- "I never disclosed, if you want to ask this

1  way."  Do you see that?

2  **A.**  Yeah, I see that.  There is no requirement to disclose.  It

3  is written in the thesis.

4  **Q.**  Now, you're aware that Dr. Revankar was making inquiries

5  about this exact question; you know that, don't know?

6  **A.**  No, I don't.

7  **Q.**  And it was Dr. Revankar who initiated inquiries that led to

8  the revelation of the fact that you were playing the role in

9  the thesis that we have now been discussing for several

10  minutes.  That was Dr. Revankar who was trying to find that

11  out, wasn't it?

12  **A.**  I don't know that.  I don't understand your question at

13  all, the legitimate of the question.  She has submitted a CV,

14  and she write thesis.  You can download the thesis from the

15  site.  This is what we do all the time.  If I wanted stricter

16  information about this thesis, it's submitted.

17  **Q.**  You know who Dr. Revankar is, right?

18  **A.**  Yes.

19  **Q.**  Dr. Revankar was and is a tenured professor in the School

20  of Nuclear Engineering, correct?

21  **A.**  Yes.

22  **Q.**  A member of the Nuclear Engineering Primary Committee,

23  correct?

24  **A.**  Yes.

25  **Q.**  Somebody who was trying to obtain this information in order

1   to do his job on the Nuclear Engineering Primary Committee,

2   correct?

3   **A.**   Correct.

4   **Q.**   Dr. Hassanein, are you Asian?

5   **A.**   No.

6   **Q.**   Are you Egyptian?

7   **A.**   Yes.

8   **Q.**   And you're an Egyptian-American?

9   **A.**   Yes.

10  **Q.**   And as an Egyptian, you were recruited to come to Purdue

11  University and the School of Nuclear Engineering, correct?

12  **A.**   As a U.S. citizen.

13  **Q.**   And also as an Egyptian?

14  **A.**   I don't know why they choose that.

15  **Q.**   Your ancestry and your nationality of origin are Egyptian,

16  correct?

17  **A.**   Yes.

18  **Q.**   So in the School of Nuclear Engineering, if someone were to

19  suggest that the School of Nuclear Engineering does not respect

20  and recruit any faculty who are not non-Asian, that would be

21  inconsistent with the recruitment of you, wouldn't it?

22  **A.**   I don't understand what you say.  There's is a lot of

23  professors in the nuclear engineering with different

24  nationalities.  You know, they are U.S. citizen, most of them,

25  but they have different background.  So what's the point?

1    **Q.**  But several of them are non-Asian, right?

2    **A.**  I still don't understand your point.

3    **Q.**  I'm not making a point.  I'm asking a question.  Several of

4    those professors are non-Asian, aren't they?

5    **A.**  Yes.

6    **Q.**  While you were the head of the School of Nuclear

7    Engineering in 2014, you approached the dean of the College of

8    Engineering to get authorization to do an opportunity hire for

9    Tatyana Sizyuk, right?

10   **A.**  I did not request.  They always give you positions, extra

11   positions, for example, for Hispanic, for women, for certain,

12   like, expertise.  There is all kind of criteria that if you

13   wanted to hire -- there is a Dream Hire, this kind of things.

14   **Q.**  And so Tatyana Sizyuk was hired into the School of Nuclear

15   Engineering under the College of Engineering's opportunity hire

16   authorization, right?

17   **A.**  I'm not sure about that.  There was a position open.  We

18   got two position, and then we form a search committee.  Search

19   committee look.  I don't even attend that.  They recommend at

20   the end a candidate.  Then the candidate come for interview,

21   submit thesis, the work, and give a presentation what the

22   impact of her or his work to the committee.

23       Then at seminar you listen to all kind of things coming

24   from, say, all the people who interviewed her, give feedback to

25   the head.  The head put it together and then also send it to

1    the College of Engineering to review and approve the position.

