```
 1                UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF INDIANA
 2                     LAFAYETTE DIVISION

 3   TATYANA SIZYUK,                )
                                    )
 4        Plaintiff,                )
                                    )
 5     vs.                          )  Case No.
                                    )  4:20-cv-00075-TLS
 6   PURDUE UNIVERSITY, BOARD OF    )
     TRUSTEES OF PURDUE             )
 7   UNIVERSITY, and MAMORU ISHII   )
     in his personal capacity       )
 8                                  )
          Defendants.               )
 9   _____ )

10

11                 DAY TWO OF JURY TRIAL
                    AFTERNOON SESSION
12                  JANUARY 23, 2024
          BEFORE THE HONORABLE THERESA L. SPRINGMANN
13               UNITED STATES DISTRICT COURT

14   APPEARANCES:

15

16   FOR THE PLAINTIFF:        RYAN P. SINK and RYAN C. FOX
                               Fox & Sink LLC
17                             6177 North College Avenue
                               Indianapolis, Indiana 46220
18                             317-254-8500
                               Fax: 317-226-9311
19                             Email: rsink@foxsinklaw.com

20   FOR DEFENDANT PURDUE:     WILLIAM P. KEALEY and
                               MATTHEW M. HUMBLE
21                             Stuart & Branigin LLP
                               300 Main Street, Suite 900
22                             P.O. Box 1010
                               Lafayette, Indiana 47902-1010
23                             765-423-1561
                               Email: wpk@stuartlaw.com

24

25
```

```
1   APPEARANCES (Continued)

2

3   FOR DEFENDANT ISHII:        JOSEPH NEAL BOWLING and
                                JANELLE P. KILIES
4                               Lewis Wagner LLP
                                1411 Roosevelt Ave Ste 102
5                               Indianapolis, IN 46201
                                317-237-0500
6                               Email: nbowling@lewiswagner.com

7

8   ALSO PRESENT:               Defendant Mamoru Ishii;
                                Plaintiff, Tatyana Sizyuk
9
    OFFICIAL REPORTER:          Angela Phipps, RMR, CRR, FCRR
10                              5400 Federal Plaza
                                Hammond, Indiana 46320
11

12

13

14

15

16

17

18

19

20

21

22

23   Proceedings reported by stenotype.  Transcript produced by

24   computer-aided transcription.

25
```

```
 1                              INDEX

 2    WITNESS:                                    PAGE:

 3    Seungjin Kim, Ph.D.

 4    Direct by Mr. Fox                           117

 5    Cross by Mr. Kealey                         155

 6    Cross by Mr. Bowling                        166

 7    Redirect by Mr. Fox                         167

 8    Recross by Mr. Kealey                       169

 9

10    MAMORU ISHII, Ph.D.

11    Direct by Mr. Sink                          172

12    Cross by Ms. Kilies                         211

13

14

15    EXHIBITS ADMITTED:                          PAGE:

16    Plaintiff's Exhibit 3                       147

17    Plaintiff's Exhibit 4                       129

18    Plaintiff's Exhibit 5                       155

19    Plaintiff's Exhibit 6                       137

20    Plaintiff's Exhibit 7                       143

21    Plaintiff's Exhibit 16                      134

22    Plaintiff's Exhibit 22                      169

23    Plaintiff's Exhibit 24                      151

24    Plaintiff's Exhibit 26                      148

25    Defendant's Exhibit M                       161
```

1      (The following proceedings were had in open court,

2       resuming at 1:00 p.m.)

3           **COURTROOM DEPUTY:**  All rise.

4           **THE COURT:**  Go ahead and be seated, please.

5      It's five minutes until 1:00.  Let me ask:  Over the lunch

6  period, has anything occurred that I need to be aware of before

7  we call the jury back in and proceed?

8      For the Plaintiff?

9           **MR. SINK:**  No, Your Honor.

10          **THE COURT:**  For Defendants?

11          **MR. KEALEY:**  Just for orientation, Your Honor.  The

12  next witness to be called by the Plaintiff is Dr. Kim, who we

13  will also be calling in our case in chief a second time, and so

14  I just provide that information to the Court for orientation.

15          **THE COURT:**  All right.  All right.  Anything else for

16  Professor Ishii?

17          **MR. BOWLING:**  No, Your Honor.

18          **THE COURT:**  Okay.  All right.  Please bring the

19  jury in.  Who's the next witness?

20          **MR. KEALEY:**  Dr. Kim.

21          **THE COURT:**  I'm sorry, Kim.  All right.  He is for

22  sure.  Is he outside?

23          **MR. SINK:**  I'll go grab him.

24          **THE COURT:**  Let's have him ready when the jury

25  comes in.

1     Sir, come up to here, and just wait a moment until the

2     jury gets in the bench, and then I'll have you take the oath.

3         (Jury in at 1:00 p.m.)

4             **THE COURT:**  You may all be seated.

5         And the next witness, as I understand, is Dr. Kim.  Is

6     that correct?

7             **MR. SINK:**  Correct, Your Honor.

8             **THE COURT:**  Sir, would you please face my clerk, and

9     he will administer the oath to you.

10        (The oath was duly administered.)

11            **THE WITNESS:**  Yes, I do.

12            **THE COURT:**  Sir, you may now take the stand.

13        Counsel, you may proceed.

14        <u>**SEUNGJIN KIM, Ph.D., PLAINTIFF'S WITNESS, SWORN**</u>

15                    <u>**DIRECT EXAMINATION**</u>

16    **BY MR. FOX:**

17    Q.   Good afternoon.  Can you please state your name for the

18    record.

19    A.   **Good afternoon.  My name is Seungjin Kim.**

20    Q.   My name is Ryan Fox.  We've never met before.  I represent

21    Dr. Sizyuk.

22        Dr. Kim, what is your race and national origin?

23    A.   **Asian, South Korean.**

24    Q.   And are you currently employed?

25    A.   **Yes, I am.**

KIM - DIRECT

```
 1   Q.   And where do you work?
 2   A.   Purdue University.
 3   Q.   And what is your position?
 4   A.   I am a professor and head of the School of Nuclear
 5   Engineering.
 6   Q.   And how long have you worked at Purdue?
 7   A.   Since June of 2017.
 8   Q.   Who was the head of the School of Nuclear Engineering
 9   before you accepted that position?
10   A.   His name was Klod Kokini.
11   Q.   And do you know an individual by the name of Dr. Mamoru
12   Ishii?
13   A.   Yes, I do.
14   Q.   When did you first meet Dr. Ishii?
15   A.   That was, I believe it was, 1992 or '93.
16   Q.   Okay.  And where did you first meet him?
17   A.   I visited his office as a graduate student.
18   Q.   Was this at Purdue?
19   A.   Yes.
20   Q.   And was Dr. Ishii ever your professor?
21   A.   Well, I -- Since then, you mean?
22   Q.   Has Dr. Ishii ever been your professor?
23   A.   How do you mean by my professor?
24   Q.   Like, did he teach you at Purdue?
25   A.   Oh, sure, yes.
```

1    Q.    Yeah.  And was this back at the time that you met him?

2    A.    **Yeah.  I mean, he accepted me and offered a position as a**

3    **research assistant, and since then I started working with him**

4    **as a graduate student.**

5    Q.    And you took classes with him?

6    A.    **Yes, I did.**

7    Q.    Okay.  Do you recall how many?

8    A.    **How many classes?**

9    Q.    Mm-hmm.

10   A.    **I think three.**

11   Q.    Okay.  How did you do in them?

12   A.    **I thought I did well.**

13   Q.    Was Dr. Ishii -- Did you ever consider him your mentor?

14   A.    **Of course.**

15   Q.    When do you think that mentorship began?

16   A.    **Since I started as a graduate student.  Yeah.**

17   Q.    Do you still see him as your mentor today?

18   A.    **To a certain degree in a professional, you know,**

19   **activities.**

20   Q.    And, eventually, you were hired at Purdue; correct?

21   A.    **Yes, in 2017.**

22   Q.    Okay.  And do you know if Dr. Ishii played any role in

23   that hiring?

24   A.    **I don't have any information.  I don't think he was a**

25   **member of the committee, if I recall correctly.**

1   Q.   And upon hire, did you become the head of the School of

2   Engineering?

3   A.   **Head of the School of Nuclear Engineering.**

4   Q.   School of Nuclear Engineering.  Yeah.

5   A.   **Yes.**

6   Q.   Upon hire, were you considered tenured as well?

7   A.   **Yes.  So I was tenured full professor prior to joining**

8   **Purdue University, so I was reviewed for tenure at the rank of**

9   **full professor when I was hired, I believe at the department**

10  **level as well as at the college level.**

11  Q.   Did you have to go through any committee meetings or

12  anything with regards to that to become the head of the School

13  of Nuclear Engineering?

14  A.   **You mean during my -- During the search?**

15  Q.   Yes.

16  A.   **Yes.**

17  Q.   Okay.  Did anyone have to present your credentials on your

18  behalf, or did you do that yourself?

19  A.   **Well, the College of Engineering arranged meetings with**

20  **people, and that's what they developed, the agenda, and**

21  **followed the agenda.**

22  Q.   They arranged meetings with people?

23  A.   **With -- Yes.**

24  Q.   With faculty members at the school of engineering, nuclear

25  school of engineering?

1  A.    **Including faculty, the group, as a group, as entire**

2  **committee, I met with them.**

3  Q.    Yeah.  Did Dr. Ishii meet with the group?

4  A.    **I don't believe he was there.**

5  Q.    You're not sure if he was part of your interview process?

6  A.    **I don't remember seeing him during the -- my meeting in**

7  **the search committee.  I don't think he was part of the search**

8  **committee.**

9  Q.    Did you have any PC committee that made you the head of

10  the School of Engineering, or was it just the search committee

11  that did that?

12  A.    **Well, I thought it was the search committee.  It should**

13  **not be a primary committee because there were other members**

14  **from the other schools and the staff members, so it will not**

15  **constitute as a primary committee.**

16  Q.    So to the best of your recollection, you think it was the

17  search committee that hired you?

18  A.    **It is my understanding.  I don't know the whole process**

19  **because I'm the one who was the candidate, but it is my**

20  **understanding that they met with all the candidates, and then**

21  **they made a recommendation to the dean, the dean finalized the**

22  **candidates.  And then, you know, the dean met with the**

23  **candidates, and then I don't know whether the dean had a**

24  **committee within the college, but the dean made a nomination to**

25  **the provost office, and provost office make a nomination to the**

1  **president office and Board of Trustees.  They make the --**

2  Q.   Do you know -- That's fine.   Thanks.

3       Do you know whether or not Dr. Ishii was on your search

4  committee?

5  A.   **Could you repeat the question.**

6  Q.   Do you know whether Dr. Ishii was on your search

7  committee?

8  A.   **If you ask me whether I knew, I didn't know; but I don't**

9  **recall meeting with Dr. Ishii during my interview process.**

10 Q.   Do you know an individual by the name of Dr. Wharry?

11 A.   **Yes.**

12 Q.   Okay.  And do you know Dr. Tatyana Sizyuk?

13 A.   **Sure.**

14 Q.   And how do you know Dr. Sizyuk?

15 A.   **As an assistant professor when I joined Purdue University**

16 **as a head and professor.**

17 Q.   Was she a professor on tenure-track at the time you joined

18 Purdue?

19 A.   **Yes, she was.**

20 Q.   Okay.  Did you ever tell Dr. Wharry that Dr. Sizyuk would

21 never get tenure?

22 A.   **No.**

23 Q.   Do you have any reason why Dr. Wharry would lie about such

24 a statement?

25 A.   **I have no clue why she said that.**

1   Q.   If Dr. Wharry were to testify that you told her that

2   Dr. Sizyuk would never get tenure, would you deny this?

3   A.   **Please repeat the question again.**

4   Q.   If Dr. Wharry were to testify that you told her Dr. Sizyuk

5   would never get tenure, would you deny this?

6   A.   **I'm denying it right now.**

7   Q.   Okay.  There's a difference between you cannot remember

8   something and you denying that you said it; is that fair?

9   A.   **If I said something like that, I would remember it; and I**

10   **don't have any memory of saying such a thing, so my answer to**

11   **you is no, and so...**

12        **MR. FOX:**  For the witness only.

13   Q.   Do you remember when you -- if you were ever deposed in

14   this matter?

15   A.   **Yes, I have a deposition.**

16   Q.   And do you remember whether or not -- if I said you were

17   deposed on July 28th of 2021, would that seem correct?

18   A.   **Yes, sounds correct.**

19   Q.   Only for -- and if you look on -- can you -- if you look

20   on page 19, do you recognize this as your deposition testimony?

21   A.   **Yes, I do.**

22   Q.   Okay.  And does this refresh your recollection on whether

23   or not you actually deny or can't recall whether or not you

24   ever said that Dr. Sizyuk will never obtain tenure?

25        **THE COURT:**  What lines, Counsel?

1              **MR. FOX:**  It is lines 9 through 20.

2    A.    **Yeah.  It looks like I said I don't recall having a such**

3    **statement or making such a statement.**

4    Q.    Yes.

5    A.    **Yes.**

6    Q.    So you did not deny that you made that statement during

7    your deposition; correct?

8    A.    **I thought that was a denial, but, you know, legally, I**

9    **don't know, yeah.**

10   Q.    Are you familiar with the process of getting tenure within

11   the School of Nuclear Engineering?

12   A.    **I'm sorry.  Could you repeat the question.**

13   Q.    Are you familiar with the process of getting tenure within

14   the School of Nuclear Engineering?

15   A.    **Of course, yes.**

16   Q.    Is there a particular committee which first considers an

17   applicant for tenure within the School of Nuclear Engineering?

18   A.    **Advocating tenure?**

19   Q.    First considers an applicant for tenure.  Is there a

20   committee called the NEPC that first considers --

21   A.    **Yes.  Nuclear Engineering Primary Committee.**

22   Q.    Are you familiar with that committee?

23   A.    **Sure.  I'm the chair of the committee.**

24   Q.    And on that committee, you've only served as the chair;

25   correct?

1    A.    **Yeah.  At my role as a department head, you are**

2    **automatically chairing the committee.**

3    Q.    Who determines who is on the NEPC committee?

4    A.    **I believe it's university, there is a policy, so all**

5    **tenured professors are invited to serve on the primary**

6    **committee.**

7    Q.    So just to be clear, if you are a tenured professor within

8    the School of Nuclear Engineering, you would serve on the NEPC

9    committee for any future applicants up for tenure; is that

10   correct?

11   A.    **That's correct.**

12   Q.    Do faculty members at Purdue receive annual performance

13   evaluations?

14   A.    **Yes.**

15   Q.    Have you done some of those evaluations?

16   A.    **Sure.**

17   Q.    Do you have meetings with faculty members regarding those

18   evaluations?

19   A.    **Yes, I do.**

20   Q.    And at some point, did Dr. Sizyuk seek tenure within the

21   School of Nuclear Engineering?

22   A.    **Yes.  So the tenure-track assistant professor --**

23   Q.    I don't -- That's all I was asking.

24   A.    **Yes.**

25   Q.    And is there a promotion and tenure criteria at Purdue

1    regarding that process?

2    A.   **Yes, there is.**

3    Q.   And there's a book in front of you.  If you could turn to

4    what's been marked as Exhibit 9.

5    A.   **Exhibit 9?**

6    Q.   Yes.  This has been admitted into evidence.

7    A.   **I'm on the exhibit.**

8         **THE COURT:**  Can you see that, ladies and gentlemen?

9         **MR. FOX:**  Technology is not my forte.

10   Q.   Can you read that in front of you?

11   A.   **I'll try.  Which line -- the whole --**

12   Q.   Well, are you familiar with what's been marked as

13   Exhibit 9 before you?

14   A.   **Yes.**

15   Q.   Okay.  And if you look at Exhibit 9, do you recognize this

16   as the promotion and tenure criteria at Purdue?

17   A.   **Yeah, as a whole document, yes.**

18   Q.   Are you familiar with this exhibit?

19   A.   **Yes.**

20   Q.   And do you agree, as part of Exhibit 9 and as part of the

21   criteria for promotion, a faculty member should have

22   demonstrated excellence and scholarly productivity in at least

23   one of these areas; discovery, learning, and/or engagement?

24   A.   **Yes.**

25   Q.   And was there an NEPC committee established for Dr. Sizyuk

1    seeking tenure?

2    A.    **NEPC --**

3    Q.    -- committee for Dr. Sizyuk?  She went in front of an NEPC

4    committee; correct?

5    A.    **Well, she submitted the dossier to the NEPC, and the**

6    **mentor presented it.**

7    Q.    Okay.  And your role on that was the head of the

8    committee; correct?

9    A.    **Chair of the committee.**

10   Q.    Chair of the committee.  And you were a nonvoting member;

11   correct?

12   A.    **That's correct.**

13   Q.    And do you recall whether, in 2019, whether or not you

14   conducted a performance review for Dr. Sizyuk?

15   A.    **You're talking about annual review?**

16   Q.    Yes.

17   A.    **Yes.**

18          **MR. FOX:**  This is not for the jury.

