```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF INDIANA
 2                        LAFAYETTE DIVISION

 3     TATYANA SIZYUK,                  )
                                        )
 4           Plaintiff,                 )
                                        ) Cause No.
 5           vs.                        ) 4:20-cv-00075-TLS
                                        )
 6     PURDUE UNIVERSITY; BOARD OF      )
       TRUSTEES OF PURDUE UNIVERSITY;   )
 7     and MAMORU ISHII, in his         )
       personal capacity,              )
 8                                      )
             Defendants.                )
 9     _____      )

10             DAY 3 OF JURY TRIAL - A.M. SESSION
                       JANUARY 24, 2024
11          BEFORE THE HONORABLE THERESA L. SPRINGMANN
                 UNITED STATES DISTRICT JUDGE
12
       APPEARANCES:
13
       For the Plaintiff:        RYAN SINK and RYAN FOX
14                               FOX & SINK LLC
                                 6177 North College Avenue
15                               Indianapolis, Indiana 46220
                                 (317) 254-8500
16                               E-mail: rsink@foxsinklaw.com

17
       For Defendant, Purdue:    WILLIAM P. KEALEY,
18                               MATTHEW M. HUMBLE, and
                                 KIRSTIE E. KLUTZKE
19                               STUART & BRANIGIN LLP
                                 300 Main Street, Suite 900
20                               P.O. Box 1010
                                 Lafayette, Indiana 47902-1010
21                               (765) 423-1561
                                 E-mail: wpk@stuartlaw.com
22

23

24     Proceedings reported by stenotype.  Transcript produced by
       computer-aided transcription.
25
```

```
 1   APPEARANCES (Continued):

 2   For Defendant, Ishii:        JOSEPH NEAL BOWLING and
                                  JANELLE P. KILIES
 3                                LEWIS WAGNER LLP
                                  1411 Roosevelt Avenue, Suite 102
 4                                Indianapolis, Indiana 46201
                                  (317) 237-0500
 5                                E-mail: Nbowling@lewiswagner.com

 6

 7   Also Present:               Plaintiff, Tatyana Sizyuk;
                                 Defendant, Mamoru Ishii
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          **I N D E X**

2                              * * *

3                    **INDEX OF WITNESSES**

4   **FOR THE PLAINTIFF**                          **PAGE**

5   <u>**MAMORU ISHII**</u>
    Cross-Examination (continued) by Ms. Kilies    6
6   Redirect Examination by Mr. Sink               19
    Recross-Examination by Ms. Kilies              24
7

8   <u>**ALLEN GARNER**</u>
    Direct Examination by Mr. Sink                 31
9   Cross-Examination by Mr. Kealey                54
    Cross-Examination by Mr. Bowling               68
10  Redirect Examination by Mr. Sink               70
    Recross-Examination by Mr. Kealey              72
11  Offer of Proof Examination by Mr. Sink         73

12

13  <u>**RUSI TALEYARKHAN**</u>
    Direct Examination by Mr. Sink                 78
    Cross-Examination by Mr. Bowling              109
14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (The following proceedings were held in open court

 2         commencing at 8:52 a.m., reported as follows:)

 3       (Call to Order of the Court.)

 4           THE COURT:  Please be seated.

 5       Good morning.  Thank you for being here on time this

 6   morning.  Let me --

 7       I think we're waiting for a few more jurors, or have they

 8   all reported?

 9           THE COURTROOM DEPUTY:  We're waiting on three

10   jurors.

11           THE COURT:  As soon as they check in, we'll be ready

12   to go forward.  Let me ask counsel, have there been any issues

13   that developed over the evening recess that I need to be aware

14   of today before we start?

15       Let me ask, for plaintiff?

16           MR. SINK:  No, Your Honor.

17           THE COURT:  Good.

18       And for defense, for your client, Mr. Ishii?

19           MS. KILIES:  I guess I'm the lone one.  Not for

20   Mr. Ishii, but we're going to get Purdue's counsel right now.

21           THE COURT:  So while we're waiting for the three

22   jurors we're waiting for, any developments over the evening for

23   Purdue that I should be aware of, Counsel?

24           MR. HUMBLE:  No, Your Honor, I don't believe so.

25           MS. KILIES:  Your Honor, before we get started,
```

1   could I put on the personal mic?

2           **THE COURT:**  Of course.  Do what you have to do.

3   Once the jurors are here and we bring them in, we will just go

4   forward with Mr. Ishii's testimony.

5       I did prepare that letter for Mr. Anderson, Juror

6   Number 1.  If I could give it to you to give to him.

7           **THE COURTROOM DEPUTY:**  We have all the jurors.

8           **THE COURT:**  All right.  Are they still eating

9   breakfast?

10          **THE COURTROOM DEPUTY:**  No.

11          **THE COURT:**  They're ready to go.  All right.

12      All the jurors have now checked in and they're ready to

13  go, so let me just confirm that we're ready to begin.  And

14  we'll have Mr. Ishii take the stand at this time, unless there

15  is anything else.

16      Mr. Ishii.

17          **MS. KILIES:**  Does he need to be sworn in again?

18          **THE COURT:**  No, he's under oath.  He just needs to

19  get back on the witness stand.

20          **MS. KILIES:**  Okay.

21          **THE COURT:**  Anything else from the plaintiff before

22  we call them in?

23          **MR. SINK:**  No, Your Honor.

24          **THE COURT:**  Please bring the jury in now.

25      (Jury in at 9:00 a.m.)

1          **THE COURT:**  Go ahead and be seated, please.

2      Good morning to you, ladies and gentlemen of the jury.

3  Thank you for being so on time today.  That's not always the

4  case, but it is greatly appreciated.

5      At this time you'll remember that we remain in the

6  plaintiff's case, and as we left yesterday, Mr. Ishii was

7  testifying on direct examination.  At this time we will proceed

8  with that testimony.

9      But before we do, let me just ask the members of the jury,

10  has anything occurred during this recess from yesterday that I

11  need to be aware of?  If so, just raise your hand, and we'll

12  take it up.

13      All right.  No hands.  All right.  Good.  We're ready to

14  go forward.

15      Counsel for the plaintiff -- I'm sorry.  We were on -- for

16  your client.  So, Counsel, you may proceed with your direct on

17  this, Ms. Kilies.

18          **MS. KILIES:**  It's actually the cross.

19          **THE COURT:**  Correct.  It's an unusual situation in

20  the presentation.

21          **MS. KILIES:**  It is.

22      **MAMORU ISHII, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

23              **CROSS-EXAMINATION (Resumed)**

24  BY MS. KILIES:

25  **Q.**  Good morning, Dr. Ishii.

1  **A.**  Good morning.

2  **Q.**  Can you hear me okay?

3  **A.**  Yes.

4  **Q.**  Yesterday -- I don't mean to be disrespectful, but I was

5  thinking about your testimony.  And I have to be honest, a lot

6  of it, your answers didn't seem to answer the questions, and I

7  was sort of left to be confused, if I'm being honest.

8      Could you hear what Mr. Sink was asking you yesterday?

9  **A.**  I think I heard only 20 or 30 percent accurately, and other

10  things I was not certain what he was asking.  I ask to repeat

11  several times, and I was embarrassed, so I more or less

12  guessed, like, 70 percent cases, question and the answer.

13  There may be a discrepancy between question and answer.

14  **Q.**  Okay.  Next time, would you make sure you ask me or

15  Mr. Sink if you don't understand something.

16  **A.**  Okay.

17  **Q.**  Nothing to be embarrassed about.

18  **A.**  Okay.  Thank you.

19  **Q.**  Yesterday, I don't know if you heard, but Mr. Sink asked

20  you if there was any reason that Dr. Hassanein might have to

21  lie about things that you've said.  Do you remember that?

22  **A.**  Yes.

23  **Q.**  Okay.  Are there reasons that you think Dr. Hassanein would

24  lie?

25  **A.**  Yes, I think so.

1   **Q.**   What are those?

2   **A.**   Well, several cases I think that.  Dr. Sizyuk case and

3   another researcher from his group, Marisol Koslowski, was also

4   in the tenure-track, and he has a vested interest to promote

5   them, and I think that cause to make some false statement.

6   **Q.**   Okay.  And then anything to do with the letter that you

7   wrote -- or you signed?  Do you remember that letter that you

8   saw yesterday?

9   **A.**   Which letter?

10          **MS. KILIES:**  For the record, this is P-22.  It has

11   already been admitted into evidence.

12   **BY MS. KILIES:**

13   **Q.**   If you want to look at it in your book -- would it help to

14   look in your book?

15   **A.**   Yes, I remember this.  Yes.

16   **Q.**   You remember writing that -- or signing that, I should say?

17   **A.**   This is drafted by the Dr. Revankar; and we concur with it

18   and then we sign it.

19   **Q.**   And what was the point of that memo?

20   **A.**   Well, basically, we sought Dr. Hassanein for his fine --

21   his role as a thesis research advisory to Dr. Sizyuk.  And we

22   actually ask several times in the NEPC primary committee, and

23   he was -- definitely said, "I'm not."  But then we ask

24   University to investigate, and they found he was actually the

25   thesis advisor.

1   **Q.**  And you've been a professor, I think you told Mr. Sink, for

2   about 35 years at Purdue?

3   **A.**  Yes.

4   **Q.**  Have you ever seen that on a dossier where somebody doesn't

5   put the accurate research advisor?

6   **A.**  No, never seen that.

7   **Q.**  Okay.  And in the letter it refers to the Conflict of

8   Interest Policy at Purdue?

9   **A.**  Yes, I am very aware of it.

10  **Q.**  Okay.

11       **MS. KILIES:**  And this is only for the witness.

12  **BY MS. KILIES:**

13  **Q.**  I'm showing the witness what's been identified as Defendant

14  Ishii's Exhibit I.  Do you see that on your screen?

15  **A.**  Yeah.  Second point --

16  **Q.**  Hold on.  Do you see it on your screen?

17  **A.**  Yes, I see.

18  **Q.**  What is that?

19  **A.**  This explain that people who may have a conflict of

20  interest and they cannot serve in certain role like promotion

21  or hiring.

22  **Q.**  So you're familiar with this document?

23  **A.**  Yes, we are inform of it every year, I think, about this.

24       **MS. KILIES:**  Okay.  I move to admit Defendant's

25  Exhibit I.

1        **MR. SINK:**  No objection.

2        **THE COURT:**  Exhibit I is admitted.

3    **BY MS. KILIES:**

4    **Q.**  Okay.  So you said earlier with this exhibit, Exhibit I

5    here, you -- are you referring to Dr. Hassanein being the -- in

6    bullet point 2, is that right, bullet point 2?

7    **A.**  Yes, two.  He was advisor and he tried to serve on the

8    promotion committee, and that violate the University rules and

9    I think it constitute misconduct.

10   **Q.**  And you reported that to the dean?

11   **A.**  Yes.  I think, first, Dr. Revankar made individual memo, I

12   think, if I remember correct.  And then later I think

13   Dr. Revankar drafted a memo for several faculty, including

14   myself, Professor Choi, Dr. Tsoukalas.  Then we went into

15   detail about wording, and we sign it.

16        **MS. KILIES:**  We can take that exhibit down.  Thank

17   you.

18   **BY MS. KILIES:**

19   **Q.**  And yesterday you testified, I believe, when Mr. Sink asked

20   you if you had ever questioned or made comments about other

21   people's dossier during your time in the NEPC, and you said no;

22   is that accurate?

23   **A.**  No, that's not accurate.  I didn't hear the question right.

24   **Q.**  Okay.  Can you -- have you ever asked questions about the

25   accuracy of somebody else's dossier?

1   **A.**   Yeah.  Normally promotion committee meet twice for one

2   person, and the first meeting usually about accuracy of

3   document and then also some personal comment about the

4   qualification for promotion.

5       And the second meeting, we really make a decision.  Really

6   each member say what they think and then we vote.  It is a

7   secret vote, and then chair of committee will not participate,

8   who is the head of the school.

9   **Q.**   And prior to these two meetings, does everybody on the NEPC

10  receive that candidate's dossier?

11  **A.**   Yes, we receive it two weeks before and we individual

12  review.

13  **Q.**   And do you review it for accuracy?

14  **A.**   Yes.  First, we will go into accuracy because it's

15  officially --

16  **Q.**   I didn't understand that word.  Say that again.

17  **A.**   First thing we do is go through for accuracy.  And the

18  second thing, we think about the qualification based on the

19  document.  The personal knowledge -- personal doesn't put

20  anything in this case, only the person on the document.

21  **Q.**   Okay.  And is it fair to say that it's your duty as an NEPC

22  member to ensure that that dossier is accurate?

23  **A.**   That's -- often many, many comment are made about accuracy,

24  publication.  And sometimes people put their paper submitted,

25  and we should ask to (indiscernible) point.

 1   **Q.**  I didn't quite understand what you just said.  Could you

 2   repeat that again?

 3   **A.**  General publication -- as a publication, some people put

 4   paper which is not yet published, they submit it.  On this case

 5   you can put 20 paper like that, maybe it's even not submitted.

 6   So we ask them to omit those things so only the one officially

 7   published should be in.  Those things, qualifications, previous

 8   jobs, all those things examined in detail.

 9   **Q.**  Okay.  And you did that for Dr. Sizyuk, but you've done it

10   for other tenure applicants as well?

11   **A.**  Yes, every time we do that.  The reason too, we do it --

12   **Q.**  And it's my understanding that the dean appointed you head

13   of the search committee over the years; is that right?  Am I

14   getting that right?

15   **A.**  Yes, search committee is appointed by the dean.  Also, the

16   chair of the committee is appointed by dean.

17   **Q.**  Okay.  And I know there was a lot of talk yesterday and

18   questions from Mr. Sink about this unconscious bias training

19   that you were supposed to go to.

20   **A.**  Yes.

21   **Q.**  And I know I already asked you some questions about that.

22   Just a few follow-up questions for you.

23       So everyone that's going to be on the search committee has

24   to participate in this training that -- part of it includes the

25   unconscious bias; is that right?

1   **A.**   Yes, that's right.

2   **Q.**   And you knew that you were not going to be able to

3   participate in that search committee because you couldn't

4   attend the full-day training; is that right?

5   **A.**   Yes.  I knew if I leave in the middle or if I don't attend,

6   I will not be qualified.

7   **Q.**   Okay.  And did you ask the search committee to make sure

8   that they attended because you wanted to make sure there was a

9   search committee?

10  **A.**   Yes.  It was very important everybody attend; otherwise, a

11  search committee may not be able to start.  And then we may

12  lose the position because then search will be delayed at least

13  one semester.  In the meantime, we may lose the position.  So

14  it's very, very serious business.

15  **Q.**   So my understanding is you have to have a search committee

16  in order to be able to -- for a job position?

17  **A.**   Yeah.  And in order to start a search committee, people in

18  the committee should be certified by the University that they

19  are qualified.

20  **Q.**   And over the years you have been certified several times;

21  is that right?

22  **A.**   I think maybe three times.

23  **Q.**   Okay.  Now, I noticed that you -- if I got this right,

24  you've never served as the head of the nuclear engineering

25  department?

1    **A.**   No, never.

2    **Q.**   Why not?

3    **A.**   I was, prior to, asked twice; and this I was also asked

4    from University of California Berkeley to serve as head.  But I

5    was not interested in that administrative work.  I want to

6    concentrate my research.

7    **Q.**   And did you say you weren't interested in the

8    administrative work?

9    **A.**   This is not the things I like to do it.  It require --

10   like, you need a meticulous attention to the rules and things

11   like that.

12   **Q.**   And you'd rather spend your time researching; is that fair

13   to say?

14   **A.**   I want to spend 100 percent on the research.

15   **Q.**   I'm nervous to ask you this because it's going to be over

16   my head.  But in a very broad sense, what do you research?

17   **A.**   Researching means discovery, and it comes down to perform

18   something new, experiment, get the data, and then develop some

19   kind of mathematic survey and then eventually develop computer

20   code to predict phenomena, mostly related to nuclear reactor

21   (indiscernible).

22   **Q.**   Okay.  I'm not going to ask any follow-up questions because

23   I don't want to sound silly.

24        You were also asked about whether Dr. Taleyarkhan might

25   have some reason -- the jury hasn't heard from him yet, but I

 1    know that he was deposed in this case.  But Dr. Sink --

 2            **MS. KILIES:**  Dr. Sink.  Gosh, I'm really giving you

 3    a lot of credit.

 4    **BY MS. KILIES:**

 5    **Q.**  Mr. Sink asked you if Dr. Taleyarkhan might have any reason

 6    to lie on the stand.  Do you remember that?

 7    **A.**  Yes, and I think so.

 8    **Q.**  Why do you think that?

 9    **A.**  Well, I think it is based on the misunderstanding of

10    Dr. Taleyarkhan.  It's going into a little bit of detail of the

11    bubble fusion he initiated at Oak Ridge, and he was claiming

12    that he produced nuclear fusion in gas chamber with acoustic

13    waves.  And, professionally, I never thought that can be done,

14    so I didn't pay attention.  But the nuclear engineering faculty

15    was --

16            **THE COURT REPORTER:**  Can you say that part again.

17    **A.**  The nuclear faculty members were impressed, so we hired --

18    **BY MS. KILIES:**

19    **Q.**  Say that last part again.  She didn't get the last part.

20    The nuclear faculty members were impressed?

21    **A.**  Nuclear engineering faculty was impressed, and then they

22    commented to the head to hire him.  So I think Dr. Taleyarkhan

23    was hired at an opportunity hire because he something did

24    very -- how to say -- unique research.