2    That's the procedure.

3    **Q.**   You made -- provided some answers to a few questions about

4    Dr. Kim, and I just want to follow up with a little bit of

5    factual clarification.

6         Before Dr. Kim came to Purdue University, he was a tenured

7    professor of nuclear engineering at Penn State University,

8    correct?

9    **A.**   Yes.

10   **Q.**   And Penn State University is an R1 university, correct?

11   **A.**   Yes.

12   **Q.**   And he had earned tenure at Penn State by going on the

13   tenure-track and being awarded tenure after being a junior

14   faculty member at that school, correct?

15   **A.**   At Penn State?

16   **Q.**   Yes.

17   **A.**   Yes.

18   **Q.**   So Purdue University was not the first school to give

19   Dr. Kim tenure, was it?

20   **A.**   No.  He's not going to leave his position in Penn State

21   without tenure to any place.  The qualification is different.

22   **Q.**   Dr. Hassanein, throughout her tenure-track professorship at

23   Purdue University, Tatyana Sizyuk's attempts to get research

24   funding was primarily to get research funding for CMUXE,

25   correct?

**A.**   CMUXE, as I said, is a center.  It's not -- I don't own the center.  She own all the -- Dr. Sizyuk, Brooks, Harilal, myself, all of us -- as I define the center, what is it?  There is some kind of misunderstanding of the center.  I didn't create the center.  The center has the requirement to form a center to highlight Purdue's research.  There is about 40 centers.  CMUXE is one of them.  That's all.

**Q.**   It's a yes-or-no question.  Is the answer yes or no?

**A.**   I just answer it.

**Q.**   So throughout her tenure-track professorship at Purdue University, Tatyana Sizyuk's efforts to get research funding were primarily to get research funding for CMUXE, correct?

**A.**   Well, she works in CMUXE.  I mean, she works for Purdue.  I work for Purdue.  We have a center called CMUXE, so when -- you write a proposal in order to see that we have a lot of capabilities, good research team, a lot of equipment for the experiment, that result.  So all of this form a center, and you have to say that part, what you can get proposal for.

You don't have to be, but if you want to be, like, a superstar, then you work in a -- you have your own research.  Most of the faculty don't have centers.  We have like, what, 500 professors.  Only in the center composed of several professors; not just one or two, several.  That's why it will not be approved as a center if this criteria is missing.  That's the whole thing.

1        So whether I wrote the proposal or Jeff Brooks write the

2    proposal, the research say CMUXE, Center for Materials Under

3    eXtreme Environment.

4    **Q.**  So whether Tatyana Sizyuk wrote the proposal, it was going

5    to say it was for CMUXE?

6    **A.**  Yeah, it's hers.  CMUXE is hers.  It's Jeff Brooks's.  It

7    is mine.  It is Harilal's.

8    **Q.**  Dr. Hassanein, do you recall reviewing Dr. Sizyuk's tenure

9    dossier?

10   **A.**  I was asked it by Dr. Kim to present her case because I was

11   mentoring Allen Garner, Professor Garner, Professor Wharry, and

12   other things over the years.  So I was not her mentor.  She has

13   another professor to mentor her because maybe she did the

14   research with me, which is legitimate to get somebody else to

15   do that.  But he asked me to do that, and then I reviewed her

16   credential to the committee.

17   **Q.**  So when you read the tenure dossier, you read the vision

18   section of that dossier?

19   **A.**  Yes.

20   **Q.**  And you know that the vision section said that her vision

21   for her future research was to continue to do CMUXE research,

22   right?

23   **A.**  Because that's her center, the center that she is -- I have

24   no clue what you're aiming for.  That's her center, my center,

25   Brooks' center, Harilal's center, Insepov's center, Atsushi's

1   center.  We have several professors.  Anybody can write a

2   proposal, so that doesn't mean when you write that you are

3   CMUXE.  You are going to get the funding.

4   **Q.**  In fact, she was the associate director of CMUXE, right?

5   **A.**  Yes.