19   Q.    If you could turn to what's been marked in your book

20   Plaintiff's Exhibit 4.

21   A.    **Yes.**

22   Q.    Do you recognize Plaintiff's Exhibit 4?

23   A.    **Yes, I do.**

24   Q.    Did you draft Plaintiff's Exhibit 4?

25   A.    **Yes, I did.**

1   Q.   Is this a true and accurate copy of the review for

2   Dr. Sizyuk on April 22nd of 2019?

3   A.   **I think so, yes.**

4           **MR. FOX:**  I move to admit Exhibit 4.

5           **THE COURT:**  Any objection?

6           **MR. KEALEY:**  No, Your Honor.

7           **MR. BOWLING:**  No, Your Honor.

8           **THE COURT:**  It's admitted.

9   **BY MR. FOX:**

10  Q.   And you did this performance review on April 15th of --

11  on April 22nd of 2019; is that correct?

12  A.   **Yes.  So this is the assessment on Dr. Sizyuk's annual**

13  **performance for the period of academic year of 2018 to '19.**

14  Q.   And you drafted this document; correct?

15  A.   **Yes, I did.**

16  Q.   Was your performance evaluation for Dr. Sizyuk truthful?

17  A.   **Yes, of course.**

18  Q.   And was your performance evaluation for Dr. Sizyuk

19  accurate?

20  A.   **I think so because I spent a lot of time to develop this.**

21  Q.   And with the regards to discovery, you rated her as very

22  good; correct?

23  A.   **Yeah, I did.**

24  Q.   And with regards to learning, you rated her as excellent;

25  correct?

1   A.   **Yes, I did.**

2   Q.   That's the highest rating; correct?

3   A.   **Well, highest rating would be the right corner of**

4   **that box.**

5   Q.   Okay.

6   A.   **Yeah.**

7   Q.   So what -- What's the difference?  Is there another saying

8   about it?

9   A.   **Well, excellent, I kind of try to show -- try to divide**

10  **into three groups for each category.  So if you notice, I put**

11  **the "X" sign at different locations for different categories.**

12  **So when it's at the center for the engagement, that's, you**

13  **know, satisfactory, but in that kind of -- give you some**

14  **qualitative assessment of how good.**

15  Q.   So it's on the left hand of the box; would be somewhat

16  excellent?

17  A.   **You could say that.**

18  Q.   In the middle would be just excellent?

19  A.   **I don't want to, you know, express in words what that**

20  **means, but it gives you some kind of qualitative notion of how**

21  **excellent you were.**

22  Q.   Did someone else instruct you that -- where you place the

23  "X" in the box?

24  A.   **No.  I explained that to -- when I meet with whoever**

25  **faculty that I'm reviewing.**

1  Q.    Okay.  Is that anywhere on the exhibit, on where the "X"

2  is makes a difference in terms of how excellent or how very

3  good one is?

4  A.    **Make difference in what?**

5  Q.    Does that make some --

6          MR. FOX:  Can you restate my question.  I'm --

7  A.    **You were asking whether that makes a difference, but I was**

8  **asking make a difference in what.**

9  Q.    Did you inform or instruct Dr. Sizyuk that where you

10 marked the "X" had some difference that she wasn't just really

11 excellent or somewhat excellent?  Did you explain that to her?

12 A.    **Yeah.  Like I said, I explained the scale of, you know,**

13 **each category when I meet with a faculty member.**

14 Q.    Is that part of some policy for --

15 A.    **No.  There's no policy.**

16 Q.    -- doing reviews?

17         THE COURT:  Sir, wait until he finishes his

18 question --

19         THE WITNESS:  Sorry about that.

20         THE COURT:  -- and then you answer that, because the

21 court reporter can't report both of you at the same time.

22         THE WITNESS:  I understand.  Thank you.

23 BY MR. FOX:

24 Q.    And is there some policy related to where you marked that

25 "X"

1  A.   **There is no policy.  This is something that I created.**

2  Q.   Because, according to Exhibit 9, which we just looked at,

3  a faculty member should have demonstrated excellence in a

4  category such as learning; correct?

5  A.   **Yes.**

6  Q.   And according to Exhibit 4, in the annual review, on

7  April 22nd, 2019, you did rate Dr. Sizyuk as excellent;

8  correct?

9  A.   **Yes.**

10  Q.   Okay.  And with regards to engagement, you rated her as

11  satisfactory?

12  A.   **I think it's important, if I may --**

13  Q.   Just answer the question, sir.

14         **THE COURT:**  Just answer the question.

15  A.   **Oh, yes.  Yes, I did, as you can see.**

16  BY MR. FOX:

17  Q.   And are discovery, learning, and engagement the three

18  criteria an NEPC committee is supposed to look at when

19  considering an applicant for tenure?

20  A.   **No.  NEPC does not review annual review.  NEPC reviews her**

21  **dossier, which is more comprehensive than annual review.  This**

22  **is a review for her performance.**

23  Q.   I'm not asking about -- I'm asking about, in terms of an

24  NEPC committee --

25  A.   **Yes.**

1   Q.    -- when they're looking at an applicant for tenure, are

2   discovery, learning, and engagement three of the criteria they

3   are supposed to look at?

4   A.    **Yes.**

5   Q.    And that criteria is established in the policy in

6   Exhibit 9; correct?

7   A.    **Yes.**

8   Q.    Okay.  Thank you.

9         With regard to Dr. Sizyuk, do you recall how many NEPC

10  meetings there were regarding her tenure?

11  A.    **NEPC meetings?**

12  Q.    Yes.

13  A.    **The former evaluation meetings, they're a couple of -- two**

14  **meetings for formal review.  But prior to that, before the**

15  **summer starts in April, we meet as a primary committee and**

16  **inform primary committee who will be up for tenure evaluation.**

17  Q.    Okay.  And so there's kind of, I think -- is there --

18  before the first meeting when you look at people for tenure, do

19  you send out an agenda for that?

20  A.    **Yes.  So in April or May, I inform NEPC members who will**

21  **be up for tenure evaluation in the fall.**

22  Q.    And do you recall off the top of your head when this first

23  meeting for Dr. Sizyuk took place?

24  A.    I think it was April.  I don't remember exact date.

25  April, 2019.

```
 1              MR. FOX:  This is for witness only.
 2   Q.   And what I'm putting in front of you as Plaintiff's
 3   Exhibit 16, if you could turn the book to Plaintiff's
 4   Exhibit 16.  It might be easier on the book right in front of
 5   you if you could turn to 16 because it is three pages.
 6   A.   Did you say 16?
 7   Q.   16, yep.
 8   A.   Do you want me to read it?
 9   Q.   No.  I just want you to -- Do you recognize it?
10   A.   Yes.
11   Q.   Okay.  And is this a true and accurate email
12   correspondence regarding the first NEPC meeting regarding
13   Dr. Sizyuk?
14   A.   I believe so.
15   Q.   Okay.  And the second page of Exhibit 16 is the agenda for
16   that first meeting?
17   A.   Yes.
18              MR. FOX:  Okay.  I move to admit Exhibit 16.
19              MR. KEALEY:  No objection.
20              MR. BOWLING:  No objection.
21              THE COURT:  It's admitted.
22   BY MR. FOX:
23   Q.   Okay.  And so if you look at Exhibit 16-- we can show it
24   to the jury here --we do see that this is an agenda?  Do you
25   see that?
```

1    A.   **Yes.**

2    Q.   And the meeting is scheduled for April 30th of 2019; is

3    that correct?

4    A.   **Yes.**

5    Q.   And was that the date of the first NEPC meeting for

6    Dr. Sizyuk?

7    A.   **Yeah.  As you can see, this is to discuss all of our, you**

8    **know, tenure-track faculty members.**

9    Q.   And according to this agenda, originally Dr. Hassanein was

10   scheduled to be her presenter; is that correct?

11   A.   **Yeah.  He was assigned as a mentor for Dr. Sizyuk at the**

12   **time.**

13   Q.   And do you recall, in terms of April 30th of 2019, with

14   regards to Dr. Sizyuk, during this meeting, was the issue of

15   whether or not Dr. Hassanein should be a presenter for

16   Dr. Sizyuk brought up?

17   A.   **Yes.  So --**

18   Q.   "Yes."  Thank you.

19        And do you recall who brought that up to your attention?

20   A.   **I don't recall.  No, I don't recall.**

21   Q.   Was it Dr. Ishii?

22   A.   **I don't know.**

23   Q.   Could it have been?

24        **MR. KEALEY:**  Calls for speculation, Your Honor.  The

25   witness said he doesn't know.

1    A.    **It could have been anybody.**

2    BY MR. FOX:

3    Q.    And prior to this meeting took place, would you agree that

4    there was an issue with Dr. Hassanein being a voting member on

5    Dr. Sizyuk's tenure committee?

6    A.    **Prior to April meeting?**

7    Q.    Yes.

8    A.    **I don't recall there was any kind of an issue that -- I**

9    **don't recall discussing this prior to this meeting.**

10   Q.    Do you know whether a former supervisor of a nominee for

11   tenure can still be a voting member for that nominee for

12   tenure?

13   A.    **To the best of my knowledge, if you had served as a former**

14   **adviser, research adviser, you are recused or excused from that**

15   **evaluation.**

16          **MR. FOX:**  This is for the witness only.

17   Q.    If you take a look at what's been in front of you as

18   Exhibit 6, do you recognize Exhibit 6?

19   A.    **Yes.**

20   Q.    And are these emails both from and to you from Arvind

21   Raman?

22   A.    **Yes.**

23   Q.    And if you turn to both pages, is this accurate emails

24   that were forwarded and sent between the two of you on

25   April 16th of 2019 and April 17th of 2019?

```
 1   A.    Yes.
 2            MR. FOX:  I move to admit Plaintiff's Exhibit 6.
 3            MR. KEALEY:  No objection, Your Honor.
 4            MR. BOWLING:  No objection.
 5            THE COURT:  It's admitted.
 6   Q.    And if you look at the middle paragraph of -- Who is
 7   Arvind Raman?
 8   A.    He was the associate dean for faculty affairs.
 9   Q.    And 13 days before the first NEPC meeting, did Mr. Arvind
10   email you that being a former Ph.D. adviser or former
11   supervisor of a nominee being considered for P&T does not
12   disqualify a senior faculty member for either voting --
13            COURT REPORTER:  Excuse me.  Can you slow down,
14   please.
15            MR. FOX:  Sorry.
16   Q.    -- being a former Ph.D. adviser or former supervisor of a
17   nominee being considered for P&T does not disqualify a senior
18   faculty member from voting on the P&T case or presenting it or
19   being the mentor for the nominee; is that correct?
20   A.    Yes.  I see that.
21   Q.    And is that your understanding of how the NEPC
22   committee -- what Mr. Arvind told you at that point?
23   A.    Yes.  And this is how I allowed Dr. Hassanein --
24   Q.    There's no question.
25   A.    -- to present his case -- or her case.
```

1    Q.    During this April 30th, 2019 meeting, you were in

2    attendance, correct, as the chair for Dr. Sizyuk's tenure, the

3    first meeting?

4    A.    **I was what, again?**

5    Q.    In attendance; correct?  You were there?

6    A.    **Yeah, I was there.**

7    Q.    During this meeting, do you recall whether you asked any

8    questions or provided any comments on her publications, grants,

9    or anything related to her qualifications?

10   A.    **I'm sorry.  If you could please repeat the question.**

11   Q.    During this meeting, do you recall asking any questions or

12   providing any comments on her publications or grants or

13   anything related to her qualifications for tenure during this

14   initial meeting?

15   A.    **No.  I don't ask questions during the meeting.**

16   Q.    Okay.  Do you recall any concerns that were brought up to

17   you during this initial April 30th, 2000 [verbatim] meeting

18   regarding Dr. Sizyuk's attempt to gain tenure during this

19   meeting?  Do you remember anything arising?

20   A.    **During the April meeting, you're talking about?**

21   Q.    Yes.

22   A.    **During the meeting, I recall that there was some good**

23   **discussion about the relationship between Dr. Hassanein and**

24   **Dr. Sizyuk, whether they are in the -- you know, as a**

25   **thesis-adviser relationship or not.**

1    Q.    So during this April 31st meeting [verbatim], was the

2    issue of Dr. Sizyuk's Ph.D. ever raised?

3    A.    **Well, in relation -- as part of that discussion, because**

4    **in order to be a thesis adviser, you have to advise the Ph.D.**

5    **thesis.  Right?  So that was a natural, kind of, follow-up**

6    **discussion.**

7    Q.    And who raised this issue?

8    A.    **Multiple primary committee members.**

9    Q.    Was Dr. Ishii part of the NEPC committee for Dr. Sizyuk?

10   A.    **I do not -- I cannot remember who raised what, so --**

11   Q.    Well, my question was:  Dr. Ishii was a voting member for

12   Dr. Sizyuk's tenure on the NEPC committee; is that correct?

13   A.    **He was one of the members, yes.**

14   Q.    Okay.  And do you recall if he was the one to raise

15   concerns about Dr. Sizyuk's Ph.D.?

16   A.    **I don't remember.**

17   Q.    Is it possible he did and you cannot recall?

18         **MR. KEALEY:**  Your Honor, the witness has answered the

19   question.  This calls for speculation.

20         **THE COURT:**  Sustained.

21   **BY MR. FOX:**

22   Q.    Do you know who raised it?

23   A.    **I don't know.  Like I said, multiple primary committee**

24   **members.  Not just one or two, but multiple.**

25   Q.    Do you know how -- this issue from the Ph.D. regarding

1  Dr. Sizyuk, was that an ongoing issue for a matter of months?

2  A.  **That, I don't know.**

3  Q.  Okay.  You don't recall off the top of your head?

4  A.  **No, I don't know because, you know, as you can see, I**

5  **joined in 2017, and she was hired in two thousand what, '14?**

6  **So...**

7  Q.  After the April 30th, 2019 meeting, did the issue of

8  Dr. Sizyuk's Ph.D. continue to come up?

9  A.  **To me, as a chair of the committee, the major issue was**

10  **the relationship between Dr. Hassanein and Dr. Sizyuk; and**

11  **that's what we -- what I'd like, you know, the university to**

12  **confirm, and whether -- about the Ph.D. degree, I would assume**

13  **that, you know, if it's written in the dossier, you would**

14  **assume that's correct information.  Right?**

15  Q.  Was there ever concern or questions whether or not

16  Dr. Sizyuk had an actual official Ph.D.?

17  A.  **I don't think it was a question about the Ph.D. degree**

18  **itself, but a question about the process.**

19  **So Dr. Sizyuk, as I recall, was a hundred percent Purdue**

20  **employee and yet was able to get a Ph.D. from an international**

21  **institution.  And the question was whether she was enrolled**

22  **into the university or not because, you know, in general, as a**

23  **common sense, if you want to get a degree, you have to --**

24  Q.  I just asked whether there was still a concern.

25         **MR. KEALEY:**  That was not a question.  The witness

```
 1   was in the middle of his answer, Your Honor.
 2              THE COURT:  I'll let him finish.
 3              THE WITNESS:  Repeat the question, please.
 4              THE COURT:  No, no.  Read it back, please.
 5         (Last question read back.)
 6   A.    Prior to April?
 7   Q.    No.  After April 30th, 2019?
 8   A.    As part of the discussion of the relationship, there was a
 9   question about how she was able to get Ph.D., yes.
10   Q.    Was there ever discussion or a concern raised whether or
11   not her Ph.D. was even an official Ph.D. degree?
12   A.    I don't -- it's very difficult to say yes or no because --
13              MR. FOX:  This is for the witness only.
14   A.    Yes.
15   BY MR. FOX:
16   Q.    If you could look at what's been marked as Plaintiff's
17   Exhibit 7.
18              THE COURT:  It says 24.  Am I missing something?
19              MR. FOX:  The bottom, Plaintiff's Exhibit 7.
20              THE COURT:  Will you push it up so we can see it on
21   the screen?
22              MR. FOX:  Oh, I'm sorry.
23              THE COURT:  Still can't see it.  P-7, is that what
24   I'm looking at?
25              MR. FOX:  P-7, yes.
```

1   Q.   If you look at both pages, it's a two-page document

2   on P-7.

3            THE COURT:  Do you see that?

4   BY MR. FOX:

5   Q.   Do you recognize this --

6            THE COURT:  Do you see that?

7            THE WITNESS:  Exhibit what?

8   BY MR. FOX:

9   Q.   P-7.  Plaintiff's 7.

10  A.   **Exhibit 24.**

11  Q.   Exhibit 7.

12  A.   **7.  Okay.**

13           THE COURT:  On the screen, it's labeled Exhibit 24.

14           THE WITNESS:  Yeah.  That's why I was looking.

15           THE COURT:  Then at the bottom, there's another

16  exhibit tag, P-7.

17           THE WITNESS:  So I'm looking at it.

18           THE COURT:  All right.

19  BY MR. FOX:

20  Q.   And do you recognize -- Do you recognize this document?

21  A.   **Yes.**

22  Q.   And on page 1 of Plaintiff's Exhibit 7, is that an email

23  from you to a Peter Hollenbeck?

24  A.   **Yes.**

25  Q.   Dated August 5th?

1   A.   **Yes.**

2   Q.   And on the second page is an email from Mr. Hollenbeck to

3   you, dated August 5th, 2019; is that correct?

4   A.   **Yes.  August 5, yes.**

5        **MR. FOX:**  I would move to admit Plaintiff's

6   Exhibit 7.

7        **MR. KEALEY:**  No objection.