25            So he came to the Purdue, but I was not interested because

1    I professionally didn't believe it.  But any scientific

2    discovery need to be repeated, reproduced.  So School of

3    Nuclear Engineering hired kind of team, four or five faculty,

4    involved to duplicate Dr. Taleyarkhan's research.  And I think

5    it was the proper thing to do because without reproducing the

6    data, scientific discovery is not to use.

7         But meantime, media noticed that, and somebody was

8    accusing our general faculty, who was doing this, they jealous

9    of Dr. Taleyarkhan result, and the data in the internet --

10   **Q.**  Did you say they wrote in the internet?

11   **A.**  The internet accused these people by the name.  They say

12   Professor Bertodano and, I think, Professor Jevremovic --

13              **THE COURT REPORTER:**  Can you say that name again?

14              **THE WITNESS:**  Bertodano and Jevremovic.  It's

15   Yugoslavian.

16   **A.**  They are both, I think, maybe associate professor with

17   tenure, and they are junior faculty, and their career is on the

18   line, and they didn't like that, so they came to my office and

19   ask to help them to --

20              **MR. SINK:**  Your Honor, I'm going to object on the

21   ground of hearsay.

22              **THE COURT:**  Sustained.

23              **MS. KILIES:**  Okay.

24   **BY MS. KILIES:**

25   **Q.**  Let's not talk about what they said.  So you eventually

 1  wrote a hand --

 2  **A.**  Eventually, I ask a dean to have a study group, maybe three

 3  professor, to say where we stand and tell the media that we are

 4  just doing the reproducing the data effort.

 5  **Q.**  Okay.  And the Inspector General of the Navy started

 6  investigating Dr. Taleyarkhan and the bubble fusion; is that

 7  right?

 8  **A.**  That's correct.

 9  **Q.**  Did you have anything to do with the Inspector General

10  coming to Purdue?

11  **A.**  No.

12  **Q.**  And the Inspector General interviewed several faculty

13  members; is that right?

14  **A.**  Basically, I think, every faculty member in the

15  engineering.

16  **Q.**  And the Inspector General found that Dr. Taleyarkhan --

17  they found two counts of misconduct, correct?

18          **MR. SINK:**  Objection.  Lack of foundation and

19  speculation.

20  **Q.**  Do you know if --

21          **THE COURT:**  Overruled.

22  **BY MS. KILIES:**

23  **Q.**  And do you know -- are you aware if the U.S. government

24  prohibited Dr. Taleyarkhan from getting any funding because of

25  this?

1    **A.**   Yes, I think Inspector General decision was two misconduct

2    related to bubble fusion; and based on that, Inspector General

3    prohibit Dr. Taleyarkhan to obtain federal research grant for

4    five years.

5    **Q.**   Okay.  There's been a lot of testimony in this case that

6    you said whites are lazy.  Have you ever said that?

7    **A.**   White are lazy?  No.  I work in this country, and I admire

8    America.  That's the reason I immigrated.

9    **Q.**   And also there has been testimony that you have said women

10   are stupid.  Have you said that?

11   **A.**   Never.

12   **Q.**   Do you hold any bias or prejudice against women?

13   **A.**   No, not at all.

14   **Q.**   What about white women?

15   **A.**   Not at all.  I married German woman when I was 25 years.  I

16   was still student, and we had a very happy marriage of

17   50 years.  I never can have such an idea about --

18   **Q.**   Thank you for your time.

19          **MS. KILIES:**  Your Honor, I would ask that Mr. Sink,

20   if he wants to ask any follow-up, if he could stand really

21   close because I guess the acoustics with hearing aids it's very

22   difficult to hear.  Thank you.

23          **THE COURT:**  Redirect?

24   **MR. SINK:**  I believe it's Mr. Kealey.

25          **MR. KEALEY:**  No questions, Your Honor.

1      **MR. SINK:**  Can I get outfitted with a microphone?

2      **THE COURT:**  Sure.

3      **MR. SINK:**  Can you hear me?

4      **THE WITNESS:**  Yes.

5                    **REDIRECT EXAMINATION**

6   **BY MR. SINK:**

7   **Q.**  Okay.  I heard you testify that you only heard 20 to

8   30 percent of my questions from yesterday.

9   **A.**  I think accurately, I mean.  I heard, but the problem was

10  so much noise from the room interfered, I didn't hear clearly.

11  **Q.**  Do you recall when I first went up to the podium, I

12  specifically asked you if you do not hear me or understand a

13  question to let me know?  Do you recall me --

14  **A.**  Yes.  I repeated several times; and then after awhile I was

15  embarrassed, so I guessed to your questions.

16  **Q.**  You testified yesterday that Dr. Wharry was not present at

17  that unconscious bias training; is that correct?

18  **A.**  That's correct.

19  **Q.**  If that is accurate, how did she continue to serve on the

20  search committee?

21  **A.**  I don't think she served in that particular search

22  committee.

23  **Q.**  Are you speculating, or do you know?

24  **A.**  Pardon?

25  **Q.**  Do you know if Dr. Wharry continued to serve on the search

1    committee?

2    **A.**   She was not certified, so she couldn't serve.

3    **Q.**   So it is your contention she was disqualified from the

4    search committee?

5    **A.**   Yes, like I was.

6    **Q.**   You also testified yesterday regarding Dr. Sizyuk's Ph.D.

7    I'm not clear whether or not you have an issue with it.  Do you

8    contend that Dr. Sizyuk has an improper Ph.D.?

9    **A.**   No.  I thought it was not a peer Ph.D., but she definitely

10   had a Ph.D.

11   **Q.**   And you've testified under oath in a deposition regarding

12   her Ph.D., correct?

13   **A.**   Could you repeat the question?

14   **Q.**   Sure.  Do you recall being deposed on July 30 of 2021?

15   **A.**   I do not understand your question.

16   **Q.**   Do you know what a deposition is, sir?

17   **A.**   My deposition?

18   **Q.**   Yes.

19   **A.**   For -- I didn't make a deposition for this case.

20          **MR. SINK:**  Okay.  Well, should we have a sidebar?

21          **MS. KILIES:**  Yeah.

22      (Bench conference on the record.)

23          **MR. SINK:**  I want to make sure I follow the motion

24   in limine order.  Do you want me to show him the page?

25          **MS. KILIES:**  He knows what it's about.  I think if

 1   you could just ask him again if he remembers being deposed and

 2   not ask to talk about --

 3              **MR. SINK:**  Not mention the case?

 4              **MS. KILIES:**  Yeah, I think that's okay.

 5              **THE COURT:**  Okay.

 6        (End of bench conference.)

 7   **BY MR. SINK:**

 8   **Q.**  Okay.  Can you hear me?

 9   **A.**  Yes, I can.

10   **Q.**  Do you recall being deposed -- do not mention the case

11   name, but do you recall being deposed on July 30 of 2021?

12   **A.**  Yes.

13   **Q.**  Okay.  And you were under oath and penalty of perjury

14   during that deposition, right?

15   **A.**  Yes.

16              **MR. SINK:**  For the witness only.

17   **Q.**  So on page 99, sir, of your deposition, line --

18   **A.**  Yes, I do.

19   **Q.**  -- 9, do you see that?

20   **A.**  Yes.

21   **Q.**  Can you read what you testified to under oath regarding

22   Dr. Sizyuk's Ph.D.

23   **A.**  Yes.  I said it not proper Ph.D. require for Purdue

24   tenure-track faculty, which is usually Ph.D. from peer

25   institution.

1    **Q.**   So in your view, that was not a proper Ph.D.?

2    **A.**   Proper Ph.D. for Purdue faculty.

3    **Q.**   You testified regarding Dr. Hassanein.  Dr. Hassanein was

4    not her Ph.D. thesis chair, correct?

5    **A.**   Thesis advisor.

6    **Q.**   He was her research advisor, correct?

7    **A.**   Usually, we don't say that.  We just say Ph.D. thesis.

8    Otherwise, I don't -- that terminology invented by doctor --

9    **Q.**   Are you finished?

10   **A.**   -- Dr. Hassanein.

11   **Q.**   Dr. Hassanein did not vote to grant Dr. Sizyuk a Ph.D.?

12   **A.**   Definitely, she did her Ph.D. thesis at Dr. Hassanein's --

13   under Dr. Hassanein advisor because she was not enrolled

14   physically into that university she got the Ph.D. from.

15   **Q.**   Yes or no, Dr. Hassanein did not vote to grant --

16   **A.**   Yes, she did -- no, he didn't vote.

17   **Q.**   Thank you.

18        Unlike you, with Dr. Kim -- Dr. Kim was your

19   Ph.D. student, correct?

20   **A.**   Yes.

21   **Q.**   And so you actually did vote to grant Dr. Kim his Ph.D.; is

22   that correct?

23   **A.**   For his Ph.D.

24   **Q.**   You were the chair advisor for Dr. Kim's Ph.D.?

25   **A.**   Yeah.

1   **Q.** And you would agree that role that you played, for example,

2   with Dr. Kim is different than the role played by Dr. Hassanein

3   over Dr. Sizyuk's Ph.D.?

4   **A.** I think my role for Dr. Kim and Dr. Hassanein's role was

5   exactly the same.

6   **Q.** Even though you agreed you voted and you were the chair

7   over Dr. Kim's Ph.D. and Dr. Hassanein did not vote and he was

8   not the chair over Dr. Sizyuk's Ph.D.?

9   **A.** Well, the university has a different system, so I cannot

10  guess what is on the university.  I don't have any knowledge.

11  **Q.** With respect to Dr. Taleyarkhan --

12  **A.** Yes.

13  **Q.** -- you were skeptical of his bubble fusion conclusions?

14  **A.** From the beginning, yes.

15  **Q.** You're a scientist?

16  **A.** Yes, as a scientist.

17  **Q.** That's your duty to be skeptical, correct?

18  **A.** That's correct.

19  **Q.** Scientists go through peer review; is that correct?

20  **A.** Yes.

21  **Q.** And so Dr. Taleyarkhan, he's also a scientist; is that

22  right?

23  **A.** Yes.

24  **Q.** And so Dr. Taleyarkhan, as a research scientist, he's been

25  through the peer review process?

1   **A.**   He can do anything and he can say anything, but new

2   scientistic discovery should be reproduced at this point.

3   **Q.**   And your position is Dr. Taleyarkhan would be so upset

4   about your skepticism of this bubble fusion that he would show

5   up and commit perjury, criminal activity, on you?

6   **A.**   It appears.  It appears.

7        (Plaintiff's counsel confer off the record.)

8            **MR. SINK:**   Okay.  We have no more.

9            **THE COURT:**   Go ahead, Counsel.

10                        **RECROSS-EXAMINATION**

11   **BY MS. KILIES:**

12   **Q.**   Almost done.  So I -- you had some deposition testimony up

13   on the screen.  Do you remember that?

14   **A.**   About the --

15   **Q.**   Don't say anything more.  Did you remember the deposition

16   testimony that you looked at?

17   **A.**   Yes, yes.

18            **THE COURT:**   Counsel, if I could ask you to position

19   so that you don't block the jurors' ability to see the witness

20   when he's testifying.

21            **MS. KILIES:**   Okay.

22   **BY MS. KILIES:**

23   **Q.**   You never told any NEPC member that you thought plaintiff's

24   Ph.D. was improper, did you?

25   **A.**   No, that was not the point of discussion.

1    **Q.**   Okay.  And in that same deposition, you said that it was

2    authentic, right?

3    **A.**   I didn't say anything like that because they have Ph.D.

4    Hiring process was not the issue.  Her performance after she

5    was hired.

6    **Q.**   So my question is a little different.  In your deposition

7    testimony, you said that you thought her Ph.D. was improper but

8    not inauthentic?

9    **A.**   Improper for the tenure faculty.

10   **Q.**   But it was authentic?

11   **A.**   Yes, definitely it's authentic.  There was document

12   of her --

13   **Q.**   And whether it was proper or not, you never discussed that

14   with any NEPC member?

15   **A.**   No.

16   **Q.**   And Dr. Kim came in as a tenured faculty member, right?

17   Dr. Kim?

18   **A.**   Yeah.

19   **Q.**   Came in as a tenured faculty member?

20   **A.**   When he came in as a head, yes.

21   **Q.**   And he already had established his independence by the time

22   you were his research advisor and when he came back to Purdue,

23   correct?

24   **A.**   Yes, maybe 20 or 15 years completely independent.

25   **Q.**   And I think only one article that you guys maybe had had

1    some involvement together, just one?

2    **A.**  I think that was the debut paper asked by the scientific

3    journal, and I didn't have enough time to write completely.

4    And the subject Dr. Kim was familiar, so I asked to coauthor

5    him.

6              **MS. KILIES:**  No other questions.  Thank you.

7              **MR. SINK:**  No more, Your Honor.

8              **MR. KEALEY:**  No questions.

9              **THE COURT:**  You may step down.

10             **MR. SINK:**  Plaintiff calls Dr. Garner.

11             **MR. BOWLING:**  Your Honor, we would like a sidebar at

12    this point, if we may.

13             **THE COURT:**  Sir, if you would come up to the front

14    and just wait right there before you get into the chair.  I

15    need to confer with counsel first.

16             **THE WITNESS:**  Yes.

17        (Bench conference on the record.)

18             **MR. BOWLING:**  If the Court will recall, there were

19    several matters that were subject to our motion in limine with

20    respect to Dr. Garner.  The first issue was an alleged quid pro

21    quo discussion with Dr. Ishii where Dr. Ishii apparently came

22    to his office and there was some discussion about supporting

23    Dr. Kim's hiring as head.  That has no bearing on any issue in

24    the case.

25        Secondly, there were some statements that were made by

  1   Dr. Garner in his deposition to the effect that he perceives --

  2   or he believes that Dr. Ishii has certain attitudes toward

  3   women and also people he perceives as different.  However, Dr.

  4   Garner was not able to identify any basis for those opinions or

  5   perceptions; therefore, they are not admissible.  They're also

  6   highly prejudicial and also just -- I'll stop there.

  7        I just want to bring that to the Court's attention before

  8   we start with his testimony, that we may have an issue there.

  9   I think the Court reserved ruling until there was further

 10   context in the trial.

 11        **THE COURT:**  Are we going to touch on those issues?

 12        **MR. SINK:**  The first issue, absolutely, from our

 13   perspective that's an admission by a party opponent what

 14   Dr. Ishii said to Dr. Garner.  It is relative to his power, his

 15   influence, and his willingness to engage in personnel decisions

 16   and influence others to bring Dr. Kim on as the head, so it's

 17   relevant and it's admissible.

 18        **MR. BOWLING:**  It's a completely different

 19   application, completely different issue.

 20        **THE COURT:**  Why?

 21        **MR. BOWLING:**  It's doctor -- it's a different hire.

 22   It's quite a bit different in time.

 23        **THE COURT:**  Why was it a different hire?  Why was it

 24   a different hire?

 25        **MR. BOWLING:**  This was a hire for the head of the

 1   School of Nuclear Engineering, somebody who was already going

 2   to be coming in with tenure.  This was not a vote on an NEPC

 3   committee as was the case with Dr. Sizyuk.

 4          **THE COURT:**  It didn't involve the tenure committee;

 5   is that correct?

 6          **MR. SINK:**  I don't know if that's correct.

 7          **MR. BOWLING:**  Correct.

 8          **MR. SINK:**  I thought we heard testimony -- I would

 9   have to go back and look at my notes.  I'm fairly certain we

10   heard testimony the NEPC did have to vote with Dr. Kim coming

11   on board.

12          **MR. BOWLING:**  If they did, it was a question of

13   hiring somebody who was already going to have tenure.  It

14   wasn't the question of promoting somebody internally to tenure,

15   so it was a different situation and --

16          **THE COURT:**  Go ahead, finish.

17          **MR. BOWLING:**  -- than Dr. Sizyuk.

18          **THE COURT:**  Mr. Kealey, did you have anything?

19          **MR. KEALEY:**  Yes, Your Honor.

20      I will also note that the Court has dismissed all of the

21   allegations with regard to Dr. Kim, so the Dr. Kim allegations,

22   that there is some connection between his role and the

23   plaintiff's grievance, is out of the case.

24          **MR. SINK:**  So, Your Honor, it goes to the issue of

25   the power and the influence of Dr. Ishii and Dr. Ishii's

 1  willingness to get involved in personnel decisions.  It's that

 2  simple.  That's what it goes to.

 3        **THE COURT:**  Well, it has to be specific with regard

 4  to this case and the circumstances of this case.  This case

 5  deals with the tenure committee and the process of obtaining

 6  tenure.  It does sound to the Court that what you are wanting

 7  to inquire of the witness is outside that scenario.

 8        **MR. SINK:**  I don't believe the evidence is accurate

 9  there.  It's my understanding the NEPC did have to approve

10  Dr. Kim coming on board with tenure.

11        **MR. BOWLING:**  If I may speak to that, Your Honor.

12  If the NEPC was involved, it was in a very different way.  It

13  was in the sense of hiring somebody as the head who already had

14  tenure at another university, so it was not a question of, "Is

15  this person tenure worthy?  Is this a tenure-worthy person who

16  doesn't have tenure?"  Again, I would just reiterate, this is

17  remote in time.  It's a totally different case.

18        **THE COURT:**  How long ago was it?

19        **MR. BOWLING:**  2017.

20        **THE COURT:**  All right.  Anything else?

21        **MR. SINK:**  No, Your Honor.

22        **THE COURT:**  Anything else?

23        **MR. KEALEY:**  No, Your Honor.

24        **THE COURT:**  My ruling on that is that I'm going to

25  not allow the testimony on that issue.

 1          **MR. SINK:**  So, Your Honor --

 2          **THE COURT:**  Unless I hear something else from the

 3   witness, but we're not going to get into it because I do not

 4   see it's relevant with regard to the tenure committee that's

 5   involved in this case and the allegations against Mr. Ishii in

 6   that scenario.