6   **Q.**  And you were the head?

7   **A.**  Yes, of the center.

8   **Q.**  You testified a little bit earlier about Dr. J.P. Allain,

9   and Dr. J.P. -- help me out.  Does he pronounce his last name

10  Allen [verbatim] or Allain?

11  **A.**  Allain.

12  **Q.**  Allain.  Thank you.

13      You were testifying about Dr. J.P. Allain.  You are aware

14  that Dr. J.P. Allain provided one of the formally requested

15  external reviewer letters for the NEPC's review of Dr. Sizyuk's

16  tenure dossier, correct?

17  **A.**  Yes.

18  **Q.**  And the reason that Dr. J.P. Allain was requested to

19  provide that letter for the tenure dossier for the NEPC's

20  review was that you suggested that the letter be requested from

21  him, right?

22  **A.**  I suggested four or five names at the request of Dr. Kim.

23  He ask everybody to submit some references.

24  **Q.**  And you --

25  **A.**  I did.

1  **Q.**  -- on your list listed Dr. J.P. Allain, didn't you?

2  **A.**  Yes.

3  **Q.**  So you thought that it was appropriate for the NEPC to

4  receive and review his external evaluation of Dr. Sizyuk as a

5  tenure candidate at Purdue University, right?

6  **A.**  Yes.  I mean, we have asked about eight people or so to

7  write reference letters.

8              **MR. KEALEY:**  Thank you, Your Honor.  No further

9  questions.

10                        **CROSS-EXAMINATION**

11  **BY MR. BOWLING:**

12  **Q.**  Dr. Hassanein, I just have a few questions --

13  **A.**  Sure.

14  **Q.**  -- I want to run by you.

15       I think you testified with respect to my client,

16  Dr. Ishii, that he had made some derogatory comments about

17  white people and about women, correct?

18  **A.**  Yes.

19  **Q.**  Did you make a written report to anyone in the university

20  about those comments?

21  **A.**  Yeah, I did mention to Dean Leah Jamieson.

22  **Q.**  Where is your report?

23  **A.**  No, we meet -- when I was a head, we meet every month --

24  **Q.**  Okay.  My question is, did you make any written report

25  about those comments?

1    **A.**  No, I did not.

2    **Q.**  Okay.  Did you make any notes at the time about the

3    comments that you claim you heard Dr. Ishii say?

4    **A.**  Not written.

5    **Q.**  Okay.  Did you send anybody any e-mails concerning those

6    comments?

7    **A.**  Again, I told the team.

8    **Q.**  Well, my question specifically is, did you send anybody any

9    e-mails discussing your concern about these comments you say

10   you heard Dr. Ishii say?

11   **A.**  No, I did not.

12   **Q.**  Okay.  So just to summarize, there is no written report, no

13   contemporaneous notes, and no e-mails concerning these

14   comments, correct?

15   **A.**  Yes.

16            **MR. BOWLING:**  Thank you.  That's all I have.

17            **THE COURT:**  Redirect?

18                         **REDIRECT EXAMINATION**

19   **BY MR. FOX:**

20   **Q.**  You served on many committees with Dr. Ishii, correct?

21   **A.**  Yes.

22   **Q.**  Did you witness Dr. Ishii's interactions with others on

23   these committees?

24   **A.**  Can you repeat that?

25   **Q.**  Did you witness Dr. Ishii's --

 1   **A.**   Yes.

 2   **Q.**   -- interactions with others on these committees?

 3           **MR. BOWLING:**   We would objection.   That's outside

 4   the scope of our cross.

 5           **THE COURT:**   Response?

 6           **MR. FOX:**   Sidebar, Your Honor.

 7      (Bench conference on the record.)