8        **MR. BOWLING:**  No objection.

9        **THE COURT:**  It's admitted.

10  BY MR. FOX:

11  Q.   Have you had a chance to review Plaintiff's Exhibit 7?

12  A.   **Could you point to which paragraph?  It's a long email,**

13  **so...**

14  Q.   Let's turn to page 2.

15  A.   **Okay.**

16  Q.   And if you look at page 2, where that's underlined, it

17  says she has an official Ph.D. degree from Rzeszow.  Do you see

18  that?

19  A.   **If you could please point to which paragraph; first,**

20  **second, third.**

21  Q.   You could look on the screen, too.  Do you see that?

22       **THE COURT:**  It's really hard to see.

23  BY MR. FOX:

24  Q.   I'll zoom it in.

25  A.   **Yeah, I can see that.**

1   Q.   Okay.  And this is something that Dr. Hollenbeck had

2   emailed from him to you; correct?

3   A.   **Yes.**

4   Q.   And do you know why he's sending you this email?

5   A.   **Because I was asking -- I was conveying the message from**

6   **primary committee as to how she was able to get the Ph.D. and**

7   **what was the relationship in getting -- between Hassanein and**

8   **her in getting the Ph.D.**

9   Q.   So does this refresh your recollection with regards to

10  that there was an issue regarding Dr. Sizyuk having a Ph.D.?

11  A.   **Yeah.  I mean, as a common sense, yes.**

12  Q.   Yes.  And if you read -- if you could, could you read --

13  Could you read that middle paragraph.

14  A.   **What -- Yes.**

15  Q.   You could read it from your book.  But could you read that

16  middle paragraph for the jury, please.

17  A.   **For the jury?**

18  Q.   Yes.

19  A.   **"We have learned nothing that the primary committee could**

20  **not have found out for themselves if they were concerned -**

21  **using a web search, Google translation, and a conversation with**

22  **Tatyana.  Any idea why they have not pursued their own**

23  **questions?  If their intention was to wait and then play**

24  **'gotcha' in an effort to sabotage her promotion proceedings,**

25  **then you've got a fire to put out, no?"**

1  Q.   And that's something Dr. Hollenbeck sent to you; correct?

2  A.   **Yes.**

3  Q.   Do you recall whether or not during the NEPC process that

4  Dr. Sizyuk had to submit an amended dossier?

5  A.   **Yes.**

6  Q.   Okay.  And that amended dossier, did that include a

7  funding that she had recently received from the Department of

8  Energy; do you recall that?  Do you recall Dr. Sizyuk receiving

9  a large fund from the Department of Energy?

10  A.   **Yes.  I am aware.  I was aware.**

11  Q.   Okay.

12  A.   **But --**

13  Q.   Was the amount of that fund approximately $750,000?

14  A.   **Yes.**

15  Q.   And was that fund received -- she got that fund in the

16  summer of 2019?

17  A.   **I don't remember exactly when she received it, but I know**

18  **it was after we had evaluation, after we had -- I mean she**

19  **submitted the dossier.**

20  Q.   Yeah.  So she had submitted the dossier to the NEPC, the

21  April 30th, 2019 committee is held, and then --

22  A.   **Right.**

23  Q.   -- in between the first NEPC meeting and the second NEPC

24  meeting, she gets a large grant; right?

25  A.   **Yes.**

1    Q.    $750,000 --

2    A.    **Yes.**

3    Q.    -- is a substantial grant; would you agree?

4    A.    **Yes, it is.**

5    Q.    And who is the sole individual responsible for that grant?

6    A.    **Dr. Sizyuk.**

7    Q.    Would you consider that a great accomplishment?

8    A.    **It's a good accomplishment, yes.**

9    Q.    Okay.  And so she amended her dossier; correct?

10   A.    **I don't think you can amend the dossier after it's frozen.**

11   **So that's the policy of the college.  So you can add a comment**

12   **during the engineering promotion committee meeting for the**

13   **evaluation.**

14   Q.    Do you know whether or not Dr. Sizyuk amended her dossier

15   to reflect that grant?

16   A.    **I don't think she was allowed to, so to answer your**

17   **question, no.**

18   Q.    Okay.  You don't think she was allowed to?

19   A.    **It's a policy that you cannot amend your document after**

20   **it's frozen.**

21          **MR. FOX:**  There were external -- For the witness

22   only.

23   Q.    Do you recognize what's been put in front of you?

24   A.    **Yes.**

25          **THE COURT:**  For the record, what is it numbered?

1    **MR. FOX:**  It's numbered 976 Bates stamp.

2    **MR. SINK:**  P-3.

3    **THE COURT:**  That's the exhibit, P, as in "Peter", 3?

4    **MR. SINK:**  Plaintiff 3, yes.

5    **THE COURT:**  Thank you.

6    **BY MR. FOX:**

7    Q.   Does this refresh your recollection in any way whether or

8    not she was allowed to amend her dossier?

9    A.   **I can see that she amended by including this new grant**

10   **awarded, but she was not supposed to.**

11   Q.   Was the amended dossier, as far as you know, ever given to

12   you the external researchers for Dr. Sizyuk's tenure?

13   A.   **No.  You are not supposed to give different dossier to**

14   **different external reviewers.**

15   **MR. KEALEY:**  Your Honor, I move Plaintiff's Exhibit 3

16   into evidence.

17   **MR. FOX:**  No objection.

18   **THE COURT:**  It's admitted.

19   **BY MR. FOX:**

20   Q.   So we're past the email from Dr. Hollenbeck on

21   August 5th.  We've not hit the second meeting.  But there was

22   a second meeting for Dr. Sizyuk; correct?

23   A.   **That's the final voting meeting, yes.**

24   **So I want to clarify that, for the former promotion and**

25   **tenure evaluation, there were two meetings in September; early**

1  **September and two weeks or three weeks later, after -- prior --**

2  **after that meeting.**

3          MR. FOX:  Okay.  For the witness only.

4  Q.   To refresh your recollection, do you recognize what's been

5  marked as Plaintiff's Exhibit No. 26?

6  A.   **Yes, I do.**

7  Q.   Okay.  And is this the agenda for the September 6, 2019

8  NEPC meeting for Dr. Sizyuk?

9  A.   **Yes.**

10          MR. FOX:  Okay.  I move to admit Plaintiff's

11  Exhibit 26.

12          MR. KEALEY:  No objection.

13          MR. BOWLING:  No objection.

14          THE COURT:  It's admitted.

15  BY MR. FOX:

16  Q.   And this is the agenda for the second meeting?

17  A.   **Yes.**

18  Q.   And second meeting --

19  A.   **Oh, no, first meeting.**

20  Q.   For the first meeting --

21  A.   **Yes.**

22  Q.   -- after the April 30th?

23          THE COURT:  Is that correct?

24  A.   **Oh, first -- first primary committee meeting to evaluate**

25  **Dr. Sizyuk's case for promotion and tenure.**

1    Q.    And you attended this meeting?

2    A.    **Yes.**

3    Q.    And was Dr. Sizyuk's learning, discovery, or engagement

4    ever discussed by NEPC committee members during this meeting?

5    A.    **Sure, yes.**

6    Q.    That's your testimony, that the committee members amongst

7    themselves discussed her qualifications?

8              **MR. KEALEY:**  Your Honor, the witness answered the

9    question "yes."

10   A.    **You mean amongst?**

11   **BY MR. FOX:**

12   Q.    Did the NEPC --

13             **THE COURT:**  Sustained.

14             **MR. FOX:**  I'm sorry.

15   Q.    I'm going to be -- try to be very specific here.

16   A.    **Yes.**

17   Q.    Did the NEPC committee members amongst themselves discuss

18   during the September 6, 2019 meeting Dr. Sizyuk's

19   qualifications?

20   A.    **I don't know why you put "amongst" there, but, yes, I**

21   **mean, they discussed this case.**

22   Q.    You specifically recall them doing so on September 6?

23   A.    **Yes.  As the agenda shows, yes.**

24   Q.    During the September 6, 2019 meeting, do you recall

25   whether Dr. Ishii brought up the validity of Dr. Sizyuk's

1    Ph.D.?

2    A.    **You mean in this meeting?**

3    Q.    Yes.

4    A.    **If I remember correctly, I conveyed provost offices, you**

5    **know, message to all the primary committee meeting members**

6    **during this -- during this meeting that -- in that -- that**

7    **Dr. Sizyuk's Ph.D. degree is valid.  So I don't recall there**

8    **was additional discussion about the validity.**

9    Q.    Because you had received that email from Dr. Hollenbeck?

10   A.    **Yeah.  Basically, they confirmed that Dr. Sizyuk's Ph.D.**

11   **degree is valid.  So I conveyed that information to the primary**

12   **committee members.**

13   Q.    Did you inform the committee members that it was not a

14   relevant issue anymore?

15   A.    **Yeah.  That's how I put it.  I mean, I may not have used**

16   **exact wording like, "not relevant," but I told them that Ph.D.**

17   **degree was found to be valid.**

18   Q.    And did you tell them this during the meeting of

19   September 6, 2019?

20   A.    **I believe so because it was raised in the April meeting.**

21   **So I must have followed -- either myself or the mentor, who was**

22   **Dr. Taleyarkhan at the time.**

23   **And I also added that -- you know, about the question**

24   **about the relationship between Dr. Taleyarkhan and Dr. Sizyuk,**

25   **that she had to change her dossier.**

1    Q.    And there was one more meeting for Dr. Sizyuk with regard

2    to tenure?

3    A.    **Following this meeting, usually we allow two weeks, and**

4    **then we have a final voting meeting.**

5             **MR. FOX:**  For the witness only.

6    Q.    Do you recognize what's been marked as Plaintiff's

7    Exhibit 24?

8    A.    **Yes, I do.**

9    Q.    And is this the agenda for the September 27th, 2019

10   NEPC meeting with regards to Dr. Sizyuk?

11   A.    **That's correct.**

12            **MR. FOX:**  I move to admit Exhibit 24.

13            **THE COURT:**  Any objection?

14            **MR. BOWLING:**  No objection.

15            **MR. KEALEY:**  No, Your Honor.

16            **THE COURT:**  It's admitted.

17   **BY MR. FOX:**

18   Q.    And did you attend the September 27th, 2019 NEPC meeting

19   with regards to Dr. Sizyuk's tenure?

20   A.    **Yes, I did.**

21   Q.    And did the NEPC committee members amongst themselves

22   discuss Dr. Sizyuk's qualifications during this meeting?

23   A.    **Yes, they did.**

24   Q.    Did you ask any questions or provide any comments during

25   this meeting pertaining to Dr. Sizyuk's discovery?

```
 1   A.   No.

 2   Q.   Did you ask any questions or provide any comments during

 3   this meeting pertaining to Dr. Sizyuk's engagement or learning?

 4   A.   No.

 5   Q.   Was the validity of Dr. Sizyuk's Ph.D. raised during this

 6   meeting?

 7   A.   No.

 8   Q.   During either the September -- the last two NEPC meetings

 9   regarding Dr. Sizyuk, was the issue of what her job title at

10   Argonne ever raised?

11   A.   Yeah, there was a question about that.

12   Q.   And who raised that issue?

13   A.   I believe it was Dr. Ishii who asked that question.

14   Q.   And do you know how long ago Dr. Sizyuk had worked at

15   Argonne?

16   A.   That, I don't remember.

17   Q.   Do you recall how long Dr. Sizyuk had been at Purdue when

18   she went up for tenure?

19   A.   I believe she was joined at -- she joined at -- in 2014 as

20   a faculty, but then she was a research scientist under

21   Dr. Hassanein prior to that.

22   Q.   And working at Purdue?

23   A.   At Purdue, yes.

24   Q.   So she had been at Purdue a number of years; is that

25   correct?
```

1    A.    **Yes.**

2    Q.    Okay.  And what was the significance of -- What did

3    Dr. Ishii raise about her job title at Argonne that you recall?

4    A.    **Well, Dr. Ishii was also an Argonne scientist before he**

5    **joined Purdue, so he was asking about the title because, based**

6    **on his recollection -- if I remember correctly, based on his**

7    **recollection, the title that was written in the dossier was**

8    **given only to the Ph.D. degree, you know, employee.**

9    Q.    How is that relevant on whether Dr. Sizyuk -- in terms of

10   Dr. Sizyuk's attempts to gain tenure?

11   A.    **Well, the dossier should be accurate, 100 percent**

12   **accurate; and it is NEPC's job to assess, make an assessment**

13   **whether what's written in there is a hundred percent accurate.**

14   **So it is a fair question as a former Argonne National Lab**

15   **employee to raise that question that he thought, you know, the**

16   **title that she wrote was given to only those who hold Ph.D.**

17   **degree.  So --**

18   Q.    So the job title at Argonne, in your opinion, was also an

19   important factor to look into?

20   A.    **That's not my opinion.  But, like I said, when we -- it is**

21   **our primary -- Nuclear Engineering Primary Committee's job to**

22   **make sure that all the information written in the dossier is a**

23   **hundred percent accurate before it makes a -- you know, it gets**

24   **forwarded to the engineering area promotion committee.**

25   Q.    And so Dr. Ishii was looking into whether or not -- if I

1  told you that Dr. Sizyuk was hired in 2017 -- or 2007, would

2  you dispute that, that she was hired by Purdue in 2007?

3  A.   **Who?**

4  Q.   Dr. Sizyuk was hired by Purdue in 2007; would you dispute

5  that?

6  A.   **No.  I mean, it should show.  I don't remember exactly**

7  **when she was hired because I was not the person who hired her.**

8  Q.   And so the issue being raised was somewhere that she had

9  worked --

10  A.   **At Argonne.**

11  Q.   Argonne, 12 years ago?

12  A.   **Yeah.  The title when she was working as an Argonne**

13  **scientist.**

14  Q.   And, eventually, Dr. Sizyuk was denied promotion; correct?

15  A.   **Yes.**

16         **MR. FOX:**  For the witness only.

17  Q.   Do you recognize what's been marked as Plaintiff's

18  Exhibit 5?

19  A.   **Exhibit 5.  Yes.  This is Form 36 of her dossier.**

20  Q.   Is this something that you created, Plaintiff's Exhibit 5?

21  A.   **Yes.**

22  Q.   Okay.  And is this the form informing Dr. Sizyuk she would

23  not be getting tenure?

24  A.   **It's a form -- it's a cover page of the dossier, and it's**

25  **prepared to show that I'm -- to show why I'm not moving forward**

1     to the engineering area committee.

2              **MR. FOX:**  I would like to move to admit Exhibit 5?

3              **MR. KEALEY:**  No objection.

4              **MR. BOWLING:**  No objection.

5              **THE COURT:**  It's admitted.

6     BY MR. FOX:

7     Q.   And according to Exhibit 5, it states that, in all areas

8     of discovery, learning, scholarly engagement activities,

9     Dr. Sizyuk was weak; do you see that?

10    A.   **Yes.**

11    Q.   In Dr. Sizyuk's 2019 review, you evaluate Dr. Sizyuk as

12    excellent in learning; correct?

13    A.   **Yeah.  That was an annual review.**

14    Q.   And you evaluated her as very good in discovery; correct?

15    A.   **Yes, I did.**

16    Q.   And satisfactory in engagement; correct?

17    A.   **Yes, I did.**

18    Q.   And then after that review, she brought in $750,000;

19    correct?

20    A.   **Yes.**

21    Q.   Is there a magic number for the amount of publications one

22    needs for tenure in the School of Nuclear Engineering?

23    A.   **No.**

24    Q.   Is there a magic number of the amount of seminars you're

25    to present at to get tenure in the School of Nuclear

KIM - CROSS BY MR. KEALEY

1   Engineering?

2   A.   **No.**

3   Q.   Is there a magic number of amount of students you need to

4   help get their Ph.D. to establish tenure in the School of

5   Nuclear Engineering?

6   A.   **No.**

7   Q.   And after the NEPC voted to deny tenure to her, could you

8   have still endorsed her for tenure for review at the EAPC?

9   A.   **It is the head's discretion that I could have taken it up**

10  **to the EAPC if I -- but --**

11  Q.   And you decided not to do that; correct?

12  A.   **That's correct.**

13  Q.   And, instead, you decided to defer to the NEPC; is that

14  correct?

15  A.   **No.  NEPC already voted, and I -- I concurred with NEPC's**

16  **decision, so I decided not to take it forward to the EAPC.**

17  Q.   You decided not to take it forward?

18  A.   **Yes.**

19       **MR. FOX:**  Thank you for your time, Dr. Kim.

20       **THE WITNESS:**  Thank you.

21                   <u>**CROSS-EXAMINATION**</u>

22  **BY MR. KEALEY:**

23  Q.   Dr. Kim, good afternoon.

24  A.   **Good afternoon.**

25  Q.   Let's continue to look at Plaintiff's Exhibit 5 for a

1   minute.  There's more that you wrote here that you weren't

2   asked about, and I want to ask you about the rest of what you

3   wrote here.

4   A.   **Yes.**

5   Q.   So we're going to have Exhibit 5 on screen.  And the

6   second sentence in that paragraph you were directed to right

7   below the number 9 is a fairly long sentence, and you were

8   asked about just the first part of it, about discovery,

9   learning, and scholarly engagement activities.