 7          **MR. SINK:**  I would like to make an offer of proof

 8   after everybody's finished with the witness outside of the jury

 9   so that it's preserved on the record for appeal.

10          **THE COURT:**  That's fine.

11      And the second issue?

12          **MR. SINK:**  I don't intend on asking him his personal

13   opinion on the vibe, I think is what he said, so I don't

14   anticipate the second issue unless he volunteers it.  I'm going

15   to stick to facts, what he heard, and what he observed.

16          **THE COURT:**  Okay.  Then you're good.

17          **MR. SINK:**  Thank you.

18      (End of bench conference.)

19          **THE COURT:**  Sir, if you would please come up to my

20   clerk, he'll administer the oath to testify.

21      (The oath was duly administered.)

22          **THE WITNESS:**  I do.

23          **THE COURT:**  And now you can come forward and take

24   the stand.  Thank you.

25

1          **ALLEN GARNER, PLAINTIFF'S WITNESS, SWORN**

2                    **DIRECT EXAMINATION**

3    **BY MR. SINK:**

4    **Q.**  Good morning.

5    **A.**  Good morning.

6    **Q.**  Can you please state your name for the record.

7    **A.**  My name is Allen Garner.

8    **Q.**  Dr. Garner, can you provide the jury with a little bit

9    about your educational background?

10   **A.**  Yes.  I received my bachelor's degree in nuclear

11   engineering from the University of Illinois in 1996; master's

12   degree in nuclear engineering from the University of Michigan

13   in 1997; master's degree in electrical and computer engineering

14   from Old Dominion University in 2003; and Ph.D. in nuclear

15   engineering from the University of Michigan in 2006.

16   **Q.**  Thank you.  Can you provide the jury with a brief synopsis

17   of your work history.

18   **A.**  Yes.  I was an active-duty naval officer from 1997 to 2003.

19   I transitioned into the Reserves in January 2004.  I'm

20   currently a Captain in the United States Navy Reserves.

21        After my Ph.D., I worked as an electromagnetic physicist

22   at GE Global Research --

23             **THE COURT REPORTER:**  Can you please slow down.

24             **THE WITNESS:**  Oh, I'm sorry.

25             **THE COURT:**  And, sir, if you could -- sorry, we're

1    just trying to manage the sound.  Could you push that

2    microphone just a little bit away from you?

3              **THE WITNESS:**  Certainly.  Is that better?

4              **THE COURT:**  Even more.  Let's try that.

5              **THE WITNESS:**  There?

6              **THE COURT:**  Let's try that.

7         Go ahead, Counsel.

8    **BY THE WITNESS:**

9    **A.**   I was an electromagnetic physicist at GE Global Research

10   from 2006 to 2012.  I joined Purdue University in 2012, and I

11   am currently a professor in nuclear engineering.

12   **BY MR. SINK:**

13   **Q.**   So you're currently employed with Purdue University?

14   **A.**   That's correct.

15   **Q.**   And what is your current position?

16   **A.**   Professor of nuclear engineering.

17   **Q.**   Which school are you in?

18   **A.**   Nuclear engineering.

19   **Q.**   Are you tenured?

20   **A.**   Yes.

21   **Q.**   Since when have you been tenured?

22   **A.**   2019.

23   **Q.**   Are you familiar with Dr. Ishii?

24   **A.**   Yes.

25   **Q.**   Have you ever heard Dr. Ishii make any statements that

1    would reflect his bias against women and/or non-Asians?

2    **A.**  I have heard him say things that may be interpreted in such

3    a manner.

4    **Q.**  And what have you heard strictly from Dr. Ishii?

5    **A.**  Specifically, when we were on a search committee together,

6    he said something to the effect -- I forget the exact words --

7    that Purdue liked to hire women as faculty and as staff.

8    **Q.**  Anything else?

9    **A.**  That was the one specific thing that I heard directly from

10   him.

11   **Q.**  Thank you.

12        And since you have been in the School of Nuclear

13   Engineering, have you had the opportunity to work with

14   Dr. Ishii?

15   **A.**  I have not, directly, other than being on committees,

16   specifically, at least one, maybe two, search committees.

17   **Q.**  And have you had the opportunity to communicate with

18   Dr. Ishii?

19   **A.**  We have communicated here and there, not terribly much.  We

20   did used to go to dinner after seminars together, himself,

21   Dr. Sizyuk, sometimes her husband, and Dr. Hassanein.

22   **Q.**  Have you had the opportunity to observe Dr. Ishii interact

23   with other faculty?

24   **A.**  Periodically.  Certainly at faculty meetings and the like.

25   **Q.**  Have you served on the NEPC with Dr. Ishii?

1    **A.**   Yes, I have.

2    **Q.**   Since when?

3    **A.**   2019.

4    **Q.**   And have you had the opportunity to observe Dr. Ishii

5    interact with other members of the NEPC?

6    **A.**   I assume you mean in the role of the NEPC since he would

7    interact with them normally?

8    **Q.**   Yes.

9    **A.**   I would say not terribly much.  When I saw him at the NEPC,

10   we were already in meetings, so he would not have necessarily

11   directly interacted with them in a personal sort of way.

12   **Q.**   And have you attended NEPC meetings with Dr. Ishii?

13   **A.**   Yes, I have.

14   **Q.**   And, in fact, you were on two of the NEPC meetings for

15   Dr. Sizyuk?

16   **A.**   Yes, I was.

17   **Q.**   And based on your observations and experiences, can you

18   describe the social dynamics of the NEPC, including any

19   factions or divisions that may have been present, in 2019?

20        **MR. KEALEY:**  Your Honor, object to the foundation

21   because it's not been established when in 2019 this witness

22   started serving on the NEPC.

23        **MR. BOWLING:**  Same objection from Dr. Ishii.

24        **MR. SINK:**  Can I lay a foundation?

25        **THE COURT:**  Certainly.

1   **BY MR. SINK:**

2   **Q.**   When you did you join the NEPC?

3   **A.**   Fall of 2019.

4   **Q.**   Do you have a month?

5   **A.**   It would have been the September meeting.

6   **Q.**   Back to my original question.  Time frame limited to

7   September of 2019, based on your observations and experiences,

8   can you describe the social dynamics within the NEPC, including

9   any factions or divisions that may have been present at that

10   time?

11   **A.**   Yes.  At the time there were -- we use the term "factions,"

12   but certainly divisions, between faculty members.  At this

13   point it's been four or five years, but it's certainly true

14   that there were some faculty aligned more on Dr. Ishii's side,

15   more the long-term faculty, and the newer faculty more so on

16   the other side.

17   **Q.**   And who would have been the doctors more aligned with

18   Dr. Ishii's side?

19   **A.**   I would say Dr. Choi, certainly.  Dr. Tsoukalas and

20   Dr. Ishii certainly seemed to communicate quite frequently.

21   There were other faculty, Dr. Revankar, who may have been more

22   influenced by Dr. Ishii.  But those would be the ones that I

23   would say would be probably more influenced than anyone else.

24              **MR. SINK:**  For the witness only.

25   **Q.**   So there is an exhibit book in front of you.  You can

 1    either look at the screen or the exhibit book.  Plaintiff's

 2    Exhibit 13, have you seen this document before?

 3    **A.**   I do not think I have.

 4    **Q.**   You're not familiar with this document?

 5    **A.**   No, I have not seen it before.

 6              **THE COURT:**  What was that exhibit number?

 7              **MR. SINK:**  P-13.

 8    **BY MR. SINK:**

 9    **Q.**   What I want to do is ask you in September of 2019 if

10    certain people were on the NEPC.  Is that okay?

11    **A.**   Yes.

12    **Q.**   Dr. Abdel-Khalik?

13    **A.**   Yes.

14    **Q.**   And is that a male?

15    **A.**   Male, yes.

16    **Q.**   Dr. Choi?

17    **A.**   Yes.

18    **Q.**   And is that a male?

19    **A.**   Yes.

20    **Q.**   Yourself, Dr. Garner, right?

21    **A.**   Yes.

22    **Q.**   Dr. Hassanein?

23    **A.**   Yes.

24    **Q.**   And Dr. Hassanein was not at the September 6 or 27th

25    meeting for Dr. Sizyuk; is that correct?

 1   **A.**   That is correct.

 2   **Q.**   And, Dr. Hassanein, did he vote on Dr. Sizyuk's tenure?

 3   **A.**   No, he did not.

 4   **Q.**   Dr. Ishii?

 5   **A.**   Yes.

 6   **Q.**   Dr. Kim was the head, correct?

 7   **A.**   That is correct.

 8   **Q.**   And did the head vote on Dr. Sizyuk?

 9   **A.**   No.

10   **Q.**   Dr. Lopez-de-Bertodano?

11   **A.**   Yes.

12   **Q.**   Is that a male?

13   **A.**   Yes.

14   **Q.**   Dr. Revankar?

15   **A.**   Yes.

16   **Q.**   And is he a male?

17   **A.**   Yes.

18   **Q.**   Dr. Taleyarkhan?

19   **A.**   Yes.

20   **Q.**   Is he a male?

21   **A.**   Yes.

22   **Q.**   And Dr. Tsoukalas?

23   **A.**   Yes.

24   **Q.**   Is that a male?

25   **A.**   Yes.

1   **Q.**  Based on your observations and experiences in September

2   of 2019, what kind of power and influence did Dr. Ishii have

3   over the NEPC?

4          **MR. BOWLING:**  Objection, Your Honor.  That calls for

5   speculation.  This witness can't talk about what's going on in

6   people's minds.

7          **MR. SINK:**  I said strictly based on experience and

8   observation.

9          **MR. BOWLING:**  Still calls for speculation.

10         **THE COURT:**  From this witness's observations?

11         **MR. BOWLING:**  Yes, even with his observations, he

12  may be speculating as to what level of influence one person may

13  be having over another.  The only person who could testify to

14  that would be the person over whom he allegedly had influence.

15         **THE COURT:**  Overruled.

16  **BY MR. SINK:**

17  **Q.**  Go ahead.

18  **A.**  So let me paraphrase the question.  So what influence did

19  Dr. Ishii have on the committee?  Is that basically the

20  question?

21  **Q.**  Yes.

22  **A.**  Dr. Ishii is, certainly, a very senior and distinguished

23  member of our faculty.  He certainly does have a significant

24  influence in the department, and I know certain faculty

25  definitely hold his opinion in high regard and definitely

1   strongly respect his opinion.

2   **Q.**   Thank you.

3        Have you ever heard of the Jedi Council?

4   **A.**   That was a name that I used for what was called the

5   executive council.

6   **Q.**   What is that?

7   **A.**   So when Dr. Kim first started as head, he wanted to

8   somewhat streamline and structure the way we ran the school.

9   So he took the undergraduate program chair, the graduate

10  program chair, and a position that he created called the

11  professor in charge of academic programs and set up a council,

12  or a committee, of those faculty to represent key items in the

13  school -- so things such as items of concern for students or

14  faculty, curricular concerns, other items of that nature -- so

15  that the senior leadership could talk about them before they

16  went to the undergraduate committee, the graduate committee, or

17  faculty for further review.

18  **Q.**   In terms of -- we just went through the list of NEPC

19  members in 2019.  Do you recall that?

20  **A.**   Yes.

21  **Q.**   Who from that list was on the Jedi Council?

22  **A.**   So Professor Choi was the professor in charge of academic

23  affairs.  Professor Revankar would have been the graduate

24  chair.  And then at the time, Professor Bertodano was the

25  undergraduate professor chair.

1   **Q.**   And you mentioned a Professor Choi.  Did Dr. Choi have any

2   other unique titles or jobs within the School of Nuclear

3   Engineering?

4   **A.**   That is the one that comes immediately to mind.  He may

5   have had others, but that was the one of most influence at the

6   time in the school.

7   **Q.**   And did you go through, as an applicant, the NEPC tenure

8   process?

9   **A.**   I did.

10   **Q.**   And in terms of going through that process as an applicant,

11   and subsequently sitting on the NEPC judging other applicants,

12   based on your observations and experiences, how important is it

13   to have the support of Dr. Ishii?

14          **MR. BOWLING:**  Objection, calls for speculation.

15          **THE COURT:**  With regard to his observation --

16          **MR. KEALEY:**  Your Honor, part of the problem here is

17   that there is no foundation that this witness would have had

18   any participation in the NEPC when he, himself, was a tenure

19   candidate.  He would not have been eligible to attend meetings

20   of the NEPC until after he was tenured.

21          **THE COURT:**  I think you need to restate -- to put

22   more details with regard to your question as to this witness's

23   involvement at any time in the NEPC process.  Where you're

24   going, you need to be specific as to time and perhaps the

25   individuals involved in that.

1          **MR. SINK:**  Let me try to narrow the question down.

2   **BY MR. SINK:**

3   **Q.**  In terms of your sitting on the NEPC with Dr. Ishii and

4   participating in deliberations where Dr. Ishii is present and

5   voting on candidates for tenure, based on your observations and

6   experiences, how important is it to have the support of

7   Dr. Ishii?

8          **THE COURT:**  Can we have a time frame?

9   **BY MR. SINK:**

10  **Q.**  Since you have been on the NEPC.

11         **THE COURT:**  And I need to know what that is, what

12  that was.

13  **BY MR. SINK:**

14  **Q.**  You testified it was September of 2019, correct?

15  **A.**  That is correct.

16         **MR. BOWLING:**  Your Honor, I would lodge the same

17  objection given the extremely narrow timeframe.  The vote at

18  issued occurred in September.  He was just getting on the board

19  in September.

20         **THE COURT:**  Hold on because I couldn't hear you very

21  well on that.

22      Just with regard to September of 2019, you were a member

23  of the NEPC at that time?

24         **THE WITNESS:**  I was, Your Honor.

25         **THE COURT:**  Any objection to him testifying with

1  regard to his experience on the NEPC in September 2019?

2        **MR. KEALEY:**  No objections.  As I understand it,

3  it's a question directed to two meetings that occurred in

4  September of 2019, so the question is that narrow.  If it's

5  that narrow, I have no objections to it.

6        **MR. BOWLING:**  The same, Your Honor.

7        **THE COURT:**  Understanding the question then, can you

8  answer that, please?

9        **THE WITNESS:**  Yes, Your Honor.

10 **A.**  So concerning Dr. Ishii's influence in the NEPC in the

11 meetings of September 2019, correct?

12        **THE COURT:**  Correct.

13        **MR. SINK:**  Yes.

14 **BY MR. SINK:**

15 **Q.**  And the question is, how important is it to have his

16 support under those parameters?

17        **MR. KEALEY:**  Your Honor, that's a different

18 question.

19        **MR. SINK:**  That's exactly the question I offered.

20        **MR. KEALEY:**  It was -- what did you observe was the

21 first question.

22        **THE COURT:**  Read back counsel's last question.

23    (The record was read as requested.)

24        **THE COURT:**  Thank you.

25    So he needs to answer your preliminary question to that,

1    the longer question, not the one the way you abbreviated it the

2    second time after the objection.

3              **MR. SINK:**  Now I'm confused.

4              **THE COURT:**  The last question that she just went

5    back to is what he will respond to.

6              **MR. SINK:**  Can she read it back again?

7              **THE COURT:**  Yes, would you read it back.

8         (The record was read as requested.)

9    **BY MR. SINK:**

10   **Q.**  Go ahead.

11   **A.**  All right.  So, again, to my earlier point, Dr. Ishii is a

12   very senior influential member of the School of Nuclear

13   Engineering, and his input and opinions carry a lot of weight,

14   particularly with certain members of the school.  So I would

15   say certainly, as someone very senior in the school, having his

16   support would be very important for going up for tenure or

17   promotion.

18   **Q.**  Thank you.

19        What year did you go up for tenure?

20   **A.**  I submitted my package a year before Dr. Sizyuk, so it

21   would have been fall of 2018 when I went up to the NEPC.

22   **Q.**  And do you recall when the NEPC voted on your tenure?

23   **A.**  I do not recall exactly.  It would have been late September

24   or early October, around the same time frame the year before.

25   **Q.**  Of 2018?

1  **A.**  That is correct.

2  **Q.**  And how did the NEPC vote on your application for tenure?

3  **A.**  I am not officially told that.  I can tell you what I heard

4  from different people, but I do not know the official vote.

5  **Q.**  Did Dr. Kim tell you how the NEPC voted?

6  **A.**  He told me that it was a split --

7         **MR. KEALEY:**  Your Honor, that's just a yes-or-no

8  question, and the answer may be hearsay.  Dr. Kim is not a

9  party in this case.

10         **MR. SINK:**  It's still 801(d)(2), Your Honor.

11         **THE COURT:**  Let's take it one at a time.  So he can

12  answer the question as to whether or not the doctor told him

13  but not go into the details yet.

14  **BY MR. SINK:**

15  **Q.**  Yes or no, did Dr. Kim --

16  **A.**  Yes, he told me the results of the vote.

17  **Q.**  And what did he tell you?

18         **MR. KEALEY:**  Your Honor, at this point it's hearsay.

19  It's being offered for the truth of the matter asserted by an

20  out-of-court witness who has been previously called and not

21  asked about this.

22         **MR. SINK:**  It's an admission by a party opponent,

23  801(d)(2).  He was the head of the NEPC.

24         **THE COURT:**  Overruled.

25

1   **BY MR. SINK:**

2   **Q.**   Go ahead.

3   **A.**   Yes, he told me that it was a split vote.

4   **Q.**   What does that mean?

5   **A.**   That means that people voted for and voted against.  So

6   what he told me was it was a split vote and that he would take

7   it to the Engineering Area Promotion Committee, which is the

8   college review of the candidates.

9   **Q.**   Did you obtain a majority vote by the NEPC in favor of

10  tenure?