 8           **MR. FOX:**   First of all, they brought up, obviously,

 9   the NEPC tenure committee first, and then he also brought up

10   why he didn't report Dr. Ishii's comments in writing in his

11   complaints.   And so I think I have a right to establish that

12   part of it is related to the fact of the power and control that

13   Dr. Ishii has within the School of Nuclear Engineering.

14           **THE COURT:**   I'm having trouble following that as to

15   why their -- with regard to their cross and that question, how

16   that opens the door for you to go back now with this question.

17           **MR. FOX:**   Because it's not -- part of the theory of

18   our case is, obviously, that Dr. Ishii has exerted his power

19   and control.

20           **THE COURT:**   Right.   Okay.

21           **MR. FOX:**   And part of the reason I want to ask him

22   that is related to why he wouldn't file a formal written

23   complaint regarding the discriminatory comments he said, which

24   was just asked by Dr. Ishii's attorney.

25           **THE COURT:**   Response?

1          **MR. BOWLING:**  Your Honor, that would have nothing to

2     do with the fact that he wouldn't have made any contemporaneous

3     notes or e-mails, anything of that sort.  There is no plausible

4     mechanism by which Dr. Ishii could have kept him from doing

5     that.

6          **THE COURT:**  Anything else?

7          **MR. KEALEY:**  No.

8          **THE COURT:**  Go ahead.

9          **MR. FOX:**  He asked whether or not -- why he didn't

10    report it.  Sending an e-mail about something or anything like

11    that is different.  He was questioning him of the fact that he

12    didn't report it as somehow significant.

13         **MR. BOWLING:**  He says he reported it, so apparently

14    he wasn't --

15         **MR. FOX:**  He specifically asked why you didn't

16    report it in writing.  Why wasn't it reported in an e-mail?

17    That is different than just telling someone verbally, so I

18    think I have the right to at least ask him why that would be.

19    And so I was trying to establish that he has had these

20    interactions with him and what kind of -- these interactions

21    were on the committees that he served, including the tenure

22    committees that he served on, and how Dr. Ishii's role is in

23    that.

24         **MR. BOWLING:**  It's just too attenuated.

25         **THE COURT:**  Dealing with other individuals, not the

1    plaintiff?

2          **MR. FOX:**  Dealing with how he views Dr. Ishii with

3    other individuals as well as himself.

4          **THE COURT:**  Anything else?

5          **MR. BOWLING:**  That's awfully attenuated, Your Honor.

6    If he did, in fact, make a verbal report, the suggestion that

7    somehow you could connect the dots between the influence that

8    Dr. Ishii exercises over the NEPC and why he wouldn't make a

9    written report is a very thin thread of any alleged relevance.

10   In fact, there is no relevance there.

11         **THE COURT:**  I don't think it opens the door for that

12   question.

13         **MR. FOX:**  Okay.

14      (End of bench conference.)

15   **BY MR. FOX:**

16   **Q.**  Is there a difference between thesis advisor and research

17   advisor?

18   **A.**  Yes.  Thesis advisor is like -- no.  Research and thesis,

19   no, but chair of the committee.  So there is -- thesis advisor

20   is like advisor on the thesis; research, over all the general

21   research.

22   **Q.**  And --

23   **A.**  But they are very close to each other.  Sometimes there's

24   just no difference.

25   **Q.**  And did -- and which one were you?

1    **A.**  I was advising her on the research, the research and the

2    thesis, but the main -- because I -- you're referring to her

3    Ph.D.?  Is that what you're referring to?

4    **Q.**  Let me ask just to the point.  Did you vote on Dr. Sizyuk's

5    Ph.D.?

6    **A.**  No.

7          **MR. FOX:**  Thank you.

8       (Plaintiff's counsel confer off the record.)

9          **MR. FOX:**  One more, sorry.

10   **BY MR. FOX:**

11   **Q.**  Were you the chair over her Ph.D. committee?

12   **A.**  No.

13        **MR. FOX:**  Thank you.

14        **THE COURT:**  Anything else from defense?

15        **MR. KEALEY:**  No, Your Honor.

16        **THE COURT:**  From Mr. Ishii?