10       And then the second part of that sentence says that, "The

11  majority of the primary committee members felt that Dr. Sizyuk

12  did not show strong evidence in demonstrating independence from

13  her former research adviser in developing research programs as

14  well as in scholarly publications"; do you see that?

15  A.   **That's correct.  Yes, I see that.**

16  Q.   So you were recording here what you observed the majority

17  of the primary committee members expressing as their reason for

18  voting against her tenure application; correct?

19  A.   **Yes.**

20  Q.   This was a record that you made of what you observed about

21  their deliberations, and you made this record shortly after you

22  observed their deliberations; correct?

23  A.   **Yes.**

24  Q.   And is this record that you made about their deliberations

25  about the lack of strong evidence in demonstrating independence

1    from her former research adviser consistent with something that

2    you had, yourself, thought about in connection with

3    Dr. Sizyuk's tenure candidacy?

4    A.   **Yes.**

5    Q.   Was that a concern that you had about her candidacy?

6    A.   **Did I have a concern?**

7    Q.   Yes.  About her independence.

8    A.   **Yes.**

9    Q.   Continuing on, you were also asked some questions about

10   Plaintiff's Exhibit 6, which is an email string between you and

11   Arvind Raman, who, I believe, you described as an associate

12   dean for faculty affairs in the College of Engineering?

13   A.   **Yes.**

14   Q.   And that string began with an email from you in April of

15   2019.  And in that April 2019 email, you asked the question

16   whether Dr. Hassanein can be a mentor who can present her case

17   to NEPC, and is Dr. Hassanein eligible for discussing her case

18   and for voting on NEPC; correct?

19   A.   **Yes.**

20   Q.   Would it be fair to say that you were trying to do this

21   process by the book, as you understood it, in the College of

22   Engineering?

23   A.   **Yeah.  As a chair of the committee, I'm responsible to**

24   **follow the policy and the guidelines set by the university,**

25   **so yes.**

1    Q.   So when you had this procedural question, you took it to a

2    higher level?

3    A.   **Yes, I did.**

4    Q.   And you received guidance?

5    A.   **Yes, I did.**

6    Q.   So let's turn, then, to -- In that same email string,

7    there's an April 17th, 2019 email from Arvind Raman, the

8    associate dean, back to you, and you were asked about one of

9    the sentences in that email, but I want to direct your

10   attention to one of the other sentences in that email.

11        In the second sentence, Dr. Raman wrote, "On the other

12   hand it is not good practice for a former supervisor or Ph.D.

13   adviser of a candidate to be the candidate's faculty mentor and

14   present their P&T case."  Do you see that?

15   A.   **Yes, I do.**

16   Q.   When you learned that that was not a good practice, did

17   you try to arrange for a better practice for Dr. Sizyuk's

18   tenure evaluation in 2019?

19   A.   **Yes, I did.**

20   Q.   Did you find another advocate for her dossier?

21   A.   **So I reached out to Dr. Taleyarkhan as a replacement for**

22   **Dr. Hassanein to present her case.**

23        **Can I add one more thing here?**

24   Q.   Certainly.

25   A.   **Because this is relevant discussion about the -- I mean**

1    **the eligibility.**

2          **So, for example, in the engineering area promotion**

3    **committee, if there is a member who was the supervisor of a**

4    **candidate, they're asked to leave in discussing the case.  So I**

5    **was trying to follow the university guideline by replacing**

6    **Dr. Hassanein with Dr. Taleyarkhan.**

7    Q.   Because it would -- it would be -- it would deprive the

8    candidate of their advocate in the meeting if their advocate

9    was asked to leave --

10   A.   **Right.**

11   Q.   -- because of a conflict of interest?

12   A.   **Yeah, you cannot cast a vote when you have a relationship.**

13   Q.   So in order for Dr. Sizyuk's advocate to remain in the

14   meeting, that person would have to be free of a conflict of

15   interest?

16   A.   **Yeah.  And it's inconsistent with university policy.**

17          **MR. KEALEY:**  Your Honor, we're going to ask the

18   witness to identify as foundation Defense Exhibit M and then

19   we'll move it into evidence.

20   **BY MR. KEALEY:**

21   Q.   Dr. Kim, I've shown you on the screen Defense Exhibit M,

22   which is a fairly several-page-long email string beginning on

23   July 15 of 2019 and going through August 8 of 2019.

24          Could you please confirm for the record that that's an

25   email string in which you were a participant back and forth

1    with Dr. Hollenbeck.

2    A.   **Yes.**

3         **MR. KEALEY:**  Your Honor, I move Defense Exhibit M

4    into evidence.

5         **THE COURT:**  Any objection?

6         **MR. SINK:**  No objection.

7         **THE COURT:**  It's admitted.

8    **BY MR. KEALEY:**

9    Q.   If you turn, Dr. Kim, to the third page of Defense

10   Exhibit M, there's an email from you to Dr. Hollenbeck.  Do you

11   see that email?

12   A.   **I can see that.  But where can I find Exhibit M?**

13        **Oh, it's here.  Okay.  Sorry.**

14        (Brief pause while witness reviewing document.)

15   A.   **Yes.**

16   Q.   Okay.  Actually, I'm going to ask you to turn a couple

17   pages further in, and just to work chronologically for

18   orientation.

19        So at the bottom of the fourth page and the top of the

20   fifth page, there's an August 5th email from Dr. Hollenbeck

21   to you, and you were asked on direct examination a question

22   about one paragraph in that email, and I want to ask you to

23   look at the final paragraph in that email, which starts with

24   the sentence "Professor H's relationship with Rzeszow is still

25   not clear to me."  Do you see that?

1   A.   **Yes, I do.**

2   Q.   And just for orientation, you and Dr. Hollenbeck were

3   discussing this question about the Polish university and the

4   doctoral degree from the Polish university and, among other

5   things, Professor Hassanein's relationship with that process;

6   correct?

7   A.   **That's correct.**

8   Q.   So then you wrote an email back to Dr. Hollenbeck on that

9   same day, a couple hours after his email, and you summarized

10  the information as you understood it.  And in the third

11  paragraph of that email, you said, regarding Dr. Sizyuk's Ph.D.

12  adviser, "I will ask Dr. Sizyuk to correct her Ph.D. adviser's

13  information from Professor Igor Tralle to Dr. A. Hassanein."

14  Do you see that?

15  A.   **Yes, I do.**

16  Q.   And then if you would please read out loud the next

17  sentence in that same paragraph.

18  A.   **"To me, it is still questionable, however, why she listed**

19  **Professor Igor Tralle as her Ph.D. adviser if she knew that**

20  **Dr. Hassanein was her Ph.D. adviser as shown in Rzeszow's**

21  **official document."**

22  Q.   And then you continue on in the next paragraph, and you

23  describe some interactions.  You begin that paragraph by

24  saying, "Based on my interactions with those who raised

25  questions."  Do you see that?

1    A.    **Yes, I do.**

2    Q.    When you say "my interactions with those who raised

3    questions," are you referring to the NEPC?

4    A.    **No.**

5    Q.    Who are you referring to?

6    A.    **I'm referring to Dr. Revankar and Dr. Bertodano.**

7    Q.    Those were the ones who raised questions?

8    A.    **Yes.  They provide me with some materials.**

9    Q.    And those were two tenured faculty members in the School

10   of Nuclear Engineering who were also on the primary committee?

11   A.    **Yes, you're correct.**

12   Q.    So it was those two individuals who had presented you with

13   some information, not Dr. Ishii?

14   A.    **No.  Dr. Ishii didn't provide me anything.**

15   Q.    And you then, in that same sentence, go on to state your

16   impression about their asking of questions; and I ask you to

17   read out loud the next sentence there.

18   A.    **The next sentence?**

19   Q.    Yeah.  After "Who raised questions", colon.

20   A.    **Starting with, "It was"?**

21   Q.    We're in the paragraph that begins, "Based on my

22   interactions with those who raised questions," colon, do you

23   see that?

24   A.    **Yes.**

25   Q.    Go ahead and read out loud the next sentence.

1  A.   **It was my impression that they were asking questions on**

2  **Dr. Sizyuk's degree and our relation with Professor Hassanein**

3  **based on the information given in the official dossier**

4  **submitted to the NEPC for promotion and tenure evaluation.**

5  Q.   Thank you.

6       If we continue on in the same email string, on the third

7  page, there's an email on August 7th, which is two days after

8  the email we were just looking at.  And that email begins,

9  "Dear Peter, I thought about this quite a bit," and you state,

10 "I think I need your guidance on this."  Do you see that?

11 A.   **I see that.**

12 Q.   I'd like you to read out loud the next paragraph.

13 A.   **"Now that it's been confirmed that Dr. Hassanein was**

14 **Dr. Sizyuk's Ph.D. adviser, I am contemplating if I should**

15 **inform this information to the letter writers who were given a**

16 **false information.  I think this is a critical information in**

17 **evaluating a candidate, and it bothers me either way whether I**

18 **should or should not share this information with the evaluators**

19 **as it is an ethics issue."**

20 Q.   When you said it bothers you either way, what did you

21 mean?

22 A.   **Well, if I did not inform it, inform this to the letter**

23 **writers, then I'm not disclosing the fact -- factual**

24 **information, so that bothers me.**

25      **If I did inform this information to the letter writers,**

1    then since this is a critical information, letter writers may

2    want to -- may have a negative impression about Dr. Sizyuk.

3        So that -- I couldn't make the decision.

4    Q.   So you tried to get advice from somebody --

5    A.   **That's right.**

6    Q.   -- who was in the senior administration of the university?

7    A.   **Right.**

8    Q.   And on that same day, Dr. Hollenbeck wrote back to you,

9    and you continued the email string through a couple of short

10   emails.  And you worked this through with Dr. Hollenbeck, and

11   he, after some back-and-forth dialogue with you, gave you his

12   final advice at the top of the first page of Exhibit M.  Do you

13   see that?

14   A.   **Yes, I do.**

15   Q.   And please read the first sentence.  What did he advise

16   you to do?

17   A.   **You mean the sentence that start --**

18   Q.   Where he says, "I agree that the external referees," could

19   you read that sentence out loud, please.

20   A.   **"I agree that the external referees ought to be provided**

21   **with accurate information.  Can this be sent out as a note?  I**

22   **strongly encourage you to collaborate with Arvind on this**

23   **issue."**

24   Q.   And Dr. Hollenbeck continued on in the next paragraph with

25   his advice, and I'd ask you to go ahead and read the next

1    sentence out loud, please.

2    A.    "At this point, the representation on her CV of a

3    non-Hassanein Ph.D. adviser, and Ahmed's protestations to the

4    school that he played no role in advising her sound like a

5    calculated attempt push her career progress forward by

6    circumventing the rule against former advisers taking part in

7    evaluation and voting.  I think the school and college need to

8    pursue this.  We will meet later, I see."

9    Q.    Thank you.

10        Dr. Kim, you've briefly summarized that you had a

11   relationship with Dr. Ishii starting in the 1990s, including

12   when you were a graduate student?

13   A.    Yes.

14   Q.    Would you agree or disagree with the proposition that

15   90 percent of your research publications have been with

16   Dr. Ishii as a coauthor?

17   A.    That's a complete false information.

18   Q.    How false is it?

19   A.    Well, since I left Purdue and became an assistant

20   professor at Penn State University-- that's 2007 --I published

21   probably 35, more than 35 publications.  I'm talking about only

22   for refereed general publications.  Among those, I think I

23   coauthored just one with Dr. Ishii because -- I had to because

24   the editor invited us as a group to contribute a general paper.

25   If you include conference proceedings, which is also considered

1    as technical papers, that's many more than that.  So I don't

2    know why anyone would make such a false, you know, statement.

3    There is a written evidence for those, so...

4          **MR. KEALEY:**  Thank you, Your Honor.  I'll reserve my

5    remaining questions for when we call Dr. Kim back during our

6    case in chief.

7          **THE COURT:**  All right.

8                         <u>CROSS-EXAMINATION</u>

9    BY MR. BOWLING:

10   Q.   Good afternoon, Dr. Kim.  Just a few questions.

11        You've known Dr. Ishii for how many years?

12   A.   **Oh, since 1994, I think.**

13   Q.   1994?  And you've spent quite a bit of time with

14   Dr. Ishii; would it be fair to say that?

15   A.   **It depends which year you're talking about.  I left Purdue**

16   **in 2003, if I remember correctly.  And since then, my**

17   **interaction with Dr. Ishii was very sparse and, you know.  But**

18   **before then and after -- Before then, I was his student, and**

19   **also he was my supervisor as a post-doc.  So, of course, I**

20   **interacted with him very often.**

21   Q.   During those times, did you ever hear Dr. Ishii make any

22   disparaging remark about women?

23   A.   **No.**

24   Q.   Did you ever hear him make any disparaging remark about

25   people of non-Asian ancestry?

1   A.   **No.**

2   Q.   And just to flip forward to what happened after the NEPC's

3   vote.

4        You made a decision not to advance Dr. Sizyuk's case to

5   the next level upwards to the EAPC; correct?

6   A.   **Engineering Area Promotion Committee, EAPC, yes.**

7   Q.   And was that decision that you made based in any way on

8   anything that Dr. Ishii had to say?

9   A.   **No.  It's based on the majority, significant majority, of**

10  **NEPC's members' opinion.**

11           **MR. BOWLING:**  Thank you.  That's all I have.

12           **MR. BOWLING:**  Your Honor, as Mr. Kealey said, we may

13  have other questions on our direct.

14           **THE COURT:**  Understood.

15                    <u>**REDIRECT EXAMINATION**</u>

16  BY MR. FOX:

17  Q.   Correct me if I'm wrong.  I thought you stated that you

18  could not remember who first -- who raised the issue with

19  regards to Dr. Sizyuk's Ph.D.; is that correct?  Or do you

20  actually remember who raised those issues?

21  A.   **You mean during the primary committee meeting?**

22  Q.   At any time during her -- during the time of the NEPC

23  committees were taking place in 2019, who raised the issue

24  about her Ph.D.?

25  A.   **Well, that discussion started during the annual review in**

1  **April; and then right after that meeting, I was given materials**

2  **that shows that Dr. Hassanein was the adviser so --**

3  Q.   Let me ask it this way.  Did Dr. Ishii ever raise concerns

4  to you regarding Dr. Sizyuk's Ph.D.?

5  A.   **Like I said, there were multiple primary committee members**

6  **raising the same question during the April meeting, so I cannot**

7  **say, you know, who raised those questions, including Dr. Ishii.**

8       **So if you asked me whether Dr. Ishii raised those**

9  **questions, then I must say that I don't remember.**

10          MR. FOX:  For the witness only.

11  Q.   Do you recognize what's been marked as Plaintiff's

12  Exhibit 22?

13  A.   **Yes, I do.**

14  Q.   Is this a letter that you received from -- that is signed

15  by Dr. Ishii on September 30th of 2019?

16  A.   **Yes.**

17          MR. FOX:  Plaintiff will move to admit --

18          **THE WITNESS:**  I'm sorry.  What's that?

19          **MR. KEALEY:**  I'm just waiting for you to finish.

20          **MR. FOX:**  Plaintiff moves to admit Plaintiff's

21  Exhibit 22.

22          **MR. KEALEY:**  No objection.

23          **MR. BOWLING:**  No objection.

24          **THE COURT:**  It's admitted.

25          **MR. FOX:**  If we can show it to the jury.

1    Q.   Is Exhibit 22 a letter that you received on

2    September 30th, 2019, that is signed by Dr. Ishii, raising

3    concerns regarding Dr. Sizyuk's Ph.D.?

4    A.   **Are you asking me?**

5    Q.   I'm asking you.

6    A.   **Yeah, together with the other faculty members.**

7    Q.   Is that a "yes"?

8    A.   **Yes.**

9    Q.   And when was the final NEPC meeting?

10   A.   **That was September 27, you said?  I mean, as document**

11   **shows.**

12   Q.   Dr. Ishii did raise concerns about -- concerning

13   Dr. Sizyuk's Ph.D.; correct?

14   A.   **Are you -- If you're referring to the letter, then he --**

15   **he signed the letter, yes.**

16          **MR. FOX:**  Thank you.

17          **THE COURT:**  Anything else?

18          **MR. KEALEY:**  Yes, Your Honor.

19                    **RECROSS EXAMINATION**

20   BY MR. KEALEY:

21   Q.   Dr. Kim, let's take a closer look at Plaintiff's

22   Exhibit 22, which you have there in front of you.

23        You just pointed out that Plaintiff's Exhibit 22 is dated

24   September 30, 2019, after the final NEPC meeting and vote on

25   Dr. Sizyuk's tenure candidacy; correct?

1    A.    **Yeah.  Looks like it, yes.**

2    Q.    And there are four signatories on this letter; Dr. Choi,

3    Dr. Ishii, Dr. Revankar, and Dr. Tsoukalas; correct?

4    A.    **Yes.**

5    Q.    Those are four of the eight NEPC members at the time of

6    the September 27th meeting; correct?

7    A.    **Yeah, and full professors.**

8    Q.    Yes.  And the first paragraph of Plaintiff's Exhibit 22

9    addresses "possible misrepresentations made by Dr. Ahmed

10   Hassanein."  Do you see that?

11   A.    **Yes, I see that.**

12   Q.    And the final paragraph of Plaintiff's Exhibit 22 states

13   what the authors wanted you to consider.  Would you go ahead

14   and please read that paragraph out loud.