11  **A.**   From Dr. Kim's official notification, I cannot tell you yes

12  or no to that question.

13  **Q.**   Is it -- did Dr. Kim endorse your candidacy up to the EAPC?

14  **A.**   Yes, he did.

15  **Q.**   And what happened at that point?

16  **A.**   The EAPC reviewed my package, it would have been January

17  of 2019, and approved it for further submission along the

18  review path.

19  **Q.**   Was Dr. Ishii on the EAPC at that time?

20  **A.**   No, he was not.

21  **Q.**   And did Dr. Kim ever provide you with a rationale as to why

22  the NEPC voted the way they did?

23  **A.**   Yes, he did.

24  **Q.**   What was the rationale given you?

25  **A.**   He told me that there was concern about my research not

1    fitting into nuclear engineering.

2    **Q.**   From a factual standpoint, do you dispute that rationale?

3    **A.**   Yes.

4    **Q.**   Why?

5    **A.**   My degrees are in nuclear engineering.  Although I modified

6    my research background slightly to differentiate from my

7    advisor, my advisor and other faculty at the University of

8    Michigan, now numbering around five or six in the nuclear

9    engineering department, do research in the same general area.

10        Other peer institutions such as the University of Illinois

11   and North Carolina State University have also recently hired

12   faculty that are also in the same broad field as mine.  I would

13   contend that my area, therefore, fits, broadly speaking, within

14   the nuclear engineering community.

15   **Q.**   Thank you.

16        Are you familiar with the criteria for tenure in the

17   School of Nuclear Engineering?

18   **A.**   Yes.

19   **Q.**   And, generally speaking, what are those criteria?

20   **A.**   The general criteria are excellence in discovery, which is

21   also called research; learning, or teaching, as it's also

22   known; and service, or engagement.

23   **Q.**   And in terms of the time frame for which to judge or review

24   an applicant, is there a specific time frame that the NEPC

25   should look at?

1   **A.**   There is.

2   **Q.**   And what is that?

3   **A.**   The NEPC predominantly looks at the time after hire, so the

4   time after starting on the tenure-track, to ensure that the

5   accomplishments of the faculty member are due to the faculty

6   member himself or herself and not due to previous influences

7   such as a past advisor or past employer.

8   **Q.**   Is a candidate's Ph.D. a proper criteria for tenure?

9   **A.**   The candidate must have a Ph.D. to get tenure; however, the

10  assessment of the Ph.D. itself is handled upon hire.

11  **Q.**   As a tenure-track professor?

12  **A.**   That is correct.

13  **Q.**   Is a candidate's prior work history and prior job title a

14  proper criteria for tenure?

15  **A.**   Again, that is upon job hire for tenure.  The main

16  emphasize is on the work done at the university.

17  **Q.**   Regarding the criteria, are you aware of any guideposts on

18  the number of publications?

19  **A.**   Yes, we have signposts.  They are not rigid rules, but we

20  have certain concepts and ideas of what we should be striving

21  for.

22  **Q.**   What are the guideposts on publications?

23  **A.**   The goal for publications is somewhere around two to three

24  per year as a senior author.  So senior author means either

25  first author or your graduate student might be the first

1    author.  Usually, there's a one- to two-year starting point

2    because students don't immediately start by being productive

3    scholars.  So the number that I was given when I was starting

4    out, by various people, was around 15 to 20 senior author

5    papers.

6    **Q.**  And that would track if a candidate was going up in their

7    fifth or sixth year; is that correct?

8    **A.**  That is correct.

9    **Q.**  And are there any guideposts on the amount of grant monies?

10   **A.**  Again, that is highly variable depending on area.  But I

11   was told by multiple people in engineering if you had

12   $1 million and you were the PI of several grants -- PI being

13   principal investigator, so the person that was the lead

14   investigator at Purdue -- then that would be looked on

15   favorably by the committee.  But, again, it's going to vary

16   depending on field and type of research.

17   **Q.**  Thank you.

18        Are there any guideposts on the number of Ph.D. or

19   master's students?

20   **A.**  Yes.  So to put this into perspective, you go up for your

21   tenure review around the five- or six-year point.  A Ph.D. can

22   take anywhere from four to six years.  So if you start with a

23   single Ph.D. student your first year, that Ph.D. student will

24   be about ready to graduate when the tenure package is

25   submitted.  So the general rule of thumb is to have at least

 1    one Ph.D. student either completed or about to be completed

 2    when the package is submitted.

 3    **Q.**   And are there any guideposts on teaching?

 4    **A.**   Yes.  So what I was told specifically is that for the

 5    teaching aspect, the candidate should have experience teaching

 6    core nuclear engineering courses, particularly the introduction

 7    to nuclear engineering course, which is Nuclear 200, as well as

 8    some experience teaching graduate-level courses.

 9    **Q.**   Thank you.

10       So, now, I want to ask you about the September 6, 2019,

11    NEPC meeting pertaining to Dr. Sizyuk's application for tenure.

12    Were you present at that meeting?

13    **A.**   Yes, I'm pretty sure that I was.

14    **Q.**   And at that time you had been granted tenure?

15    **A.**   That is correct.

16    **Q.**   Tell the jury what you remember Dr. Ishii saying during

17    that meeting?

18    **A.**   There were two main points that I remember Dr. Ishii

19    emphasizing the most.  One was concern about the Ph.D. that

20    Dr. Sizyuk had, particularly, the university, the work with

21    Dr. Hassanein, whether or not it was a true Ph.D.

22       The other aspect that Dr. Ishii brought up -- being that

23    prior to joining Purdue he had worked at Argonne for quite some

24    time -- was the exact title Dr. Sizyuk had for her past

25    position at Argonne.

1  **Q.**  And were you present at the September 27, 2019, NEPC

2  meeting regarding Dr. Sizyuk?

3  **A.**  Yes, I was.

4  **Q.**  What do you recall Dr. Ishii saying at that meeting?

5  **A.**  Again, it's been some time, so I don't remember the

6  details, but I do remember those two points being emphasized by

7  Dr. Ishii.

8  **Q.**  Do you recall if Dr. Kim said anything at the September 27

9  meeting?

10 **A.**  Yes, I do.

11 **Q.**  What did he say?

12 **A.**  He told Dr. Ishii that those comments were not part of the

13 NEPC deliberation.  Those are HR issues and not to be reviewed

14 as part of the tenure review.

15 **Q.**  At either of those meetings, September 6 or September 27th,

16 did Dr. Ishii ever make any statements or ask any questions

17 about Dr. Sizyuk's discovery, learning, or engagement?

18 **A.**  It is possible that he did, but I do not remember at this

19 time.

20 **Q.**  Were you on the search committee that initially hired

21 Dr. Sizyuk for tenure-track?

22 **A.**  Yes, I was.

23 **Q.**  And do you recall if you reviewed her CV or resume at that

24 time?

25 **A.**  Yes, I did.

 1  **Q.**  And would that CV have included her job title at Argonne?

 2  **A.**  I'm sure it would have.

 3  **Q.**  Was Dr. Ishii on that search committee with you?

 4  **A.**  He was.

 5  **Q.**  And do you recall at the time if Dr. Sizyuk informed the

 6  search committee that her Ph.D. would be forthcoming from the

 7  University of Rzeszów?

 8  **A.**  Yes.

 9  **Q.**  And at that time the search committee did not disqualify

10  Dr. Sizyuk from a tenure-track position because her Ph.D. would

11  come from the University of Rzeszów?

12  **A.**  That is correct.

13  **Q.**  Did you participate -- did you vote on September 27th

14  regarding Dr. Sizyuk?

15  **A.**  Yes, I did.

16  **Q.**  How did you vote?

17  **A.**  I voted in favor of tenure.

18  **Q.**  Why?

19  **A.**  So one of the major components of being a tenure-track

20  faculty, and one of the more challenging ones, is obtaining

21  funding and setting up the group.  And as part of that, another

22  key aspect is to obtain and demonstrate independence from your

23  past academic advisors.

24      Dr. Sizyuk, working in our department with Dr. Hassanein,

25  who was her advisor and long-term mentor and colleague,

1    demonstrating independence was a major challenge.  And one of

2    the things that I was looking for demonstrating that

3    independence was her ability to obtain a grant without

4    Dr. Hassanein as either PI, principal investigator, or co-PI,

5    as well as being able to graduate her own Ph.D. students,

6    again, without Dr. Hassanein as the chair or co-chair of that

7    student.

8        And right at the time of reviewing the package, she had

9    received quite a substantial grant from the Department of

10   Energy.  It was $750,000.  She was the PI without

11   Dr. Hassanein.  She had also recently graduated her first

12   independent Ph.D. student and her second independent Ph.D.

13   student on whose committee I served, defended later that year.

14   So in my mind, she had demonstrated the necessary independence

15   and scholarly ability to be a tenured faculty.

16   **Q.**  Did your vote have anything to do with her publications and

17   research?

18   **A.**  Yes.  She also -- throughout her time there, she had

19   published very good work.  Again, one of the challenges that

20   she had was many of her publications were collaborations with

21   Dr. Hassanein.  But, again, towards the end of her time in the

22   tenure-track, she started to demonstrate independence and

23   publish papers without Dr. Hassanein and, of particular

24   importance, with her students as the lead author demonstrating

25   her mentorship abilities with the students.

 1   **Q.**  And did your vote have anything to do with her teaching
 2   upper-level courses?
 3   **A.**  Yes.  Dr. Sizyuk, in particular, started a computational
 4   physics course that our seniors and graduate students took.  In
 5   fact, several of my students took that course, and it was a
 6   very valuable course for them.
 7   **Q.**  Since you have been on the NEPC, have any women ever served
 8   on the NEPC?
 9   **A.**  Not since I have been a member, no.
10   **Q.**  Did you review Dr. Sizyuk's dossier before you voted?
11   **A.**  I did.
12   **Q.**  And were you aware of a letter by Dr. Allain before you
13   voted?
14   **A.**  I was.
15   **Q.**  And does a single negative reference letter disqualify
16   Dr. Sizyuk for tenure?
17   **A.**  Certainly not.
18        **MR. SINK:**  Your Honor, subject to the offer of
19   proof, I have no more.
20        **THE COURT:**  I have just one question.
21    And let me ask you, sir, I haven't heard testimony as to
22   how the vote is taken with regard to the NEPC and tenure
23   issues.  Is it a raise of hands of the council, or is it
24   anonymous blank slip?  How is the vote made?
25        **THE WITNESS:**  It is done by anonymous, blank slip.

1    We can also write comments.  I remember writing some comments

2    about my vote on there as well.

3              **THE COURT:**  But the way the vote is given is that

4    the members of the committee can vote anonymously; is that

5    right?

6              **THE WITNESS:**  That is correct.

7              **THE COURT:**  And unless they indicate who they voted

8    for, it remains anonymous of record, correct?

9              **THE WITNESS:**  That is correct.  There is no way to

10   know from the voting itself who voted which direction.

11             **THE COURT:**  All right.  Thank you.

12             **THE WITNESS:**  Yes, Your Honor.

13                          **CROSS-EXAMINATION**

14   BY MR. KEALEY:

15   **Q.**  Good morning, Dr. Garner.  Good to see you again.

16   **A.**  Good morning.

17   **Q.**  I want to just circle back to a few things you have been

18   talking about and ask a few follow-up questions.

19        And let's just start with a follow-up from the question

20   that the judge just posed.  You were testifying that you were

21   at the September 27, 2019, NEPC meeting where there was a vote

22   on the tenure candidacy for Dr. Sizyuk, correct?

23   **A.**  Yes.

24   **Q.**  And the vote at that meeting on Dr. Sizyuk's tenure

25   candidacy was performed and recorded in the way that you have

1   just described in response to the judge's question, correct?

2   **A.**   Yes.

3   **Q.**   So that was an anonymous or secret ballot vote, correct?

4   **A.**   Yes.

5   **Q.**   So when you were referring earlier to Dr. Ishii having

6   influence in September of 2019 in the NEPC, you're not

7   referring to the secret ballot that was cast on September 27th,

8   are you?

9   **A.**   That is correct, he had no influence on the secret ballot,

10  per se.

11  **Q.**   In other words, anybody who cast their ballot would cast it

12  in a way where, if they wished it not to be known how they

13  voted, they could ensure that it be not known how they voted?

14  **A.**   That is correct.

15  **Q.**   You, yourself, have described that you are tenured at

16  Purdue since 2019.  That was a promotion for you in the School

17  of Nuclear Engineering, correct?

18  **A.**   Yes.

19  **Q.**   And have you subsequently been promoted in the School of

20  Nuclear Engineering?

21  **A.**   Yes, I have.  I was promoted effective August of 2023 to

22  professor.

23  **Q.**   So you have been promoted twice in the School of Nuclear

24  Engineering?

25  **A.**   That is correct.

1   **Q.**   And I'll pose it as a question.  You are not Asian,

2   correct?

3   **A.**   That is correct.

4   **Q.**   You are an American?

5   **A.**   Yes, I am.

6   **Q.**   You went through a list of names on the NEPC as of 2019,

7   and I just would like to go through that list and ask you

8   to whether you have an understanding as to the race or national

9   origin of that individual.  If you don't, you can just say so.

10  If you do, I'd ask you to share that with us.

11        Dr. Abdel-Khalik?

12  **A.**   He's from Egypt.

13  **Q.**   Dr. Choi?

14  **A.**   He's from South Korea.

15  **Q.**   And, of course, you're Dr. Garner.

16        Dr. Hassanein?

17  **A.**   I think he's from Egypt as well.

18  **Q.**   Dr. Ishii?

19  **A.**   He's from Japan.

20  **Q.**   Dr. Lopez-de-Bertodano?

21  **A.**   He's from Argentina.

22  **Q.**   Dr. Revankar?

23  **A.**   He's from India.

24  **Q.**   Dr. Taleyarkhan?

25  **A.**   He's from India as well.

1    **Q.**   And Dr. Tsoukalas?

2    **A.**   He's from Greece.

3    **Q.**   So the list we just worked through, how many, to your

4    understanding, are either from Asia or of Asian ancestry?

5    **A.**   So, let's see.  That would be Dr. Ishii, Dr. Choi,

6    Dr. Revankar from India and then -- did we go through

7    Dr. Taleyarkhan?  Yes, we did.  So Dr. Taleyarkhan as well.

8    **Q.**   So you believe that Dr. Revankar and Dr. Taleyarkhan would

9    consider themselves to be Asians?

10   **A.**   Depends on your perspective of Asian.

11   **Q.**   Do you have any understanding --

12   **A.**   South Asian or Asia, more broadly speaking.

13   **Q.**   As to whether India is part of Asia?

14   **A.**   Right.

15   **Q.**   And if they did not consider themselves to be Asian, how

16   many of that list of names would be Asian?

17   **A.**   In that case, it would be Dr. Ishii and Dr. Choi.

18   **Q.**   You were asked a question about whether there are currently

19   any women on the NEPC, and you said that there are not

20   currently.  Have you ever acquired any knowledge as to whether

21   there have been women on the NEPC in the past?

22   **A.**   Yes, there would have been.

23   **Q.**   You answered a few questions about independence, and you

24   said that, if I wrote it down correctly with regard to

25   Dr. Sizyuk, "...demonstrating independence was a major

 1   challenge."

 2        Do you recall saying that?

 3   **A.**   Yes, I do.

 4   **Q.**   Could you elaborate on what you meant by that?

 5   **A.**   Yes.  So before joining Purdue, Dr. Sizyuk worked at

 6   Argonne National Lab with Dr. Hassanein and then came with

 7   Dr. Hassanein's group to Purdue and worked with him for several

 8   years as a research scientist and also received her Ph.D. with

 9   Dr. Hassanein as her advisor.

10        So Dr. Sizyuk spent quite a lot of time working with

11   Dr. Hassanein who, much like Dr. Ishii in his field, is one of

12   the more well-known and prolific scientists in his area.  So

13   one of the challenges when you're starting off as a junior

14   faculty member and you have worked that closely with someone

15   who is that renowned is trying to demonstrate your independence

16   and showing your own work, particularly, if you're in the same

17   institution as that faculty.

18   **Q.**   And, in fact, that was a concern that you expressly

19   identified from the very outset of Dr. Sizyuk's tenure-track

20   time in the School of Nuclear Engineering?

21   **A.**   Yes, that's correct.

22             **MR. KEALEY:**  We're going to put on the screen a

23   document that's not yet in evidence and ask the witness to

24   speak to it.  So this would be for the witness only at this

25   point, Defense Exhibit C, like cat.

1    **BY MR. KEALEY:**

2    **Q.** Dr. Garner, please take a look at Defense Exhibit C on the

3    screen in front of you and verify that is a letter -- or

4    e-mail, rather, that you sent to Dr. Hassanein?

5    **A.** Yes, it is.

6    **Q.** And the date on that letter?

7    **A.** April 17, 2014.

8         **MR. KEALEY:** Your Honor, we move Defense Exhibit C

9    into evidence.

10        **MR. SINK:** Your Honor, I would object on the grounds

11   of relevance. It's too attenuated in time.

12        **MR. KEALEY:** Your Honor, it speaks directly about

13   the plaintiff. It speaks directly about the plaintiff in the

14   context of her hiring, which was a subject covered in the

15   direct examination this morning, and it speaks directly to the

16   topic that this witness just said was very important. He said

17   that, in response to direct exam questions, that demonstrating

18   independence was a major challenge and the second -- the

19   paragraph that's highlighted on the screen is on that exact

20   topic to which the plaintiff opened the door just minutes ago.

21        **MR. SINK:** It's five years before the decision.

22   It's too far of a time period.

23        **THE COURT:** I see it as being relevant to the issues

24   involved in this case that the jury is going to have to decide,

25   so the objection is overruled.