17        **MR. BOWLING:**  No, Your Honor.

18        **THE COURT:**  Okay.  Ladies and gentlemen of the jury,

19   let me ask you:  Do you have any questions of this witness?  If

20   so, let me know and write it down so I can review it?

21      No one?  All right.

22      Can this witness now be excused?

23        **MR. SINK:**  Yes, Your Honor.

24        **THE COURT:**  For the defense?

25        **MR. KEALEY:**  Yes, Your --

1      **JUROR:**  Sorry, Your Honor.  I am writing down one

2  question.

3      **THE COURT:**  Okay.  Write it down, and the bailiff

4  will bring it to me, and I will review it with counsel.

5      (Document tendered to Court.)

6      **THE COURT:**  Counsel, would you please approach.

7      (Bench conference on the record.)

8      **THE COURT:**  The question that was presented is, did

9  you participate in bias training, and what impact did that have

10  on your role as an NEPC committee member when voting on tenure?

11      **MR. FOX:**  No objection.

12      **MR. KEALEY:**  He didn't vote on this plaintiff's

13  tenure application, so I don't think it's material.  And he was

14  disqualified from participation.

15      **MR. BOWLING:**  I concur.

16      **MR. FOX:**  He voted on numerous other applicants for

17  tenure, and she's asking what impact bias had.  That's a fair

18  question.  He participated in many NEPC committees for tenure,

19  which he did vote on.

20      **THE COURT:**  As an NEPC committee member?

21      **MR. FOX:**  Yes.

22      **THE COURT:**  She's not specific as to this one;

23  whether as to others is how I'm reading it.

24      **MR. KEALEY:**  Yeah.  It has to be connected up to

25  this case in order to be material; and how he voted and how

 1      that training bore on his participation in other NEPC committee

 2      reviews for other candidates is just way far afield from this

 3      case.

 4              **THE COURT:**  Because of the individuality with regard

 5      to the candidates?

 6              **MR. KEALEY:**  That's correct.  Yes, Your Honor.

 7              **THE COURT:**  Anything else?

 8              **MR. FOX:**  She's not --

 9              **MR. BOWLING:**  He was not a voter on this

10      particular --

11              **THE COURT:**  One at a time.

12              **MR. FOX:**  Let's be clear.  We all agree that he was

13      on NEPC committees --

14              **THE COURT:**  You should be talking to me.

15              **MR. FOX:**  We all agree that he was on NEPC

16      committees where he voted for tenure, and she's asking whether

17      that bias training had any impact on his participation in those

18      NEPC committees -- on that bias training, because one of the

19      things here that did not happen is that Dr. Ishii never did

20      complete the bias training.  It's a perfectly legitimate

21      question.

22          He has experience on this.  He has been head of the School

23      of Nuclear Engineering.  He has been on all these committees.

24      And the juror has a question, and I think it is highly

25      relevant.

1           **MR. BOWLING:**  May I respond?

2       Dr. Hassanein's bias or lack thereof is simply not an

3    issue in this case as far as his race or gender bias.  That's

4    not an issue.

5           **MR. FOX:**  The training that the individual tenure

6    professors have to take to go on an NEPC committee and if they

7    were required to attend those and the fact that he hasn't

8    attended that is relevant.

9           **MR. KEALEY:**  Your Honor, if I may suggest --

10          **THE COURT:**  Are you done?

11          **MR. FOX:**  Yes, I am.

12          **MR. KEALEY:**  Your Honor, I would suggest that there

13   is a version of this question with some editing that could be

14   appropriate, and that is to just ask, number one, whether he

15   participated in such training and what he took away from that

16   training.  I have no objection to that question.

17          **MR. BOWLING:**  That would be fine with us.

18          **THE COURT:**  Just whether or not he ever participated

19   in -- that's essentially what this is.

20          **MR. KEALEY:**  And how it was useful to him, not how

21   did he apply it in other cases.  Just what he found helpful to

22   him in his professional development.  That's a fair question.