15   A.    **"This is indeed a very troubling reversal of what**

16   **Dr. Hassanein was claiming for years, that is, he was not**

17   **Dr. Tatyana Sizyuk's dissertation adviser.  We believe this**

18   **behavior may constitute falsification and/or fabrication that**

19   **falls within university policy on academic misconduct, and for**

20   **the record we would like to state the facts as we have**

21   **witnessed them."**

22   Q.    Dr. Kim, did you understand that the authors of this

23   letter were calling your attention to what they had witnessed

24   as academic misconduct potentially by Dr. Hassanein?

25   A.    **Yes.**

1   Q.   And they wanted you to be aware, as head of the unit, of

2   academic misconduct by Dr. Hassanein?

3   A.   **That's right.**

4              **MR. KEALEY:**  Thank you.

5              **MR. BOWLING:**  Nothing further from Dr. Ishii.

6              **MR. FOX:**  Nothing further from Plaintiffs.

7              **THE COURT:**  Can this witness be excused at this time?

8              **MR. FOX:**  Yes, Your Honor.

9              **THE COURT:**  All right.  You may step down.

10             **THE WITNESS:**  Thank you, Your Honor.

11             **THE COURT:**  Let me ask the jury:  Do you want a

12   recess right now, maybe about 10 minutes or so?  Anyone?  Yes?

13   Ten minutes?

14        (Jurors responded affirmatively.)

15        All right, let's take a ten-minute break at this time.

16   It's 2:20.  We'll be back on the record at 2:30.

17        (Jury out at 2:20 p.m.)

18             **THE COURT:**  All right.  Ten minutes.

19        (Recess taken 2:20 p.m. to 2:33 p.m.)

20             **COURTROOM DEPUTY:**  All rise.

21             **THE COURT:**  Go ahead and be seated, please.

22        Any issues arise during that short recess that I need to

23   take up?  For Plaintiff?

24             **MR. SINK:**  No, Your Honor.

25             **THE COURT:**  For Defendants?

1      **MR. KEALEY:**  No, Your Honor.

2      **MS. KILIES:**  On behalf of Dr. Ishii, I believe he's

3  the next witness, and I would just caution that he has trouble

4  hearing.  He has hearing aids.  So to the extent you could talk

5  loud and slowly, we would appreciate it.

6      **MR. SINK:**  I'll do my best.

7      **THE COURT:**  But he has the hearing aid?

8      **MS. KILIES:**  Yes.

9      **THE COURT:**  All right.  Good.  Left or right?

10      **MS. KILIES:**  Both.

11      **THE COURT:**  Okay.  All right.  Please bring the

12  jury in.

13      (Jury in at 2:35 p.m.)

14      Go ahead and be seated.  The jury is back.

15      Is there a next witness?

16      **MR. SINK:**  Yes, Your Honor.  The Plaintiff calls

17  Dr. Ishii.

18      **THE COURT:**  Dr. Ishii, if you would please face my

19  clerk, and he'll administer the oath to you.

20      (The oath was duly administered.)

21      **THE WITNESS:**  Yes, sir.

22      **MAMORU ISHII, Ph.D., PLAINTIFF'S WITNESS, SWORN**

23                      **DIRECT EXAMINATION**

24  BY MR. SINK:

25  Q.   Good afternoon.

1    A.    **Hi.**

2    Q.    If at any point you cannot hear me, just ask me to repeat

3    the question.

4    A.    **Yes.**

5    Q.    Okay?  Can you state your name for the record.

6    A.    **Yes.  My name is Mamoru Ishii.  I was born in Tokyo,**

7    **Japan.**

8    Q.    Thank you.  You already knew where I was going with my

9    next questions.  You're from Japan; correct?

10   A.    **Yes.**

11   Q.    Dr. Ishii, do you hold any bias against women and/or

12   non-Asians?

13   A.    **No, not at all.  I strongly believe that the gender,**

14   **nationality, and race has nothing to do with individual**

15   **ability, but education have a huge impact on it.  That's the**

16   **reason I became a teacher at the university.**

17   Q.    You heard the testimony from Dr. Brooks from this morning?

18   A.    **Pardon?**

19   Q.    You were present for Dr. Brooks, his testimony this

20   morning?

21   A.    **Yes.**

22              **THE COURT:**  Could you lower down the volume from the

23   microphone.

24              **MR. SINK:**  Sorry.  I was told to speak up.

25              **THE COURT:**  It's thunderous.

```
 1              MR. SINK:  Sorry.

 2              THE COURT:  Go ahead, Counsel.

 3              MR. SINK:  Is this better?  Okay.

 4    Q.   You were present for the testimony of Dr. Brooks this

 5    morning; correct?

 6    A.   Yes.

 7    Q.   And Dr. Brooks testified under oath that you refer to

 8    women as "stupid."  Do you recall that testimony?

 9    A.   Not at all.  I didn't say that.

10    Q.   You dispute that testimony?

11    A.   Pardon?

12    Q.   Do you dispute Dr. Brooks' testimony?

13    A.   Who was -- Who?

14    Q.   Dr. Brooks, this morning, testified under oath --

15    A.   Yes.

16    Q.   -- that you referred to women as "stupid."  Do you dispute

17    that?

18    A.   I didn't say that, no.

19    Q.   He also testified that you refer to women as "lazy."  Do

20    you dispute that testimony?

21    A.   No.

22    Q.   No, you do not dispute that testimony?

23    A.   Could you repeat the question.

24    Q.   Do you admit that you referred to women as "lazy"?

25    A.   No.
```

1  Q.   Dr. Brooks also testified that he heard you say that women

2  use "the stupid U.S. legal system."  Do you dispute saying

3  that?

4  A.   **I didn't say that.  I disagree with it.**

5  Q.   So it's your contention that Dr. Brooks lied under oath

6  this morning?

7  A.   **Well, I think so.**

8  Q.   Do you have any reason to believe why Dr. Brooks would

9  show up and commit perjury?

10 A.   **Well, I think it's politically motivated to give a -- the**

11 **impression of my personality.  It's an insult to me.**

12 Q.   I didn't hear the word that came before "motivated."  Can

13 you say that again.

14 A.   **Well, I think it is not true, and it is politically**

15 **motivated, and it's an insult to me, to my personality.**

16 Q.   What do you mean, politically motivated?

17 A.   **Well, I am not that kind of person at all.**

18 Q.   What kind of political motivations would Dr. Brooks have

19 to lie under oath about you?

20 A.   **Could you repeat?**

21 Q.   Yeah.  You used the term "politically motivated," so my

22 question to you is:  What political motivation would Dr. Brooks

23 have to show up and lie under oath about you?

24 A.   **I don't know why this kind of comment came out.**

25 Q.   And you also heard the testimony of Dr. Hassanein this

1   morning; correct?

2   A.   **Yes.**

3   Q.   And according to Dr. Hassanein, he heard you also refer to

4   women as "stupid."  Do you dispute that?

5   A.   **I heard that, but it's not true.**

6   Q.   I think I understood your answer to be you dispute that;

7   right?

8   A.   **Pardon?**

9   Q.   You dispute Dr. Hassanein's testimony?

10  A.   **Yes, strongly dispute that.**

11  Q.   Dr. Hassanein also testified that he heard you say white

12  men are "lazy and stupid."  Do you dispute that?

13  A.   **I heard it, but it's not true.**

14  Q.   And Dr. Hassanein also testified that he heard you refer

15  to Dr. Jamieson, who is a female, as "stupid."  Do you dispute

16  that?

17  A.   **I dispute.  I didn't say that.**

18  Q.   And are you aware of any reason why Dr. Hassanein would

19  show up and lie under oath about you?

20  A.   **What are you asking?  I didn't understand.**

21  Q.   Well, your contention is that Dr. Hassanein lied about you

22  under oath.

23  A.   **Yes, on this point.  This point, yes.**

24  Q.   Why would Dr. Hassanein commit perjury about you?

25  A.   **Well, I think he want to help this case for Dr. Sizyuk and**

 1   **by insulting me and making wrong statement, not true statement.**

 2   Q.   Were you present also yesterday for the testimony of

 3   Dr. Wharry?

 4   A.   **Could you repeat?**

 5   Q.   Janelle Wharry, you know who she is; right?  Dr. Wharry?

 6   A.   **Dr. Wharry is a very excellent professor.**

 7   Q.   She --

 8   A.   **Yeah.**

 9   Q.   Thank you.  She testified yesterday; correct?

10   A.   **Yes, I heard it.**

11   Q.   And you were here in the courtroom for that testimony?

12   A.   **Yeah.  I heard several statement made by her, yes.**

13   Q.   And she testified that she overheard a conversation

14   between you and Dr. Revankar on the day of her NEPC vote, and

15   she testified under oath that she heard you tell Revankar not

16   to vote for her or Dr. Garner because they were all stupid,

17   lazy Americans.  Do you dispute that testimony?

18   A.   **I heard, but it's not true.  I didn't say that.**

19   Q.   So your contention is that Dr. Wharry, like Dr. Hassanein

20   and Dr. Brooks, also committed perjury when she testified?

21   A.   **I think they form a faction in the School of Nuclear**

22   **Engineering.**

23   Q.   And according to you, they're all willing to commit

24   perjury against you?

25   A.   **I think they're trying to support the case for Dr. Sizyuk.**

1   Q.   Are you aware of any other reason why Dr. Wharry would lie

2   under oath about you?

3   A.   **Well, Dr. Wharry said that she heard something like that,**

4   **so that's possible that she didn't hear right.**

5   **And I think one case clearly is, I don't know anything**

6   **this -- in the deposition, she said that she heard I'm**

7   **threatening Dr. Revankar to vote no for her case, but we didn't**

8   **discuss -- First of all, I was not supporting Dr. Revankar's**

9   **promotion.  Dr. Wharry said because I was threatening**

10  **Dr. Revankar to vote no because I supported his case.  But I**

11  **was asked by the dean to recuse myself from that primary**

12  **committee because I -- he was working for me as a research**

13  **scientist long, long time ago before he became tenured faculty,**

14  **tenure-track full vote.**

15  Q.   So Dr. Wharry also testified that you made a comment

16  regarding her former adviser, Dr. Was?

17  A.   **Yes.**

18  Q.   As to --

19  A.   **This is --**

20  Q.   Can you -- can you wait --

21  A.   **We discussed that.  But she made the story very, very**

22  **short, and it sound a little bit not good for me, but I can**

23  **tell you what I really discussed with her.**

24  Q.   All right.  Let --

25  A.   **Really --**

```
1   Q.    -- me ask you a question, please.

2           THE COURT:  Professor --

3   Q.    I was in the middle of the question.

4           THE COURT:  Let me take care of this.  Professor,

5   listen carefully to the question --

6           THE WITNESS:  Yeah.

7           THE COURT:  -- that the lawyer asked.

8           THE WITNESS:  Yeah.  Okay.  Could you --

9           THE COURT:  And, Professor, just answer that and each

10  question one by one.

11          THE WITNESS:  All right.

12  BY MR. SINK:

13  Q.    So please try to wait until I'm finished.

14  A.    Yeah.

15  Q.    Dr. Wharry testified that you made a comment regarding her

16  former adviser to her, wherein you stated that Purdue was only

17  interested in hiring women.  Do you dispute that testimony?

18  A.    Not only interested, I didn't say that.

19  Q.    So you --

20  A.    I said Purdue was --

21  Q.    -- dispute that testimony?

22  A.    -- very much interested.

23          COURT REPORTER:  Excuse me.  I didn't hear you.

24  A.    No.  In this case, no, I didn't say that.

25  Q.    Okay.  Thank you.
```

1   A.   **Sorry.**

2   Q.   There's going to be more witnesses in this case.  Are you

3   aware of any reason why Dr. Taleyarkhan would lie under oath

4   against you?

5   A.   **I didn't understand the question.**

6   Q.   Do you have any reason to believe why -- You know

7   Dr. Taleyarkhan; right?  Rusi Taleyarkhan, do you know who

8   he is?

9   A.   **Dr. Taleyarkhan, yes.**

10  Q.   My question to you is:  Do you have any reason to believe

11  why he would lie under oath against you?

12  A.   **I had kind of problem with him from the beginning of his**

13  **employment at Purdue because I didn't believe his research in**

14  **the bubble fusion as a professional in that field.  So I was**

15  **not very happy, but this bubble fusion become a very bad**

16  **problem for our department, but I didn't initiate this problem.**

17  Q.   Okay.  In your view, this problem with this -- what did

18  you call it?  Bubble fusion.  In your opinion, do you think

19  that problem would be big enough to cause Dr. Taleyarkhan to

20  lie under oath and commit perjury against you?

21  A.   **Which statement?  I don't know what he write.  Which**

22  **statement of Dr. Taleyarkhan?  I didn't hear Dr. Taleyarkhan**

23  **speak, so...**

24  Q.   Sure.  Okay.

25  A.   **In the deposition, I was not present, so I --**

1  Q.   You know who Dr. Garner is; correct?

2  A.   **Pardon?**

3  Q.   Allen Garner, you know who he is; right?  Allen Garner?

4  A.   **Dr. Garner was our professor.  Yes, I know him.**

5  Q.   Okay.  In your opinion, is Dr. Garner honest and truthful?

6  A.   **Dr. Garner is a very capable faculty, and I'm proud to**

7  **have him in our department.**

8  Q.   Is he honest and truthful?

9  A.   **Yes.**

10  Q.   Are you aware of any reason why Dr. Garner would commit

11  perjury on you?

12  A.   **I read in the deposition statement that Dr. Garner said**

13  **Dr. Kim will be a good head, and I think probably I said that.**

14         **MR. BOWLING:**  Your Honor, I'm sorry to interrupt.

15  Can we approach?

16         **THE COURT:**  Yes.

17     (Bench conference had as follows:)

18         **MR. BOWLING:**  I think that Dr. Ishii may have maybe,

19  I think, unintentionally gotten into something that is actually

20  a subject of a motion in limine, which is the alleged quid pro

21  quo discussion with Dr. Garner.  The Court withheld ruling on

22  the motion in limine until the Court can see the context at

23  trial.  For reasons stated in the motion in limine, it's not

24  relevant to any issue here in this case.  If we could just move

25  on to a different topic from what -- I don't think -- I

```
 1   understand counsel's question was not designed to elicit that,

 2   but if we could just stop here and then go to another question.

 3            THE COURT:  Counsel.

 4            MR. SINK:  I didn't ask him that.  He just

 5   volunteered that.

 6            MR. BOWLING:  I understand.

 7            MR. SINK:  I have no problem moving on.  I'm there,

 8   so I can just move on at this point.

 9            THE COURT:  Then it's over.

10            MR. SINK:  Thank you.

11        (Private conference concluded.)

12   BY MR. SINK:

13   Q.   Okay.  We're going to change topics here.

14        You first came to Purdue in 1988; is that correct?

15   A.   Could you repeat that again?

16   Q.   You first came to Purdue University in 1988?

17   A.   I don't understand.

18   Q.   When did your employment start at Purdue University?

19   A.   I was at Argonne National Laboratory from 1974 to 1988,

20   when I joined Purdue.

21   Q.   So in 1988, you came to Purdue; correct?

22   A.   Yes.

23   Q.   And you were automatically granted tenure upon your hire

24   at Purdue; is that correct?

25   A.   I was hired as a full professor with tenure.
```

1  Q.   Did you have tenure somewhere else before you came to

2  Purdue?

3  A.   **No.**

4  Q.   Do you know if the NEPC voted to provide you with tenure

5  when you came to Purdue?

6  A.   **Yeah.**

7  Q.   They did?  Is that a "yes"?

8  A.   **With primary committee, it variated.  Different in my**

9  **case.**

10  Q.   Since 1988, have you served on any search committees with

11  Purdue University?

12  A.   **Yes.  I was 35 years at Purdue.  And about 25 years, I was**

13  **search committee chair.**

14  Q.   And, in fact, you were on the search committee that hired

15  Dr. Sizyuk as a tenure-track professor?

16  A.   **Dr. Sizyuk applied for one search committee, but we want**

17  **to find the professor in the different field, and we had a**

18  **better candidate, and then we hire.  So she was in there,**

19  **finalist three, but she was not hired through that search**

20  **committee.**

21  Q.   Were you on a search committee that interviewed

22  Dr. Sizyuk?

23  A.   **She was not hired through the search committee.  She was**

24  **so-called opportunity hire.  You find somebody capable; head**

25  **can recommend to the dean.  And if dean can create a new**

1    **position, then we get that faculty as a tenure-track.**

2    Q.    Nevertheless, you were on a search committee that

3    considered Dr. Sizyuk?