1        Defense Exhibit C is admitted.

2   **BY MR. SINK:**

3   **Q.**   So, Dr. Garner, Exhibit C is on your screen still in front

4   of you, and you have given the context that this was an e-mail

5   that you sent in December -- excuse me, in April of 2014 to

6   Dr. Hassanein.  And just for a little bit of additional

7   context, at that time Dr. Hassanein was the head of the School

8   of Nuclear Engineering, correct?

9   **A.**   That is correct.

10  **Q.**   And there had been a decision process about hiring

11  Tatyana Sizyuk into a tenure-track position, correct?

12  **A.**   That is correct.

13  **Q.**   And you were involved with that process?

14  **A.**   That is correct.

15  **Q.**   What was your involvement?

16  **A.**   I was a member of the search committee.

17  **Q.**   And what was the context then of this e-mail in connection

18  with your involvement?

19  **A.**   Yes.  So after every interview with the potential

20  candidates, or the applicants, we write summaries; and this was

21  in response to a request from Dr. Hassanein about my thoughts

22  on the interview and for Dr. Sizyuk as a potential junior

23  faculty member.

24  **Q.**   After he requested your thoughts, you shared them with him

25  in this e-mail, correct?

1    **A.**   That is correct.

2    **Q.**   And could you read for us the highlighted box from your

3    e-mail in Defense Exhibit C.

4    **A.**   Yes.  "Although her Ph.D. is not from Purdue, she has been

5    affiliated with Purdue for a number of years and would

6    essentially be an internal hire.  One common concern in

7    academia with internal hires is their ability to distinguish

8    themselves from their academic advisors.  While it is an

9    advantage that she can easily draw upon her colleagues at CMUXE

10   to get started on joint proposals and projects, she will want

11   to be very careful to make sure that she develops projects that

12   are independent of CMUXE (For instance, collaborations with me

13   in areas adjacent to but separate from CMUXE or in areas

14   perhaps focusing more on pure computation).  This is mainly a

15   consideration for when she would go up for tenure at the

16   college level."

17   **Q.**   So that was your opinion then that this was an issue, as

18   you've described it here, and that it would remain an issue

19   clear through the time when she would go up for tenure,

20   correct?

21   **A.**   That is correct.

22   **Q.**   And you stand by that opinion, correct?

23   **A.**   Yes, I do.

24   **Q.**   And having expressed this concern in 2014, you would agree,

25   would you not, that other NEPC members could reasonably share

1    this concern?

2              **MR. SINK:**  Objection.  Calls for speculation.

3              **THE COURT:**  Response?

4              **MR. KEALEY:**  Your Honor, I'm just asking whether he

5    has an opinion about whether his colleagues could reasonably

6    share his concern.  I'm not asking him to say which colleagues

7    did shared the concern but just whether he believes that his

8    concern, as stated and shared with the head, is one that could

9    reasonably be discussed among colleagues.

10             **MR. SINK:**  Same objection.  Improper opinion

11   testimony.

12             **THE COURT:**  Overruled.

13   **BY THE WITNESS:**

14   **A.**  Yes, it could certainly be something that could be of

15   concern to NEPC members.

16   **BY MR. KEALEY:**

17   **Q.**  You were asked some questions a short time ago about your

18   evolving view on this topic by the time that Dr. Sizyuk came up

19   for tenure.

20        I ask you, would you agree that other people could

21   reasonably disagree with you as of 2019 about whether

22   Dr. Sizyuk had overcome the concern that you identified in your

23   e-mail in 2014?

24             **MR. SINK:**  Objection.  Calls for speculation.

25             **THE COURT:**  Response?

1            **MR. KEALEY:**  Your Honor, this door was opened by

2    Mr. Sink on direct examination as to whether this was an

3    appropriate topic for consideration at the time of the

4    September 27 vote.  The witness shared his opinion, and I'm

5    simply asking him whether he would recognize that his

6    colleagues could reasonably reach a different conclusion on the

7    same topic.

8            **MR. SINK:**  He is asking the witness to speculate on

9    the state of mind of other NEPC members.

10            **MR. KEALEY:**  I'm just asking the witness for his

11    personal opinion, nothing more.

12            **THE COURT:**  Overruled.  You can answer that

13    question.

14            **THE WITNESS:**  So can we -- you restate the question?

15            **THE COURT:**  You want it read back?

16            **MR. KEALEY:**  Yes, please.

17        (The record was read as requested.)

18    **BY THE WITNESS:**

19    **A.**  Yes.

20    **BY MR. KEALEY:**

21    **Q.**  Just one last topic I want to spend a moment on,

22    Dr. Garner.  You talked a little bit about getting a grant

23    without Dr. Hassanein.  Do you recall that?

24    **A.**  Yes, I do.

25    **Q.**  And you referred to a grant without Dr. Hassanein as PI or

1   co-PI?

2   **A.**   That is correct.

3          **MR. KEALEY:**  If you could leave Defense Exhibit C on

4   the screen for a moment, please.

5          **MR. HUMBLE:**  Sorry.  There we go.

6   **BY MR. KEALEY:**

7   **Q.**   So in the highlighted box in Defense Exhibit C that we're

8   looking at on screen, you use the phrase, quote, "...she

9   develops projects that are independent of CMUXE," unquote.

10       Do you see that?

11  **A.**   Yes.

12  **Q.**   And so developing projects that are independent of CMUXE

13  requires funding, right?

14  **A.**   Yes.

15  **Q.**   And so that concern you were flagging there encompasses

16  developing funding for projects that are independent of CMUXE,

17  right?

18  **A.**   Yes.

19  **Q.**   So if one wanted to see what was her ability to get funding

20  independent of CMUXE, one would need to look at whether she got

21  a $750,000 grant that was independent of CMUXE, right?

22  **A.**   Yes.

23  **Q.**   Because a $750,000 grant that was not independent of CMUXE

24  would fall exactly in the category that you spotlighted in your

25  e-mail on the screen?

1    **A.**   Yes.

2    **Q.**   Did anybody ever share any information with you about

3    whether that $750,000 grant was independent of CMUXE?

4    **A.**   I looked at the dossier and -- the big thing I was looking

5    for was whether it was independent of Dr. Hassanein, so that

6    was my major criterion when I was reviewing that.

7    **Q.**   So just to clarify, you're referring to the tenure dossier

8    listing out the grant?

9    **A.**   That is correct.

10   **Q.**   Dr. Garner, while we're pulling up an exhibit on the

11   screen, let me just cover some preliminary questions relating

12   to this exhibit.

13            **THE COURT:**  Why isn't that up?  It's on my screen.

14            **MR. KEALEY:**  This is the exhibit I'm going to ask

15   the witness about.  It's in evidence.  We're going to -- I'm

16   not sure why it hasn't --

17            **THE COURTROOM DEPUTY:**  Exhibit A I don't have in

18   evidence.

19            **MR. KEALEY:**  It is in evidence, the same exhibit as

20   Plaintiff's Exhibit 3.  It has already been admitted.  It's the

21   dossier.

22            **THE COURT:**  We'll get them to identify it then as A,

23   and then we'll match it up.

24            **MR. KEALEY:**  Your Honor, the sticker on screen is

25   our sticker, so that's a Defense Exhibit A, but it is already

 1    in evidence as Plaintiff's Exhibit 3.

 2                **THE COURT:**  Understood.

 3                **MR. KEALEY:**  Thank you.

 4    **BY MR. KEALEY:**

 5    **Q.**  Dr. Garner, you should see on your screen an exhibit,

 6    Dr. Sizyuk's tenure dossier.  Do you generally recognize that?

 7    **A.**  Yes, I do.

 8    **Q.**  And we're going to, in a moment, jump to the part of that

 9    exhibit that is subheaded "Grant Activity."  Are you generally

10    familiar with there being a part of a dossier entitled, "Grant

11    Activity"?

12    **A.**  Yes, I am.

13    **Q.**  And so that's the part of the dossier that you were

14    referring to looking at for Dr. Sizyuk's tenure dossier,

15    correct?

16    **A.**  That is correct.

17    **Q.**  So here's this page in Plaintiff's Exhibit 3.  The page

18    numbering is somewhat obscured, so I'm just going to show

19    counsel.

20         And in this page numbering in Plaintiff's Exhibit 3 at the

21    bottom of the left page, there is a box that says "New Grant

22    Awarded."  Do you see that?

23    **A.**  Yes, I do.

24    **Q.**  Is that the grant award that you're referring to?

25    **A.**  Yes, it is.

1    **Q.**   For $750,000?

2    **A.**   That is correct.

3    **Q.**   And that grant in the box that's on the right page on your

4    screen has a box 5, sub-box 5, entitled "Co-investigators."  Do

5    you see that?

6    **A.**   Yes, I do.

7    **Q.**   And one of the coinvestigators is listed as Dr. Jay Brooks.

8    Do you see that?

9    **A.**   I do.

10   **Q.**   Do you know Dr. Jay Brooks?

11   **A.**   I do.

12   **Q.**   Who do you know him to be?

13   **A.**   He was, at that time, a research professor that worked in

14   Dr. Hassanein's group.

15   **Q.**   And so the fact that Dr. Jay Brooks is listed as a

16   coinvestigator would be some evidence that this grant was

17   funding a CMUXE research project, right?

18   **A.**   It was, at least, funding someone from CMUXE, yes.

19   **Q.**   And in order to know the degree to which it was funding a

20   CMUXE research project, you would actually have to see the

21   whole grant proposal, right?

22   **A.**   That would be correct.

23   **Q.**   Did anyone supply -- were you supplied with any information

24   to show whether Dr. Hassanein participated in the writing and

25   the getting of this grant?

1   **A.**   I was not, no.

2   **Q.**   Would that information have been relevant to you?

3   **A.**   Certainly possibly depending on the level.  I mean, it's

4   not uncommon when faculty are starting off to get help and

5   advice from their advisors or senior faculty.  So in and of

6   itself it would not be disqualifying, but it could be.

7   **Q.**   Would it have been relevant to you to know that at one

8   point the grant was proposing to underwrite Dr. Hassanein's own

9   summer salary?

10  **A.**   That would make a difference, yes.

11          **MR. KEALEY:**   Thank you, Your Honor.  Nothing

12  further.

13                      **CROSS-EXAMINATION**

14  **BY MR. BOWLING:**

15  **Q.**   Good morning, again, Dr. Garner.  I just have a few

16  questions.  You obtained tenure in 2019, correct?

17  **A.**   That is correct.

18  **Q.**   Okay.  And I think you said something to the effect that

19  Dr. Ishii -- you perceive him to be highly respected in the

20  School of Nuclear Engineering, correct?

21  **A.**   Yes.

22  **Q.**   Yet he did not influence you in any way in your vote, did

23  he?

24  **A.**   No.

25  **Q.**   Okay.  And, in fact, notwithstanding that he is respected

 1   in the school, you can't say that he influenced anybody on the

 2   NEPC with respect to the vote on Dr. Sizyuk's tenure, correct?

 3   **A.**   I cannot say what other people were thinking directly, no.

 4   **Q.**   And you can't say whether Dr. Ishii had any impact at all

 5   on their votes, correct?

 6   **A.**   I cannot.

 7   **Q.**   Dr. Garner, I think you said that you served on the search

 8   committee that interviewed Dr. Sizyuk back in 2014; is that

 9   correct?

10   **A.**   That is correct.

11   **Q.**   And I think you said that you had her job description on

12   the application, correct, or at least on her CV?

13   **A.**   It must have been.  I don't recall immediately, but it is

14   common to put that on the job application.

15   **Q.**   And, in fact, Dr. Sizyuk was not hired as a result of that

16   search committee's activities, correct?

17   **A.**   I thought that she was, but it has been a while.

18   **Q.**   Okay.  In any event, her tenure dossier -- let me back up a

19   second.

20        The dossier is a document that is created once a person

21   has already been hired into a tenure-track position, correct?

22   **A.**   That is correct.

23   **Q.**   And when the NEPC deliberates on a tenure applicant, each

24   member of the NEPC has a full copy of the dossier, correct?

25   **A.**   That is correct.

 1   **Q.**  But as of 2014 when Dr. Sizyuk was interviewing for a

 2   tenure-track position, sort of by definition, her dossier -- or

 3   tenure dossier would not have existed, correct?

 4   **A.**  That is correct.

 5   **Q.**  So if somebody were bringing up -- if somebody on the

 6   NEPC -- fast forward to 2019.  If somebody on the NEPC were

 7   bringing up a question about the accuracy of a part of the

 8   dossier, they would necessarily be raising a question about a

 9   document that didn't exist back when Dr. Sizyuk was first

10   hired?

11   **A.**  That is correct.

12           **MR. BOWLING:**  One moment, please.

13       (Defendant Ishii's counsel confer off the record.)

14           **MR. BOWLING:**  Thank you, Dr. Garner.  That's all I

15   have.

16                     **REDIRECT EXAMINATION**

17   **BY MR. SINK:**

18   **Q.**  Okay.  I just have a few.

19        Dr. Garner, we saw an e-mail from you dated back in 2014.

20   Do you recall seeing that a few moments ago?

21   **A.**  Yes, I do.

22   **Q.**  And that was over five years before you took the vote on

23   Dr. Sizyuk?

24   **A.**  That is correct.

25   **Q.**  And at the time you voted five-plus years later on

1   September 27 of 2019, in your opinion, had Dr. Sizyuk

2   established independence from Dr. Hassanein?

3   **A.**   Yes, she had.

4   **Q.**   And, in your opinion, did she qualify for tenure?

5   **A.**   Yes, she did.

6   **Q.**   You were asked about whether certain information was

7   volunteered to the NEPC regarding this DOE grant.  Do you

8   recall that?

9   **A.**   Yes.

10   **Q.**   And what's the purpose of having in-person deliberations by

11   the NEPC?

12   **A.**   Well, I think it is so that it can facilitate discussions

13   because on Teams or Webex or whatever online forum you have,

14   it's very hard to have fluid discussions, so that's certainly

15   one reason why we do that.

16   **Q.**   During those NEPC meetings, can the members ask questions

17   to the presenter?

18   **A.**   Yes.

19   **Q.**   And can the members request information from the presenter?

20   **A.**   Yes.

21   **Q.**   And the presenter for Dr. Sizyuk was who?

22   **A.**   Professor Taleyarkhan.

23   **Q.**   Did anyone ask Dr. Taleyarkhan to look into whether this

24   DOE grant was tied to CMUXE?

25   **A.**   I do not recall anyone asking that question.

 1   **Q.** Dr. Ishii never made that inquiry?

 2   **A.** I cannot recall if he did.

 3        **MR. SINK:** I have no more.

 4        **THE COURT:** Anything else?

 5        **MR. KEALEY:** (Nodding head.)

 6                    **RECROSS-EXAMINATION**

 7   BY MR. KEALEY:

 8   **Q.** Dr. Garner, do you have an understanding as to what the

 9   vote tally was on Dr. Sizyuk's tenure vote on September 27th?

10   **A.** Yes.

11   **Q.** And what was that?

12   **A.** It was a six to two.

13   **Q.** So two in favor?

14   **A.** That is correct.

15   **Q.** And one of whom was you?

16   **A.** Yes.

17   **Q.** And did you ever acquire any information about who the

18   other one was, who voted in favor?

19   **A.** I heard that it was Professor Taleyarkhan.

20   **Q.** So the two people who voted in favor were you, and you

21   chose not to ask for more information at that meeting about

22   that grant, correct?

23   **A.** That is correct.

24        **MR. KEALEY:** Thank you.

25        **THE WITNESS:** Yes, sir.

—————————Ashley N. Stokes, CSR, RPR—————————
Ashley_Stokes@innd.uscourts.gov/ (219) 852-6557

1          **THE COURT:**  Anything else?

2          **MR. BOWLING:**  No, Your Honor.

3          **THE COURT:**  Anything else?

4          **MR. SINK:**  I would like to do the offer of proof.

5          **THE COURT:**  All right.  At sidebar or outside --

6          **MR. SINK:**  Outside the presence of the jury.

7          **THE COURT:**  At this time, ladies and gentlemen,

8  let's take our recess for the morning.  It's 20 minutes to

9  11:00.  Let's take about ten minutes to get this done.

10      In the meantime, remember to take with you your notes and

11  anything else you brought with you into the jury box.  We'll

12  call you in when we're ready.

13      (Jury out at 10:38 a.m.)

14          **THE COURT:**  Go ahead and be seated.

15      (The following examination was conducted outside the

16       presence and hearing of the jury, reported as follows:)

17                           **EXAMINATION**

18  **BY MR. SINK:**

19  **Q.**  Do you understand you're still under oath and penalty of

20  perjury?

21  **A.**  Yes.

22  **Q.**  Were you involved in the hiring of Dr. Kim as the head of

23  the School of Nuclear Engineering?

24  **A.**  Yes, I was.

25  **Q.**  How so?

1   **A.**   I was a member of the search committee.

2   **Q.**   And did Dr. Ishii ever talk to you about hiring Dr. Kim?

3   **A.**   Yes, he did.

4   **Q.**   What did he say to you?

5   **A.**   He came into my office one day, closed the door, and

6   encouraged me to support Dr. Kim.  He told me that Dr. Kim was

7   a very nice person and would be very supportive toward my

8   tenure case.

9   **Q.**   And what occurred after that regarding Dr. Kim?

10  **A.**   In what way?

11  **Q.**   Was he hired as the head?

12  **A.**   Yes, he was.

13  **Q.**   And what was the process by which he was hired as the head

14  after that discussion?

15  **A.**   Yes.  So we reviewed as a committee.  Dr. Ishii recused

16  himself because he was Dr. Kim's advisor.  Then we interviewed

17  the different candidates.  We lowered the poll down to three

18  whom we interviewed.  And then we made the recommendations to

19  the dean on who would be hirable or not hirable.  But at the

20  end of the day, the dean made the decision based on the dean's

21  own perspective.