23          **THE COURT:**  So the question will be:  Did you

24   participate in bias training, and what import did that have on

25   your role as an NEPC member?

1        What changes?

2            **MR. KEALEY:**  Well, it's a compound question, so the

3    first question is, did you participate?  That's a yes or a no.

4    And what would change is to take out the part about NEPC

5    participation and just ask the witness, how was the training

6    useful to you or how was it relevant to you?

7            **THE COURT:**  Without going into your role in the

8    NEPC?

9            **MR. KEALEY:**  Yes.

10           **THE COURT:**  I'm concerned because then he would be

11   speaking for the entire committee, the time he's on the

12   committee.  He's not being presented as an expert with regard

13   to how these committees come together and make these decisions.

14           **MR. FOX:**  I think he would be testifying based on

15   his experience, how the bias training affected him on the NEPC

16   committees for tenure that he served on.

17           **THE COURT:**  That's going into other cases and

18   other --

19           **MR. KEALEY:**  Then it would open the door for us to

20   ask questions about all those other cases.

21           **THE COURT:**  That's the problem.  I think to ask the

22   question whether or not he got that training, that's

23   appropriate, and how relevant it was.

24           **MR. KEALEY:**  How was it useful to you, or how was it

25   relevant to you?

1            THE COURT:  I'll ask that.  So the question will be:

2    Did you participate in bias training?  And what relevance did

3    it have for you?  Right?

4            MR. BOWLING:  Yes.

5        (Court and Law Clerk confer off the record.)

6            MR. FOX:  I think it was referred to as unconscious

7    bias training.

8            MS. GOFFETTE:  Implicit bias training.

9            MR. FOX:  I think it was implicit bias training.

10            MS. GOFFETTE:  Yes, whatever term was used.

11            THE COURT:  Okay.  Did you participate in implicit

12    bias training?  And if yes, how is that relevant to you?

13            MR. FOX:  Impact you.

14            THE COURT:  Impact?

15            MR. FOX:  Impact or relevant.

16            THE COURT:  I'm going to go with relevant.  It's

17    what lawyers use.

18        (End of bench conference.)

19            THE COURT:  All right.  At this time I'm going to

20    ask you a question similar to what the juror had proposed.

21         Did you participate in implicit bias training?  And if so,

22    was that relevant to you when you served on the committee?

23            THE WITNESS:  Before I served on the committee --

24            MR. KEALEY:  Your Honor, that was not --

25            THE COURT:  I'm sorry.

1       Did you participate in implicit bias training when you

2   were at Purdue?

3               **THE WITNESS:**  Yes.

4               **THE COURT:**  And if so, how is that relevance -- what

5   relevance did it give you?

6               **THE WITNESS:**  I don't understand.

7               **THE COURT:**  How is that relevant to you, taking that

8   implicit bias training?

9               **THE WITNESS:**  How has it affected?

10              **THE COURT:**  How is it relevant to you?  Why was that

11  important or not?

12              **THE WITNESS:**  All the faculty, they supposed to go

13  through training against -- bias training, so that's procedure

14  to be also on any committee to do that.

15      But I don't understand.  Like, specifically or just --

16              **THE COURT:**  Generally.

17              **THE WITNESS:**  Generally everybody has to do that.

18  We also go to do that to make sure there is no bias.  Again,

19  it's like certain group or so.  So that's very important,

20  diversity, you know, this kind of things.

21      That's what -- yeah, that's -- I mean, that's the main

22  reason for people to understand all kind of race issue,

23  religion, all of that and -- yeah.

24      What I can add in this sense for regarding the bias and

25  stuff like that is it's supposed to be, you know, very, very

1   clear to the faculty not to really discriminate, basically, and

2   this -- for this particular case, our department -- in fact,

3   back when I was recruited, Dean Jamieson said we have a lot of

4   problems in the --

5           **MR. BOWLING:**  Objection, Your Honor.  We're getting

6   far afield from the question.  I move to strike the last

7   statement.