4    A.    **I served as the chair where we evaluated Dr. Sizyuk**

5    **capability, yes.**

6    Q.    And you actually agreed with the recommendation to hire

7    Dr. Sizyuk?

8    A.    **Dr. Sizyuk didn't have a Ph.D. yet, and she indicated that**

9    **she will get very soon.  And then it was very important for**

10   **Purdue University to hire female faculty.  So we put her in**

11   **finalist three candidate, and she looked like a very good**

12   **researcher.  As her capability, we didn't know.**

13   Q.    And with respect to her Ph.D., she told the search

14   committee which you were on that her Ph.D. would come from the

15   University of Rzeszow; correct?

16   A.    **No.  In that time, search committee knew that we cannot**

17   **hire her.  She didn't have a Ph.D.  So we didn't even go into**

18   **the detail where -- what university.**

19       **My impression I can tell you is that she probably enrolled**

20   **in the Ph.D. in Poland a long time ago and just didn't finish**

21   **and she was just finishing.  That's my imagination.**

22   Q.    So if Dr. Sizyuk were to testify under oath that she told

23   the search committee that she would be receiving a Ph.D. from

24   the University of Rzeszow, you would dispute that testimony?

25   A.    **Maybe I (indiscernible) --**

```
 1              COURT REPORTER:  Excuse me.  I didn't hear you.
 2     A.   But I didn't make an issue -- issue --
 3              THE COURT:  Professor, if you would speak slowly so
 4     my court reporter can catch every word accurately.
 5              THE WITNESS:  Thank you.
 6     A.   At the promotion committee, primary promotion committee,
 7     her degree was not the issue.  If I remember correctly, her
 8     degree --
 9     Q.   Right now, I'm only talking about the search committee,
10     not the promotion --
11     A.   Oh, search committee, we didn't know what the
12     university -- She put some university which was not known to
13     us.  And also, she didn't have the Ph.D.  She was saying she's
14     going to get.  So we believed that.  That's all.
15     Q.   That's what my question was aimed at, sir.  So if
16     Dr. Sizyuk were to testify under oath that she told the search
17     committee that her Ph.D. would be coming from the University of
18     Rzeszow, would you dispute that testimony?
19     A.   Warsaw?  No.
20     Q.   Rzeszow, out of Poland.
21     A.   I don't remember, but the difficult -- "Rzeow" -- Rzeszow,
22     university name was, not Warsaw.
23     Q.   Okay.  I'm not Polish.  I don't know exactly how to
24     pronounce it.  I can spell it on paper if you want, but it's
25     out of Poland.
```

1          At the time that Dr. Sizyuk was being considered by the

2   search committee, did you know where her Ph.D. was coming from?

3   A.   **She -- I honestly believed that she's going to get very**

4   **soon, maybe in two months.  That's what she maybe wrote in the**

5   **resume.  I don't remember how I knew.**

6   Q.   And at that time, do you recall whether you viewed that

7   university as a peer institution of Purdue?

8   A.   **I didn't know it.**

9   Q.   So you would not have viewed it as a peer --

10  A.   **Later, I found out myself.**

11  Q.   And at the time that the search committee considered

12  Dr. Sizyuk for a tenure-track position, did the search

13  committee look at her CV or resume?

14  A.   **We evaluate her promotion dossier.  There, university name**

15  **was clearly stated.**

16  Q.   And that would have shown you and the search committee

17  that she had worked at Argonne, the national laboratory, and it

18  would have told you what her title was; correct?

19  A.   **Yes.**

20  Q.   And at that time while you were on the search committee

21  looking at Dr. Sizyuk for a tenure-track position, did you ever

22  raise any issues on how she could be at Argonne with that title

23  without a Ph.D.?

24  A.   **No, I didn't make an issue.**

25  Q.   Now, as a precondition of serving on this search

```
 1   committee, does Purdue require that you go through implicit
 2   bias or unconscious bias training?
 3   A.   Yes.
 4   Q.   Is that a "yes"?
 5   A.   Yes.
 6   Q.   You did not complete that training, did you?
 7   A.   Could you repeat.
 8   Q.   You did not complete that training?
 9   A.   No.
10   Q.   You walked out?  You showed up to it initially; right?
11   A.   I don't understand what you're --
12   Q.   You initially showed up to the unconscious bias training;
13   correct?
14   A.   I cannot understand.  Could you change the way you're
15   asking the question.
16   Q.   Do you recall if you were initially in attendance --
17   A.   Yes.
18   Q.   -- at this training?  And do you recall if you walked out
19   before it was complete?
20   A.   Yes.
21   Q.   And what, if anything, did you say to Dr. Revankar when
22   you walked out?
23   A.   The issue was not where she got the Ph.D., but
24   performance, six years, five or six years' performance after
25   she was --
```

1    Q.   I'm not talking about that, sir.  My question is very

2    narrow.  When you walked out of unconscious bias training,

3    what, if anything, did you say to Dr. Revankar?

4    A.   **Walk out.  I didn't say anything.**

5    Q.   And this occurred back in 2017; is that correct?

6    A.   **Probably.**

7    Q.   And today it's 2024.  So it's been approximately

8    seven years.  In that interim time, have you now completed

9    unconscious bias training?

10   A.   **Bias?  What did you just say?**

11   Q.   It's okay.

12   A.   **This large room, acoustics so bad for my hearing, yeah.**

13   Q.   From 2017 until today, have you gone back and completed

14   the unconscious bias training?

15   A.   **Oh.  I probably attended this three bias training.  Maybe**

16   **every five years or so, you should go.  We don't call it the**

17   **bias training, but search committee member workshop, and I**

18   **attended several.  I think maybe three.  But the last one, I**

19   **attended only half.**

20   Q.   And that's my point.  The last one, where you only

21   attended half, ever since then, have you gone back and

22   finished it?

23   A.   **Well, I was intended to resign from the chair of search**

24   **committee because of my wife's medical condition, so I couldn't**

25   **physically do it.  But I went to that training, or workshop, to**

1   check all other member attending because, otherwise, search

2   committee cannot be started.  I went there to check.  It's a

3   very large room, maybe two, three hundred people.  I went there

4   to the table and checked who was --

5   Q.   Dr. Ishii, the answer is "no"; correct?

6   A.   Pardon?

7   Q.   The answer is no, you have not gone back and completed

8   that training?

9   A.   I didn't complete that day's training.

10  Q.   You never served on a search committee with Purdue since

11  you walked out?

12  A.   Yes.  On the -- Probably Dr. Kim talked to me, and he said

13  I cannot serve as a chair with search committee.  So I said I

14  was intended to resign, so please find another chair.  That's

15  what I think we had the discussion like that.

16  Q.   And so you resigned; and since then, you have not served

17  on any search committee with Purdue University; is that

18  correct?

19  A.   I served many, many years, but that last one I resigned.

20  Q.   Yet, since 2017, you have continuously served on the NEPC;

21  correct?

22  A.   2017, or what did you say?

23  Q.   Throughout your entire employment at Purdue, you've always

24  served on the NEPC?

25  A.   NEPC is, yes, one or two meetings, so you can serve --

1    Q.    You have never been disqualified from the NEPC?

2    A.    **Around that time, I also took a sabbatical leave twice**

3    **because of my wife was -- The one was a so-called research**

4    **sabbatical.  Didn't pay.  I paid through my research fund.  So**

5    **at that time, I was not so much in the campus.  I don't**

6    **remember which year, but two years I was --**

7    Q.    Sure.

8    A.    **-- on the campus.**

9    Q.    So aside from any kind of sabbatical, you have

10   continuously served on the NEPC throughout your employment?

11   A.    **Normally, sabbatical taking of faculty, we not serve in**

12   **the promotion committee.**

13   Q.    Is that a "yes" to my question?

14   A.    **But I don't remember we had a search committee or not.**

15   **Not search -- promotion committee.**

16   Q.    Is that a "yes" to my question, sir?

17   A.    **Yeah.**

18   Q.    Okay.  Dr. Ishii, you've been a distinguished professor

19   since 2002?

20   A.    **I think from 1999.**

21   Q.    Were you recently inducted to some kind of hall of fame?

22   A.    **Yes, I had been on it.**

23   Q.    What is that?

24   A.    **It was maybe two or three years ago, I think.  I don't**

25   **remember.  I don't pay attention to those.**

1   Q.   Have you been the director of the Institute of

2   Thermal-Hydraulics?

3   A.   **Yes.**

4   Q.   What is that?

5   A.   **That is a very important institute, established by the**

6   **Nuclear Regulatory Commission.  It's American institution, or**

7   **institute, voucher institute, involved in many other -- maybe**

8   **four or five universities.  And the budget was very -- maybe**

9   **total money we got was maybe $20 million.  I was the director**

10  **of the institute, appointed by the Nuclear Regulatory.**

11  Q.   Sir, are you the longest serving tenured professor in the

12  School of Nuclear Engineering?

13  A.   **Could you repeat again?**

14  Q.   Yeah.  Do you -- I hate to use the term "tenure."  But do

15  you have more tenure in the School of Nuclear Engineering

16  compared to any other professor?  Have you been there the

17  longest?

18  A.   **Yeah.**

19  Q.   Do you agree that you are very well respected in the

20  School of Nuclear Engineering?

21  A.   **Well, I am respected in my professional field.  I don't**

22  **know what university -- every tenured professor very**

23  **independent.  They don't have one opinion.**

24  Q.   Do you dispute whether or not you're the leader of a

25  faction or an alliance within the School of Nuclear

ISHII - DIRECT

1    Engineering?

2    A.    **I don't have any bias.**

3    Q.    You have no alliance with a Dr. Choi, Dr. Revankar, a

4    Dr. Bertodano, and/or Dr. Tsoukalas?

5    A.    **What -- I don't -- What did you say?**

6    Q.    Yeah.  Do you have any kind of alliance or faction among

7    you and those doctors that I just mentioned?

8    A.    **To what?  Who?  To Dr. Tsoukalas or --**

9    Q.    Well, in general.

10   A.    **No, I don't have any.**

11   Q.    Do other professors in the School of Nuclear Engineering

12   appear to listen to you?

13   A.    **Yes.**

14   Q.    Do they often comply with your suggestions?

15   A.    **Could you repeat again.**

16   Q.    Yeah.  Do other professors in the School of Nuclear

17   Engineering comply with your suggestions?

18   A.    **Yes.**

19   Q.    Do they comply with your requests in terms of what classes

20   to teach?

21   A.    **What process takes to become professor.  Well, there are**

22   **two criteria for associate professor with tenure.  Basically,**

23   **you need to establish national preeminent --**

24   Q.    We're not there yet.  Just hold on one second.

25   A.    **Yeah.**

1  Q.   Okay.  You were present at all three NEPC meetings

2  regarding Dr. Sizyuk's --

3  A.   **Yes.**

4  Q.   -- candidacy for tenure; correct?

5  A.   **Yes.  I participate.**

6  Q.   And that would have been the April 30, 2019 meeting; you

7  were there for that one?

8  A.   **Yes, I participate.**

9  Q.   And the September 6, 2019 meeting, you were there for

10 that one?

11 A.   **Yes.**

12 Q.   And the September 27th, 2019 meeting, you were present

13 for that one?

14 A.   **Yes.**

15 Q.   Now, during all three of those, did you ever raise any

16 concerns with Dr. Sizyuk's Ph.D.?

17 A.   **I didn't raise issue of Ph.D. itself, but I had some**

18 **concern about her research independence, so having this**

19 **independent laboratory research group, and graduate, how own**

20 **Ph.D. student, maybe two or three.  These are the requirement**

21 **normally and also having individually secured research fund of**

22 **maybe about $1 million over five years.**

23 Q.   Did you ever raise any concerns about the validity of her

24 Ph.D.?

25 A.   **Pardon?**

1    Q.   Did you ever raise any concerns about the validity of
2    Dr. Sizyuk's Ph.D.?
3    A.   **I didn't raise issue because that's not the issue at the**
4    **promotion.  She was already tenure-track faculty for five or**
5    **six years.**
6    Q.   Did you ever raise any concerns about Dr. Sizyuk's title
7    that she held while at Argonne?
8    A.   **I didn't raise issue at Argonne.  She -- I don't remember,**
9    **but she said something she was out there, research scientist.**
10   **I worked at Argonne for 14 years, and I was a group leader, and**
11   ** also I was deputy director for a multiphase flow research**
12   **institute, so I know what kind of people become scientist.**
13        **Basically, you need to have a Ph.D. to become scientist,**
14   **and the entry level job for scientist is called assistant.  I**
15   **was hired by the Argonne as assistant mechanical engineer,**
16   **which Ph.D. plus two years of research experience, one year in**
17   **fund.  And I need to be promoted within six years to be**
18   **associate mechanical engineer.  Otherwise, I need to leave.**
19   **It's like a university tenure system because Argonne was**
20   **operated by University of Chicago, so there was a very part of**
21   **the system with the faculty at the University of Chicago, so**
22   **assistant professor means assistant engineer, assistant**
23   **scientist.**
24   Q.   So let's stay on track here.  Okay.  Is it your contention
25   that, in order to be a research scientist at Argonne, one must

1  have a Ph.D.?

2  A.    **Well, that was my impression, but I didn't say she did --**

3  **was not research scientist.  I thought she need much more clear**

4  **specification, assistant physicist or something like that.**

5  **Argonne doesn't have a position called research scientist.  We**

6  **are assistant physicist, assistant chemist, assistant**

7  **mechanical engineer, or something like that.  So I thought that**

8  **she -- she was more qualified for actually her position.  I was**

9  **not saying that she was not a scientist.**

10  Q.   Is it your contention during any of the three NEPC

11  meetings that you raised questions and/or concerns about

12  Dr. Sizyuk's discovery, learning, or engagement?

13  A.    **I was impressed by her research record publication, but I**

14  **didn't see that she was independent from Dr. Hassanein.  That**

15  **was my concern.**

16  Q.   And my question was a little more narrow than that.  I'm

17  asking whether you raised.  Did you voice any concerns at any

18  of those three meetings about her discovery, learning or

19  engagement?

20  A.    **So publication was good.  And the -- My concern was she**

21  **didn't give clear indication she's independent with**

22  **Dr. Hassanein.  And that is very important for us because**

23  **tenure means a permanent employment.  You know, you cannot fire**

24  **the professors.  So for School for Nuclear Engineering and also**

25  **for part of university, it's very, very important we are sure**

1    that that person can continue whole life as a good professor.

2    Q.   You would agree that the three criteria for tenure are

3    discovery, learning, and engagement; correct?

4    A.   **Could you repeat.  Sorry, very sorry.**

5    Q.   You would agree that the three criteria for tenure that

6    the NEPC should look at would be discovery, learning, and

7    engagement?

8    A.   **That's a general word, but engineering has a more**

9    **specific, unwritten rules that's independent research, group,**

10   **and a fund and so --**

11   Q.   Sure.  You would also agree that an applicant's -- where

12   they receive their Ph.D. is not part of discovery, learning, or

13   engagement?

14   A.   **I didn't mention about her --**

15   Q.   You would agree with what I said, yes?

16   A.   **I didn't make issue on that.  I didn't think anybody --**

17   Q.   That's not the question, sir.  Very narrow.

18       You would agree that, where an applicant received his or

19   her Ph.D. is not part of discovery, learning, or engagement?

20   Yes or no?

21   A.   **No.  That was not the issue.**

22   Q.   I'm sorry.  No what?

23   A.   **The Ph.D. was not the issue.**

24   Q.   And, in fact, the Ph.D. should not even be considered by

25   the NEPC; correct?

1  A.  **Yeah.**

2  Q.  The focus should be on the applicant's work after they

3  started --

4  A.  **Yes.**

5  Q.  -- as a tenure-track professor?

6  A.  **Exactly.**

7  Q.  So -- and to that end --

8  A.  **To --**

9  Q.  Hold on a second.

10         THE COURT:  Gentlemen, both of you, let him finish

11  his question.  Don't anticipate it.

12         THE WITNESS:  Okay.

13         THE COURT:  And then you respond, and you let him

14  finish responding.

15         THE WITNESS:  Sorry.

16         THE COURT:  And then the next question.  We're

17  getting both of you in at the same time, and the recorder

18  cannot take your statements in at the same time.

19         THE WITNESS:  I understand.  Sorry.

20  BY MR. SINK:

21  Q.  Okay.  So to that end, an applicant's prior work history

22  before they started at Purdue, you would agree that is not

23  relevant to the criteria for tenure?

24  A.  **Yes.  Not everything was bad.  There were certain things**

25  **that she was very good, but not completely good.**

1   Q.    Have you sat on NEPC deliberations for other candidates
2   outside of Dr. Sizyuk?
3   A.    **Yes.**
4   Q.    And in any of those deliberations, have you ever raised
5   any concerns about an applicant's Ph.D.?
6   A.    **Could you repeat the question again.**
7   Q.    Sure.  In any other NEPC deliberations, outside of
8   Dr. Sizyuk, did you ever raise any concern about an applicant's
9   Ph.D.?
10  A.    **Yes.  If the faculty is already hired as tenure-track**
11  **already, then we don't discuss about Ph.D.**
12  Q.    So the answer would be no to my question?
13  A.    **No.**
14  Q.    Thank you.  And in those other NEPC deliberations, outside
15  of Dr. Sizyuk, have you ever raised any concerns about an
16  applicant's job title for a job prior to Purdue?
17  A.    **I don't remember that.**
18  Q.    Did you vote on Dr. Sizyuk's candidacy for tenure?
19  A.    **I voted no.**
20  Q.    Why did you vote no?
21  A.    **Well, to me, it was that she didn't clearly establish her**
22  **independence.  It seems that she didn't implement research**
23  **group, and the research funds she obtained was not clear that**
24  **she was -- independently obtained it herself.**
25        **And I have another concern, reason, I didn't track her**

1    promotion, was she didn't establish very clear national

2    preeminence, and usually this come from the department or

3    colloquium at our peer institution, like MIT, University of

4    Michigan, University of Illinois, and I didn't see much of

5    that.  So I think she was lacking in that aspect.  That was two

6    reason voted no.