22  **Q.**   And who was the dean?

23  **A.**   Who was the dean?  I think it was still Leah back then.

24  **Q.**   Was there an NEPC in the School of Nuclear Engineering at

25  that time?

1   **A.**   Yes, there would have been an NEPC.

2   **Q.**   Was the NEPC involved in the hiring of Dr. Kim?

3   **A.**   The NEPC would have been involved in that they would have

4   had to confer tenure upon him when he joined.

5   **Q.**   And, to your knowledge, did NEPC vote to award tenure to

6   Dr. Kim?

7   **A.**   Yes.

8   **Q.**   Do you know if Dr. Ishii was involved in that vote?

9   **A.**   I was not a member of the NEPC, so I could not tell you.

10          **MR. SINK:**   Your Honor, I would ask you to reconsider

11   the prior ruling given the testimony.

12          **THE COURT:**   And as to the offer, what do you

13   intend -- how -- tell the Court how you believe this is

14   relevant for the issues in this case involving your client for

15   the jury to understand.

16          **MR. SINK:**   Well, Dr. Ishii, obviously, knew it would

17   be improper as he recused himself; yet, he made it clear to

18   Dr. Garner that his case would be in very good shape if he

19   helped and aided Dr. Kim being hired as the head.

20       So, again, it goes to the issue of his power and

21   influence, his willingness to get involved in personnel

22   decisions even when he knows it's improper.

23          **THE COURT:**   With regard to this witness and with

24   regard to his involvement on the search committee, but it

25   doesn't -- and you're asking to allow that testimony to come in

1   with regard to this separate event years later on a different

2   committee, correct?

3          **MR. SINK:**  Yes, but as we just heard from the

4   witness, the NEPC was involved.  They would have had to have

5   voted to approve tenure, so there is a connection.

6          **THE COURT:**  Okay.  All right.  Anything else?

7          **MR. SINK:**  No, Your Honor.

8          **THE COURT:**  Anything else that you wish to put into

9   the record with regard to this offer of proof?  For University?

10          **MR. KEALEY:**  We stand on our previous sidebar

11   comments.

12          **THE COURT:**  Anything else for your client?

13          **MR. BOWLING:**  Yes, Your Honor.  I think the comments

14   of counsel underscore why this is inadmissible 404(b) evidence

15   to the extent there is an alleged inference of an attempt to

16   exert an improper influence.  And, furthermore, just to stand

17   on the prior argument and note also that Dr. Garner importantly

18   was not even on the NEPC at the time this conversation

19   occurred, so it's even -- again, underscores the lack of

20   relevance.  That's all.  Thank you.

21          **THE COURT:**  All right.  The Court's ruling will

22   remain in place.  Thank you.

23      Do we need a recess at this point?  Otherwise, we'll go

24   until 11:00 o'clock or so.

25      Is there another witness?

```
 1              MR. SINK:  There is another witness.  Do you want me
 2     to -- can we maybe take a five-minute restroom break?
 3              THE COURT:  Right.  Let's do it.  But we're done
 4     with this witness?
 5              MR. SINK:  Yes.
 6              THE COURT:  You may step down.
 7              THE WITNESS:  Thank you, Your Honor.
 8              THE COURT:  Who is the next?
 9              MR. SINK:  Dr. Taleyarkhan.
10              THE COURT:  Let's take about a five-minute break.
11         (Recess at 10:43 a.m., and proceedings resumed in open
12          court commencing at 10:52 a.m., reported as follows:)
13              THE COURT:  Everybody is back in the courtroom.
14     Anything else before I bring the jury back?
15              MR. SINK:  No, Your Honor.
16              THE COURT:  For the University?
17              MR. KEALEY:  No, Your Honor.
18              THE COURT:  For the professor?
19              MR. BOWLING:  No, Your Honor.
20              THE COURT:  Bring the jury in.
21         (Jury in at 10:53 a.m.)
22              THE COURT:  Before we take the next witness, ladies
23     and gentlemen of the jury, let me remind you.  Thank you for
24     the note that some of the screens were not working in the jury
25     box so you weren't able to utilize that.
```

 1       If that happens again, just raise your hand and let me

 2   know and we can take care of it right away.  Anything you need

 3   in that jury box during the trial, or if anything is

 4   malfunctioning or you can't hear, somebody wave me so we can

 5   take care of it right there and then.  We don't have to wait

 6   until a note or wait until a recess.

 7       Okay.  All right.  Thank you.  With that, our next witness

 8   is ready to testify.

 9       Sir, would you please face my deputy.

10       Counsel, you maybe seated.

11       Please face my deputy, and we'll give you the oath for

12   your testimony.

13       (The oath was duly administered.)

14           **THE WITNESS:**  I do.

15           **THE COURT:**  Sir, you may now take the stand.

16       **RUSI TALEYARKHAN, PLAINTIFF'S WITNESS, SWORN**

17                   **DIRECT EXAMINATION**

18   **BY MR. SINK:**

19   **Q.**  Good morning.

20   **A.**  Good morning.

21   **Q.**  Can you state your name for the record.

22   **A.**  My name is Rusi Taleyarkhan.

23           **THE COURT:**  Sir, can you pull the microphone a

24   little bit closer to you.

25

1    **BY MR. SINK:**

2    **Q.**  Dr. Taleyarkhan, can you provide a brief background of your

3    educational background to the jury.

4    **A.**  I got my bachelor's degree in mechanical engineering from

5    the Indian Institute of Technology in Madras, India, in 1977.

6    I was invited to join the Rensselaer Polytechnic Institute in

7    upstate New York in 1977.  I obtained my master's degree in

8    nuclear engineering in 1978.  In 1980 I got my master's in

9    business administration, and in 1982 I obtained my Ph.D. degree

10   in nuclear engineering.

11   **Q.**  From which school?

12   **A.**  All three graduate degrees from the same institution,

13   Rensselaer Polytechnic Institute in upstate New York.

14   **Q.**  Thank you.  Can you provide the jury with a brief synopsis

15   of your work history background?

16   **A.**  With all due respect, as I mentioned, I forgot my hearing

17   aids in my car along with all my electronics, which I knew I

18   had to keep.  Please repeat that question.

19   **Q.**  Thank you for saying that.

20   **A.**  I hope you don't mind it.

21          **THE COURT:**  Let me just ask, would it be better for

22   you to get those, to go down to the parking lot?

23          **THE WITNESS:**  I would prefer that if it is okay with

24   the Court, but I can still hear.

25          **MR. SINK:**  I will try to speak up.  If it becomes an

 1    issue --

 2              **THE WITNESS:**  Thank you so much.

 3              **MR. SINK:**  -- let me know.  Okay?

 4              **THE WITNESS:**  Okay.  And you can understand my

 5    accent, right?

 6              **MR. SINK:**  Yes.

 7              **THE WITNESS:**  Okay.

 8    **BY MR. SINK:**

 9    **Q.**   So the question, sir, I believe, is, can you provide a very

10    brief synopsis of your work history background?

11    **A.**   Okay.  My work has been diverse.

12    **Q.**   Just in terms of the names of the employers and positions.

13    **A.**   Okay.  After I finished my Ph.D. degree, I was hired as a

14    research associate at the same institution for about two years

15    where I conducted research in the world of nuclear energy and

16    safety.

17        Thereafter, I was invited to join Westinghouse Electric

18    Corporation in Pittsburgh, Pennsylvania, where I spent my time

19    doing, once again, research in nuclear engineering; and that

20    went on until 1988, after which I was invited to join the Oak

21    Ridge National Laboratory, which is a federal institution of

22    research in Oak Ridge, Tennessee, where I conducted research on

23    a wide array of areas, both classified as well as unclassified,

24    covering a broad range of topics, nuclear engineering

25    inclusive.  I rose to the rank of -- to the top rank of

1  distinguished R and D staff member over there, at which point

2  in about circa 2002, 2003, I was invited to join Purdue

3  University as a full professor with a chair and tenure.

4  **Q.**  Thank you.  Are you currently employed by Purdue

5  University?

6  **A.**  Yes.

7  **Q.**  And which school?

8  **A.**  The School of Nuclear Engineering.

9  **Q.**  And you just said it, but I want to be clear, are you a

10  tenured professor?

11  **A.**  I am.

12  **Q.**  Have you always been tenured in the School of Nuclear

13  Engineering?

14  **A.**  That's right.  I received immediate tenure.

15  **Q.**  And that was since, I thought you said, 2002?

16  **A.**  2003 is when I joined Purdue, yeah.

17  **Q.**  And have you served on the NEPC since 2003?

18  **A.**  I've served in the NEPC since 2003, yeah.

19  **Q.**  There is a book in front of you entitled "Plaintiff's

20  Exhibits."  Can you turn to Plaintiff's Exhibit 8.  Have you

21  seen this document before?

22  **A.**  Yes.

23  **Q.**  What is it entitled?

24  **A.**  "Procedures For Granting Academic Tenure and Promotion."

25  **Q.**  Does this appear to be a true and accurate copy of the

 1   documents you have seen before?

 2   **A.**   It appears to be, yeah.

 3           **MR. SINK:**  Your Honor, I would move to admit P-8.

 4           **THE COURT:**  Any objection?

 5           **MR. KEALEY:**  No objection.

 6           **MR. BOWLING:**  No objection.

 7           **THE COURT:**  It's admitted.

 8   **BY MR. SINK:**

 9   **Q.**   Are NEPC members required to be familiar with and follow

10   this exhibit?

11   **A.**   Yes.

12   **Q.**   What I want to do is go to the second page under

13   subsection D at the bottom.

14   **A.**   Did you say "B" or "D," sir?

15   **Q.**   "D" as in dog?

16   **A.**   "D" as in dog.  Okay.

17   **Q.**   This section indicates that those candidates who receive a

18   simple majority vote are sent forward to the area committee for

19   review unless the candidate chooses to withdraw his or her

20   candidacy at that stage.  In addition, the chair of the primary

21   committee may endorse a candidate who does not receive the

22   majority vote and send forward the nomination with his/her

23   statement providing a rationale for the divergence from the

24   primary committee.

25       Do you see that?

1    **A.**   Yes.

2    **Q.**   Did I read that accurately?

3    **A.**   Yes.

4    **Q.**   And based on this procedure, can the EAPC ever consider a

5    candidate for tenure if the NEPC did not issue a majority vote

6    in favor of tenure or if the chair did not endorse a candidate

7    for review?

8              **MR. KEALEY:**  Objection to the form of the question.

9    Overbroad.  This witness doesn't have a foundation of knowledge

10   as to the entire history of the University and all areas of the

11   University.

12             **THE COURT:**  Please rephrase.

13             **MR. SINK:**  First off, let me back up a little.

14   **BY MR. SINK:**

15   **Q.**   Is that policy accurate to your knowledge, that I just

16   read?

17   **A.**   My understanding is that in case the chair does not decide

18   to move a candidate forward to the area promotions committee,

19   because a majority vote did not transpire, the candidate in

20   question may appeal to the vice provost -- I believe it's for

21   faculty affairs, if I'm not mistaken -- and then that

22   particular decision from the vice provost may supersede the

23   decision of the chair.

24   **Q.**   Okay.  Have you ever served on the EAPC?

25   **A.**   Yes.  Multiple times, yeah.

1  **Q.**  Have you ever encountered a situation where the EAPC

2  considered an applicant for tenure where the NEPC either, one,

3  did not issue a majority vote in favor of tenure; two, the

4  chair did not endorse that candidate for review at the EAPC;

5  or, three, the internal appeal that you just mentioned was

6  denied?

7  **A.**  No.

8  **Q.**  Were you the presenter for Dr. Sizyuk on her candidacy for

9  tenure?

10  **A.**  Yes.  In her ultimate year, yeah.

11  **Q.**  And what role does a presenter have during those NEPC

12  deliberations?

13  **A.**  Well, that role is to -- is to act as a mentor to the

14  candidate based upon your own personal experience and the rules

15  and regulations of the system and help them prepare their

16  promotion package for tenure and help them get prepared to be

17  able to move successfully forward.

18  **Q.**  And when you mentioned promotion package, is that also

19  referred to as a dossier?

20  **A.**  Yes.

21  **Q.**  Is a candidate allowed to amend or update that dossier?

22  **A.**  Yes.  Up until the voting is done, yeah.

23  **Q.**  And is there a reason for that?

24  **A.**  Okay.

25  **Q.**  Do you need me to clarify?

 1  **A.**  Yes.  These are just part of the regulations for the

 2  university system.  I do not know what went through the minds

 3  of those who crafted these regulations.

 4  **Q.**  Is there a gap of time between when the dossier is

 5  originally provided to the NEPC compared to when the NEPC

 6  finally votes on the candidate?

 7  **A.**  Yes, there is a gap of usually several months, yeah.

 8  **Q.**  And during that time, is it possible for a candidate to

 9  have additional achievements?

10  **A.**  Oh, yes.

11  **Q.**  Such as grants?

12  **A.**  Yes, grants.

13  **Q.**  Publications?

14  **A.**  And recognitions.

15  **Q.**  Teaching evaluations, things of that nature?

16  **A.**  Yes.

17  **Q.**  Is a candidate, him or herself, allowed to be present

18  during the NEPC deliberations?

19  **A.**  No.

20  **Q.**  And is that the role that you take as the presenter, to be

21  the proxy for the candidate?

22  **A.**  I present the candidates, at least me or whoever else is

23  the mentor, the assigned mentor who has agreed to be the

24  mentor, to be able to then present the case to the NEPC.

25  **Q.**  Are you familiar with a standard of criteria for granting

 1   or denying tenure in the School of Nuclear Engineering?

 2   **A.**   In a general sense, yes.  There's nothing written in

 3   concrete --

 4   **Q.**   Can you turn to Exhibit 9.

 5   **A.**   -- to my knowledge.

 6            **MR. SINK:**  This has already been admitted.

 7   **BY MR. SINK:**

 8   **Q.**   It can be quite hard to read, but what I want to do is

 9   focus on this area here (indicating).  And then if you look at

10   the middle, it says, "To be considered for promotion, a faculty

11   member should have demonstrated excellence in scholarly

12   productivity in at least one of these areas:  Discovery,

13   learning, and/or engagement."

14        Do you see that?

15   **A.**   Yes.

16   **Q.**   "Ordinarily, strengths should be manifest in more than one

17   of these areas.  In evaluating performance in any of the three

18   areas, no single indicator should be used as a sole measure of

19   excellence and/or scholarly productivity but rather multiple

20   elements as described in the university and unit promotion

21   criteria documents should be considered as part of a holistic

22   assessment."

23        Did I read that correctly?

24   **A.**   Yes.

25   **Q.**   Does this truly and accurately describe the standard of

1    criteria for tenure in the School of Nuclear Engineering, to

2    the best of your knowledge?

3    **A.**    Yes.

4    **Q.**    Is that the responsibility of each NEPC member to be

5    familiar with this criteria?

6    **A.**    It is expected to be, yeah.

7    **Q.**    And is where a candidate receives his or her Ph.D. -- is

8    that proper criteria for considering a candidate for tenure?

9         **MR. KEALEY:**  Objection to the form of the question,

10   Your Honor.  Leading.

11        **THE COURT:**  Overruled.

12        **MR. SINK:**  Go ahead.

13        **THE COURT:**  You can answer the question.

14   **BY THE WITNESS:**

15   **A.**    We look at it -- at least I look at it from a holistic

16   viewpoint, having myself come from and enjoyed all the freedoms

17   of the United States that while different countries, different

18   parts of the world, function differently.  They have

19   institutions of their own and their own metrics for their

20   rankings.

21        So we do try to make sure that while the institution from

22   where somebody has obtained that Ph.D. is, at least, a

23   recognizable institution, and that is basically it, yeah.  What

24   is most important, at least in my mind, is whether this

25   candidate has met the requirements -- I won't say requirements,

 1  but the expectations of receiving tenure and becoming part of

 2  the family of tenured professors.

 3  **BY MR. SINK:**

 4  **Q.**   And in terms of the time period that the NEPC would look at

 5  to determine whether a candidate has met the criteria for

 6  tenure, is there a specific time period that should be focussed

 7  on?

 8  **A.**   At the assistant associate professor level, which

 9  automatically goes along with tenure, it is a period of five

10  years, yeah.

11  **Q.**   So the time period would be when they were a tenure-track

12  professor?

13  **A.**   That is correct.

14  **Q.**   Is the work history and the prior job titles of a candidate

15  before they were employed with Purdue a relevant criteria to

16  tenure?

17  **A.**   No.

18  **Q.**   Are you familiar with a campus promotion committee?

19  **A.**   I serve currently on the area promotions committee for the

20  College of Engineering.  I represent the faculty interests of

21  the School of Nuclear Engineering as elected official.

22  **Q.**   That would be known as the EAPC?

23  **A.**   The EAPC, yes, sir.

24  **Q.**   And is the campus promotion committee above the EAPC?

25  **A.**   Yes, you're right.  It is at the provost level, yeah.

1   **Q.**   Have you ever served on that committee?

2   **A.**   No.

3   **Q.**   So I want to talk about the NEPC meetings that were held

4   regarding Dr. Sizyuk.  The first meeting was on April 30 of

5   2019.  Were you present at that meeting?

6   **A.**   To my recollection, yes.

7   **Q.**   Do you recall what was discussed at that meeting?

8   **A.**   I believe the -- her promotion document at that time was

9   presented by her previous mentor, Dr. Hassanein.  That's what

10  was discussed, yeah.