8           **THE COURT:**  That's stricken, the last sentence.  All

9   right.  Thank you.

10          **THE WITNESS:**  Thank you.

11          **THE COURT:**  Any follow-up by plaintiff?

12          **MR. FOX:**  No, Your Honor.

13          **THE COURT:**  For the University?

14          **MR. KEALEY:**  No, Your Honor.

15          **THE COURT:**  For Mr. Ishii?

16          **MR. BOWLING:**  No, Your Honor.

17          **THE COURT:**  All right.  Any other notes that came up

18   other than from Number 10?  Okay.

19      All right.  Is this witness now going to be excused?

20          **MR. FOX:**  Yes, Your Honor.

21          **THE COURT:**  Is it anticipated he's going to be

22   recalled by the defense?

23          **MR. KEALEY:**  No, Your Honor.

24          **THE COURT:**  Or by you?

25          **MR. BOWLING:**  No, Your Honor.

1          **THE COURT:**  You may step down.  You're also excused.

2          **THE WITNESS:**  Thank you, Your Honor.

3          **THE COURT:**  All right.  Ladies and gentlemen of the

4    jury, we're at 12:00 o'clock exactly.  We, again, have provided

5    or made arrangements for you to have lunch downstairs.  I would

6    ask you to be back here by about ten minutes before 1:00, and

7    we'll keep to the same schedule that we were on yesterday; that

8    is, we'll go forward with the evidence in the case until 4:00

9    o'clock this afternoon.

10         Keep in mind the Court's admonition that during this

11   recess you're not to discuss this case with anyone.  This

12   includes the other jurors, anyone involved in the case, any

13   strangers that may approach you with regard to your involvement

14   in this case, and you're not to expose yourself to any reports,

15   whether on your phone or on television or any other source.

16         You're required to keep an open mind until you have heard

17   all the evidence in the case and the closing arguments of

18   counsel and receive the final instructions of law provided to

19   you by the Court at the end of the case.

20         With that, we'll see you back in about 50 minutes.

21   Remember to take your notebooks and leave them in the jury

22   room.

23         (Jury out at 12:01 p.m.)

24         **THE COURT:**  Go ahead and be seated, please.

25         Anything else before we recess for lunch, plaintiff?

1          **MR. SINK:**  Your Honor, I thought I just heard you

2    say 4:00.  I thought we were going until 5:00 o'clock.

3          **THE COURT:**  Not that I remember.  Didn't I say we

4    were going to 4:00 o'clock every day?  9:00 to 4:00.

5          **MR. SINK:**  Okay.

6          **THE COURT:**  And that's because it's still daylight

7    and for people to get out of the downtown area and get back

8    home.  That's why I usually set it at that.

9       Anything else from plaintiff?

10          **MR. SINK:**  No, Your Honor.

11          **THE COURT:**  How about for the University?

12          **MR. KEALEY:**  I would like to confirm that next

13    witness to be called by the plaintiff will be Dr. Kim.

14          **MR. SINK:**  Correct.

15          **MR. KEALEY:**  Followed by Dr. Ishii.

16          **MR. SINK:**  Hopefully, yes.

17          **THE COURT:**  Anything else from Dr. Ishii?

18          **MR. BOWLING:**  No, Your Honor.

19          **THE COURT:**  All right.  We're in recess.  Thank you.

20       (Recess taken at 12:02 p.m.)

21

22

23

24

25

1                              * * * * *

2                            *CERTIFICATION*

3

4          I, ASHLEY N. STOKES, Federal Court Reporter, certify
   that the foregoing is a correct transcript from the record of
   proceedings in the above-entitled matter.

5

6
           S/Ashley N. Stokes_____January 24, 2024
7          Certified Realtime Reporter
           United States District Court
8          Northern District of Indiana
           Hammond Division

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25