7    Q.   Did your vote have anything to do with her Ph.D?

8    A.   **Pardon?**

9    Q.   Did your vote for no have anything to do with her Ph.D.?

10   A.   **No, nothing.**

11   Q.   Do you recall answering interrogatories in this case?

12   A.   **I don't recall.**

13        **MR. SINK:**  For the witness only.

14   Q.   This document is entitled "Defendant Mamoru Ishii's

15   Response to Plaintiff's First Set of Interrogatories."  Do you

16   see that?

17   A.   **Yes.**

18   Q.   Do you see the verification at the bottom of this

19   document?

20   A.   **Yes.**

21   Q.   And it says, "I affirm under the penalties for perjury

22   that the foregoing is true and correct"?

23   A.   **Yes.**

24   Q.   Did you sign this on February 12th of 2021?

25   A.   **Yes.**

1    Q.   And did you review this document before you signed it?  Do

2    you recall if you reviewed this before you signed it?

3         (Brief pause.)

4    A.   **This "D" is not correct.**

5              **THE COURT:**  Which interrogatory are --

6              **MR. SINK:**  Yeah, I was going to say.

7    Q.   Let's go through it.

8         So interrogatory 3 asks:  Describe in detail why Defendant

9    Ishii voted to deny Plaintiff's application for tenure.

10        And we have a number of objections, and then we have a

11   part that says "beginning of confidential designation."  Do you

12   see that under subsection A?

13        (Brief pause.)

14        Do you see this?

15   A.   **What do you ask me?**

16   Q.   Sir, in here, it states, second sentence, "Dr. Ishii

17   believes that it is in the best interests of Purdue University

18   to award tenure to candidates whose doctorates were obtained

19   from institutions that are peers of Purdue in terms of quality

20   and reputation.  Plaintiff's doctorate was obtained at an

21   institution, the University of Rzeszow, that is not regarded as

22   a peer of Purdue and whose reputation is substantially below

23   that of Purdue."  Do you see that?

24   A.   **I don't think that was the base of voting no.  Also, I was**

25   **not happy that she didn't have a Ph.D. from a peer institution,**

1    but that's not her fault to me because Purdue hired her.  So

2    maybe head and the dean has the responsibility, not her fault,

3    I think.  That's in my opinion.

4    Q.   So is the interrogatory inaccurate, or do you want to

5    revise your testimony today?

6    A.   **Yes.**

7    Q.   You would like to revise it?  So do you agree that you

8    voted, at least in part, because of her Ph.D.?

9    A.   **I don't agree that the -- I don't think, including myself,**

10   **nobody voted because of her Ph.D.  I'm not sure Dr. Kim**

11   **remember everything correctly.**

12   Q.   Do you contend that Dr. Sizyuk's qualifications were weak?

13   A.   **Pardon?**

14   Q.   Do you contend that Dr. Sizyuk's qualifications for tenure

15   were weak?

16   A.   **Qualification was not very good, yes.**

17   Q.   Would you describe it as weak?

18   A.   **Weak, yes.**

19   Q.   Dr. Sizyuk -- did you -- I'm sorry.

20        Did you review Dr. Sizyuk's dossier before you voted?

21   A.   **Well, first, I want the dossier to be very accurate.**

22   **That's the reason I raise the point about Argonne employment.**

23   **I was not critical but I -- I tried to help her to be accurate,**

24   **but other people also review it.**

25   Q.   My question, though, was:  Did you review her dossier?

1  A.   **Dossier --**

2  Q.   Yes.

3  A.   **-- was very well written, but didn't demonstrate**

4  **independence.**

5  Q.   Third time.  Did you review her dossier; yes or no?

6  A.   **Yes.**

7  Q.   Thank you.

8      And that dossier reflected that, from the time she started

9  at Purdue until the time she went up for tenure, that she had

10  18 referred journal papers that were published.  Is that weak

11  in your opinion?

12  A.   **I don't remember, but she had a good publication network,**

13  **I think.**

14  Q.   That would be an average of 3.6 per year.  Is that above

15  the average in your opinion?

16  A.   **I think she had better than average publication.**

17  Q.   And 4 of those 18 were completely independent of

18  Dr. Hassanein.  Is that weak in your opinion?

19  A.   **Many publication was with Dr. Hassanein, and I think**

20  **normally we want to see independent publication from the --**

21          **COURT REPORTER:**  Excuse me.  Can you repeat that.

22  A.   **Her publication was often with Dr. Hassanein.  We like to**

23  **see publication independent from her former assistant adviser.**

24  Q.   That dossier also reflected six referred conference or

25  symposium papers since 2014 that were published.  Is that week

1    in your opinion?

2    A.   **Publication which -- she was strong.**

3    Q.   Let's move on from publication, then.

4         In terms of grant funding, that dossier reflected over

5    2 million in grant funding, $750,000 of which she was a sole

6    PI.  Is that weak in your opinion?

7    A.   **Well, to me, it was not clear she really get this funding**

8    **independent or Dr. Hassanein helped to get that.**

9    Q.   You're saying the dossier was not clear?

10   A.   **Because she was working in Hassanein's lab.**

11   Q.   There's an exhibit book in front of you entitled

12   "Plaintiff's Exhibit Book."  Can you turn to Exhibit 3.

13        **MR. SINK:**  Do you want me -- Can I approach the

14   witness?

15        **THE COURT:**  Yes.  Would you close the other one,

16   Counsel, so it takes up less space in that area.  Thank you.

17   **BY MR. SINK:**

18   Q.   So I direct your attention to Exhibit 3, page 976 of the

19   dossier.  And this can be in front of the jury as well.  It's

20   been admitted.

21        What about this part of the grant is unclear whether or

22   not it's by herself?

23   A.   **When I see this document, first things I notice is she**

24   **didn't indicate that she was the sole PI.**

25   Q.   Can you --

1    A.    **These things -- probably she was sole PI but -- Oh, here**

2    **it is.   Okay.**

3    Q.    Turn to the next page, please.

4    A.    **Well, then it's okay.   Yes.   So different -- Let me see.**

5    **So she had a co-investigator.   Then normally you need to**

6    **indicate what share of this total 750,000, and I didn't see**

7    **that.**

8    Q.    There's no co --

9    A.    **So this is incomplete in this document probably.**

10   Q.    According to this document, she's the sole PI; correct?

11   A.    **Dr. Brooks -- budgeted as a potential participant**

12   **investigator.   So this is not clear to me that she was really**

13   **the PI.   Why she stated co-investigator section something like**

14   **that, because she was a true, sort of, PI, then this item five**

15   **shouldn't appear.**

16   Q.    Turn to the previous page, 976.   If you look at the other

17   grants, where there's a co-PI, it says co-PI.   Do you see that?

18   A.    **I don't see this page.   Where is this?   Let me see.   Oh,**

19   **here.   Yes.   Yeah.**

20   Q.    So if there's -- on these other grants, where there's a

21   co-PI, she identifies as co-PI --

22   A.    **Yeah.   That's the way, right, yes.**

23   Q.    Then if you look at the DOE grant, is there a co-PI listed

24   there?

25   A.    **The PI, it looks like a sole, but why she has a statement**

1    in Item 5, Dr. Brooks.  This is under the co-PI.  The other big

2    grant, like 850,000, she was co-PI with Dr. Hassanein, who had

3    much more larger share.  And then another grant also she was a

4    co-PI.  Another grant, she was also co-PI.  And then it looks

5    like this --

6    Q.   Doctor --

7    A.   **She had only one solo PI, looks to me.**

8    Q.   Sure.  For 750,000; right?

9    A.   **Yeah.**

10   Q.   In addition to grants, Dr. Sizyuk had graduated one Ph.D.

11   student and one master student.  In your opinion, is that weak?

12   A.   **It's a little bit weak compared to others.  Usually, we**

13   **like to have two or three Ph.D. student.**

14   Q.   Do you recall that Dr. Taleyarkhan was the presenter for

15   Dr. Sizyuk at those three -- or at the latter two NEPC

16   meetings?

17   A.   **In general, she was not -- I cannot say she was not doing**

18   **good at all, but she was doing but not reach the point of**

19   **promotion.**

20   Q.   My question, sir, is only whether Dr. Taleyarkhan was the

21   presenter for Dr. Sizyuk.

22   A.   **I don't remember.**

23   Q.   You don't remember?  Do you recall if Dr. Taleyarkhan, at

24   either the September 6th meeting or September 27th meeting,

25   stated that it was a not necessary to have a Ph.D. in order to

 1   be a research scientist at Argonne?

 2   A.   **Probably he said that, yeah.**

 3   Q.   Do you recall those three NEPC meetings, did you make it

 4   clear based on your comments and what you said how you were

 5   going to vote on Dr. Sizyuk's candidacy for tenure?

 6   A.   **Well, vote is a secret vote, but normally almost everybody**

 7   **know whether as a professor we vote, especially if you're**

 8   **negative.  You're going to vote negative, you should clearly**

 9   **indicate.  It's irresponsible to say something positive and**

10   **vote no.  So the professor having negative feeling usually say**

11   **that.  I think it's a duty of professor.**

12   Q.   Did you say anything positive about Dr. Sizyuk during --

13   A.   **No.  I -- I wasn't negative --**

14   Q.   You said --

15   A.   **Clearly --**

16   Q.   You clearly --

17   A.   **At this point --**

18          THE COURT:  Gentlemen, you can't speak over each

19   other.  Last question was did you say anything positive about

20   Dr. Sizyuk during -- and your answer before he finished was:

21   No, I wasn't negative.  The next question is "You said."  So

22   let's get back to your last question, and listen to it

23   carefully.  And, Professor, let him finish his question.

24          **THE WITNESS:**  Yes.

25          THE COURT:  And then you answer, and counsel will not

```
 1    start another question until you're done.
 2              THE WITNESS:  Sorry.
 3              MR. SINK:  Okay.
 4              THE WITNESS:  Sorry.
 5    BY MR. SINK:
 6    Q.    During those three NEPC meetings regarding Dr. Sizyuk, you
 7    only stated negative things about Dr. Sizyuk?
 8    A.    Yes.
 9    Q.    Thank you.
10          Have you ever voted on the NEPC to grant tenure to a
11    female?
12    A.    Yes.
13    Q.    Who?
14    A.    I served many, many tenure promotion cases.  I don't
15    remember, but maybe 15 or so.
16    Q.    You can't give me the name?
17    A.    Recent one is Dr. Garner and then --
18    Q.    Did you say Dr. Garner?
19    A.    Dr. Garner.
20    Q.    G-a-r-n-e-r?
21    A.    Assistant to associate professor.
22    Q.    I'm asking -- The question was:  Have you ever voted for a
23    female to be granted tenure?
24    A.    Female was -- Let me remember.  Dr. Wharry case.  Yeah.  I
25    participated.  Okay.  Ask question, please.
```

 1  Q.   Sure.  And your testimony is, you voted yes to grant
 2  Dr. Wharry tenure?
 3  A.   **Yes.  I participated.**
 4          **COURT REPORTER:**  Can you please repeat that.
 5  A.   **Yes.**
 6          **THE COURT:**  Is that Wharry, W-A-R-R-Y?
 7          **MR. SINK:**  W-H-A-R-R-Y.
 8          **THE COURT:**  I'm asking the professor.
 9          **MR. SINK:**  Sorry.
10          **THE COURT:**  Is that Dr. Wharry, W-H-A-R-R-Y?
11          **THE WITNESS:**  Yes.
12          **THE COURT:**  Thank you.
13  **BY MR. SINK:**
14  Q.   So not only do you dispute the testimony of Dr. Wharry
15  that you heard from her, you contend you actually voted to
16  grant her tenure?
17          **MR. KEALEY:**  Your Honor, I have no idea what the
18  foundation is of --
19          **THE WITNESS:**  Her case was --
20          **THE COURT:**  Wait, wait.
21          **MR. KEALEY:**  -- Dr. Wharry, so I can't understand the
22  question myself.  She testified for well over an hour, and I
23  don't know what the predicate of this question is.
24          **MR. SINK:**  It seems pretty obvious.
25          **MR. KEALEY:**  Well, the question was:  Do you dispute

1   the testimony of Dr. Wharry?  I don't know which testimony

2   we're referring to.

3                **THE COURT:**  Correct.

4            **MR. SINK:**  I can be more specific.

5                **THE COURT:**  Sustained.  The objection is sustained.

6   What's your next question?

7   **BY MR. SINK:**

8   Q.   Sure.  So you dispute the testimony of Dr. Wharry wherein

9   she testified that she overheard a conversation between you and

10  Dr. Revankar on the day of her NEPC vote?

11  A.   **She said that, but I don't believe that's true.**

12  Q.   Sure.  And so you also contend under oath today that, not

13  only did that conversation not occur as she testified to it,

14  but you voted in favor of granting tenure to Dr. Wharry?

15  A.   **Dr. Wharry was a very good professor, and I definitely**

16  **wanted to promote her, but she asked tenure in just two years.**

17  **No one in tenure is asked after five or six years and I -- so**

18  **she need her more track record, and the PC meeting I clearly**

19  **said next year if she can sustain the performance, I**

20  **would, yes.**

21  Q.   So you actually voted no?

22  A.   **No.  Yes.**

23  Q.   Thank you.  Was Dr. Kim your Ph.D. student?

24  A.   **She was a Ph.D. student --**

25  Q.   Dr. Kim, Seungjin Kim.

1    A.    **Dr. Kim was my Ph.D. student.**

2    Q.    At Purdue University?

3    A.    **Yes.**

4    Q.    And have you published papers with Dr. Kim?

5    A.    **When he was a graduate student and post-doc, I think we**

6    **probably issued maybe 10 general papers, something like that.**

7    Q.    A lot more than 10, right?

8    A.    **After he left, we almost never had -- he became**

9    **independent.**

10   Q.    Are your publications available on Google Scholar?

11   A.    **Could you repeat the question.**

12   Q.    Do you know what Google Scholar is?

13   A.    **I don't know how much publication he had that --**

14   Q.    I'm asking about your publications.  Are they publicly

15   available?

16   A.    **I don't understand your question.**

17   Q.    You do publications; correct?

18   A.    **We have together many publications.**

19   Q.    Are those publications publicly available on Google

20   Scholar, and that would show how many publications you had with

21   Dr. Kim; is that correct?

22   A.    **You can go to -- search Google scientists, and you can**

23   **find everything.**

24   Q.    Were you the thesis adviser for Dr. Kim's Ph.D.?

25   A.    **Yes.**

1   Q.   Have you been a co-PI with Dr. Kim on grant funding?

2   A.   **Yes.**

3   Q.   Did you vote to deny tenure to Dr. Sizyuk because she

4   refused to leave CMUXE?

5   A.   **No, I don't think so.**

6   Q.   Do you agree that one can be a member of CMUXE and still

7   establish independence from Dr. Hassanein?

8   A.   **She was always with Dr. Hassanein, so she didn't establish**

9   **independence.**

10  Q.   Do you contend that the only way Dr. Sizyuk could have

11  established independence would be to leave CMUXE?

12  A.   **Not only one calls for negative vote.  There was another**

13  **one I mentioned already about the peer recommendation.**

14  Q.   It's a "yes" or "no," sir.  Do you contend that, in order

15  for Dr. Sizyuk to establish independence from Dr. Hassanein,

16  she would have been required to leave CMUXE?

17  A.   **Yes.**

18  Q.   Okay.  Give me one minute.

19       (Brief pause.)

20            **MR. SINK:**  I have no more.

21                    <u>**CROSS-EXAMINATION**</u>

22  BY MS. KILIES:

23  Q.   Good afternoon.

24  A.   **Good afternoon.**

25  Q.   You seem to have a lot of trouble hearing Mr. Sink; is

1    that right --

2    A.    **No, that's okay.**

3           **MS. KILIES:**  Can I have a personal microphone that I

4    could be a little bit closer?  Because I don't think he can

5    hear well.

6         (Discussion off the record.)

7    **BY MS. KILIES:**

8    Q.    Dr. Ishii, do you have hearing aids in?

9    A.    **Yes.**

10   Q.    In both ears?

11   A.    **Both, yeah.**

12   Q.    Did you have trouble hearing Mr. Sink?

13   A.    **Yes.  If somebody speak far away, it's very difficult to**

14   **hear.**

15   Q.    Okay.

16   A.    **I can maybe hear only 60, 70 percent.  Sorry for that.**

17   Q.    Your answers were confusing, and I don't think you

18   understood a lot of the questions.

19   A.    **Yeah.  Many I couldn't tell --**

20   Q.    Okay.  Do you hear me okay?

21   A.    **Yes.  If you're close to me, I can hear.**

22   Q.    Okay.  He mentioned something about unconscious bias

23   training?

24   A.    **Yes.**

25   Q.    You have attended several unconscious bias trainings; is

1    that right?

2    A.   **Yes.  The first one for the chair of the search committee,**

3    **and it was very intensive and very legal and it was**

4    **professional, and I thought it was very, very good.  But later**

5    **when I attended, it become very diluted.  So I was kind of**

6    **disappointed, especially last one I attended only half-day, was**

7    **very diluted and didn't help very well (indiscernible).**

8         (Court reporter requested witness to repeat.)