11  **Q.**   Do you recall anything else being discussed at that

12  April 30, 2019, meeting?

13  **A.**   To the effect that while some advice would be given to

14  improve her track record for grants; that is, make the efforts

15  to sort of get that under her belt and provide some evidence

16  that she was on the right track, yeah.

17  **Q.**   Do you recall if Dr. Ishii said anything during this

18  April 30th meeting?

19  **A.**   At this stage, no, I do not recall.

20  **Q.**   Do you recall giving a deposition in this case?

21  **A.**   Could you please repeat that question.

22  **Q.**   Do you recall testifying under oath in this case?

23  **A.**   Yes.

24  **Q.**   Would reviewing that deposition testimony help refresh your

25  memory?

 1  **A.**   Oh, yes, please.

 2  **Q.**   Do you have it in front of you right now?

 3  **A.**   Oh, yes, I do.

 4          **MR. SINK:**   Permission to approach the witness,

 5  Your Honor?

 6          **THE COURT:**   You have it.   You can approach.

 7          **THE WITNESS:**   Thank you.

 8          **MR. SINK:**   Sure.

 9  **BY MR. SINK:**

10  **Q.**   So if you could turn to page 54 --

11          **JUROR:**   Your Honor, if they're going to show things,

12  we're still having the same issues here.

13          **MR. SINK:**   I'm going to have the witness read it

14  himself.

15          **THE COURT:**   But there is still issues, so we'll get

16  it fixed before it goes on the screen.

17  **BY MR. SINK:**

18  **Q.**   Please turn to page 54 and read page 54 silently, and let

19  me know when you're finished.

20          **THE COURT:**   I don't have it on my screen.   It's not

21  up.

22          **MR. SINK:**   Yeah, I'm trying to find it.   Hold on a

23  second.

24          **THE COURT:**   What page?

25          **MR. SINK:**   54.

 1    **BY THE WITNESS:**

 2    **A.**   Yes, thank you for helping me refresh my memory.

 3    **BY MR. SINK:**

 4    **Q.**   Have you read that?

 5    **A.**   I stand corrected.

 6    **Q.**   Does this help refresh your memory?

 7    **A.**   Yes, please.

 8    **Q.**   What do you recall Dr. Ishii saying in the April 30th,

 9    2019, meeting?

10    **A.**   That's right.  There were concerns and objections raised as

11    to the appropriateness for Dr. Hassanein to be serving as a

12    mentor for her promotions and tenure committee, representation;

13    and, thereafter, as I look back, there was also -- for the

14    ability for Ph.D. degree, to find out if it was genuine, and

15    also whether she has served in that role as stated in her

16    promotion package while she was at Argonne National Laboratory.

17    **Q.**   Okay.  Do you recall anything else?  Is that it from what

18    you remember from the April 30th meeting?

19         Let me ask it another way.  Were there any questions, to

20    the best of your memory, by any NEPC members on April 30, 2019,

21    about Dr. Sizyuk's discovery, learning, or engagement?

22         Can you remember?

23    **A.**   There were doubts seeded about the validity of her Ph.D.,

24    also about her background while she was at Argonne National

25    Laboratory and --

1  **Q.**  So not her --

2  **A.**  Those were the two main focus areas along with, I guess,

3  the questions regarding independence and, more importantly,

4  about her getting her own funding and track history

5  established, yeah.

6  **Q.**  So can you turn to page 77 of your deposition transcript.

7  **A.**  Page 77?

8  **Q.**  If you read on page 77, lines 20 through 25.

9  **A.**  Okay.

10  **Q.**  And then turn to page 78 and read your answer to that

11  question.

12      Does that refresh your memory on whether or not there were

13  any questions by any NEPC members regarding Dr. Sizyuk's

14  discovery, learning, or engagement?

15          **MR. BOWLING:**  Objection, Your Honor.  He just

16  answered that question.

17          **THE COURT:**  Overruled.  I'll let it be clarified.

18  **BY THE WITNESS:**

19  **A.**  No, there was no question challenging her scientific work,

20  yeah, if that's what you're alluding to.

21  **BY MR. SINK:**

22  **Q.**  Thank you.

23      So April 30, 2019, you were not her presenter at that

24  time, right?

25  **A.**  That is correct, yes.

1    **Q.**   And then after April 30th, at some point what happened in

2    regard to your role with Dr. Sizyuk?

3    **A.**   Okay.  Some background.  Before that I knew that she was on

4    the tenure-track, but that was basically it.  Our paths hardly

5    ever crossed except in faculty meeting.

6         After this particular meeting in April, the head, Dr. Kim,

7    he personally requested me saying that he is having a hard time

8    finding people to agree to be her mentor, and so he asked if I

9    would -- if I would kindly fill that role, and I accepted.  At

10   that point I took further interest in her situation, and I

11   spent a fair amount of time thereafter.

12   **Q.**   Thank you.

13        So on the September 6, 2019, meeting, were you her

14   presenter at that meeting?

15   **A.**   Yes.

16   **Q.**   During that meeting, what do you recall Dr. Ishii saying,

17   if anything?

18   **A.**   I heard several repeat derogatory statements and doubts

19   being brought up about her validity as a staff scientist in

20   that particular role of research scientist at Argonne National

21   Laboratory claiming that only a Ph.D. holder could ever have

22   that particular staff role at a major United States federal

23   national laboratory.  That was one part.

24        The other part was, also, again, brought up again about

25   her obtaining her Ph.D. and that -- and that it was, to put it

1    mildly, obtained improperly together with actions of her

2    previous mentor; that was Dr. Hassanein.  And that was a very

3    toxic environment at that stage --

4              **MR. BOWLING:**  Objection, Your Honor.

5              **MR. SINK:**  Sure.  That's fine.

6    **BY MR. SINK:**

7    **Q.**  Have you answered everything you recall Dr. Ishii saying

8    during this September 6, 2019, meeting?

9    **A.**  Those were the arguments being made, yeah.

10   **Q.**  Were there any questions or concerns raised by any NEPC

11   members specifically regarding Dr. Sizyuk's discovery,

12   learning, or engagement on September 6th of '19?

13   **A.**  Not on those questions.

14   **Q.**  Okay.  After this September 6, '19, meeting, did you

15   conduct any research regarding either Dr. Sizyuk's Ph.D. and/or

16   her title in Argonne?

17   **A.**  I was asked to look into that, yeah, and I replied back on

18   the next meeting that it was not my role to act as the HR

19   representative for the university.  It was not my role to pass

20   judgment on that fact, and I refused to do so, yeah.

21   **Q.**  Okay.  Did you come to -- did you do any research on

22   whether a Ph.D. is required to be a scientist at Argonne?

23   **A.**  Yes, I did a little bit of research specifically for

24   Argonne.  But after having spent close to 17 years at an

25   equivalent, if not somewhat higher ranked national laboratory,

1   the Oak Ridge National Laboratory in Oak Ridge, Tennessee, in

2   various roles, I knew for sure that a Ph.D. was not required,

3   yeah, for such roles.  And later on I also tried to search for

4   the current job postings, current at the time, job postings at

5   Argonne National Laboratory, and there were equivalent

6   positions that mentioned nothing about requiring a Ph.D.

7   **Q.**   Thank you.

8       Let's talk about the September 27, 2019, meeting.  Were

9   you present at that meeting?

10  **A.**   Yes, I was.

11  **Q.**   And what, if anything, do you recall Dr. Ishii saying at

12  that meeting?

13  **A.**   The same comments and complaints were brought up at that

14  point; so what I mentioned earlier stands.

15  **Q.**   Thank you.

16      Were there any -- this is pertaining to the September 27th

17  NEPC meeting.  Were there any questions by any of the NEPC

18  members regarding Dr. Sizyuk's discovery, learning, or

19  engagement?

20  **A.**   They were indirectly aimed at that when I presented her

21  case in terms of the evidence provided from the letters of

22  recommendation from folks all across the world, and there were

23  derogatory statements made on some of those letter writers,

24  yeah, saying they did not believe some of those letter writers

25  that were positively inclined in her favor.

1  **Q.**  Do you recall whose external letter writers, in particular,

2  were identified?

3  **A.**  No, I do not at this stage.

4  **Q.**  If I were to identify those from her dossier, could that

5  help refresh your memory?

6  **A.**  It might.  Believe me, it's been so many years.  That is

7  not directly my field of expertise nor research area, so I may

8  not recognize those names, yeah.

9  **Q.**  And then was a vote then taken after the deliberations were

10  over on September 27th?

11  **A.**  The vote was taken at that point, yes.

12  **Q.**  Did you participate in that vote?

13  **A.**  I did participate, yes.

14  **Q.**  Did you vote?

15  **A.**  Yes, I voted.

16  **Q.**  And how did you vote?

17  **A.**  I voted in favor.

18  **Q.**  To grant tenure?

19  **A.**  For promotion and tenure, yes.

20  **Q.**  Why did you vote that way?

21  **A.**  Okay.  I considered at a distance, despite I was her mentor

22  and I was presenting her case, in my own personal self-interest

23  and in the interest of the university at large, yeah.  We want

24  to succeed together, so I look for several metrics along those

25  lines, yeah.

 1       I look for scholarship.  I look for relative independence

 2  in achieving success, and then I look to see what kind of roles

 3  that particular individual has played in society at large,

 4  yeah.

 5       And there is one more metric that was entered circa 2019

 6  by the then-president, or ex-governor, Mitch Daniels, that

 7  deals with impact, impact of your work.  He wanted Purdue not

 8  just to remain in the top 100 of research universities but be

 9  on the preeminent status, the top five.  That's what we were

10  told, at least when I was participating in the area promotions

11  committee, to look for and pay specific and far more attention

12  to that fact.

13       Now, impact, how do you define impact?  (Indicating with

14  sound.)  That's an impact, but that's not what we're talking

15  about over here.  We're talking about what resonance it has in

16  the field and for the university at large worldwide, yeah.

17       So I took it upon myself to question the administration,

18  give me some examples of what kind of feedback I can provide to

19  my faculty folks in my school, yeah.

20  **Q.**  So if I could just stop you right here.  That's criteria

21  you're looking at.  My question to you, though, is specifically

22  applying that criteria to Dr. Sizyuk, why did you vote in favor

23  of tenure?

24  **A.**  I'm getting to it, sir --

25  **Q.**  Okay.  Thank you.

1    **A.**   -- if you could give me a moment, yeah.

2    **Q.**   Sure.

3    **A.**   With all due respect, of course.

4    **Q.**   Sure.

5    **A.**   So impact was important, yeah.  And I found out that while

6    examples of such impact would be from a nonbiased, third-party

7    venue; in this case, we disseminate our scientific research

8    work for publication in prestigious journals.  There are

9    various tiers of journals, as you can well imagine, in every

10   field.  In the world of technology, you have preeminent

11   journals like "Science."  And then you've got the second level

12   but still very high, and you've got tiers over there.  Those

13   tier levels for nuclear engineering field journals generally

14   are level of about one, one and a half or so.  I won't get into

15   those details of impact factors, but I looked at the journals

16   where Dr. Sizyuk's, Tatyana Sizyuk's, works, recent works with

17   her as a leader for that particular project that was being

18   disseminated -- those were in the three category, two and a

19   half to three-plus category.

20        Significantly above -- and not only that, they were being

21   cast as the front page, front page dissemination articles for

22   visibility in the interest of that journal, a third-party,

23   unbiased venue, so to speak.  I took that into consideration to

24   present as evidence of impact, which I would have if I were

25   presenting her case -- at least supporting her case at the area

1    promotions committee of which I was a part of.

2          Thereafter, I looked at independence, yeah.  Much is

3    talked about independence, but in my own case I receive

4    immediate tenure, and I was never independent, yeah.  In all of

5    my works at the national laboratory, I always relied on my team

6    members.  I led many of those teams.  There were worldwide

7    international team members involved, but I could never say that

8    this was just my work alone, yeah.  I worked in a team.

9          Tatyana Sizyuk worked as part of a team is what I'm trying

10   to get at.  We enticed them to leave Argonne National

11   Laboratory.  I was part of that -- I was a culprit in that

12   venue.  I worked with the administration at the time circa

13   2006, 2007, with the vice provost for research, Chip Rutledge,

14   and we wanted them to come to Purdue.  She was part of that

15   center that was established.  She was part of the team that was

16   writing joint proposals.

17         So I look for independence.  Post-2014 is when she started

18   getting into the tenure-track route.  That's when you expect

19   the candidate to rise above that particular immediate family to

20   which she belongs, just like our children.  They grow up with

21   us, and then they march off exponentially and never say "hello"

22   to you afterwards, yeah.  Excuse me for saying that.  I've got

23   three daughters.

24              **THE COURT:**  All right.  The next question.

25              **THE WITNESS:**  Yes.  And I'm answering that, if you

1    just give me a moment.  I'm not here to give a lecture to you

2    folks.  It's just that --

3              THE COURT:  But he really needs to ask you question

4    by question, and that makes the best record.

5              THE WITNESS:  I'm sorry.  So he's asking me for my

6    view for why I voted for her.

7              THE COURT:  He'll ask you the next question, and

8    then you can answer that and give detail where it's

9    appropriate.  Okay?

10             THE WITNESS:  Yes, Your Honor.  Sorry for my

11   mistake.

12             THE COURT:  Not to worry.

13       Next question.

14             MR. SINK:  Thank you, Judge.

15   BY MR. SINK:

16   Q.   Did Dr. Sizyuk establish independence from Dr. Hassanein?

17   A.   In my opinion, yes.

18   Q.   Can you briefly -- briefly -- explain why you feel that

19   way?

20   A.   I say that because of the track history that I noted.  She

21   was on a major, multimillion-dollar proposal as a coprincipal

22   investigator with close to a million dollars to her name and

23   her responsibility starting in 2014 or so.  So I would have

24   expected her name to be on multiple journal articles written

25   jointly with the principal investigator, Dr. Hassanein, during

1    that time frame when she was on the tenure-track route, yeah.

2    It's important to keep in mind -- that would have been a

3    reason.  I would have been surprised if it was not, yeah.

4         Thereafter, as she closed in on 2018, 2019, she started

5    producing journal articles that were peer reviewed and

6    exemplified as top-notch as color-page articles independently

7    of herself, and she started working very hard.  I encouraged

8    her to nail down certain grants, and she worked feverishly on

9    that front; and at that point she also established her grant of

10   about 800,000 to $750,000 just during that time frame when her

11   promotion package was being considered for voting, yeah.

12   **Q.**  Thank you.

13        Have you sat on other NEPC committees with Dr. Ishii for

14   other applicants?

15   **A.**  Yes.

16   **Q.**  And have you had communications with Dr. Ishii?

17   **A.**  Only in those meetings, yeah.

18   **Q.**  Have you observed Dr. Ishii communicate with other faculty

19   in those NEPC meetings?

20   **A.**  Yeah, we have joint discussions.

21   **Q.**  In any other NEPC meeting, have you ever heard -- outside

22   of Dr. Sizyuk, have you ever heard Dr. Ishii raise any concern

23   over the validity of a candidate's Ph.D.?

24        **MR. KEALEY:**  Your Honor, at this point we're getting

25   into collateral matters because the case-by-case decisions

1    about other candidates are very candidate specific, and if this

2    door is opened, we'll have to spend all kinds of time talking

3    about all kinds of information to put this in context, and

4    that's just far afield from our task at hand.

5              THE COURT:  Can you rephrase the question to be more

6    specific?

7              MR. SINK:  It's pretty specific.

8              MR. KEALEY:  Your Honor, if I may, Dr. Taleyarkhan

9    has testified that he's been a tenured member of the faculty

10   since 2003, 20 years ago.  That's a long period of time and a

11   lot of NEPC meetings and a lot of candidates.

12             MR. SINK:  That just proves my point that I'm trying

13   to make, Your Honor.

14             THE COURT:  He can answer that, and we'll see where

15   we're going on that.  I just would suggest, Counsel, that your

16   questions be very specific and that the witness just answer

17   that question because it's easier for us to take in your

18   testimony --

19             THE WITNESS:  Yes, Your Honor.

20             THE COURT:  -- on a sentence-by-sentence kind of

21   presentation.  Okay?

22             THE WITNESS:  I will.  Thank you.

23   BY MR. SINK:

24   Q.  So the question, sir, was:  Outside of Dr. Sizyuk, have

25   you -- in the context of NEPC deliberations, have you ever

1    heard Dr. Ishii raise any concern over any other candidate's

2    validity of their Ph.D.?

3    **A.**   No.

4    **Q.**   And, again, outside of Dr. Sizyuk and the --

5    **A.**   Excuse me.  I'm now just recollecting.  The answer is yes.

6    It was just after I had joined Purdue University in 2003, 2004

7    area where during deliberations for --

8    **Q.**   So don't -- let me stop you right there.

9              **THE COURT:**  He'll ask you the next question.

10             **MR. SINK:**  Yeah.  You said yes.  You answered the

11   question.

12             **THE WITNESS:**  I'm so sorry.

13             **MR. SINK:**  Okay.  I'm going to move on.

14   **BY MR. SINK:**

15   **Q.**   Have you ever heard Dr. Ishii make any statements that

16   would reflect his bias against women and/or non-Asians?

17   **A.**   Yes.

18   **Q.**   What have you heard directly from Dr. Ishii, not from third

19   parties?

20   **A.**   That especially women, and I guess Caucasian, candidates

21   were not up to par and, of course, in another case that their

22   Ph.D. that was obtained elsewhere in the world could not be

23   considered as being equivalent or appropriate for Purdue

24   University.

25   **Q.**   Anything else?

1   **A.**   Generally speaking, that -- it's very difficult for me to

2   say this for a colleague, but that, I guess, the Caucasian

3   Americans, men and women, especially women, were lazy; wouldn't

4   do half the work of somebody from Asia, especially from the

5   orient.  And so it's difficult.  I try to sort of close my ears

6   when I hear those statements.