9    A.   **Didn't help very well the search committee members.**

10   Q.   And you might have heard -- Dr. Sink -- Mr. Sink tell you

11   that Janelle said something about you leaving early during the

12   last unconscious bias training?

13   A.   **Yes.  Actually, I don't know how she can say that.  I went**

14   **to that training because it's very important all this search**

15   **committee member attend.  Otherwise, they would be**

16   **disqualified.  And the next workshop would be next semester, so**

17   **it would be six months.**

18       **I went there to see whether everybody attend that**

19   **training, and the only person who didn't come was Dr. Wharry.**

20   **And I left half -- of the half day because I need to attend to**

21   **my wife.  I was intent to resign already as the search**

22   **committee chair.  So it was not important to attend that whole**

23   **day.  I couldn't.**

24   Q.   And why couldn't you attend?

25   A.   **I just went to see whether the all the members of search**

1   committee attend.  Otherwise, it would be a very big problem,

2   and maybe we lose the position if we don't start as soon as

3   possible.

4   Q.   Okay.  And did you ever -- Well, why couldn't you attend

5   all day?  You said something about your wife, but I couldn't

6   catch it.

7   A.   **Yeah.  That's because my wife required draining every day,**

8   **about 600 CC, and I need to inject the coagulant medicine**

9   **because she was very end of the time stage four cancer.**

10  Q.   Did you ever tell Dr. Revankar that you were leaving the

11  unconscious bias training for any reason?

12  A.   **No, I don't think I talk to anybody.  I just left.  And I**

13  **knew I will not be certified because this is -- you need to**

14  **attend morning to the end of the day.**

15  Q.   So after the training, you realized you couldn't stay the

16  whole time because your wife.  Did you then resign from the

17  search committee?

18  A.   **Well, immediately after this workshop, university report**

19  **to the head who attended, and he found I myself and Dr. Wharry**

20  **didn't attend, so he came to my office, what happening, so I**

21  **said I would resign, and that's the reason I didn't attend the**

22  **whole workshop.**

23  Q.   Talking about Dr. Wharry, you stated earlier you thought

24  she was a really good scientist?

25  A.   **Yes.  She was excellent.  Not only that she -- her**

1    promotion, she was very, very accurate.  And I was very

2    impressed, and I was very happy that we hired her.  So it was

3    very unfortunate that she left our department.

4    Q.   But I'm a little confused because you voted no for her

5    tenure, so explain to me.

6    A.   Okay.  Normally, tenure is -- evaluation is based on,

7    like, a five or six years performance after person was

8    appointed as assistant professor without tenure.  So six years

9    of performance, five years of performance, very important.

10        And then some person who is excellent in performance is

11   called fast-track promotion.  Normally, four years, after four

12   years.

13        But Dr. Wharry asked to be promoted after only two years,

14   and almost -- most of the full professor didn't like that,

15   because two years is not sufficient to show track record

16   because we are evaluating her future, potential for whole her

17   life, because we give job for life.  So I clearly said in the

18   NEPC that I would like to promote her after three years but two

19   years is insufficient.

20   Q.   And then also there was some questions about conversations

21   you might have had about Janelle's mentor, Gary Was?

22   A.   Yes.  She stated in deposition -- it's partially true, but

23   she didn't tell whole story I told her.

24        We had the dean's search committee, and then I was serving

25   in the search committee.  And then we came back down with -- we

1    call it the candidate who can be invited to campus to evaluate

2    them.  And then her adviser, Dr. Gary Was, who was associate

3    dean for Michigan for research, which is the second important

4    position in engineering; and then there's another doctor, Linda

5    Katehi from also Michigan.  She was also associate dean.  Both

6    looked very good in the resume.  So both, I think they are

7    second and third ranked.

8        And the other one we thought was the best was internal

9    candidate from electrical engineering.  So top three should be

10   invited, I thought.

11       But search committee chair certainly said that if we keep

12   Dr. Was, Dr. Linda Katehi may withdraw the application, and he

13   doesn't like to see that, so we should drop Dr. Was.

14       I saw in that point that Purdue really strongly wanted to

15   qualified female dean.  I was not objecting, but I told

16   Dr. Wharry that's the way her adviser was dropped, and I can

17   talk about that because it was many, many years ago, maybe

18   10 years ago.

19       So that's the -- then we interviewed the remaining three,

20   the fast -- top-rated person from internal one withdraw

21   immediately after Dr. Was was eliminated, because people talk.

22   And he was -- his name was Ken Fuchs, and he immediately become

23   a dean of the Cornell University and become provost, and now

24   he's the president of University of Florida, so he was really

25   qualified.  So he was really qualified.  Dr. Was was very good.

1    He was a nuclear engineer.  I know him very well.  He was very

2    capable of bringing government fund.  Michigan was very good.

3    They are rated number one with MIT together in nuclear

4    engineering.

5         But when we interviewed Dr. Katehi, I was very impressed.

6    She was very articulate, and she had a good vision for the

7    future of engineering.  So I was a hundred percent for

8    Dr. Katehi.  Fortunately, she accepted our offer.  I think she

9    was the best dean of engineering, at least for the School of

10   Nuclear Engineering.

11        She helped us quite a bit because we had a lot of

12   financial problems, budget problems, and she also increased

13   number of faculty members at the School of Nuclear Engineering.

14   So I think she was the best for us.

15   Q.   Thank you for that.

16   A.   Thank you.

17   Q.   So the Plaintiff in this case, Dr. Sizyuk, how did it come

18   to be she was on tenure-track at Purdue?

19   A.   Well, we had a search committee for particular field of

20   nuclear engineering.  It's called the neutronics.  And she was

21   not in there, and we had a very good candidate.  Eventually, we

22   hired associate professor with tenure.  He was from North

23   Carolina State University, and he was very capable.  And he's

24   now full professor and doing very, very good, and definitely he

25   was way outstanding than any.

1      But the dean's office doesn't like to recommend only one

2  person.  That's like we are forcing her to make a decision

3  based on our -- she usually require -- I mean, in that case it

4  was -- she -- ask -- normally ask us to have three candidate.

5  And also, if we don't put the female name in it, often they

6  will put it back and restart the search again.

7      So that's one of the reason that Sizyuk was put in.  And

8  she was, as a researcher, I thought very good research.  But

9  she doesn't have a U.S. Ph.D., but at that time because we had

10  very, very good candidate, so it was not so much problem, so we

11  put it -- not myself, but the committee put in.

12      So she was not chosen, and doctor Abdkel-Khalik from North

13  Carolina State was hired, and we are very happy.

14      And then I think Dr. Hassanein thought maybe he can

15  recommend Dr. Sizyuk to the dean to have opportunity hire.

16  University has a different port to hire people.  So this is not

17  normal in position, but dean can create, and this is called

18  opportunity hire.

19  Q.   And you're using a lot of names, and it's getting kind of

20  confusing.  I'm going to ask you a little more direct

21  questions.

22  A.   So Dr. Hassanein asked me to write the recommendation

23  letter.  I initially refuse because I don't know much about.

24  But he insisted on -- he was head, and he's very, very long

25  researcher, so I wrote, I think, written letter.  But this was

1    not official recommendation for search or anything like that

2    because there was no search, but then he was successful to hire

3    Dr. Sizyuk as opportunity hire.  Means somehow dean created

4    position which --

5    Q.    So let me stop you there.  You agreed with hiring

6    Dr. Sizyuk as an opportunity hire?

7    A.    We didn't have any -- really was not because -- she was

8    hired without knowing faculty participation.  It was decision

9    between head and the dean.

10   Q.    And then you were one of the eight members of the NEPC who

11   voted on Plaintiff's tenure; is that right?

12   A.    Yes.

13   Q.    Okay.  And earlier, you -- Mr. Sink asked you if you only

14   stated negative things about Dr. Sizyuk.  I don't know if you

15   heard him ask you that question.

16   A.    I don't know.  I didn't say anything negative.  I think

17   she was good researcher in the general sense, but she

18   didn't (indiscernible).

19        (Court reporter requested witness to repeat.)

20   A.    She was a good engineer, but she didn't clear the hard

21   rules set by the engineering -- College of Engineering.

22   Q.    Did you tell anybody on the NEPC committee how to vote?

23   A.    No, this, you never can do it.

24   Q.    Did you discuss at all what your vote was going to be?

25   A.    No.

1    Q.    Have you ever tried to influence anybody on how to vote at

2    the NEPC --

3    A.    **First of all, if you understand the university culture,**

4    **tenured faculty, especially tenured full professor, so**

5    **independent.  If you try to influence, would be really angry**

6    **and insulted.  So this will probably have opposite effect if**

7    **you try something.  So everybody think this is stupid, so**

8    **nobody tried to influence or tell someone to vote yes or no.**

9    **This never happen.**

10   Q.    And you raised concerns with whether the title on her

11   dossier was accurate for Argonne.  Do you remember that?

12   A.    **Yeah.  I was not criticizing.  I thought she can be more**

13   **accurate, and because Argonne has maybe 50 job specification,**

14   **and senior scientist is not really specification.  This a**

15   **general grouping of the position.  That's the reason.  So to --**

16   **accurate dossier would have helped evaluation better.**

17   Q.    And the dossier wasn't something that you're presented

18   with when somebody is becoming on tenure-track; it's created

19   while they're on the track; is that right?

20   A.    **Yeah.**

21   Q.    Got that right?

22   A.    **Promotion process is actually -- doesn't happen in one**

23   **year.  As Dr. Kim said, every junior faculty evaluate, and we**

24   **advise what can be improved and what should be accomplished to**

25   **get the tenure, and that, Dr. Kim, I think, said that, or maybe**

1    yesterday somebody showed it.  And I think you showed it

2    yesterday, his recommendation to Dr. Sizyuk.

3        And then we had a -- a recurring issue that she didn't

4    demonstrate independence of Dr. Hassanein, and that's also

5    becoming the other issue at the final promotion meeting.  But I

6    also thought she didn't establish independence.

7        Another concern I had was, she was not really established

8    clearly the national preeminence in the field of specialty

9    which is generally, in the engineering, required.

10   Q.   And with respect to her Ph.D., would you agree with me

11   that the validity of someone's Ph.D. or their prior work

12   experience in terms of what she did at Argonne, all of that

13   stuff is stuff that's -- should be decided by Purdue when

14   somebody is hired to be on tenure track?  Do I have that right?

15   A.   Yes.  I didn't track her Ph.D.  Didn't look like peer

16   institution, peer, like MIT or Michigan.  It's almost -- also

17   she -- it looked like she was really not enrolled in the

18   university because she was full-time working at Argonne, and

19   the Poland University.  So physically she was not in the

20   university.  So I didn't like it, but this was not -- things

21   happened, and they're all in the university.  Then the head,

22   Dr. Hassanein, and Dean Jamieson made the decision.  So it was

23   already done, so it's not issue for us.  We cannot go back.

24   But I was not happy with it.  I didn't know that when

25   Dr. Sizyuk applied with the -- we found out maybe several years

1    later.  Some professor can speak Polish or Russian, and they

2    went into university document, and more or less we knew that

3    this was distance Ph.D.

4              THE COURT:  Is this your last question for today?

5              MS. KILIES:  It will be.

6              THE COURT:  Okay.

7              MS. KILIES:  Let me think about it for a second.

8              THE COURT:  You've got one minute.

9    A.    But that was not the issue --

10   BY MS. KILIES:

11   Q.    Hold on.  Hold on.

12   A.    Primary committee for promotion.

13   Q.    Hold on.  Let me ask the question first.

14         I know you say you didn't like it, but was it a

15   consideration in your mind or in a discussion with NEPC when

16   she was up for tenure?  Was the -- Was where she got her Ph.D.,

17   did you think about that in the tenure process, or that ship

18   already sailed?

19   A.    Not at all, because it's not her responsibility.  She was

20   hired.  She was already hired by the Purdue University, so we

21   should respect that decision made by management of engineering.

22             MS. KILIES:  That's all I have for today.

23             THE COURT:  For today.  You'll reserve tomorrow?

24             MS. KILIES:  Yes.

25             THE COURT:  All right.  Ladies and gentlemen of the

1    jury, it's 4:00, and so we're done for the day.  My admonition

2    to you is the same as I mentioned to you yesterday and this

3    morning, but I need to go over it again because it's required.

4         During this evening recess and all other recesses, you're

5    not to discuss this case with anyone.  This includes your

6    family, other jurors, and anyone involved in the trial.  You're

7    not to watch or listen to any news reports that there might be

8    with regard to the trial, by whatever source, whether or not

9    it's television or radio or news accounts, in the newspaper, or

10   even on the internet, and you're not to view any media from the

11   community that might be discussing this case, if any.

12        You are required to keep an open mind until you've heard

13   all of the evidence in the case as well as the closing

14   arguments of counsel and the final instructions of law that

15   will be provided by the Court.

16        Now, with that being said, we'll have the same schedule

17   tomorrow as we did today; and that is, I'd ask that you be here

18   by a quarter to nine.  And we'll start at 9:00.  And we'll go

19   forward with the same schedule, that we will be done by 4:00

20   tomorrow afternoon.  Not done with the case, I don't think, but

21   we'll stop at that time.

22        So remember, too, that if you're taking notes, leave those

23   notebooks in the jury room.

24        That's it.  We'll see you tomorrow morning.  We'll have

25   the same -- Are they getting breakfast items?

1      Okay.  There will be breakfast items, just like today, as

2  well as lunch will be available as well.  So have a good

3  evening, and we'll see you tomorrow morning.

4      (Jury out at 4:01 p.m.)

5          **THE COURT:**  You can step down, Professor.  You can

6  step down.

7      Counsel, you can be seated.  Are there any issues that I

8  need to think about before we adjourn for the today?

9      For Plaintiff?

10          **MR. SINK:**  No, Your Honor.

11          **THE COURT:**  For the University?

12          **MR. KEALEY:**  Only, perhaps, an observation about

13  scheduling for tomorrow.  As I understand it, the Plaintiff

14  will complete their case in chief maybe in the late morning.

15  And as we've indicated previously, we will be presenting a

16  Rule 50 motion, and we will be filing that tomorrow as well as

17  requested through ECF.  We would welcome the opportunity to

18  argue that motion at whatever point in the court day, if the

19  Court would be open to that.

20          **THE COURT:**  It depends on how much time you expect it

21  will take.

22          **MR. KEALEY:**  Well, I think our motion is detailed,

23  and it could easily involve 45 minutes or more to argue it.

24          **THE COURT:**  Go ahead.  I didn't mean to interrupt

25  you, but I wanted to know that first.

1          **MR. KEALEY:**  So I'm sharing this just to equip the
2     Court with the information so, perhaps, at some point we could
3     get guidance about how the Court would like to proceed.

4          **THE COURT:**  Let me go back to Plaintiffs.  About how
5     much time do you anticipate tomorrow?  Be done by noon?

6          **MR. SINK:**  No.  Absolutely not.  Because we have
7     Dr. Garner at 9 a.m.  Dr. Taleyarkhan, who we were not able to
8     get in Monday is coming at ten-ish, and then we have Dr. Sizyuk
9     after that.

10          **THE COURT:**  All right.

11          **MR. SINK:**  So I would say it's more likely we're
12     going to close after lunch.

13          **MS. KILIES:**  Just a reminder, I need to finish with
14     Dr. Ishii tomorrow morning.

15          **THE COURT:**  So by the time we're ready for the
16     Rule 50 motion, it's probably going to be after lunch and
17     probably around 2:00 or 3:00.  Is my guess --

18          **MR. SINK:**  Yes.

19          **THE COURT:**  Is that about accurate?

20          **MR. KEALEY:**  Seems accurate.

21          **THE COURT:**  All right.

22          **MR. SINK:**  And for the record, Your Honor --

23          **THE COURT:**  Everything is for the record.

24          **MR. SINK:**  Informational purposes, as Mr. Kealey
25     would put it.  We would prefer just to orally -- as is

1    customarily done, just orally argue the motion.

2              **THE COURT:**  And I will tell you, too, counsel that I

3    ordinarily take those Rule 50 motions under advisement until

4    after the jury comes back.  All right?  That's what I usually

5    do, but we'll see.  Each case is different, but that's usually

6    what I end up doing.

7         Anything else from Purdue?

8              **MR. KEALEY:**  No, Your Honor.

9              **THE COURT:**  Anything else for Mr. Ishii?

10             **MR. BOWLING:**  No, Your Honor.

11             **THE COURT:**  Then if you could just keep the same

12   schedule we had today, to be here tomorrow at the latest 8:45,

13   but the courtroom will be open by 8:45.  We'll see you then.

14        (Court adjourned at 4:05 p.m.)

15        * * *

16                      CERTIFICATE OF REPORTER

17             I, Angela Phipps, RMR, CRR, FCRR, certify that the

18   foregoing is a true, complete, and accurate transcript of the

19   record of proceedings in the above-entitled matter before the

20   Honorable Theresa L. Springmann, on January 23, 2024.

21

22   Date:  January 24, 2024        **S/Angela Phipps, RMR, CRR, FCRR**
                                     Official Court Reporter
23                                   for the U.S. District Court

24

25