7   **Q.**   I want to focus in on a time period of September 2019.

8   **A.**   September, okay.

9   **Q.**   Can you describe for the jury any social dynamics within

10   the NEPC at that time, including any factions or alliances?

11   **A.**   The environment that I witnessed at that voting meeting was

12   almost like that of a lynch mob, yeah.

13          **MR. BOWLING:**   Your Honor, objection.  Nonresponsive

14   and move to strike and admonish the jury --

15          **THE WITNESS:**   That was the environment --

16          **THE COURT:**   Wait.  Stop.  Sir, please stop because I

17   have to go over that and rule on his objection, so just wait.

18      Hold on.  Let me read what's on the transcript here.

19          **THE WITNESS:**   With all due respect, I need a lot of

20   guidance on how to act in court.

21          **THE COURT:**   That's okay.  Just ask me if you have a

22   question, okay.  We'll get your testimony in.  Just wait now

23   until I hear from the attorneys and make a decision.

24          **THE WITNESS:**   Okay.

25          **THE COURT:**   All right.  Let's go to sidebar on this,

 1    please, Counsel.

 2         (Bench conference on the record.)

 3              **THE COURT:**  Okay.  Your objection, go ahead.

 4              **MR. BOWLING:**  Your Honor, it was nonresponsive to

 5    the question; and, moreover, it is inflammatory and a matter of

 6    opinion.  It has nothing to do with the question about whether

 7    there might be factions or whether there may be allegiances or

 8    other networks on the committee.  Saying the committee is a

 9    lynch mob, that's just inflammatory rhetoric.  It's not his

10    personal knowledge that he can testify.

11              **THE COURT:**  But the question was specific to him and

12    his discussions with Ishii, but I don't know if I've heard a

13    time period.

14              **MR. SINK:**  At the very beginning I said September of

15    2019.

16              **THE COURT:**  On that question?

17              **MR. SINK:**  Yes.

18              **MR. KEALEY:**  I think the question was observation of

19    factions, and that's -- what was answered was not observation

20    of factions.  What was answered was something else.  That's

21    hard to say --

22              **THE COURT:**  He was hard to follow.

23              **MR. KEALEY:**  Yeah.

24              **THE COURT:**  I think we need to go back and be

25    specific in your question and anticipate, if you do so, that

1    he'll be allowed to respond to it.  But you need to do it --

2    you need to keep it clear so that this jury can take it in

3    properly.

4              **MR. SINK:**  Okay.

5              **THE COURT:**  We have time.  We have about 20 more

6    minutes before we recess.  I anticipate you need to tell him to

7    just answer the questions that are being asked.

8              **MR. SINK:**  Okay.  Okay.

9              **THE COURT:**  Or I can do it, and I'll keep doing it,

10   but it's really the lawyers that need to.

11             **MR. SINK:**  I can't lead so I'm walking a fine line.

12   I'll do my best.

13             **THE COURT:**  You can say "Stop."

14             **MR. SINK:**  Sure.

15             **THE COURT:**  All right.  Anything else?

16             **MR. BOWLING:**  Your Honor, we still object to the

17   phrase "lynch mob."  It's inflammatory and nonresponsive.  We'd

18   ask the jury to be admonished to disregard it.

19             **THE COURT:**  I'll try to remember that.

20        Anything else?  Well, you know what, you're highlighting

21   it again.  Let's just leave it and --

22             **MR. BOWLING:**  Fair enough.

23             **THE COURT:**  -- reset.

24             **MR. KEALEY:**  Leave it there.  I'll explore it on

25   cross-examination.

1          **THE COURT:**  Let's reset.  Let's go.

2      (End of bench conference.)

3          **THE COURT:**  Professor, what I want you to do is just

4  listen to the question that is asked of you by any of the

5  attorneys that are asking you questions.  Okay?  Just answer

6  that.  And if there is additional information they want to get

7  from you, they'll ask you a follow-up question.

8          **THE WITNESS:**  Okay.  I'll do my best.

9          **THE COURT:**  It's really the best way to make our

10  record in this case and for the jury to understand your

11  testimony.  Okay?

12          **THE WITNESS:**  I'll do my best, Your Honor.  I'm

13  sorry for my behavior.  I don't mean disrespect.

14          **THE COURT:**  I understand that.  Let's just take it a

15  question at a time.  Okay?

16          **THE WITNESS:**  Okay.

17          **THE COURT:**  If you have any questions, you can ask

18  me.

19          **THE WITNESS:**  Thank you very much.

20          **THE COURT:**  All right.

21      Next question.

22  **BY MR. SINK:**

23  **Q.**  So parameters here.  Time period, September 2019.  My

24  question is specifically to your observations of any factions

25  or alliances in the school of -- the NEPC at the time.  Please

 1   do not opine on any other matter further.

 2       So can you describe, based on your observations and

 3   experiences, in September of 2019 the social dynamics within

 4   the NEPC, including any factions or alliances at that time.

 5   **A.**   I do not recall.  I do not.

 6   **Q.**   You were present at all three of these NEPC meetings?

 7   **A.**   Yes.

 8   **Q.**   And you heard what Dr. Ishii said at all three of those

 9   meetings, right?

10   **A.**   I was there, yeah.

11   **Q.**   And his statements that were made during those three

12   meetings regarding Dr. Sizyuk's Ph.D. and her title at Argonne,

13   what impact did that have on the overall deliberations that

14   occurred?

15           **MR. BOWLING:**  Objection.  Calls for speculation as

16   to --

17           **THE COURT:**  Rephrase.  It does.  If you could

18   rephrase that so that he's not speculating.

19           **MR. SINK:**  Well, I'm asking for his observations of

20   what was explicitly discussed.

21           **THE COURT:**  I hear -- rephrase it.  We'll get there,

22   but rephrase it.

23           **MR. SINK:**  Okay.

24   **BY MR. SINK:**

25   **Q.**   So you were at all three meetings and you heard what

1  Dr. Ishii had to say regarding Dr. Sizyuk's Ph.D. and title at

2  Argonne, right?

3  **A.**   Yes.

4  **Q.**   Okay.  Dr. Ishii's statement on those topics, did that

5  impact the substance of what was verbally discussed among the

6  NEPC members?

7  **A.**   It was brought up.

8  **Q.**   Was her Ph.D. then discussed?

9  **A.**   It was discussed as being inappropriate, yeah.

10  **Q.**   And was her prior job title at Argonne then discussed?

11  **A.**   I presented my findings at that point, and there was no

12  objections.

13       (Plaintiff's Counsel confer off the record.)

14           **MR. SINK:**  Thank you, sir.  I have no more at this

15  time.

16                     **CROSS-EXAMINATION**

17  **BY MR. BOWLING:**

18  **Q.**   Good morning, Dr. Taleyarkhan.  I guess it's almost noon

19  but still morning.  I have a few questions for you.

20        I'm going to go back to this April 30, 2019, NEPC meeting.

21  You don't specifically recall what Dr. Ishii said, correct?

22  **A.**   Not the specific words, yeah.

23  **Q.**   Right.  And you don't specifically remember -- strike that.

24  **A.**   May I correct myself?

25  **Q.**   If your prior answer was incorrect, yeah.

1   **A.**   Okay.  If I may respond?

2   **Q.**   Yes, please, if it's responsive to --

3          **THE COURT:**  Yes, you may make your statement if

4   you're correcting something you just said.

5          **THE WITNESS:**  Yes.

6   **BY THE WITNESS:**

7   **A.**   I wanted to correct that while -- what I mentioned in

8   context that there were -- derogatory statements made against

9   Caucasian and women, in particular, were correct, yeah.  That's

10  all I wanted to say.

11  **BY MR. BOWLING:**

12  **Q.**   And -- okay.  My question specifically was about the

13  April 30, 2019, NEPC meeting.  Okay.  Are you following me?

14  **A.**   Yes.

15  **Q.**   Okay.  Are you contending -- you don't contend that

16  Dr. Ishii said anything negative about women or Caucasians at

17  that meeting, correct?

18  **A.**   I said he did.

19  **Q.**   At the NEPC meeting?

20  **A.**   At the NEPC meetings, yeah.

21  **Q.**   Okay.

22          **THE COURT:**  If I can interject while you're looking

23  for that, Counsel.

24          **MR. BOWLING:**  Sure.

25          **THE COURT:**  Are there reports taken of each of these

1    committees?  Like that NEPC meeting, is that recorded where

2    somebody is taking notes?

3              **THE WITNESS:**  My recollection, Judge, is that at one

4    point long time ago it used to but not for these meetings.  The

5    secretary who used to do that was asked to not do any

6    recording.

7              **THE COURT:**  Okay.  Thank you.

8    **BY MR. BOWLING:**

9    **Q.**  Dr. Taleyarkhan, you remember giving a deposition in this

10   case back in 2021?

11   **A.**  Yes, I do.

12   **Q.**  Okay.  Do you remember being asked questions about whether

13   Dr. Ishii had made derogatory statements about women?

14   **A.**  No, I do not.

15   **Q.**  Okay.

16   **A.**  Well, at least not from you or from the -- from an attorney

17   other than Mr. Sink.

18   **Q.**  I'm sorry, sir.  I didn't understand your answer.

19   **A.**  I do not recall being asked that question by multiple

20   attorneys.  I remember the question that was asked by Mr. Sink,

21   and he pointed out that I answered a similar question on

22   April 30.  He pointed out to that page 54, which we went

23   through just a short while ago.

24   **Q.**  Do you have a deposition in front of you, sir?

25   **A.**  Maybe it was same question being asked differently.  It

1  could be different.  I don't know, if that's what you're

2  pointing out.

3  Q.  No, Dr. Revankar -- I'm sorry.

4      Dr. Taleyarkhan, do you have the deposition in front of

5  you?

6  A.  Yes, I do.

7  Q.  Would you please turn to page 83.  Let me know when you're

8  there, please.

9  A.  I'm on page 83.

10 Q.  Okay.  Would you read to yourself, not aloud, please,

11 the -- beginning on page 83, line 13, over to page 84, line 4,

12 and let me know when you're done, please.

13 A.  Yes, I'm done.

14 Q.  At that deposition you testified that, in fact, these

15 alleged statements by Dr. Ishii that were derogatory with

16 respect to women and Caucasians were made, to use your words,

17 2004, maybe 2006, 2008, correct?

18 A.  Right.

19 Q.  That was considerably earlier than the NEPC meeting in

20 2019, correct?

21 A.  Yes.

22 Q.  Okay.  And, in fact, at your deposition -- go back to

23 page 54, please.  Let me know when you're there.

24 A.  Okay.

25 Q.  At that deposition you were asked, do you remember

1   specifically what -- again, with respect to the April 30, 2019,

2   meeting, do you remember specifically what Dr. Ishii said about

3   those issues during this meeting?  And your answer was "No,"

4   correct?

5   **A.**  Yes.  That's what I answer at that time.

6   **Q.**  Okay.  And at the 2001 deposition where -- let me back up a

7   second.  At the 2001 deposition --

8   **A.**  Did you say 2021 or 2001?

9   **Q.**  I'm sorry.  I misspoke.  You're right.  At the 2021

10  deposition you took an oath to tell the truth, correct?

11  **A.**  Yes.

12  **Q.**  And at that deposition, you never said anything about

13  Dr. Ishii making negative comments about women or Caucasians at

14  the 2019 NEPC meeting, right?

15  **A.**  At the point that was my recollection, yeah.

16  **Q.**  I'm sorry?

17  **A.**  That was my recollection as best I could remember at the

18  time.

19  **Q.**  Okay.  So are you saying -- are you saying your memory is

20  better today than it was in 2021?

21  **A.**  It's just that this case has come up, and you go back

22  memory lane that you don't have the time to do when you're

23  under a deposition.  I'm just a scientist, so I make mistakes.

24  And if I recollect, I'm under oath today to say things that I

25  recollect as best as I can of events of the past, and that's

1    what I'm trying to do as best as I can.

2    **Q.**  Just so I'm clear, you are remembering things today in

3    January of 2024 that you didn't remember in June of 2021,

4    correct?

5    **A.**  Under the circumstances, yes.

6    **Q.**  Okay.  And there were seven other people present at that

7    NEPC committee meeting, right?

8    **A.**  2019, yeah, I believe there were seven or eight.

9    **Q.**  And that's true of all three meetings, correct?

10   **A.**  That's my recollection.  I'm not exactly sure of the

11   precise number.

12   **Q.**  And just to be clear, you're sitting there hearing -- at

13   this NEPC meeting in 2013, you're hearing Dr. Ishii make

14   derogatory comments about women and Caucasians, correct?

15   **A.**  (Nodding head.)

16   **Q.**  You have to answer out loud, sir.

17   **A.**  For this particular case.

18   **Q.**  Okay.  And did you take any notes about those comments?

19   **A.**  No, we're not allowed to take notes.

20   **Q.**  Did you make any kind of report to the Purdue

21   administration to say, "Hey, we got a professor here at a

22   tenure committee meeting making derogatory remarks about people

23   based on race and gender"?

24   **A.**  I did not at the time, no.

25   **Q.**  Did you do it at any time?

1    **A.**  This goes back to 2006 --

2    **Q.**  No, we're talking about 2019.  My question is --

3    **A.**  For this -- are you asking --

4    **Q.**  No, no, no.  I'm asking --

5          **THE COURT:**  Stop.  Listen to his question, or we can

6    read it back --

7          **THE WITNESS:**  Please --

8          **THE COURT:**  -- but you can't -- Professor, we can't

9    talk over each other.  It's hard to follow by the jury, by me,

10   but also for the court reporter, so that's why we have to go

11   very orderly back and forth.

12       Read back counsel's last question in full.  Listen to

13   that, Professor, and answer that if you can.

14         **THE WITNESS:**  Okay.  Please, if you wouldn't mind

15   repeating the question.

16         **THE COURT:**  She will.  She's finding it.

17       (The record was read as requested.)

18   **BY THE WITNESS:**

19   **A.**  The answer is no.

20   **BY MR. BOWLING:**

21   **Q.**  Did you send anybody an e-mail saying words to the effect,

22   "Hey, I just heard a professor make sexist and racist remarks

23   at a tenure committee meeting"?

24   **A.**  We're not allowed to do so, and I did not.

25   **Q.**  You're not allowed to send an e-mail?

 1   **A.**   We are supposed to keep those deliberations confidential.

 2   **Q.**   And if those comments were made by Dr. Ishii at an NEPC

 3   meeting, presumably other people heard them, correct?

 4   **A.**   I would presume so.

 5   **Q.**   Okay.  And presumably they could tell this Court that they

 6   heard them, correct?

 7   **A.**   Could you please repeat the question.

 8   **Q.**   Well, if those other folks were present and heard Dr. Ishii

 9   make sexist and racist remarks at a tenure committee meeting,

10   those folks could come in and verify that with this Court,

11   correct?

12   **A.**   Under normal circumstances, you would expect to see that

13   happen.

14   **Q.**   In about 2006, that time period, you're aware that

15   Dr. Ishii made a written request to the Purdue administration

16   asking that some of your -- some issues related to your

17   research be examined, correct?

18   **A.**   My research --

19              **MR. SINK:**  Objection.

20              **THE COURT:**  Stop.  There's an objection.

21              **MR. SINK:**  Objection.  It's beyond the scope of

22   direct.

23              **THE COURT:**  That's true.

24              **MR. BOWLING:**  It goes to bias, Your Honor.

25              **THE COURT:**  All right.  We'll take it up over the

 1    lunch hour.  It's 12:00 o'clock now, so we're going to take our

 2    lunch break.

 3        Ladies and gentlemen of the jury, we have the same setup

 4    for lunch for you today as we did yesterday.  I just remind you

 5    that during this recess, there should be no discussion with

 6    regard to the case or the testimony that you have been hearing

 7    or the evidence that has been put into the record.  So keep

 8    that in mind.

 9        I would ask you to be back here by 1:00 o'clock, and we'll

10    resume and keep the same time as we have been; that is, we will

11    be concluded today by 4:00 o'clock.  Remember to leave your

12    notebooks in the jury room and, again, make sure that you are

13    not -- the Court's admonition to you that you cannot discuss

14    the case with anyone.  Don't listen to any media.  If somebody

15    goes by or is close by that's not a juror and they're talking

16    about the case, you must not stay in place.  You must walk away

17    from that so you don't hear what they are saying.

18        With that, please be back here by 1:00 o'clock, and we'll

19    be back at it.  Thank you.

20        (Jury out at 11:59 a.m.)

21            **THE COURT:**  Go ahead and be seated, please.

22        You can step down.  You should take your notes with you.

23    You can step down right now.

24        So I would ask that you be back here by 20 minutes until

25    1:00, and we can resolve, hopefully, any issues that we have

Ashley N. Stokes, CSR, RPR
Ashley_Stokes@innd.uscourts.gov/ (219) 852-6557

1    been -- that you anticipate presenting so that it's not on the

2    jury's time so by the time they come back into the courtroom to

3    listen to testimony, everybody's got their ducks in a row.

4    Okay.  We're adjourned.

5        (Recess taken at 12:02 p.m.)

6                          * * * * *

7                        *CERTIFICATION*

8

9        I, ASHLEY N. STOKES, Federal Court Reporter, certify
     that the foregoing is a correct transcript from the record of
10   proceedings in the above-entitled matter.

11

12       S/Ashley N. Stokes_____ January 25, 2024
         Certified Realtime Reporter
13       United States District Court
         Northern District of Indiana
14       Hammond Division

15

16

17

18

19

20

21

22

23

24

25

                    Ashley N. Stokes, CSR, RPR
            Ashley_Stokes@innd.uscourts.gov/ (219) 852-6557