```
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF INDIANA
2                        LAFAYETTE DIVISION

3  TATYANA SIZYUK,                    )
                                      )
4       Plaintiff,                    )
                                      )
5    vs.                              )  Case No.
                                      )  4:20-cv-00075-TLS
6  PURDUE UNIVERSITY, BOARD OF        )
   TRUSTEES OF PURDUE                 )
7  UNIVERSITY, and MAMORU ISHII       )
   in his personal capacity           )
8                                     )
        Defendants.                   )
9  _____   )

10

11                  DAY THREE OF JURY TRIAL
                      AFTERNOON SESSION
12                    JANUARY 24, 2024
             BEFORE THE HONORABLE THERESA L. SPRINGMANN
13                 UNITED STATES DISTRICT COURT

14  APPEARANCES:

15

16  FOR THE PLAINTIFF:       RYAN P. SINK and RYAN C. FOX
                             Fox & Sink LLC
17                           6177 North College Avenue
                             Indianapolis, Indiana 46220
18                           317-254-8500
                             Fax: 317-226-9311
19                           Email: rsink@foxsinklaw.com

20

21  FOR DEFENDANT PURDUE:    WILLIAM P. KEALEY and
                             MATTHEW M. HUMBLE
22                           KIRSTIE E. KLUTZKE
                             Stuart & Branigin LLP
23                           300 Main Street, Suite 900
                             P.O. Box 1010
24                           Lafayette, Indiana 47902-1010
                             765-423-1561
25                           Email: wpk@stuartlaw.com
```

```
 1   APPEARANCES (Continued)

 2

 3   FOR DEFENDANT ISHII:       JOSEPH NEAL BOWLING and
                                JANELLE P. KILIES
 4                              Lewis Wagner LLP
                                1411 Roosevelt Ave Ste 102
 5                              Indianapolis, IN 46201
                                317-237-0500
 6                              Email: nbowling@lewiswagner.com

 7

 8   ALSO PRESENT:             Dr. Mamoru Ishii

 9

10   OFFICIAL REPORTER:        Angela Phipps, RMR, CRR, FCRR
                                5400 Federal Plaza
11                              Hammond, Indiana 46320

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings reported by stenotype.  Transcript produced by

25   computer-aided transcription.
```

1          **COURTROOM DEPUTY:**  All rise.

2          **THE COURT:**  Go ahead and be seated, please.  And

3    thank you, Counsel, for coming back on the lunch so we can take

4    care of this issue, the last objection.

5          So was there anything else to add to the discussion,

6    Mr. Bowling?

7          **MR. BOWLING:**  Yes, Your Honor, if I may.  As we

8    pointed out under Rule 404(b)(2), evidence is admissible to

9    prove motive, and that's exactly what we'll be using this

10   evidence for.

11         And, furthermore, on a larger scale of things, the

12   plaintiff's counsel was asked multiple times why would -- in

13   fact, our own client, why would Dr. Taleyarkhan lie; what

14   motive does he have.  That certainly opens the door for us to

15   get into any possible motivation that Dr. Taleyarkhan may have

16   so we may address that very question.

17         **THE COURT:**  Anything else --

18         **MR. SINK:**  Yes, Your Honor.

19         **THE COURT:**  -- for the Plaintiff?  Go ahead,

20   Mr. Sink.

21         **MR. SINK:**  That question was asked to Dr. Ishii, not

22   to Dr. Taleyarkhan, so I believe it's beyond the scope of my

23   direct.  And, furthermore, I just did a quick Google search; it

24   appears there was even litigation over this issue.  So my fear

25   is kind of, like other objections have been raised, this will

1   essentially create, like, a little mini-trial that goes well

2   beyond the scope of what's relevant in the case.

3           **THE COURT:**  Well, what, is there other litigation or

4   was there in the past; is that an issue that we're going to

5   have to deal with?

6           **MR. KEALEY:**  I can speak to that, Your Honor.

7           **THE COURT:**  All right.  Go ahead, sir.

8           **MR. KEALEY:**  In or about 2008 to 2010,

9   Dr. Taleyarkhan filed a Title VII lawsuit against the

10  university, alleging race and national origin discrimination

11  relating to the bubble fusion investigation.

12      He also filed lawsuits against the federal government

13  relating to the bubble fusion investigation.

14          **THE COURT:**  Is that still -- That's an old case?

15          **MR. KEALEY:**  Yeah.

16          **THE COURT:**  So I assume it was resolved?

17          **MR. KEALEY:**  The Title VII case was dismissed long

18  ago by Judge Moody on procedural grounds, and the federal --

19  the allegations against federal government, I believe, went

20  away a decade or more ago.

21          **THE COURT:**  All right.

22          **MR. SINK:**  Your Honor, if I may add?

23          **THE COURT:**  Go ahead.

24          **MR. SINK:**  It would be one thing if there was a

25  lawsuit by Dr. Taleyarkhan against Dr. Ishii.  But to my

```
 1   knowledge, but Mr. Kealey could correct me if I'm wrong,

 2   Dr. Ishii was not sued individually by Dr. Taleyarkhan.

 3             THE COURT:  It was only against Purdue; is that

 4   right?

 5             MR. SINK:  I'm not sure.

 6             MR. KEALEY:  I believe it was a Title VII claim

 7   against the university.  There was also a Section 1983 claim in

 8   that complaint, and I don't recall who the individual-named

 9   defendant was.  But, yes, he does have a history of adversity

10   that I, frankly, might explore on my cross-examination, because

11   he has in the past expressed a lot of, kind of, upset that

12   we've already seen elicited on direct examination.

13             THE COURT:  Referencing?

14             MR. KEALEY:  Referencing the School of Nuclear

15   Engineering.  The specific subject of his Title VII lawsuit was

16   his contention that the university, in responding to research

17   misconduct allegations that came from, among other people, some

18   of his colleagues in the School of Nuclear Engineering, that

19   the university responded to those allegations on the basis of

20   his race and national origin.

21             MR. BOWLING:  And if I may add, Your Honor.

22             THE COURT:  Go ahead.

23             MR. BOWLING:  I don't intend to get into all of the

24   subsequent litigation.  I don't really care about any of that.

25   But there was some testimony in Dr. Taleyarkhan's deposition
```

```
 1    where he specifically mentioned he volunteered that he believes

 2    the investigation that led to -- the investigation over the

 3    bubble fusion experiments, whether he's right or not, he

 4    believes they were initiated because of a letter from

 5    Dr. Ishii.  That certainly goes to his motive to potentially

 6    mischaracterize or even fabricate allegations against

 7    Dr. Ishii.

 8              MR. SINK:  Your Honor, I don't recall that testimony.

 9    And if it's possible, I'd like to see that in the record.

10              MR. BOWLING:  On page 87, I believe.

11              THE COURT:  Of his deposition?

12              MR. BOWLING:  I believe so.

13              MR. SINK:  Oh, okay, I was talking about his live

14    testimony.  All of this relates back to whether or not

15    Dr. Taleyarkhan would have bias and lie under oath against

16    Dr. Ishii.  So absent that connection --

17              THE COURT:  So how far are we going into that, then,

18    if the Court considers it relevant to follow up on?

19              MR. BOWLING:  I'm sorry, Your Honor?

20              THE COURT:  How far are we going to go into the

21    details?

22              MR. BOWLING:  My intention, Your Honor, was to ask,

23    first of all:  You are aware that Dr. Ishii submitted a request

24    to the Purdue administration to conduct an examination of some

25    issues related to your research.  I assume he's going to say
```

1    yes, and that that investigation, in fact, resulted in formal

2    discipline and that the -- it also led to the U.S. government

3    conducting an investigation, which led to his -- or I'll stop

4    there.

5            **THE COURT:**  Okay.

6            **MR. SINK:**  I would make a continuing objection on

7    that entire line because, again, it's not connected to

8    Dr. Ishii.

9            **MR. BOWLING:**  Well, actually, it is, and since -- in

10   the sense of at least Dr. Taleyarkhan appears to believe that

11   it is possible of Dr. Ishii.

12           **MR. SINK:**  I've heard no testimony today from

13   Dr. Taleyarkhan saying that.

14           **MR. KEALEY:**  Dr. Ishii himself has testified on this

15   topic of the federal environment earlier today.

16           **THE COURT:**  But all these individuals are on the

17   committee as well?

18           **MR. KEALEY:**  Yes.  Dr. Taleyarkhan is.  Dr. Ishii is.

19           **THE COURT:**  All right.  What was the last question?

20   Because we have to go back to that.  I have a new court

21   reporter.  When you go back to the podium, what's going to be

22   the next question to follow up on that?

23           **MR. BOWLING:**  Do you want me to --

24           **THE COURT:**  No, just tell me what it is.  Stay there

25   until I get the jury back in.

1         **MR. BOWLING:**  It would be:  Dr. Taleyarkhan, you're

2   aware that Dr. Ishii submitted a written request to the Purdue

3   administration --

4         **THE COURT:**  Back in?

5         **MR. BOWLING:**  -- requesting an examination of certain

6   issues related to your bubble fusion experiment?

7         **THE COURT:**  So as long as we are not going into the

8   whole litigation and everything involved in it.

9         **MR. BOWLING:**  No.

10        **THE COURT:**  But just, you know, mark it as an event

11  to which the Plaintiff can respond.  I'm going to allow that.

12        **MR. BOWLING:**  Yeah, I have no intention at all of

13  asking about any lawsuits.

14        **THE COURT:**  Okay.  Anything else, then, the Plaintiff

15  wants to put in the record on that, understanding that very

16  narrow inquiry?

17        **MR. SINK:**  I think my objection is noted for the

18  record.

19        **THE COURT:**  All right.

20        **MR. SINK:**  I'll say no more.

21        **MR. BOWLING:**  And just for counsels' benefit, I think

22  I misspoke about the pages of the deposition.  It was actually

23  pages 89 to 90, Ryan, where --

24        **THE COURT:**  I have it page 87 -- I'm sorry.  That was

25  Plaintiff.  So where are you going to reference in the depo?

1        **MR. BOWLING:**  Assuming that he does not testify

2   inconsistent with the deposition, I don't intend to bring up

3   his deposition testimony.  It would only be should he testify

4   inconsistently.

5        **THE COURT:**  Well, that's what we'll do when he comes

6   back on the stand; he can be asked that question.  But just as

7   counsel realizes, the Court is looking at this as being a very

8   specific question and answer.

9        **MR. BOWLING:**  I will try to keep it very tight.

10       **THE COURT:**  Without going into all of the litigation

11   involved.

12       We've got five more minutes, and so I'm going to share

13   with you my thoughts over the lunch, and that is with regard to

14   Mr. Garner.  Now, has he gone back to Lafayette?  Is he back

15   there now or is he still --

16       **MR. SINK:**  He's a voting member, so I cannot talk to

17   him outside of scheduling.

18       **MR. KEALEY:**  He told me on his way out of the

19   courtroom he was heading back, Your Honor.

20       **THE COURT:**  That he was going back.  All right.  All

21   right.  I've been thinking through our sidebar with regard to

22   his testimony, and with regard to the conversation that he had

23   with Mr. Ishii and going back to some other matters in the

24   record as I was taking in his testimony and anticipating

25   whether or not they are pertinent to what I've heard and seen

1    in the trial so far.  And I'm of a mind right now to go back on

2    my ruling, to allow him to testify on that point, on that

3    issue.  And that was, there was an objection by the Defense on

4    that, and I granted it.  And as I've gone back now and looked

5    at my notes and the background in this case, I think I should

6    have overruled that objection.

7         My concern, I've only done this, I think, one other time

8    in another case many, many, many years ago.  And what I allowed

9    was to have that witness come back and to allow that question

10   that was blocked preliminarily, that he could answer that

11   question and any follow-up.  If they're not available to come

12   back in person, then to do a Zoom or something that would allow

13   that very limited testimony to come in.

14        I think, you know, it is relevant to the issues, and even

15   though it was the search committee, given the relationship

16   between Garner and Ishii at the time, I think it is relevant

17   and appropriate.  I don't think it's outside the issues that

18   we're dealing with in this case.

19        So I just wanted you all to know so that he can be called

20   back.  It's going to be very limited, but I wanted to let you

21   know that and maybe think through how you want to do it over

22   the afternoon, and maybe we could get it done first thing

23   tomorrow, because it should be, you know, nothing more than a

24   five- to ten-minute presentation.  But that's my ruling at this

25   point.

1      So any question on that?  Because, otherwise, I'm going to

2   leave it to counsel to figure out how you want to do that.

3          **MR. SINK:**  Yeah, just under --

4          **THE COURT:**  You don't have to tell me yet.

5          **MR. SINK:**  Sure.  Under the confines of Rule 4.2, I

6   will just need counsel for Purdue's help organizing that.  And

7   I'm willing to, you know -- I think it would be kind of silly

8   to have him drive all the way back for 30 seconds to a minute

9   of testimony.

10         **THE COURT:**  You can do that, too.  He can either come

11  back in person; or if there's something that can be read into

12  the record to that effect from his deposition or whatever,

13  that's fine, too.

14         **MR. BOWLING:**  Well, there actually is the offer of

15  proof on the record.

16         **THE COURT:**  Pardon?

17         **MR. BOWLING:**  There is the offer of proof on the

18  record.

19         **THE COURT:**  I'm leaving it to you.  I'm just telling

20  you, it can come in in some form.

21         **MR. SINK:**  Okay.  We'll talk about it.

22         **THE COURT:**  Okay.  Good.  And I think it makes a

23  better record for everybody's -- in everybody's interests to do

24  that at this point.

25      All right.  Five minutes.  Anything else we need to

```
 1    discuss before we bring the jury back in and tell them they're
 2    missing five minutes on their lunch?  For Plaintiff?
 3            MR. SINK:  No, Your Honor.
 4            THE COURT:  For the university?
 5            MR. KEALEY:  No, Your Honor.
 6            THE COURT:  For the professor?
 7            MR. BOWLING:  No, Your Honor.
 8            THE COURT:  Tell them they can come in.  It's a
 9    little bit earlier, but if they're ready, we're ready for them.
10        Where's the professor?  Is he outside?  Is he waiting
11    outside?
12            MR. FOX:  I'll go get him.
13            MR. SINK:  I need him, right?
14            THE COURT:  Pardon?
15            MR. SINK:  I said we need him, don't we?
16            THE COURT:  Well, you've all been just, really, very
17    good about keeping our time schedule and getting people here
18    and the presentation, so let's just keep it going.
19            MR. BOWLING:  Your Honor, just to advise the Court,
20    my colleague stepped out for a second to work on something;
21    she'll be right back.
22            THE COURT:  It's okay if we go forward?
23            MR. BOWLING:  Yes.
24            THE COURT:  Okay.
25        (Jury in at 1:00 p.m.)
```

1    **THE COURT:**  Go ahead and be seated now.

2        Let me ask the jury-- go ahead; be seated --any events

3    occur over the luncheon that you think you need to report to

4    me?  If not, we're ready to go.

5        (No response.)

6        **THE COURT:**  Okay.  No issues.  Thank you.

7        Just a reminder, too, that if you have any questions of

8    witnesses, just remember all you have to do is just write it

9    down and just wave before they leave the courtroom so we can

10   make sure we get those responded.

11       All right.  With that, Mr. Bowling, you may continue with

12   your examination.

13       **MR. BOWLING:**  Thank you, Your Honor.

14                      <u>**CROSS-EXAMINATION**</u>

15   BY MR. BOWLING:

16   Q.   Dr. Taleyarkhan, I want to follow up with a couple -- on a

17   couple other matters.  As a preliminary issue, I may have a

18   question for you that calls for a yes or no answer.  I

19   understand there may be other things you want to say, but

20   you'll have that opportunity on redirect.  So if you would, if

21   I ask you a question that calls for a yes or no answer, if you

22   could please supply "yes" or "no."

23       Now, before lunch, I was starting to ask you a question.

24   You're aware that, back in about 2006, Dr. Ishii made a written

25   request to the Purdue administration requesting an examination

1   of some issues related to your research; correct?

2   A.    **I'm aware of a letter being written.**

3   Q.    By Dr. Ishii?

4   A.    **Yeah, but not to the administration.  To the head of the**

5   **school.**

6   Q.    To the head of the school?

7   A.    **Yeah.**

8   Q.    Of?

9   A.    **Of Nuclear Engineering.**

10  Q.    Of Nuclear Engineering, okay.  Thank you.

11        And, in fact, an investigation was done concerning your

12  bubble fusion research, correct, by the university?

13  A.    **By the -- Yes.**

14  Q.    Okay.  And as a result of that investigation, you were

15  judged guilty of research misconduct; correct?

16  A.    **Yes.**

17  Q.    And you were judged guilty of falsification of the

18  research record; correct?

19  A.    **Yes.**

20  Q.    Okay.  And the federal government conducted its own

21  investigation of those very matters; correct?

22  A.    (No immediate response.)

23  Q.    **Let me rephrase the question.  Maybe it's a poor --**

24  A.    **I'm not aware of the federal government having a separate**

25  **investigation.**

1    Q.    Okay.  It's a poor -- Maybe it was a bad question.  Let me

2    rephrase.

3        The federal government also conducted an investigation

4    concerning your bubble fusion research; correct?

5    A.    **No.**

6    Q.    The federal government conducted an investigation related

7    to some of your research; correct?

8    A.    **Not that I'm aware of.**

9    Q.    Well, the federal government took some adverse action

10   against you related to your research; correct?

11            **MR. SINK:**  Objection; lack of foundation.

12            **MR. BOWLING:**  He knows whether or not the federal

13   government took some adverse action.

14            **THE COURT:**  Well, it doesn't sound like it, so

15   sustained; rephrase.  Rephrase the question.

16   **BY MR. BOWLING:**

17   Q.    Dr. Taleyarkhan, in the past, has some of your work

18   involved obtaining grants from the federal government?

19   A.    **Yes.**

20   Q.    Did there come a time back shortly -- I mean, in the years

21   shortly after 2006, when you were unable to obtain any grant

22   from the federal government?

23   A.    **Yes.**

24   Q.    And why was that?

25   A.    **It's because I was debarred by the federal government,**

1  **yeah.**

2  Q.   Okay.  And that debarment was based, at least in part, on

3  your bubble fusion research; correct?

4  A.   **It was a based upon the investigation results at Purdue**

5  **University, yeah.**

6  Q.   And at least to some extent, you blamed Dr. Ishii for

7  that; correct?

8  A.   **I cannot blame him.  I can blame the overall process.**

9  Q.   And you feel you were treated unfairly; correct?

10  A.   **I was not treated fairly.**

11  Q.   Okay.  Now, I want to go to a different topic,

12  Dr. Taleyarkhan.

13      You stated that some issues were raised at the first NEPC

14  meeting in April of 2019 concerning Dr. Sizyuk's Ph.D.;

15  correct?

16  A.   **That is correct, yeah.**

17  Q.   Okay.  And at the time, Dr. Kim was the head of the School

18  of Nuclear Engineering; correct?

19  A.   **Yes.**

20  Q.   Okay.  And Dr. Kim was the NEPC's conduit to the provost

21  office on this issue; correct?

22  A.   **Could you please repeat that.**

23  Q.   It's a bad question.  Let me rephrase.

24      First of all, let me ask you:  You know what the provost

25  office is; correct?

TALEYARKHAN - CROSS BY MR. BOWLING

1    A.    **The provost?**

2    Q.    Yes.

3    A.    **Yeah, I knew who the provost was, yeah.**

4    Q.    Okay.  And at one point, Dr. Kim was asked by the NEPC to

5    discuss the issue of Dr. Sizyuk's Ph.D. with the provost

6    office; correct?

7    A.    **Did you say EAPC?**

8    Q.    No.  NEPC.

9    A.    Okay.  You said EAPC.

10   Q.    I'm sorry.  If I did, I misspoke.

11   A.    **All right.  There's a big difference.**

12   Q.    Yes.  And Dr. Kim reported back to the NEPC about his

13   discussions with the provost office; correct?

14   A.    **That is correct, yes.**

15   Q.    Okay.  And Dr. Kim explained that it was the opinion of

16   the provost office that Dr. Sizyuk's Ph.D. was valid; correct?

17   A.    **Was done right, correct.**

18   Q.    Okay.  And he relayed that to the entire NEPC; correct?

19   A.    **During the September meeting, as I recollect.**

20   Q.    Yeah.  Okay.

21        **MR. BOWLING:**  If I may have just one moment,

22   Your Honor.

23        (Brief pause.)

24        **MR. BOWLING:**  That's all I have.  Thank you,

25   Dr. Taleyarkhan.

1          **THE COURT:** Redirect?

2          **MR. KEALEY:** Your Honor, I have some.

3          **THE COURT:** Oh, I'm sorry, sir.

4                        **CROSS-EXAMINATION**

5     BY MR. KEALEY:

6     Q.    Good afternoon, Dr. Taleyarkhan.

7     A.    **Good afternoon.**

8     Q.    Shortly before lunch, you testified that you witnessed a

9     lynch mob on September 27th; do you recall that?

10    A.    **Yes.**

11    Q.    And that was an NEPC meeting that you were referring to?

12    A.    **Yes.**

13    Q.    Which of your NEPC colleagues were in the lynch mob?

14    A.    **I can certainly say for sure it was Dr. Ishii,**

15    **Dr. Revankar, and Dr. Choi, and Dr. Kim participated in those**

16    **discussions, did not stop the denigration on basis of Ph.D. and**

17    **so on.  And, of course, the last one that I can think about is**

18    **the two others, Dr. Abdel-Khalik and Dr. Garner did not.  I was**

19    **the eighth person I think.**

20    Q.    So you used the word "lynch mob" to describe discussion of

21    information on the first page of Dr. Sizyuk's tenure dossier?

22    A.    **On the discussions with regard to everything other than --**

23    **other than the record being presented.  It was more focused on**

24    **whether or not the Ph.D. itself was obtained legitimately, and**

25    **as to whether or not her record at her previous employer was,**

1    indeed -- was, indeed, valid as a research scientist.  I

2    believe that was the title at Argonne National Laboratory.

3        And so, along those lines, it felt like it was such a

4    toxic environment.  Nobody was talking about the details about

5    her -- her actual progress and achievements that I was talking

6    about.  Everything was, well, hey, does it even matter, yeah?

7    So if I use the word "lynch mob," that's a feeling that was

8    there in me.  Of course, I did not use those words in front of

9    that particular audience at the time.

10   Q.   But your testimony under oath today is that you witnessed

11   lynching behavior in that meeting?

12   A.   To the effect that -- well, you know --

13   Q.   That the people you've named had an intent to lynch

14   Dr. Sizyuk?

15   A.   I felt that it -- if it were me at the other end of the

16   spectrum who was being -- who was being looked at for promotion

17   and tenure along those lines and they were not looking at my

18   record of achievements for the metrics that are commonly

19   understood and they were talking about even the very validity

20   of my case being at Purdue University, that's -- that's the

21   feeling I got, yeah.

22   Q.   You consider criticism of information in a dossier

23   presented for tenure to be lynch mob behavior?

24   A.   Not -- not for the record of achievements, in a scholarly

25   viewpoint, from an engagement viewpoint, and for other research

1    **activity and grant activity.  But when it comes to not**

2    **recognizing your very existence as being legitimate, I consider**

3    **that to be lynching.**

4    Q.    So your testimony now is that the people who were speaking

5    at that meeting were questioning the very legitimacy of

6    Dr. Sizyuk being in the tenure process?

7    A.    **Yes.  To that extent, yeah.**

8    Q.    Now, those people have participated in annual primary

9    committee meetings over a period of years relating to

10   Dr. Sizyuk, had they not?

11   A.    **Many of them, yes.**

12   Q.    And you participated in those meetings as well,

13   didn't you?

14   A.    **Well, that's right, yeah.**

15        **MR. KEALEY:**  This will be for the witness only at

16   this point, Your Honor.  This exhibit is not yet in evidence.

17   Q.    Dr. Taleyarkhan, in front of you on the screen is an

18   exhibit marked as Defense Exhibit D., and it has the heading

19   "Minutes from NEPC meeting on Wednesday, March 2nd, 2016."

20        Do you see that?

21   A.    **Yes, I do.**

22   Q.    And it shows attendees at that meeting, and your name is

23   included on the attendees; correct?

24   A.    **That is correct, yes.**

25   Q.    Please take a look at the two pages of Defense Exhibit D,

1   and verify that they are, in fact, minutes of the meeting you

2   attended that day?

3   A.   **Yes, I see both pages.**

4   Q.   And you see that those are minutes of a meeting, NEPC

5   meeting that you attended on March 2nd, 2016?

6   A.   **2016, yeah.**

7            **MR. BOWLING:**  Your Honor, I move Defense D into

8   evidence.

9            **THE COURT:**  Any objection?

10           **MR. SINK:**  Yes, Your Honor, we object.  It's dated

11   2016, so it's not relevant.  It also contains hearsay.

12           **THE COURT:**  Response.

13           **MR. KEALEY:**  This is a meeting of the NEPC, which, of

14   course, we've already heard testimony, met annually to review

15   Dr. Sizyuk, among others.  We've heard testimony about those

16   reviews, and these are minutes of a meeting in which those

17   reviews were discussed and noted.  And as minutes of the

18   meeting, it's a business record made by the participants in the

19   meeting.

20           **THE COURT:**  Anything else on the objection?

21           **MR. SINK:**  Yes, Your Honor.  It's not even the same

22   NEPC committee members that voted on Dr. Sizyuk.

23           **MR. KEALEY:**  It is the members of the NEPC who were

24   on the NEPC in 2016, several of which shown here,

25   Dr. Abdel-Khalik, Dr. Choi, Dr. Bertodano, and Dr. Taleyarkhan

 1 were all, in fact, in the 2019 vote.

 2          **MR. SINK:**  Dr. Yang was not.  Dr. Garner is also not

 3 on here.

 4          **THE COURT:**  It was the committee of that time;

 5 correct?

 6          **MR. KEALEY:**  That's correct.

 7          **THE COURT:**  The objection is overruled.  The Court

 8 will admit exhibit Defendant's D.

 9 **BY MR. KEALEY:**

10 Q.    So, Dr. Taleyarkhan, looking at Defense Exhibit D, I've

11 referred a moment ago to the list of attendees in the left

12 column on the top of the left page on the screen, and we'll

13 just briefly talk through that list.

14       Dr. Abdel-Khalik was and is a member of the NEPC; correct?

15 A.    **Yes.**

16 Q.    Dr. Choi was and is a member of the NEPC; correct?

17 A.    **Yes.**

18 Q.    Dr. Bertodano was and is a member of the NEPC; correct?

19 A.    **Yes.  May I make a slight clarification?**

20 Q.    Yes.

21 A.    **For cases from assistant to associate, these names are all**

22 **seemingly okay, yeah.  I don't see Dr. Ishii's name over here,**

23 **which I cannot recall why at this stage, but I'm not saying it**

24 **was improper.**

25 Q.    Okay.  Thank you.  You anticipated my next question.

TALEYARKHAN - CROSS BY MR. KEALEY

1   A.   **You asked the question whether Dr. Martin Bertodano and**

2   **Dr. Khalik were members of the NEPC, but only for assistant**

3   **associate.   They were not yet full professors, so they could**

4   **not vote for associate full professors.   Okay.   That's the only**

5   **clarification.**

6   Q.   In any event, as you just noted, Dr. Ishii was not at this

7   NEPC meeting, was he?

8   A.   **Not according to this list.**

9   Q.   And the paragraph in the middle of the left page or the

10  first page says that, "Any recommendations/comments from the

11  group pertaining to an assistant professor will be discussed

12  with the assistant professor only by Dr. Kokini."

13       Do you see that?

14  A.   **Yes.**

15  Q.   And then the next sentence says, "The group reviewed four

16  assistant professors and discussed their progress."

17       Do you see that?

18  A.   **Yes.**

19  Q.   And then "All comments/recommendations were given to

20  Dr. Kokini to discuss with each assistant professor."

21       Do you see that?

22  A.   **Yes.**

23  Q.   And who was Dr. Kokini at that time?

24  A.   **He was the interim head.**

25  Q.   So he was the head in between Dr. Hassanein and Dr. Kim?

TALEYARKHAN - CROSS BY MR. KEALEY

1   A.   **Yes.**

2   Q.   If we turn, then, to the next page of Defense Exhibit D,

3   there is a list of comments under the header "Review of

4   Dr. Tatyana Sizyuk."  Do you see that?

5   A.   **Yes.**

6   Q.   And these are comments that, as we just saw on the

7   previous page, came out of that meeting and were for Dr. Kokini

8   to discuss with Dr. Sizyuk; correct?

9   A.   **I see what's on the page, yeah.**

10  Q.   And that's what you recall?

11  A.   **I don't think this was shared with me per my recollection,**

12  **but I could be wrong.**

13  Q.   All right.  In any event, let's look at the --

14  A.   **These are usually shared with the candidate by the head.**

15  Q.   Very well.

16       So in the list of comments under "Review of Dr. Tatyana

17  Sizyuk," the third comment is, "Who was her adviser for grad

18  degree?"  Do you see that?

19  A.   **Yes.**

20  Q.   Next comment, "The Ph.D. paper with adviser, if published,

21  should show."  Do you see that?

22  A.   **Yes.**

23  Q.   So at this meeting attended by you in 2016, questions were

24  raised by the attendees, who did not include Dr. Ishii, on

25  these points of who was her adviser for the grad degree, and

 1    Ph.D. paper with adviser, if published, should show; right?

 2    A.   **Should show, yeah.**

 3    Q.   Now, this 2016 NEPC meeting was not a mob meeting, was it?

 4    A.   **Not to my recollection, no.**

 5    Q.   If it was, you would have told somebody, wouldn't you?

 6    A.   **I would have talked only with the head, yeah; Dr. Kokini**

 7    **at this stage.**

 8    Q.   If you thought Dr. Kokini was running a meeting that was

 9    engaged in intemperate behavior towards Dr. Sizyuk, you would

10    have expressed that to Dr. Kokini and expected something to be

11    done about it, wouldn't you?

12    A.   **Yes.**

13    Q.   But you did not do that, because you did not witness

14    inappropriate behavior at this meeting, did you?

15    A.   **That is correct, yeah.**

16    Q.   In that same list of comments, continuing down just a

17    little further, there's a comment, "Needs to show independence

18    in research and publications."  Do you see that?

19    A.   (No audible response.)

20    Q.   Do you see that?

21    A.   **Yes.  Yes.**

22    Q.   And "Needs publications without Dr. Hassanein."  Do you

23    see that?

24    A.   **Yes.**

25    Q.   Those comments were appropriate for the NEPC to supply to

1    Dr. Kokini to discuss with Dr. Sizyuk, weren't they?

2    A.   **The part about needing publications with Dr. Hassanein was**

3    **not something that I -- I offered as a recommendation.  So in**

4    **my mind, having joint publications was appropriate here, when**

5    **she was working in that group on a proposal on which she was a**

6    **co-PI.**

7    Q.   My question was simpler.  These comments were appropriated

8    in the judgment of the NEPC as a group to be shared by

9    Dr. Kokini with Dr. Sizyuk, weren't they?

10   A.   **With several from the group, yes.**

11   Q.   And in such a group, your opinion is one of several;

12   right?

13   A.   **Yes, my opinion is just one of several.**

14   Q.   Dr. Taleyarkhan, you should see on the screen an exhibit

15   that is for identification Defense Exhibit E; it's not yet in

16   evidence.

17       Please review the two pages of this document and verify

18   whether you recognize it as a set of notes from the February

19   8th, 2017, NEPC meeting attended by you?

20       (Brief pause while reviewing as requested.)

21   Q.   Do you recognize this document, Dr. Taleyarkhan?

22   A.   **I do not recall this document from that time, but I see**

23   **that it is stated over here, and I have no reason to doubt it.**

24   **Let me put it that way.**

25   Q.   You have no reason to doubt that it's the minutes of the

 1   meeting?

 2   A.   **Yes.**

 3        **MR. KEALEY:**  Your Honor, I move Defense E into

 4   evidence.

 5        **MR. SINK:**  We'll object, again, on relevance with the

 6   time period, hearsay, and the witness testifying he does not

 7   actually recall the document.

 8        **MR. KEALEY:**  Your Honor, my response is the same as

 9   with respect to Defense Exhibit D.

10        **THE COURT:**  The objection is overruled.  The Court

11   will admit Defendant E.

12   **BY MR. KEALEY:**

13   Q.   Dr. Taleyarkhan, in Defense Exhibit E, just below the

14   list -- Well, let's just start with the list of names.  The

15   list of names is inclusive of a few names from the same list

16   the previous year we looked at and has a couple of different

17   and additional names, including Dr. Ishii.  And I just ask you

18   to verify that it shows your name as an attendee first.

19   A.   **Yes, it does.**

20   Q.   And just below that list of names, there's a sentence that

21   states, "This meeting is an annual review," and then lists out

22   a few people, including Tatyana Sizyuk, as the individuals

23   being reviewed; do you see that?

24   A.   **Yes.**

25   Q.   And all those individuals being reviewed at that meeting

1  or at that time on various tenure tracks in the School of

2  Nuclear Engineering; correct?

3  A.   **I'm not sure about Dr. Miloshevsky, but the other one,**

4  **two, three, four, yes, I recall.**

5  Q.   Okay.  And I'm only going to ask you questions about

6  Dr. Sizyuk in any event.

7       So let's turn to the next page, the second page that's on

8  screen.  And at the bottom is a bullet list under the heading

9  "Review of Dr. Tatyana Sizyuk."  Do you see that?

10 A.   **Yes.**

11 Q.   And in that bullet list on bullet five it says "Need to

12 show that she can stand on her own for proposals and

13 submissions.  Independence."  Do you see that?

14 A.   **Yes.**

15 Q.   And then below that, "Dr. Kokini talked to Dr. Sizyuk last

16 year regarding independence."  Do you see that?

17 A.   **Yes.**

18 Q.   And so those points were discussed at this NEPC meeting in

19 2017, weren't they?

20 A.   **According to this document, yes.**

21 Q.   And you don't have any inconsistent recollection, do you?

22 A.   **No, I don't.**

23 Q.   And the next bullet list down says "For Dr. Sizyuk's

24 Ph.D., need to list adviser on papers, what came out of that

25 work.  What kind of thesis did she do?  Can we see the thesis?

1   Who was her adviser on the thesis?"

2        Do you see that?

3   A.   **Yes.**

4   Q.   Those questions were raised in February, 2017, which was

5   approximately two-and-a-half years before the September 27,

6   2019 NEPC meeting on which her tenure vote came up; correct?

7   A.   **Yes.  But according to this document, yeah.**

8   Q.   And the people who participated in that meeting when those

9   topics came up included you?

10  A.   **I do not recollect this meeting, but I have no doubt**

11  **that -- I don't have doubts that this happened.  I just don't**

12  **recollect.**

13  Q.   And you don't recall anybody raising those questions and

14  concerns in an intemperate spirit, do you?

15  A.   **One second.  I do not recall this particular meeting.  I**

16  **do not recall the details of that particular meeting.**

17  Q.   If somebody had raised those concerns with inappropriate

18  emotion or sentiment, or in some way as an attack on

19  Dr. Sizyuk, you would remember that, wouldn't you?

20  A.   **As being a potential cause for concern, but not in any --**

21  **to use the language that was used before in a lynch mob-type**

22  **mentality, no.**

23  Q.   And in any event, these minutes don't reflect that anybody

24  dissented at that meeting, that anybody, including you,

25  dissented from pursuing these points with Dr. Sizyuk; right?

1    A.   **Yes.**

2    Q.   Dr. Taleyarkhan, on your screen is Plaintiff's Exhibit 13

3    for identification; not yet in evidence.  This document has the

4    heading, NE primary committee members.

5         And I'd ask you whether you recognize this as a document

6    you've seen before.

7    A.   **I believe it was part of the package that was given to me.**

8    **I mean, my deposition package.  I'm not exactly sure if all**

9    **these individuals -- for the different years, yeah.  I was more**

10   **or less focusing on the 2019-type era.**

11   Q.   Is this the type of document you recall seeing as a record

12   kept in the School of Nuclear Engineering showing the primary

13   committee members year by year?

14   A.   **No, I don't recall seeing this document before.**

15   Q.   Okay.

16   A.   **I mean, before this particular proceeding, yeah.**

17   Q.   In any event, you've been at Purdue in the School of

18   Nuclear Engineering since 2003?

19   A.   **2003/4, yeah.**

20   Q.   And during that period, there have been women on the

21   primary committee; correct?

22   A.   **Yes.**

23   Q.   And in order to be on the primary committee, you have to

24   be a tenured-faculty member in the School of Nuclear

25   Engineering; correct?

TALEYARKHAN - CROSS BY MR. KEALEY

1    A.    **Yes.**

2    Q.    Dr. Taleyarkhan, do you self-identify by any particular

3    race or national origin or ancestry?

4    A.    **I identify as an American.**

5    Q.    Do you consider yourself to be of Asian ancestry?

6    A.    **I was born in India, so if somebody asked me how do you**

7    **recognize yourself as an American, I say an Indian American.**

8    Q.    But you don't say an Asian American?

9    A.    **No.  At least I don't emphasize that point, yeah.**

10   Q.    And you testified earlier that you were recruited to

11   Purdue in 2003 from Oak Ridge?

12   A.    **Yes.**

13   Q.    And you were offered tenure upon arrival at Purdue;

14   correct?

15   A.    **Yes.**

16   Q.    Notwithstanding that, you're not, by self-description,

17   Asian?

18   A.    **Yes.  Although I don't deny the fact that I came from**

19   **Asia.  I guess I was born in Asia.  So I just want to state the**

20   **obvious in this case.**

21   Q.    Dr. Taleyarkhan, I want to continue talking about the

22   primary committee for a minute and ask you to focus on

23   September of 2019 -- Excuse me.  I want to begin with a little

24   earlier in 2019.  The April, 2019 nuclear engineering primary

25   committee meeting.  Did you attend that meeting?

1   A.   **I don't -- are you referring to --**

2   Q.   I'm not referring to a document right now.

3   A.   **Oh, okay.  In September, I believe it was.  In September,**

4   **there was the two meetings, yes.**

5   Q.   And there was also a meeting in April; correct?

6   A.   **That is correct, yes.**

7   Q.   And so asking you to focus for the moment on the April

8   meeting, at the April meeting, the promotion and tenure

9   document, so-called tenure dossier for Dr. Sizyuk was reviewed

10  and discussed; correct?

11  A.   **I don't -- I don't recall the specifics of the document at**

12  **that stage, but yes.  To answer your question, yes.**

13  Q.   At the moment, I'm not asking you about any specifics of

14  the document, just whether it was discussed.

15  A.   **Please forgive me.  Yes.  The answer is yes.**

16  Q.   And the presentation of that dossier at that meeting was

17  made by Dr. Hassanein; correct?

18  A.   **That's my recollection, yes.**

19  Q.   And during that discussion, there was a question raised by

20  one of the committee members that the research supervisor

21  cannot participate in the promotion and tenure discussion.

22       Do you recall that?

23  A.   **I do not recall that specific.  I've seen the**

24  **documentation given to me in this deposition package, and there**

25  **is some documentation on that front where the head was asked to**

1    sort of check with the -- the dean's office on that front.

2    Q.   And at that meeting, there was discussion that a primary

3    committee member cannot serve on the primary committee for an

4    applicant if that primary committee member was the research

5    supervisor or adviser for the applicant's Ph.D. thesis; do you

6    recall that?

7    A.   **Yes.**

8    Q.   And during those discussions, Dr. Hassanein several times

9    mentioned that he is not the Ph.D. research supervisor for

10   Dr. Tatyana Sizyuk; do you recall that?

11   A.   **No.**

12   Q.   You don't recall Dr. Hassanein saying that?

13        MR. SINK:   Objection; asked and answered.

14   A.   **I do not recall that specifically.  I do not recall that**

15   **specifically.**

16        THE COURT:   Overruled.  For clarification, allowed.

17   BY MR. KEALEY:

18   Q.   Do you recall it generally?

19   A.   **I just don't remember the specific.  It was not uppermost**

20   **in my mind at the time, yeah.  Whether or not he was -- his**

21   **research -- her research supervisor for her doctorate**

22   **dissertation, that discussion picked up steam while we**

23   **approached September; and at that point, I asked the head to**

24   **check with the provost office to find out what is the**

25   **university's position on this -- on this particular topic that**

1    **seems to be coming up over and over again.  And he reported**

2    **that --**

3    Q.    For the moment, I'm just asking about recollections of the

4    April meeting.

5    A.    **Okay.**

6    Q.    So let's stay with that.

7          So still at the April meeting, which you attended, during

8    the discussion at that meeting, for about five to eight

9    minutes, Dr. Hassanein argued that he is not the Ph.D. thesis

10   research supervisor for Dr. Tatyana Sizyuk and, therefore, he

11   should be allowed to serve on the primary committee for

12   Dr. Sizyuk.

13         Do you remember that?

14              **MR. SINK:**  Objection; asked and answered.

15              **THE COURT:**  Overruled.

16   A.    **I do not recall that part, that specific part.  I do not**

17   **recall it.**

18   **(Whereupon, the Court Reporter requested that the Witness**

19   **move closer to the microphone.)**

20              **THE WITNESS:**  Okay.

21              **THE COURT:**  Closer.

22              **THE WITNESS:**  A little closer to me?  Oh, okay.

23   **BY MR. KEALEY:**

24   Q.    And then you've mentioned that the next primary committee

25   meeting was held on September 6th of 2019, so I'd ask you to

TALEYARKHAN - CROSS BY MR. KEALEY

1    shift your focus forward to that meeting.  You attended that

2    meeting; correct?

3    A.   **Yes.  Yeah.**

4    Q.   And there was a resumption of discussion on the tenure

5    dossier of Dr. Sizyuk at that meeting; correct?

6    A.   **Yes.**

7    Q.   And at that meeting, there was updated tenure dossier of

8    Dr. Sizyuk showing her Ph.D. research supervisor as Professor

9    Ahmed Hassanein; do you recall that?

10   A.   **If you could please point it out to me, I will take a look**

11   **at it.**

12   Q.   I'm just asking whether you recall it as you sit here

13   today.

14   A.   **I'm sorry.**

15   Q.   I'm just asking whether you recall that, between the April

16   meeting, when Dr. Hassanein denied that he was the doctoral

17   research supervisor, and the September meeting, Dr. Sizyuk's

18   tenure dossier was updated to show that the research supervisor

19   for her doctorate was Professor Ahmed Hassanein.

20   A.   **Oh, yeah to the effect that her research was predominantly**

21   **done with Dr. Hassanein, yes.**

22   Q.   And because her tenure dossier was updated to show that

23   fact, Dr. Hassanein did not participate in the discussion of

24   Dr. Sizyuk's tenure case during the September 6th, 2019

25   primary committee meeting; right?

1          **MR. SINK:**  Objection; calls for speculation.

2          **MR. KEALEY:**  The question is just whether

3    Dr. Hassanein participated.

4          **THE COURT:**  Overruled.  He can answer if he knows.

5    A.   **In September, my recollection, he was not there, what was**

6    **my recollection.**

7    BY MR. KEALEY:

8    Q.   And at that meeting on September 6th, several members of

9    the primary committee asked why there was a change in the

10   research supervisor's name in Dr. Sizyuk's tenure dossier; do

11   you recall that?

12   A.   **I recall discussions challenging the validity of the**

13   **doctorate degree itself.  And the specifics, I do not -- do not**

14   **recall.**

15   Q.   You don't recall whether anybody asked the question why

16   there was a change in the research supervisor's name in the

17   dossier?

18   A.   **Well, the mechanics of updating the Ph.D. degree in**

19   **Poland, where the system was different in who chairs the**

20   **committee to decide whether or not to give it, I recall there**

21   **was some discussion on whether that was appropriate or**

22   **inappropriate to have Dr. Hassanein up-front or not a**

23   **participant in that decision-making process.  That, I do -- I**

24   **remember, yeah.**

25   Q.   You don't recall anybody asking the question why there was

1    a change in the research supervisor's name?

2    A.    **I do not remember the specifics, but I can also say that**

3    **I -- I cannot say for sure that it was not said here.**

4    Q.    When, during the year of promotion consideration, a tenure

5    applicant changes their dossier between the April meeting and

6    the September meeting, it's natural to ask why they did so,

7    isn't it?

8    A.    **If they made that change, yes, it is a natural question.**

9    Q.    It's not a mob question to ask, is it?

10   A.    **Not in that context, no.  And I would like to sort of**

11   **clarify that reference to the words "lynch mob" question was on**

12   **the final voting meeting.  It was related to the voting meeting**

13   **that followed that particular meeting.**

14   Q.    Just a couple more questions, Dr. Taleyarkhan.

15         In the context of applying for grants in the School of

16   Nuclear Engineering or the College of Engineering, are you

17   familiar with the concept of a pre-proposal?

18   A.    **Yes.**

19   Q.    What is a pre-proposal?

20   A.    **A pre-proposal is sometimes asked for to gauge whether or**

21   **not a full proposal should be invited.  That's the context in**

22   **which I've experienced pre-proposals.**

23   Q.    So a faculty member who's going to ask, for example, a

24   federal agency such as the National Science Foundation or the

25   navy, the Department of Defense, for research funding might

1    have a preliminary discussion with a contact person in that

2    agency about their receptiveness to receiving a proposal?

3    A.    **A full proposal, yes.**

4    Q.    And if there was receptiveness to receiving the proposal,

5    sometimes one of the steps is to provide a preview of the

6    proposal called a pre-proposal; right?

7    A.    **Yes.**

8    Q.    So the pre-proposal is part of the paper trail, if you

9    will, leading up to the full-blown proposal?

10   A.    **Yeah.  Yes.**

11   Q.    The pre-proposal describes in a preliminary form, the same

12   research as the formal proposal; right?

13   A.    **It's a summary.**

14   Q.    So if we look at the pre-proposal for such a grant, we can

15   see how the research plan that's to be funded was being put

16   together; right?

17   A.    **Yes.**

18   Q.    And so if somebody was curious about a grant that

19   Dr. Sizyuk obtained in 2019 from the Department of Energy and

20   wanted to know more, part of the information that would tell us

21   more about that grant is the pre-proposal; right?

22   A.    **It would be maintenance for the full proposal, yes.**

23         **MR. KEALEY:**  Thank you.  Nothing further, Your Honor.

24                    **REDIRECT EXAMINATION**

25   \\\

1    BY MR. SINK:

2    Q.   I just have one question.  What comes after the

3    pre-proposal?

4    A.   **It is an invitation or -- or a note saying we'll prefer**

5    **you do not submit.**

6    Q.   Is there something called a "final proposal"?

7    A.   **Yeah.  If you're invited to submit the full proposal,**

8    **which is a much more extensive activity, that becomes a final**

9    **proposal.  That is what really matters, yeah.**

10   Q.   What would provide more detail about the grant, the

11   pre-proposal or the final proposal?

12   A.   **It is a final proposal.  A pre-proposal is a teaser,**

13   **saying this is what I have to offer in a general sense.  If**

14   **there's any interest to the general party, they say yeah, we**

15   **want a full proposal.**

16              **MR. SINK:**  Thank you.

17              **THE COURT:**  Any follow-up?

18              **MR. KEALEY:**  No.

19              **THE COURT:**  No?  Can this witness now be excused?

20              **MR. SINK:**  Yes, Your Honor.

21              **THE WITNESS:**  Thank you.

22              **THE COURT:**  You may step down.

23              **MR. KEALEY:**  May I approach?

24        (Bench conference had as follows:)

25              **MR. KEALEY:**  It was just noted to me that the jury

```
 1   wasn't polled for whether they had any questions of

 2   Dr. Taleyarkhan.

 3           THE COURT:  I haven't done that.  One moment.  Hold

 4   him until.

 5           MR. KEALEY:  Okay.

 6       (Private conference concluded.)

 7           THE COURT:  Did any jurors have any questions for

 8   that last witness?  Anybody raise their hand?  There were no

 9   jurors raising their hand.

10           JUROR:  I had a question.

11           THE COURT:  Oh, I'm sorry, Ms. Hoekstra.  Am I

12   pronouncing that right, Hoekstra?

13           JUROR:  Yes.

14           THE COURT:  So bring him back.  You've got to wave

15   higher or something.

16           JUROR:  No, that's all right.

17           THE COURT:  I don't think we need a recess right now,

18   so let's just be patient and wait for him to come back in.

19       Mr. Sink is going to get him; is that right, Counsel?

20           MR. FOX:  I believe so.

21           THE COURT:  Okay.

22           MS. KLUTZKE:  Yes.

23           THE COURT:  All right.  Okay.

24       (Whereupon, there was a pause while awaiting the witness'

25   return to the courtroom.)
```

1          **THE COURT:**  Sorry, Professor.  Please sit down.  And

2    so I let you go too soon because one of our jurors has a

3    question for you.  I let the jurors present questions.

4          **THE WITNESS:**  Yes.

5          **THE COURT:**  And so this is the question that has been

6    presented:  Have you voted during other NEPC meetings on female

7    candidates where Dr. Ishii was also a voting member?

8        Any issue with regard to that question?

9          **MR. SINK:**  No, Your Honor.

10         **THE COURT:**  By the university?

11         **MR. KEALEY:**  I understand it to be just a yes or no

12   question, Your Honor.

13         **THE COURT:**  Correct.

14         **MR. KEALEY:**  If it's just a yes or no question, I

15   don't have an objection.

16         **MR. BOWLING:**  Same objection.

17         **THE COURT:**  All right.  So it's a yes or no.  Again:

18   Have you voted during other NEPC meetings on female candidates

19   where Dr. Ishii was also a voting member?

20         **THE WITNESS:  Yes.**

21         **THE COURT:**  Okay.  With that, anything else from the

22   jury?

23       (No response.)

24         **THE COURT:**  Counsel?

25       (No response.)

```
 1              THE COURT:  Defendants?
 2         (No response.)
 3              THE COURT:  Okay.  Thank you.  Now you may leave.
 4              THE WITNESS:  Thank you so much.
 5              THE COURT:  Okay.
 6              THE WITNESS:  I leave for the last time.
 7              THE COURT:  I'm sorry, what?
 8              THE WITNESS:  I leave for the last time?
 9              THE COURT:  Last time.
10         Next witness.
11              MR. SINK:  Plaintiff calls Tatyana Sizyuk.
12              THE COURT:  If you would please face the clerk, he'll
13    administer the oath.
14         (The oath was duly administered.)
15              THE WITNESS:  Yes.
16              TATYANA SIZYUK, PLAINTIFF, SWORN
17                  DIRECT EXAMINATION
18    BY MR. SINK:
19    Q.   Good afternoon.
20    A.   Good afternoon.
21    Q.   Can you state your name for the record.
22    A.   Tatyana Sizyuk.
23    Q.   And, Dr. Sizyuk, I'll just -- Make sure you speak up when
24    testifying.
25    A.   Okay.
```

```
 1   Q.   Can you provide the jury with some basic background
 2   information about yourself?
 3   A.   So, I received my bachelor degree in math, and master
 4   degree in applied math through --
 5        (Court Reporter requested witness to repeat.)
 6   A.   Mathematics from Belarusian State University in 1988.
 7   Q.   Where are you from?
 8   A.   From Belarus.
 9   Q.   And when did you immigrate to the United States?
10   A.   In 2002.
11   Q.   Are you a U.S. citizen?
12   A.   Yes.
13   Q.   Do you have any other degrees besides a master's and a
14   baccalaureate in mathematics?
15   A.   Yes, I received Ph.D. degree in 2014 from Rzeszow
16   University, Poland.
17   Q.   Can you explain the process by which you obtained your
18   Ph.D.?
19   A.   In Rzeszow, I prepared thesis based on my published
20   papers, and then I sent this to Dr. Tralle to Poland.  He's the
21   chair of my Ph.D. thesis committee.
22        (Court Reporter asked the witness to repeat.)
23   A.   My Ph.D. thesis committee.  And he reviewed it and sent
24   the review to other people.  Then he approved and scheduled
25   time pass qualifying exams -- for me qualifying exams and for
```

1   the thesis difference.

2   Q.   Okay.  So I believe you testified Dr. Tralle was your

3   thesis chair; is that correct?

4   A.   **Yes.**

5   Q.   And is Dr. Tralle with the University of Rzeszow?

6   A.   **Yes.**

7   Q.   Did Dr. Hassanein vote or act as a chair on your Ph.D.?

8   A.   **No, he cannot vote.**

9   Q.   Where did you work prior to Purdue University?

10  A.   **I worked at Argonne National Laboratory.**

11  Q.   What did you do there?

12  A.   **I did research, meaning that I developed computational**

13  **models to simulate different kind of plasma physics devices.**

14  **So I ran -- developed simulation called on super computers over**

15  **at Argonne and analyzed the results and prepared these results**

16  **for publications in presentations in the conferences.**

17  Q.   Thank you.  Did you work on something called HEIGHTS?

18  A.   **Yes.**

19  Q.   What is HEIGHTS?

20  A.   **High Energy Interactions with Heterogeneous Targets.**

21  Q.   And kind of zooming out a little bit, is HEIGHTS software

22  for modeling simulations?

23  A.   **Yes.**

24  Q.   In the nuclear engineering field?

25  A.   **In many fields.**

1    Q.   Okay.

2    A.   **In many fields.**

3    Q.   Okay.  So at Argonne, you're not actually smashing

4    particles together; it's modeling simulation; is that correct?

5    A.   **Yes, it's modeling and simulation, yes.**

6    Q.   Now, when were you at Argonne, by the way; what were your

7    dates of employment?

8    A.   **2003, but actually I started work one month in 2002, but**

9    **it was only one month.  Actually 2003.**

10   Q.   Until when?

11   A.   **Until 2007.**

12        (Court reporter requested witness repeat.)

13   A.   **2007.**

14   Q.   Now, from 2003 to 2007, did you have a Ph.D.?

15   A.   **No.**

16   Q.   And when did your employment at Purdue start?

17   A.   **In October 2007.**

18   Q.   When did you obtain your Ph.D.?

19   A.   **In 2014.**

20   Q.   Do you recall what month you obtained it?

21   A.   **May.**

22   Q.   When you first started at Purdue, what was your original

23   position?

24   A.   **Some -- so some kind of research scientist, but the level**

25   **was increased with -- time to time.  I mean, initially research**

1    **scientist and senior research scientist.**

2    Q.    And when you came over to Purdue, did you work with what's

3    called CMUXE?

4    A.    **Came to Purdue and we actually created CMUXE in 2008.**

5    Q.    Is CMUXE part of Purdue, or is it a separate company?

6    A.    **Not of course -- one of the centers is Purdue, yeah.**

7    Q.    And did you work at CMUXE when you came over to Purdue?

8    A.    **Yeah.**

9    Q.    What did you do generally speaking at CMUXE before you

10   became tenure-track?

11   A.    **Similar what I did at Argonne National Laboratory.  We**

12   **worked on the development models, took over more and more areas**

13   **to include more physics in order to actually work with what was**

14   **benefit at the CMUXE that we both a lot of --**

15        (Court reporter requested witness to repeat.)

16   A.    **A lot of with meet -- agreement for the experiments.**

17   **CMUXE experiments.  And we could do together both modeling and**

18   **experiments and compare results.  It was very, very important**

19   **to test both.**

20   Q.    Thank you.  And at some point, Dr. Sizyuk, did you

21   transition to a tenure-track position at Purdue?

22   A.    **Say --**

23   Q.    Sure.  At some point, did you transition to a tenure-track

24   position at Purdue?

25   A.    **Mm-hmm.**

1    Q.   Is that a "yes"?

2    A.   **Yes.**

3    Q.   When was that?

4    A.   **In 2014.**

5    Q.   There's an exhibit book in front of you.  Please turn to

6    Exhibit P-27.  For the witness only.

7         Do you have that exhibit until front of you?

8    A.   **Yeah.**

9    Q.   What is this document?

10   A.   **This is my offer letter for assistant professor at Purdue.**

11   Q.   Is this the offer letter for you to become a tenure-track

12   professor?

13   A.   **Yes, mm-hmm.  Yes.**

14   Q.   And have you seen this document before?

15   A.   **Yes.**

16   Q.   Does this appear to be a true and accurate copy of the one

17   you've seen before?

18   A.   **Yes.**

19           **MR. SINK:**  Your Honor, I'd move to admit P-27.

20           **MR. KEALEY:**  No objection.

21           **MR. BOWLING:**  No objection.

22           **THE COURT:**  It's admitted.

23   **BY MR. SINK:**

24   Q.   I would like to draw your attention to, first off, the

25   date.  What's the date of this letter?

1    A.    **April 23.**

2    Q.    Of what?

3    A.    **2014, mm-hmm.**

4    Q.    And then there's a portion entitled "Contingencies"?

5    A.    **Yes.**

6    Q.    That indicates that, "This offer is contingent upon

7    successful completion and obtaining your Ph.D. degree before

8    the start date of this appointment."  Do you see that?

9    A.    **Yes.**

10   Q.    And did you do that?

11   A.    **Yes.  Yes.**

12   Q.    Before you received that letter, were you interviewed by

13   any search committee at Purdue?

14   A.    **Yes.**

15   Q.    And did you submit any kind of CV or resume to that search

16   committee about yourself?

17   A.    **Of course, and even I submitted my view of work which I**

18   **will do as a tenure-track professor.**

19   Q.    And on that CV or resume, did that indicate your job

20   titles at Argonne?

21   A.    **Yes.**

22   Q.    Okay.  And during the interviews with the search

23   committee, did anyone on that search committee ever tell you

24   that you were not qualified to be a tenure-track professor at

25   Purdue?

1   A.   **No.**

2   Q.   And during the interviews with that search committee, did

3   you verbally convey to the search committee that you would be

4   receiving your Ph.D. from the University of Rzeszow?

5   A.   **Yes.**

6   Q.   And did anybody on that search committee tell you that

7   that degree would disqualify you in any manner from being a

8   tenure-track professor?

9   A.   **No.**

10  Q.   When you became a tenure-track professor, did you receive

11  evaluations about your employment?

12  A.   **I mean, I did not receive what was in the NEPC meetings.**

13  **Just I -- once a year, I had meetings, these current head.  He**

14  **discussed with me what -- where I need to do improvements and**

15  **so on.**

16  Q.   So I can understand you.  I'm not sure if everybody can.

17  I want to make sure we're clear.  I believe you testified you

18  have discussions once a year with the current head?

19  A.   **Current head, yes.**

20  Q.   In the book, can you go to Exhibit P-4, which is already

21  admitted?

22  A.   **Yes.**

23  Q.   Have you seen this document before?

24  A.   **Yes, mm-hmm.  Yeah.**

25  Q.   This is your evaluation dated what?

1    A.   **Evaluation of my performance in 2019.  April, 2019.**

2    Q.   And can you turn to the second page.

3         Are you there?

4    A.   **Yeah.**

5    Q.   Okay.  And can you identify for the jury what rating you

6    were given from learning as of April 22nd, 2019?

7    A.   **It's excellent.**

8    Q.   And what was your rating for discovery?

9    A.   **Very good.**

10   Q.   What was your rating for engagement?

11   A.   **Satisfactory.**

12   Q.   And what was your rating for leadership?

13   A.   **Very good.**

14   Q.   Do you have any issue with the rating of satisfactory on

15   engagement?

16   A.   **Yes.**

17   Q.   What's your issue with that?

18   A.   **Actually, when Dr. Kim became a head in 2017, he removed**

19   **me from all committees in the School of Nuclear Engineering.**

20   **And engagement, it's basically based on the participation in**

21   **such committees.  And due to our meeting in 2018, one year**

22   **after he removed, he told me that I have very low participation**

23   **in the school activities.  I said that, "You removed me from**

24   **all committees." He said, "Really?  Okay." But it just looks**

25   **like joke.  He added me to the committee just few days before**

1  voting on my promotion case.  So I worked in the committee

2  after I already was denied.

3  Q.   Okay.  I want to go -- Thank you for that.  Go to Exhibit

4  P-3, which has already been admitted.

5       Are you there?

6  A.   Yeah.

7  Q.   Do you recognize this as your dossier?

8  A.   Yeah.

9  Q.   Did you compile this document?

10  A.   Yeah.

11  Q.   Did anyone help you make this?

12  A.   Dr. Taleyarkhan reviewed this before -- before the meeting

13  at NEPC.

14       (Court Reporter requested the witness to repeat.)

15  A.   Meeting at NEPC.

16  Q.   I want to kind of walk through some of this stuff here.

17  We're going to start with your honors and awards.

18       Do you see where it says senior member of SPIE?

19  A.   Yes.  Yeah.

20  Q.   Okay.  Can you just briefly explain to the jury what that

21  means.

22  A.   Senior member, this is one of the highest level of

23  membership.  It's the association for optics and photonics.

24  And actually I currently -- two years ago, I became a fellow

25  member of the association; it's the highest level.

1   Q.   Did you say "helo?"

2   A.   **Fellow.**

3   Q.   Oh, sorry.  Fellow.  All right.

4        Can you go to the next one.  It says senior member of

5   IEEE.  What is that?

6   A.   **This also institute for electrical and electronics**

7   **engineering.  And senior member is also one of the highest**

8   **level of this membership.**

9   Q.   Okay.  And below that, it looks like it identifies two

10  awards.  Did you receive those awards?

11  A.   **Yes.**

12  Q.   Next under learning/mentoring, does this then begin to

13  identify some of the classes that you taught?

14  A.   **Yes.**

15  Q.   And what kinds of classes did you teach?

16  A.   **Initially, I developed my course on computational physics.**

17  **So I taught different levels.  I taught this course for**

18  **graduate students and for undergraduate students.**

19       **And then, later, I taught core nuclear engineering**

20  **courses, Introduction to Nuclear Engineering and radiation**

21  **interaction with materials.**

22  Q.   Okay.  If you could go to the next page.

23       And here, it identifies, it says "Committees Chaired" at

24  the top.  And then it's got information regarding Ph.D.'s,

25  Ph.D. and master's students; do you see that?

1    A.    **Yes.**

2    Q.    Now, did you graduate any Ph.D. students where you were

3    the sole chair?

4    A.    **Yes.**

5    Q.    And who would that have been?

6    A.    **It's -- it's a little bit -- you need to move a little bit**

7    **down.   John Oliver.**

8    Q.    Sorry about that.

9    A.    **Yeah, John Oliver, mm-hmm.**

10   Q.    And did you graduate any master students where you were

11   the sole chair?

12   A.    **Yes.**

13   Q.    Who would that be?

14   A.    **Enes Ercikan.**

15   Q.    Right here?

16   A.    **Yes.**

17   Q.    I would like to direct your attention -- This may be

18   easier in the book as opposed on the screen.  It's Bates stamp

19   969, and it's entitled at the top "Referred Journal Papers."

20        Do you see that?

21   A.    **Yes.**

22   Q.    Can you go to that in the book for me, in the book.

23   A.    **What page?**

24   Q.    (Whereupon, the attorney turned to the page.)

25   A.    **Thank you.**

1   Q.   What is a referred journal paper?

2   A.   **Journal paper is the type of publications which is --**

3   **which you use it by several people, scientists in the same**

4   **area.  Usually two, three reviewers.  Then make comments and**

5   **can approve publication or can disapprove.**

6   Q.   So what I want you to do is look on this page and the next

7   page and tell the jury how many referred journal papers you had

8   published from 2014 through 2019?

9   A.   **Eighteen.**

10  Q.   And out of those 18, how many of those are independent of

11  Dr. Hassanein?

12  A.   **Four.  Four.  I think four.**

13  Q.   Okay.  And how many total referred journal publications do

14  you have listed in here?

15  A.   **How many total, 44.**

16  Q.   Thank you.  So let's go to the page, Bates stamped page

17  971.  And there's a section entitled "Referred Conference or

18  Symposium Papers."  Do you see that?

19  A.   **Yes.**

20  Q.   Tell the jury how many of those publications you had from

21  2014 through 2019?

22  A.   **Seven.**

23  Q.   And how many of those --

24  A.   **No, six, six.**

25  Q.   Thank you.  And how many of those were completely

1    independent of Dr. Hassanein?

2    A.   **Three.**

3    Q.   And how many of those were you the first author?

4    A.   **Four -- No.  Five.  Five.**

5    Q.   And actually, I want to go back.  If you could go back to

6    the 18 referred journal papers since 2014 that we just

7    looked at.

8    A.   **Mm-hmm.**

9    Q.   Out of those, how many of those were you the first author?

10   A.   **Six.**

11   Q.   Let's go to the next section entitled "Other

12   Publications."  Do you see that?

13   A.   **Yes.**

14   Q.   How many other publications and products are identified in

15   your dossier from 2014 through 2019?

16   A.   **Eight.  Eight.**

17   Q.   And how many of those were independent of Dr. Hassanein?

18   A.   **Without?**

19   Q.   Correct.

20   A.   **All them is.  All of them is Dr. Hassanein -- No, no, no.**

21   **One.  One.  Sorry.  One.  Yes, one.**

22   Q.   Thank you.

23   A.   **Mm-hmm.**

24   Q.   And how many of those were you the first author?

25   A.   **Three.**

1   Q.   Under the next page, Bates stamped 973, there's an area

2   that is indicated "Products Under Review."  Do you see that?

3   A.   **Yes.**

4   Q.   Were those papers eventually published?

5   A.   **Yes.  Published -- It was published a few days after this**

6   **promotion committee when I was denied.**

7   Q.   And how many of those two papers were independent of

8   Dr. Hassanein?

9   A.   **All of these papers were my papers or my students' papers.**

10  Q.   On the next section entitled "Symposium Presentations,"

11  how many of those are identified since 2014?

12  A.   **I have three.  Mm-hmm.**

13  Q.   Well, if you look on page 973 and then page 974.

14  A.   **Are you talking about contributed; right?**

15  Q.   Yes, I see --

16  A.   **Okay.**

17  Q.   I see 18 dating back to May of '14; do you see that?

18  A.   **Yeah, 18, Mm-hmm.**

19  Q.   Okay.  Let's talk about your grants.  As a sole PI, as a

20  sole PI, how much grant money did you bring in prior to the

21  vote on your tenure?

22  A.   **As co-PI, I bring -- totally, or -- Are you asking about**

23  **totally; right?**

24  Q.   I'm asking as the sole principal investigator.

25  A.   **Ah, sole principal.  Sole principal, I brought -- without**

1   **anybody; right?**

2   Q.   Correct.

3   A.   **I had this grant, the grant 750,000.**

4   Q.   And including other grant money where you were the co-PI

5   how much in total in grant money had you brought in?

6   A.   **Approximately around 2 million.**

7   Q.   You said 2 million, correct?

8   A.   **Yeah, 2 million.**

9   Q.   Now, that dossier also contains certain external review

10  letters; is that correct?

11  A.   **Yes.**

12  Q.   With respect to this DOE grant, when were you notified

13  that you were awarded the DOE grant?

14  A.   **At the end of June 2019.**

15  Q.   And to your knowledge, would that have been after these

16  external reviewers received your dossier?

17  A.   **I am not sure, because I actually sent updated dossier to**

18  **Dr. Kim, but I don't know what was sent to the reviewers.**

19  Q.   Do you know if any of those external reviewers ever

20  submitted amended or revised external review letters?

21  A.   **Yes.**

22  Q.   Do you know?

23  A.   **What do I know?**

24  Q.   Do you know if they did?

25  A.   **Ah.  No.  I mean, the reviewers were asked second time to**

1    **send me but --**

2         (Court Reporter requested witness to repeat.)

3    A.   **Reviewers were asked to send me their -- second time.**

4    Q.   Okay.  I'm only asking what you know or don't know.

5    A.   **No.**

6    Q.   Do you know whether or not the external letter

7    reviewers were asked to submit -- I'm sorry.

8         Do you know whether the external letter reviewers actually

9    submitted revised or amended review letters?

10   A.   **Actually, I could not know.**

11   Q.   Thank you.

12   A.   **I cannot see the reviewer letters.**

13   Q.   Do you know whether or not Dr. Allain was aware of your

14   $750,000 DOE grant?

15        **MR. KEALEY:**  Your Honor, it's just a yes or no

16   question, and there's no foundation that this witness has even

17   seen Dr. Allain's letter.

18        **THE COURT:**  You need to rephrase that.  Sustained.

19   **BY MR. SINK:**

20   Q.   Let's look at it.  Turn to Bates stamp page 984.

21   A.   **This one?**

22        **THE COURT:**  We'll take a break in 10 minutes.  Okay?

23   A.   **Mm-hmm.**

24   Q.   Have you seen this document before?

25        **THE COURT:**  Is this in the book, Counsel?

```
 1              MR. SINK:  Yes.
 2              THE COURT:  What tag?
 3              MR. SINK:  Bates stamp page 984.
 4   A.   Yes.  I saw when documents were provided by the
 5   university.
 6   Q.   Does this document and the few after it appear to be the
 7   external review letter by Dr. Allain?
 8   A.   Yes.
 9   Q.   And if you can turn to page -- Bates stamped page 987.
10   Not sure why this is not focusing, so I won't read it.
11   A.   Okay.
12   Q.   I'm going to read a portion in this letter and ask for
13   your response.
14        It says, "Dr. Sizyuk's peers are averaging about 500K of
15   extramural funding per year or more.  Dr. Sizyuk has been
16   responsible for only one funded grant of 450,000 with the U.S.
17   Nuclear Regulatory Commission and the well-known Faculty
18   Development Program, of which she is credited with 234,300.  A
19   large grant by NSF PIRE program is listed in her dossier.
20   However, the PI is Ahmed Hassanein, and her role as a co-PI is
21   not clear.  The remainder of DOE grants listed in her dossier
22   are all prior to her activities as a tenure-track assistant
23   professor at Purdue University, and were both with Ahmed
24   Hassanein as PI."  Do you see that?
25   A.   Yes.
```

1   Q.    What's your response to that?

2   A.    **So this letter writers did not count and did not mention**

3   **even my DOE grant, which actually will make average amount per**

4   **year approximately similar what he proposed for faculty to have**

5   **to be promoted.**

6   Q.    Thank you.  Before I leave the dossier, is there anything

7   else you want to tell the jury about your dossier?

8   A.    **No.**

9   Q.    No?  Okay.  Are you familiar with Dr. Ishii?

10  A.    **Yes.**

11  Q.    Have you ever heard Dr. Ishii make any statements that

12  would reflect bias against women?

13  A.    **Yes.**

14  Q.    What have you heard?

15  A.    **One of first times when we went to dinner, so it was -- we**

16  **had in our department after seminars --**

17       (Court Reporter requested witness to repeat.)

18  A.    **Okay.  After seminars, we had dinner with several faculty**

19  **members.  And probably even it was after my seminar when I**

20  **presented my work, when I applied for tenure-track position.**

21  **And we went to the dinner with Dr. Ishii.**

22       **I remember Dr. Hibiki was, and most probably**

23  **Dr. Hassanein, because he was usually at the end of these**

24  **dinners.  And I remember that Dr. Ishii made some kind of jokes**

25  **about our Dean of College of Engineering at the time.  And**

1    **something like about that she is not capable to perform**

2    **dean job.**

3    Q.    Thank you.  Dr. Sizyuk, as a result of your tenure being

4    denied, did your employment at Purdue end?

5    A.    **My employment ended in 2021.**

6    Q.    After you were denied tenure, did you submit an internal

7    appeal?

8    A.    **I submitted to the Office of the Vice Provost.**

9    Q.    And in that internal appeal, did you allege discrimination

10   based on your race, gender, and/or national origin?

11   A.    **No.  I just asked the vice provost if the committee could**

12   **review my dossier for promotion.**

13   Q.    Thank you.  Can you turn to Exhibit P-20 in the book.

14         Have you seen this document before?

15   A.    **Yes, Mm-hmm.**

16   Q.    What is it?

17   A.    **I think when I -- when Dr. Kim informed me --**

18   Q.    Hold on.  Hold on.  Does this appear to be an email chain

19   between you and Dr. Taleyarkhan?

20   A.    **Yes.**

21   Q.    Have you seen this document before?

22   A.    **I think so, but I need to read.  Okay.**

23   Q.    Let me know when you're done.

24   A.    **Yes.**

25   Q.    Okay.  Have you seen this before?

 1   A.   **Yeah.**

 2   Q.   Does this appear to be a true and accurate copy of the one

 3   you've seen before?

 4   A.   **Yeah, mm-hmm.**

 5           **MR. SINK:**  I would move to admit P-20.

 6           **MR. KEALEY:**  No objection.

 7           **MR. BOWLING:**  No objection.

 8           **THE COURT:**  20 is admitted.

 9   **BY MR. SINK:**

10   Q.   I want to focus on a part of the email you wrote here.

11   Good Lord.   Okay.

12       So this is an email you wrote to Dr. Taleyarkhan

13   October 10th of 2019.   Do you see that?

14   A.   **Yes.**

15   Q.   And, in here, you wrote to him -- second sentence of that

16   paragraph I just highlighted, "I am suffering from severe

17   stresses and had to go to the doctor twice in the last week.  I

18   could not think clearly after my meeting with Dr. Kim.   The

19   doctor advised me immediately to not teach under this

20   condition.   I communicated this information with Human

21   Resources Department.   I couldn't sleep since October 1, and I

22   am sorry again for not contacting you earlier."

23       Do you see that?

24   A.   **Yes.**

25   Q.   Was what you wrote in here accurate?

1   A.   **Yes.**

2   Q.   Have you been diagnosed with any kind of medical

3   condition?

4   A.   **Yes.**

5   Q.   What?

6   A.   **Think -- depression.**

7   Q.   And have you experienced any --

8        THE COURT:  What was that?  Could I get clarification

9   on that?

10       THE WITNESS:  **It was depression, but I don't remember**

11  **exactly called, depression.**

12       THE COURT:  Depression; right?

13       THE WITNESS:  **Mm-hmm.**

14       THE COURT:  Is that "yes"?

15       THE WITNESS:  **Yes.**

16  BY MR. SINK:

17  Q.   In this email, you referenced medical leave.  Did you take

18  time off work?

19  A.   **Yes.  I just could not work.  It was only way, yeah.**

20  Q.   And did you ever suffer any kind of anxiety or panic

21  attacks?

22  A.   **Yes, this is exactly, yeah.**

23  Q.   Can you tell the jury about that?

24  A.   **Actually for -- first, when I heard, I understood that**

25  **this is the end of my career, and I -- I could not sleep.  I**

1    cried a lot.  And it's -- it's important that for me to -- that

2    I work very, very, very hard.  I worked weekends.  Just advise

3    the students.  Wrote many proposals.  The chance to get

4    proposal funded, one to ten submitted proposals.  So to get

5    funded proposals --

6              THE COURT:  Wait.  Wait.  Wait.  Can you understand

7    what she's saying?

8              COURT REPORTER:  Please slow down a little bit.

9              THE COURT:  Okay.  Go slow.

10             THE WITNESS:  Okay.  So to get one awarded proposal,

11   you need to submit 10 proposals.  One of 10 will be awarded

12   approximately.

13        So it means that I was needed to submit many, many

14   proposals before.  And I worked really, really hard and

15   together with this hard work during several years, and to get

16   this news that I will not get work, will not continue to work,

17   it was so really painful for me.

18   BY MR. SINK:

19   Q.   Thank you.  Is there anything else you would like to tell

20   the jury regarding the emotional, any kind of issues you had?

21   A.   Yes.  It has also affected my interactions with my

22   husband, because I still continue to be aggressive, interaction

23   with him, but my husband is very kind, and he tried to just

24   tell me that I been through this condition, so he helps me.

25   Q.   In the academic community that you are in, what is the

1  damage done to one's reputation when they're denied tenure?

2  A.  **It's -- For me also in this too, if I was denied tenure,**

3  **it means that people will think that I not deserve this,**

4  **deserve, yeah.**

5       **MR. SINK:**  I have no more.  Thank you.

6       **THE COURT:**  We're going to take our afternoon recess

7  right now.  Let's do about 15 minutes, 20 minutes-ish.  It's

8  2:20 right now.  So, ladies and gentlemen of the jury, we'll

9  take this time and call you back in when we're ready to

10  proceed.  We're staying with our schedule to be done by 4:00

11  today for the presentation to you.

12       Please remember to take your notes with you going back

13  into the jury room.

14       (Jury out at 2:30 p.m.)

15       **THE COURT:**  All right.  We're in recess, Counsel.

16       (Recess taken 2:30 p.m. to 2:52 p.m.)

17       **THE COURT:**  Any issues that came up over that recess

18  that we need to discuss before I bring the jury back in, for

19  Plaintiff?

20       **MR. SINK:**  No, Your Honor.

21       **THE COURT:**  For the university?

22       **MR. KEALEY:**  A scheduling question, Your Honor.

23       **THE COURT:**  Okay.

24       **MR. KEALEY:**  We do have a witness, the first witness

25  in our case-in-chief ready to go this afternoon.  I know

 1    there's been some discussion about whether we had carved time

 2    for Rule 50 motion argument and the Court seemed to suggest

 3    maybe that would be deferred until later in the case, so I'm

 4    trying to get a sense of when we'll go straight into our

 5    case-in-chief.

 6              **THE COURT:**  What I've done is, in the past, depending

 7    on agreement and timing, is that if there's a Rule 50

 8    presentation, which there always is, we can take it in, or if

 9    it's agreed between the parties, if there is an issue with

10    regard to witnesses and the timing might be better to hold off

11    on that without making any error or any problem into the record

12    to be able to follow up on it, if needed.  So I hope the

13    attorneys can be agreeable to it.

14        I'm also aware that the jurors don't want to wait -- don't

15    want to add more hours to tomorrow if we have to because of

16    this.  So I'm suggesting to the lawyers that they should be in

17    agreement on it one way or the other.

18              **MR. SINK:**  The issue from Plaintiff's end, Your

19    Honor, is theoretically and technically we cannot rest because

20    we still have that issue with Dr. Garner.

21        One thing we would be willing to do is -- I just learned

22    that the witness testimony is audio recorded.  We would be

23    willing to play, in lieu of him bringing him all the way back

24    here, we would willing to play that audio recording to the

25    jury.

 1          That would then permit us to close today.

 2              **THE COURT:**  If there's agreement on that, if that's

 3     the way to do it.  But if not, then --

 4              **COURT REPORTER:**  Our audio recording is not available

 5     to the public.

 6              **THE COURT:**  No, no, no, no.  No, it's probably a --

 7              **MR. SINK:**  It's not my recording.  I had asked you if

 8     there was an audio recording.

 9              **THE COURT:**  Oh, you were right.  I thought that

10     somebody had taken a recorded --

11              **MR. SINK:**  No.

12              **THE COURT:**  -- statement from him at another time.

13              **MR. SINK:**  No.

14              **THE COURT:**  Then no, she can't.

15              **MR. SINK:**  Oh, that's not a possibility?

16              **THE COURT:**  By tomorrow morning, with today?

17              **MR. SINK:**  Yeah.

18              **COURT REPORTER:**  Our audio is not available.

19              **MR. SINK:**  Well, then, I don't see how theoretically

20     we could close today unless we bring him back on Zoom very

21     quickly after Dr. Sizyuk is done.

22              **THE COURT:**  I suggested that, too.

23              **MR. SINK:**  And we talked about it, and we have not

24     come to a resolution.

25              **THE COURT:**  Can we finish with this?  Are we done

```
 1    with this?  We're going back for redirect on her?

 2              MR. KEALEY:  We're just beginning cross.

 3              THE COURT:  Oh, that's right.  We're going into

 4    cross.  Can we finish this witness, this party, so that the

 5    jury can see that is done and indicate to them that -- Well,

 6    any other suggestions?  To be creative on this, what can you

 7    agree to?

 8              MR. SINK:  I was thinking creative, I don't know if

 9    this is even a thing, but we could do a conditional closure,

10    conditioned upon Dr. Garner returning either in person or Zoom

11    and then testifying to that issue?  That would permit

12    Dr. Tsoukalas to start today.

13              THE COURT:  I have to advise the jury what we're

14    doing, and I don't want to put something -- This is the first

15    time for almost all of them.  I don't want to put something

16    into the record before then that they're going to wonder about

17    why we're doing that, and if we have to go back and bring in

18    another witness and such, that can be problematic for them to

19    understand.

20              MR. SINK:  The only other --

21              THE COURT:  To explain.

22              MR. SINK:  Sure.  The only option is reading it back.

23    I would need to talk to my client.  Obviously, we'd prefer in

24    person or live testimony.

25              THE COURT:  So back to it.  We may not be able to get
```

1    Garner's questions and answers, which I think is probably only

2    about 5 minutes or 10 minutes to get it done.

3            **MR. SINK:**  If that.

4            **THE COURT:**  Have you made any contact with him this

5    afternoon?  I know it's been close.

6            **MR. SINK:**  I cannot contact him.  That's got to be

7    done through Purdue.

8            **THE COURT:**  Can that be done?

9            **MR. KEALEY:**  We have been in court, so we have not

10   tried.

11           **THE COURT:**  Got a lot of folks here that might be

12   able to make a phone call.

13           **MR. KEALEY:**  I agree.  Counsel and I just discussed

14   this at the break, and so we are just trying to do it a second

15   time.

16           **THE COURT:**  Let's do this:  Let's finish this

17   witness, plaintiff, get that done, so the jury sees that at

18   that point, and then we'll take another brief -- We'll let them

19   go back into the jury room for a few minutes while we see what

20   we can do with regard to Mr. Garner.

21       How about that?  That will work.  So somebody make some

22   phone calls to see where he is and what we can do, and then

23   we've got a better record.

24           **THE COURT:**  All right.  That works?

25           **MR. KEALEY:**  We're going to try to reach him.

1    **THE COURT:**  Are we ready to go forward, though, with

2    cross?

3    **MR. KEALEY:**  Yes.

4    **THE COURT:**  So he'll come back and let you all know

5    and -- and at the right time when she steps down, you can

6    advise me and have them go back into the jury room.

7    Agreeable to the Plaintiff?

8    **MR. SINK:**  Yes, Your Honor.

9    **THE COURT:**  All right.  Please bring the jury

10   back in.

11   You can stay there, but stand, yes.

12   (Jury in at 3:00 p.m.)

13   **THE COURT:**  Go ahead and be seated, please.  The jury

14   has been returned to the courtroom.  Cross-examination.

15   **MR. KEALEY:**  Yes, Your Honor.  Thank you.

16   **JUROR:**  Your Honor.

17   **THE COURT:**  Oh, I'm sorry.

18   **JUROR:**  Can we request the witness speak a little

19   slower during the responses?  Some of us are having trouble

20   understanding.

21   **THE COURT:**  Yes.  Thank you.

22   Ms. Sizyuk, as the juror has requested, if you would just

23   answer the questions a little slower so that it can be heard

24   and understood and recorded by the court reporter as well, and

25   for the jury to understand.  Okay?  So just take it easy and go

1    slow on all your answers now going forward a little bit better.

2         All right.  Counsel, you may proceed with cross.

3              **MR. KEALEY:**  Thank you, Your Honor.

4                        <u>**CROSS EXAMINATION**</u>

5    **BY MR. KEALEY:**

6    Q.   Good afternoon, Dr. Sizyuk.

7    A.   Good afternoon.

8              **THE COURT:**  You can be louder, but you can't be

9    faster.

10   **BY MR. KEALEY:**

11   Q.   You are currently employed; right?

12   A.   **Yes.**

13   Q.   And where are you currently employed?

14             **MR. SINK:**  Objection; relevance.

15             **THE COURT:**  Response.

16             **MR. KEALEY:**  The door has been open quite wide to

17   this, Your Honor.

18             **MR. SINK:**  Your Honor, pursuant to the motion in

19   limine, certain categories of issues are not to be inquired

20   about.

21             **THE COURT:**  Sidebar.

22        (Bench conference had as follows:)

23             **THE COURT:**  Where is that; what did I miss?

24             **MR. SINK:**  Motion in limine post employment past

25   Purdue, it was not even objected to.

1          **MR. KEALEY:**  It's just been a request -- questioning

2    on direct about the effects on her professional reputation and

3    opportunities just a few minutes ago.

4          **THE COURT:**  Wasn't that motion in limine with regard

5    to her income?

6          **MR. SINK:**  Yeah, correct.

7          **THE COURT:**  It was just asking if she was working.

8          **MR. SINK:**  I suppose if we're not going to go into

9    those issues.

10         **MR. KEALEY:**  We're not going into anything.

11         **THE COURT:**  All right.  Denied.

12    Hold up one minute.

13    (Private conference concluded.)

14         **THE COURT:**  Hold up one minute.  Let me scroll back.

15    Overruled.  You can answer the question.  Do you want it

16    read back to you, please?

17         **THE WITNESS:  Yes, please.  Where I'm working; right?**

18    **Argonne National Laboratory.**

19    **BY MR. KEALEY:**

20    Q.   And what is your current title at Argonne National

21    Laboratory?

22    A.   **Computational scientist.**

23         (Court Reporter requested witness to repeat.)

24         **THE WITNESS:**  Computational scientist.

25         **COURT REPORTER:**  Thank you.

1          **THE WITNESS:** Mm-hmm.

2   **BY MR. KEALEY:**

3   Q.    Computational, like mathematical computations?

4   A.    **No.  I work in computational physics department.  It means**

5   **computational modeling, also different kind of physics**

6   **processes, similar what I did here.**

7   Q.    Similar to what you did at Purdue?

8   A.    **Yes.**

9   Q.    And that's full-time employment?

10  A.    **Yes.**

11  Q.    And when did you begin that full-time employment at

12  Argonne?

13  A.    **In September 2021.**

14  Q.    And how long was it between when you left Purdue and when

15  you started your position at Argonne in 2021?

16  A.    **Four months.**

17  Q.    Do you enjoy your job at Argonne?

18  A.    **Yes.**

19  Q.    Are you working in a research field that you find

20  professionally interesting?

21  A.    **Yes.**

22  Q.    Dr. Sizyuk, you do not contend that Purdue University is

23  biased against women or non-Asians, do you?

24  A.    **Sorry.  Can you please repeat the question.**

25  Q.    You do not contend that Purdue University is biased

1   against women or non-Asians, do you?

2   A.   **Not Purdue University.   Just certain people.**

3   Q.   Not Purdue University?

4   A.   **Not Purdue University.**

5   Q.   Dr. Sizyuk, would you agree with me that you have

6   apparently a very deep loyalty to Dr. Hassanein?

7   A.   **What do you mean "deep loyalty"?**

8   Q.   You've worked with him for a long time, right?

9   A.   **Yes.**

10  Q.   He provided you professional opportunities, right?

11  A.   **What kind of professional opportunities?**

12  Q.   Your first professional opportunity in this country was

13  working with him at Argonne National Labs; correct?

14  A.   **In this instance, yes.**

15  Q.   And you worked with him during your entire previous stint

16  at Argonne through 2007, right?

17  A.   **Yes.**

18  Q.   And the opportunity to come to Purdue University was an

19  opportunity provided to you by Dr. Hassanein, correct?

20  A.   **I don't know in what details it was discussed.**

21         **COURT REPORTER:**  Could you repeat your answer?

22         **THE WITNESS:**  I don't know in what details it was

23  discussed was Dr. Hassanein when he was recruited.  I believe

24  when he was recruited to Purdue University, it was discussion

25  to bring the group of people.

1  BY MR. KEALEY:

2  Q.   My question was:  The opportunity for you to come to

3  Purdue University was from his provision to you of that

4  opportunity; right?

5  A.   **Let's see.  We came to Purdue as a group.  Of course, the**

6  **leader of group was Dr. Hassanein.**

7  Q.   If Dr. Hassanein didn't want you at Purdue when he came

8  from Argonne, you wouldn't have come to Purdue, right?

9  A.   **In this instance yes.**

10 Q.   And you were here in the courtroom when he testified that

11 not everybody that worked with him at Argonne came to Purdue;

12 you heard that didn't you?

13 A.   **Know anybody?  Excuse me.**

14 Q.   Not everybody.

15 A.   **Not everybody, yes.**

16 Q.   Not everybody came from Argonne --

17 A.   **Yeah.  Yeah.**

18 Q.   -- to Purdue?

19 A.   **Yeah.**

20      **MR. KEALEY:**  I'd like to show this newly-marked

21 Exhibit EE to the witness, Your Honor.  It's on the ELMO.

22      **THE COURT:**  Exhibit E?

23      **MR. KEALEY:**  Double E.  Defendant's EE.

24      **THE COURT:**  Okay.  EE.  Thank you.

25      **MR. KEALEY:**  I also have a hard copy, which might be

1    easier for the witness, if I may approach.

2            THE COURT:  Of course.

3            MR. KEALEY:  And a hard copy for the Court.

4        (Tendered to witness and the Court.)

5            THE COURT:  Thank you.

6            MR. KEALEY:  And I previously provided a hard copy to

7    counsel.

8    Q.   Dr. Sizyuk, you have in front of you Defendant's Exhibit

9    EE; two pages.  Do you recognize these as the cover page and

10   acknowledgements page from your doctoral dissertation?

11   A.   **Yes.**

12           MR. KEALEY:  Your Honor, I move Defendant's Exhibit

13   EE into evidence.

14           MR. SINK:  No objection.

15           THE COURT:  It's admitted.

16   **BY MR. KEALEY:**

17   Q.   So on the screen and with you is that cover page of your

18   doctoral thesis.  And it shows a date toward the bottom, if you

19   can scroll up just a little bit.

20           MR. HUMBLE:  I can switch it to my control if you'd

21   like.

22   **BY MR. KEALEY:**

23   Q.   In any event, Dr. Sizyuk, it's dated 2014, of course, when

24   you received your Ph.D.  And if we go to the second page of

25   Exhibit EE, entitled "acknowledgements," there's a text which

1   appears to have been written by you.  Is that correct?

2   A.   **Yes, I did.  What?**

3   Q.   You wrote this?

4   A.   **Yes.**

5   Q.   Set of acknowledgments?

6   A.   **Yes.**

7   Q.   And the opening paragraph of your acknowledgments starts

8   out, "first of all," do you see that?

9   A.   **Yeah.**

10  Q.   Would you please read that paragraph out loud.

11  A.   **"First of all, I would like to express my sincere**

12  **gratitude and deep appreciation to my adviser, Professor Ahmed**

13  **Hassanein.  He is the greatest teacher in my life who has**

14  **taught me thinking, allowed me believing in myself, and without**

15  **whom all this would have never been possible."**

16  Q.   When you wrote in paragraph in 2014 describing

17  Dr. Hassanein as your adviser, you were describing him as your

18  adviser for, among other things, the research in this thesis;

19  right?

20  A.   **Yes.  Because this thesis was based on publications**

21  **produced together with Professor Hassanein.  All this is not**

22  **produced on previous publications.**

23  Q.   And you felt some loyalty to him for his assistance as an

24  adviser to you in earning your doctoral degree; correct?

25  A.   **Not in earning my doctoral degree.  But in providing me**

1    **assistance to do research that allowed me to get doctor degree.**

2    Q.   The way you earned the doctoral degree is as a first step

3    to do the research under the advising of Dr. Hassanein, right?

4    A.   **When I do this research, I did not think about doctoral**

5    **degree at all.  I just did my research.**

6    Q.   Let's talk for a moment about CMUXE.

7        When you were at CMUXE, prior to 2014, everyone at CMUXE,

8    including you, depended on grants for funding of salaries,

9    compensation for the people working there; right?

10   A.   **Yes.  Salary went -- were from our grant.**

11       (Court reporter requested witness to repeat.)

12   A.   **We paid from our grants.**

13   Q.   And so the grant-getting ability of Dr. Hassanein in those

14   years was necessary for you to continue to be employed at

15   Purdue University; right?

16   A.   (No immediate response.)

17   Q.   Dr. Hassanein had to bring in grant funding in order to

18   pay your salary during those years, didn't he?

19   A.   **We all at CMUXE sent needed proposals to be paid from this**

20   **granted proposal.  We had at the time before 2016 maybe about**

21   **five, seven projects at the same time.  Professor Hassanein**

22   **could never submit and manage  --**

23            COURT REPORTER:  Please slow down.

24   A.   **-- submit and manage so many projects at the same time.**

25   Q.   My question was much simpler.  If Dr. Hassanein didn't

1  bring in the grant money, you didn't get a salary, did you?

2  A.   **If I could not write proposals, I could not have my**

3  **salary.**

4  Q.   So your salary depended on Dr. Hassanein and CMUXE,

5  because Purdue University itself was not going to guarantee you

6  a salary; right?

7  A.   **Again, my salary depend -- was dependent on how**

8  **efficiently I am submitting proposal and receiving funding.**

9  Q.   Well, let's be clear.  Those proposals were being

10 submitted with Dr. Hassanein, weren't they?

11 A.   **Yes, in all proposals, Dr. Hassanein, yes.**

12 Q.   In those years, 2007 to 2014, the principal investigator

13 on those proposals had to be Dr. Hassanein, didn't it?

14 A.   **I remember I submitted several as I principal**

15 **investigator.  Yes, several.**

16     **I don't -- I think not on one -- not on one were -- were**

17 **awarded which I submitted.**

18     (Court Reporter requested the witness to repeat.)

19          **THE WITNESS:  So I submitted several --**

20          **THE COURT:**  Please, Ms. Sizyuk.  Ms. Sizyuk, please

21 go slower as you're speaking so my reporter can hear you and

22 properly preserve your statements.  Okay?  When she turns to

23 you and asks you to do that, please stop and go back and

24 restate your statement.

25     Will you do that?

1          **THE WITNESS:  Mm-hmm.**

2          **THE COURT:**  Is that "yes"?

3          **THE WITNESS:  Yes.**

4          **THE COURT:**  All right.  Let's do that.  So please ask

5    your last question, and she'll answer.

6          **MR. KEALEY:**  Thank you.

7    Q.   During those years 2007 to 2014, the principal

8    investigator on those requests for funding had to be

9    Dr. Hassanein, didn't it?

10   A.   **So can you please -- I still don't understand your**

11   **question.**

12   Q.   You know what a principal investigator is, don't you?

13   A.   **Not only him.**

14   Q.   In order to be a principal investigator at Purdue

15   University, you have to be a member of the faculty; right?

16   A.   **No, no.  Research scientist can also be principal**

17   **investigator.  And even Dr. Hassanein submitted request to**

18   **officials that I could be allowed to be principal investigator.**

19   Q.   When you put in research funding proposals in those years,

20   they showed Dr. Hassanein as a principal investigator, didn't

21   they?

22   A.   **Proposals after 2014?**

23   Q.   2007 to 2014.

24   A.   **Mm-hmm, yes.**

25   Q.   Yes?

1    A.    **Not only Ahmed Hassanein.**

2    Q.    I didn't say "not only."  I just asked you if they showed

3    Dr. Hassanein as a principal investigator, yes or no?

4    A.    **In several proposals, yes, and projects; in several.  In**

5    **several, no.**

6    Q.    In nearly all, yes, right?

7    A.    **Not nearly.  Approximately.  I cannot say, but we had**

8    **proposals not with Dr. Hassanein as principal investigator.**

9    Q.    Dr. Sizyuk, we're going to put on the screen what's been

10   marked for identification as Defense Exhibit X.

11        Do you recognize Defense Exhibit X?

12   A.    **Sure.  I actually managed this website.  And most of the**

13   **figures on this website I created.**

14   Q.    Very good.

15        **MR. KEALEY:**  Then, Your Honor, we move Defense

16   Exhibit X into evidence.

17        **THE COURT:**  Any objection?

18        **MR. SINK:**  No objection.

19        **THE COURT:**  X is admitted.

20   **BY MR. KEALEY:**

21   Q.    So Defense Exhibit X is a website description that you

22   created showing what CMUXE does and some of the publications

23   and some of the personnel of CMUXE; correct?

24   A.    **Yes.**

25   Q.    And in the lower right-hand corner of what's on the

1    screen, it identifies three web -- excuse me -- three email

2    addresses:  Dr. Hassanein's, yours, and Doctor Valeryi Sizyuk,

3    correct?

4    A.    **Yes.**

5    Q.    That website is still up today, correct?

6    A.    **When I left in 2021, not update this website.  Therefore,**

7    **my name still on this website.**

8    Q.    So it is still up today?

9    A.    Hmm?

10   Q.    This website still appears today?

11   A.    **It appears, but it's not recent.  Not recent information.**

12   Q.    So the types of research that are described in Defense

13   Exhibit X are the types of research that involve you and

14   Dr. Hassanein; correct?

15   A.    **Types of research involves many people from CMUXE, yes.**

16   Q.    Yes.  And so if there is a research publication, for

17   example, that involves the HEIGHTS software program, that's a

18   publication that comes out of CMUXE; right?

19   A.    **There is no so close connection, HEIGHTS and CMUXE.  So I**

20   **would not say such -- I mean -- I don't know.  I could not**

21   **connect exactly HEIGHTS and CMUXE, no.**

22   Q.    You testified on direct examination about the HEIGHTS

23   software program; you remember that?

24   A.    **About what?**

25   Q.    The HEIGHTS software program?

1   A.   **Yes, Mm-hmm.**

2   Q.   That's a software program that you were involved in

3   creating; right?

4   A.   **Yes.**

5   Q.   A software program that, according to Defense Exhibit X,

6   is front page decriptor of the research that's done at CMUXE;

7   right?

8   A.   **HEIGHTS program was not completed at CMUXE, no, not**

9   **developed at CMUXE.   HEIGHTS package initially was -- start**

10  **development of HEIGHTS package --**

11          **COURT REPORTER:**  Please slow down.

12  A.   **Development of HEIGHTS package initially was at Argonne**

13  **National Lab.**

14  Q.   Let's look at the first sentence on the first page of

15  Exhibit X under the heading "HEIGHTS Simulation Package."  Do

16  you see there that it says that the HEIGHTS simulation package

17  developed initially at Argonne and now continuing at Purdue has

18  been used for fusion as well as numerous other scientific and

19  engineering research areas?  Do you see that?

20  A.   **Yes.**

21  Q.   So this website that you created showed that HEIGHTS

22  research done at Purdue involving you or Dr. Hassanein, or both

23  of you, was CMUXE research; right?

24  A.   **People from CMUXE, I mean, if these people will move from**

25  **CMUXE, they still will continue to work on HEIGHTS, but not at**

1    **CMUXE.**

2    Q.   I'm just asking about research involving you and

3    Dr. Hassanein.

4    A.   **Mm-hmm.**

5    Q.   That research involving you and Dr. Hassanein and HEIGHTS

6    at Purdue was CMUXE research, wasn't it?

7    A.   **It was at CMUXE center, yes.**

8    Q.   And you referred to other CMUXE personnel.  There were

9    other CMUXE personnel beyond you and Valeryi Sizyuk and

10   Dr. Hassanein; correct?

11   A.   **Yes.**

12   Q.   John Oliver, for example, was at CMUXE?

13   A.   **Who, sorry.**

14   Q.   John Oliver?

15   A.   **He's my student.**

16   Q.   At CMUXE?

17   A.   **Yes.**

18   Q.   And there were others; right?

19   A.   **Yes.**

20   Q.   So one could go to the CMUXE records and see the list of

21   CMUXE personnel and compare that to publications and see

22   whether publication involves CMUXE personnel; right?

23   A.   **We all part of CMUXE.  We all members of CMUXE.  And we**

24   **all created CMUXE.  So, therefore, for me, your question is**

25   **still not clear.**

1  Q.   Research that involves CMUXE personnel was CMUXE research;
2  right?
3  A.   **Research which involves CMUXE personnel, this is research**
4  **of CMUXE person.**
5  Q.   And one could look at a roster of those CMUXE persons and
6  compare it to a list of publications and see which publications
7  came out of CMUXE; right?
8  A.   **Come of people who are members of CMUXE.**
9  Q.   Are you drawing a distinction between people who are
10  members of CMUXE and CMUXE?
11  A.   **I don't understand what you mean on the CMUXE.  It's**
12  **better to say members of CMUXE.  I don't understand what do you**
13  **mean under CMUXE.**
14  Q.   Well, let's say that somebody on the nuclear engineering
15  primary committee who knew who the personnel in CMUXE were
16  looked at one of your publications and saw some of those CMUXE
17  personnel names on that publication.  It would be reasonable to
18  conclude that that publication came out of CMUXE, wouldn't it?
19  A.   **He could conclude that this publication came from this**
20  **author, this author, this author, and some of them from CMUXE.**
21  Q.   And you were aware from your annual reviews each year that
22  the primary committee was thinking about that question and
23  looking at that question and talking with you about that
24  question, weren't you?
25  A.   **About what?**

1    Q.    About your involvement in CMUXE and whether you were doing

2    anything out of -- outside of CMUXE, you knew that was an issue

3    of interest and concern to the nuclear engineering primary

4    committee, didn't you?

5    A.    **No.  Let's say I'm one of the main developers of HEIGHTS**

6    **package.  So it means that, when I became tenure-track faculty,**

7    **I could -- I used cord which I developed myself.  Also CMUXE,**

8    **the strengths of CMUXE, it has modeling, very good modeling.**

9    **It has -- package -- package, not only single package.  I also**

10   **developed another package, ITMC.**

11   **Okay.  But strengths of CMUXE that we have, very good**

12   **modeling capabilities and very good facilities for the**

13   **experiments.  And I could not find such facilities in any place**

14   **at Purdue.**

15   **I know this because we had many requests from other**

16   **departments to use our facilities.  Even more, I bought some of**

17   **equipment at CMUXE, some facilities; for example,**

18   **laser-produced plasma device, laser-produced, from my grants.**

19   **So, therefore, I don't see any reason to go outside CMUXE where**

20   **I bought my equipment and to not use HEIGHTS, which I**

21   **developed.**

22   Q.    You didn't see any reason to go outside of CMUXE, but you

23   knew that the nuclear engineering primary committee saw reasons

24   for you to go outside of CMUXE, didn't you?

25   A.    **No.  I did not hear this -- this questions regarding**

1    dependence -- independence of CMUXE.  Only what I remember was

2    question regarding the independence on Professor Hassanein, not

3    CMUXE.

4    Q.   You didn't hear anybody ever tell you to do things outside

5    of CMUXE?

6    A.   **No.**

7    Q.   Nobody ever told you that?

8    A.   **No.**

9    Q.   Not Dr. Garner?

10   A.   **No.  Dr. Garner sometimes tried to -- not tried --**

11   **contacted me to work on proposals together, and even -- one**

12   **time, he even worked where HEIGHTS package could be used.**

13   **        So -- And another way, I worked a lot with one of students**

14   **of Professor Garner on the development of computer cords for**

15   **his group.  I worked with faculty outside.**

16   Q.   So as you sit here today, you don't recall anybody in the

17   primary committee of the School of Nuclear Engineering at

18   Purdue University telling you that it was important if you

19   wanted to get tenure in that school and in the College of

20   Engineering to do independent research outside of CMUXE?

21   A.   **No.**

22   Q.   And in the annual reviews that you had, nobody ever told

23   you that?

24   A.   **The annual reviews, not all time.  The current -- he told**

25   **me to be independent on Hassanein and nobody told me to be**

1   **independent on CMUXE.**

2   Q.   So you did know you needed to be independent of

3   Dr. Hassanein?

4   A.   **Yes.**

5   Q.   And as long as you were working in CMUXE, Dr. Hassanein

6   was working with you, wasn't he?

7   A.   **He worked on his projects.  I worked on my projects.**

8   Q.   And many of those projects you worked on together, right?

9   A.   **Many and several I worked without him.**

10  Q.   You said several you worked on without him.  How many is

11  "several"?

12  A.   **Probably, I remember this in our C proposal and DOE**

13  **proposal.**

14          **COURT REPORTER:**  Can you repeat that?

15  A.   **In our C proposal -- project and DOE project.**

16  **BY MR. KEALEY:**

17  Q.   Ms. Sizyuk, in the binder in front of you should be

18  Defense Exhibit AA.  Do you have access to that in the binder?

19  It's tab AA.

20      Tab AA is taken from your tenure dossier.  And if you'd

21  like to see the hard copy, it's in the binder.  The first page

22  is on the screen in front of you.

23      I'd like you to take a quick look at defense Exhibit AA

24  and verify that it is what I just described.

25  A.   **Yes.**

1          **MR. KEALEY:**  Your Honor, I move Defense Exhibit AA

2     into evidence.

3          **THE COURT:**  Any objection?

4          **MR. SINK:**  Yes, Your Honor.  I would object.  Her

5     dossier is already in the record.  This is essentially an

6     exhibit with notes.  I believe it was a demonstrative exhibit

7     earlier in the case.  So it's akin to me making notes on an

8     exhibit and then introducing that as evidence.

9          **THE COURT:**  Response.

10         **MR. KEALEY:**  Your Honor, an excerpt of an admitted

11    exhibit is already by definition in evidence, and highlighting

12    an excerpt of an admitted exhibit is simply illustrating for

13    the benefit of the jury some of the content of that excerpt.

14         **THE COURT:**  Which one was the accepted, AA?

15         **MR. KEALEY:**  Plaintiff's Exhibit 3.

16         **THE COURT:**  The objection is overruled.  Moving for

17    Defendant's AA, it's --

18    **BY MR. KEALEY:**

19    Q.   Dr. Sizyuk, Defendant's Exhibit AA, which is now on screen

20    has highlights of Dr. Hassanein's name in the section of your

21    dossier that begins with the header, "publications,

22    presentations and research grants."

23    A.   **Yeah.**

24    Q.   And I'd ask you to look through that list of highlights to

25    whatever extent you wish.  But just to verify to me that the

1    Hassanein name that's highlighted in these publication lists

2    is, in fact, Dr. Ahmed Hassanein, your doctoral adviser and

3    your colleague at CMUXE?

4    A.    **So these -- this work was done with my research adviser,**

5    **Dr. Hassanein, and several colleagues from CMUXE.**

6    Q.    So if we look at the first two pages of Defense Exhibit

7    AA, you have a total of 44 referee journal papers listed.  Tell

8    me how many of those 44 don't have Dr. Hassanein's name on

9    them?

10   A.    **Four.**

11   Q.    And then you have a list of -- so 4 out of 44 --

12   A.    **Yeah.**

13   Q.    -- is about nine percent; right?

14   A.    **Yes, and all of them after I was advised not to -- to**

15   **publish result -- to publish my work with Dr. Hassanein, all of**

16   **them after I was advised.**

17   Q.    Well, for example, paper number four on that list

18   published in 2018 has Dr. Hassanein as coauthor; right?

19   A.    **Yes.**

20   Q.    And paper number two on that list, published in 2019, as

21   Dr. Hassanein as a coauthor; right?

22   A.    **Yes.**

23   Q.    And you were involved and advised as early as 2016 to move

24   away from that practice of researching and publishing with

25   Dr. Hassanein?

1    A.   **Not totally move away.  To show that I capable to publish**

2    **papers without Dr. Hassanein, not totally -- totally get**

3    **away --**

4         **COURT REPORTER:**  Could you repeat that, please.

5         **THE WITNESS:  Not totally go away from Dr. Hassanein.**

6    BY MR. KEALEY:

7    Q.   I want to ask you to bear in mind that number of 4 out of

8    44.  We'll come back to that.

9         But before we move on from this particular exhibit, I'll

10   ask you:  Would it surprise you if you were told that

11   Dr. Hassanein's name appears 100 times in this exhibit?

12   A.   **I did not count.**

13   Q.   Would it surprise you?

14   A.   **I don't understand your question.  Sorry.**

15   Q.   Would it surprise you that his name appears 100 times in

16   this exhibit?

17   A.   **What is the question?  I don't understand still.**

18   Q.   It would not be surprising for somebody looking at this

19   exhibit and seeing his name 100 times has some questions about

20   that fact, would it?

21   A.   **What question?  All the papers, most of the papers were**

22   **published before 2014.  And we worked in very -- so what -- we**

23   **actually developed very good capabilities at our CMUXE center.**

24   **Therefore, in our public -- could produce very good quality**

25   **publications, result in Poland of anybody else outside.**

1    Therefore, in almost our publications include people from

2    **CMUXE**.  And what I like to say, in many publications, only few

3    authors.  But the quality of work, most of publications only

4    few authors.  But the quality of work is similar, which is work

5    usually published by 10 and more co-authors.

6    Q.   Dr. Sizyuk, you have in the binder in front of you Defense

7    Exhibit BB.  And I'd ask you to either look at that in the

8    binder or we'll also put it on screen for your reference.  It's

9    not yet in evidence.

10         **MR. KEALEY:**  Your Honor, the demonstrative Exhibit BB

11    refers to four documents that are now in evidence and,

12    therefore, I'd move Defense Exhibit BB into evidence.

13         **MR. SINK:**  Same objection as earlier.  It's

14    essentially making notes and editing an exhibit.

15         **THE COURT:**  Which is allowable.  But just for

16    clarification in the record, what other exhibit that's already

17    in from Plaintiff's case does Defendant's Exhibit BB represent

18    or include?

19         **MR. KEALEY:**  Yes, so the 2014 block on Defense

20    Exhibit BB is from Dr. Garner's letter which is admitted

21    earlier today as --

22         **MR. HUMBLE:**  C.

23         **MR. KEALEY:**  Exhibit C like "cat."  The 2016 excerpt

24    shown on Defense Exhibit B was admitted earlier today as

25    Exhibit --

1          **MR. HUMBLE:**  D.

2          **MR. KEALEY:**  -- D like "David."

3          **THE COURT:**  All right.  D as in "David."

4          **MR. KEALEY:**  The 2017 block on this exhibit was

5  admitted earlier today as --

6          **MR. HUMBLE:**  E.

7          **MR. KEALEY:**  -- Defendant's E like "elephant."

8      And the 2018 block was admitted from Plaintiff's book by

9  plaintiffs as --

10          **MR. HUMBLE:**  I'm not sure.

11          **MR. KEALEY:**  We'll take a look.

12          **MR. SINK:**  I think it's P-4.

13          **MR. KEALEY:**  P-4, thank you.

14          **THE COURT:**  Okay.  It's admitted.  The objection is

15  overruled.

16  **BY MR. KEALEY:**

17  Q.  So Dr. Sizyuk, we're looking at some highlighted excerpts

18  of some documents that are already in the record.  And I'll ask

19  you first to look at the 2016 block on this page.

20      The 2016 block, you were here in the courtroom, is from an

21  NEPC set of meeting minutes where those minutes reflect

22  discussion of these highlighted questions, and you were in the

23  courtroom when we talked about the fact that those minutes

24  reflect that these concerns would be discussed with you.

25      You remember that, don't you?

1    A.    **No.**

2    Q.    You don't remember that testimony from today?

3    A.    **The testimony, yes.  But I don't remember these documents,**

4    **because these documents I could not see these documents because**

5    **NEPC documents.**

6    Q.    So you met with your mentor in 2016, didn't you?

7    A.    **Two thousand -- Dr. Hibiki, probably yes.**

8    Q.    You met with a mentor every year you were on the

9    tenure-track; right?

10   A.    **Actually met with Dr. Hibiki more often, because he always**

11   **helped me, and I would come to his office and ask any question,**

12   **so...**

13   Q.    And you thought well of Dr. Hibiki; right?

14   A.    **Yes.**

15   Q.    You didn't find him to be biased against women, did you?

16   A.    **He's very nice person.**

17   Q.    And Dr. Hibiki discussed with you that you needed to show

18   independence and research in publications, didn't he?

19   A.    **Actually, regarding Dr. Hibiki, I don't remember this.**

20   **Probably we discussed, but most often we discussed about --**

21   **about -- he advised me about teaching, about proposals and so**

22   **on.  I cannot recall.  But we discussed this with the dean --**

23   **the head at this time, Dr. Kokini, and I remember this.  He**

24   **told me to show independence, yes.**

25   Q.    Told you to show independence?

1   A.   **Yes.**

2   Q.   Dr. Kokini told you that?

3   A.   **Yes.**

4   Q.   And you remember that?

5   A.   **Yes.**

6   Q.   And Dr. Kokini told you that when he was the interim head

7   of the School of Nuclear Engineering in the period between the

8   beginning of 2016 and mid-2017; right?

9   A.   **Yeah.**

10  Q.   And if we look at the 2017 block in Defense Exhibit BB,

11  there is a set of yellow highlighted bullet points.  And one of

12  those bullet points says "Dr. Kokini talked to Dr. Sizyuk last

13  year regarding independence."  Do you see that?

14  A.   **Yeah.  Yeah.**

15  Q.   So that's true, yes?

16  A.   **Yes.**

17  Q.   And you were also -- you also had a discussion with your

18  mentor in 2017 about that same topic, that you needed to show

19  that you could stand on your own for proposals and submissions,

20  independence, right?

21  A.   **Senior faculty always advise tenure-track faculty to**

22  **produce more proposals, to produce more publications.  This is**

23  **regular advice.**

24  Q.   And in 2018, you were specifically advised to minimize

25  having Dr. Hassanein as a co-PI, weren't you?

1    A.   **Yes.**

2    Q.   And you were specifically advised do not coauthor with

3    Dr. Hassanein, right?

4    A.   **Minimize.   Minimize.   Not to coauthor.   Minimize.   And I**

5    **minimized.   I published after 2018 two regular publications**

6    **without Dr. Hassanein, and maybe one or two conference**

7    **proceedings.   Yes, two.**

8    Q.   Dr. Sizyuk, I'd ask you to look at Defense Exhibit W,

9    which is in your binder and will also be on your screen.   It's

10   not yet in evidence.   Do you see that there?

11   A.   **(No audible response.)**

12   Q.   Yes?

13   A.   **Yes.**

14   Q.   Okay.   And so in the chart for the year 2018, there's a

15   orange-tinged column with the number four and a blue-tinged

16   column for the number two.   And the blue-tinged column is for

17   publications without CMUXE.   Are those the two publications in

18   2018 that you're referring to?

19   A.   **This is -- this result CMUXE.   But I'm talking about this**

20   **is result Dr. Hassanein.**

21   Q.   So in 2018, you had four publications with CMUXE personnel

22   and two without; right?

23   A.   **Yeah.**

24   Q.   In 2019, you had one publication without CMUXE personnel

25   and six with CMUXE personnel; right?

1   A.   **So what I would like to say that all this publications**

2   **with CMUXE personnel because I'm CMUXE personnel.  I am member**

3   **of CMUXE.**

4   Q.   To clarify my question, my question is about whether you

5   published with CMUXE personnel, and if so, on how many

6   occasions in that year?

7   A.   **I CMUXE personnel.  That means that all my publications**

8   **with CMUXE personnel.**

9   Q.   So you're defining a CMUXE person as yourself.  My --

10  A.   **It's in --**

11  Q.   -- question --

12       THE COURT:  Don't talk over him.  Wait until he's

13  done.

14       MR. KEALEY:  My -- I'm sorry, Your Honor.

15       THE COURT:  No, go ahead.

16  **BY MR. KEALEY:**

17  Q.   If you're a CMUXE person, and you publish with a coauthor

18  who is a CMUXE person, I'm asking you to consider that, you and

19  them, to be a publication by you with CMUXE personnel, okay?

20  A.   **Okay.**

21  Q.   In 2019, you had six publications with CMUXE personnel,

22  didn't you?

23  A.   **Yes.**

24  Q.   And one without?

25  A.   **Yes.**

1   Q.   That was the year that you went up for promotion and

2   tenure, right?

3   A.   **Yes, but I don't see any problem here.  I am member of**

4   **CMUXE.**

5   Q.   So take a look at the chart, the whole chart, and tell me

6   whether the BLUE columns in this chart are accurate as to the

7   counts shown and the years shown?

8   A.   **I did not count myself.  I need to check everything.  But**

9   **again, it doesn't matter, because I don't see any problem here**

10  **that I published with CMUXE personnel, because I was not asked**

11  **to not publish without CMUXE personnel.  I was asked to publish**

12  **without Dr. Hassanein.**

13  Q.   Dr. Sizyuk, if you look in your binder under tab Z, there

14  is a spreadsheet.  Looks like that?

15  A.   **Yeah, Mm-hmm.**

16  Q.   I'd like you to have a look at it.  Could you go ahead and

17  get convenient access to it.

18  A.   **From screen, from the screen.**

19  Q.   It's going to be easier to look at it from the binder, so

20  go ahead and access the spreadsheet from the binder.

21  A.   **Where it is?**

22  Q.   Tab Z.

23          **THE COURT:**  Is that showing up on your screens in the

24  box?

25          **MR. KEALEY:**  It's not, because it's not yet in

```
 1    evidence, Your Honor.
 2              THE COURT:  Okay.
 3              MR. KEALEY:  I'm laying foundation for this
 4    demonstrative.
 5              THE WITNESS:  Sorry.  This is it.  Yes.
 6    BY MR. KEALEY:
 7    Q.   Dr. Sizyuk, I'll represent to you and ask you to verify
 8    for yourself that the spreadsheet that you have in front of
 9    you --
10    A.   Yes.
11    Q.   -- is a list of your publications since 2004.  And in that
12    list of publications, highlighted in pink are publications of
13    yours where at least some of your co-authors were CMUXE
14    personnel, to our understanding?
15    A.   Yes.
16    Q.   And in blue on that spreadsheet are publications of yours
17    from those years that did not have CMUXE personnel.  And so I'd
18    ask you to take a look at that spreadsheet and verify that the
19    number of blue publications, publications by you without CMUXE
20    personnel --
21    A.   Actually, what I see, this is not CMUXE personnel, but
22    involving HEIGHTS.  All right?  CMUXE or HEIGHTS.
23    Q.   CMUXE or HEIGHTS, meaning HEIGHTS when you were at Argonne
24    before you came to Purdue and called your group CMUXE?
25    A.   This list is not correct, because there are two papers of
```

 1   my student who does not work, did not work with HEIGHTS.

 2   Q.   HEIGHTS is one of the types of things that CMUXE did; it's

 3   not the only thing, is it?

 4   A.   Yes, but here included marked two papers.  His papers were

 5   published using HEIGHTS, but these papers were published by my

 6   student, and he did not use HEIGHTS.

 7   Q.   But he was working with you and CMUXE?

 8   A.   Working with CMUXE.

 9   Q.   Published by your student working with you, and CMUXE is a

10   paper involving you and CMUXE personnel; right?

11   A.   My student, involving me and my student.

12   Q.   And CMUXE?

13   A.   Me and my student at CMUXE.

14   Q.   Okay.  So having a look at that spreadsheet, can you

15   please verify the total number of publications that did not

16   involve you and CMUXE personnel was nine?

17   A.   I did not count, but I don't see any problem to publish

18   with CMUXE personnel.

19   Q.   I'm just asking you a simple data question.  You have a

20   strong set of data skills, do you not, Dr. Sizyuk?

21   A.   Sorry?

22   Q.   You know how to count things well?

23   A.   I just -- so you said nine?

24   Q.   Yes.

25   A.   Okay.  Let's see nine.

1  Q.    Okay.

2  A.    **For me --**

3            **THE COURT:**  Wait.

4            **MR. KEALEY:**  Okay.  Your Honor, I move Defense

5  Exhibit W into evidence.

6            **THE COURT:**  Any objection to Z?

7            **MR. SINK:**  Yeah, I was going to say it's Z.  Yess, we

8  object.  Unlike the other demonstrative exhibits that were

9  snapshots of actual exhibits, this is a newly-created, distinct

10  document.

11      Dr. Sizyuk testified it's not even accurate to some

12  extent, and there's absolutely no evidence in the record that

13  any witness, let alone any PC, actually ever reviewed this

14  document.

15            **THE WITNESS:**  Yes.

16            **THE COURT:**  Response.

17            **MR. KEALEY:**  Your Honor, the witness just said that

18  nine sounds correct to her.

19            **THE WITNESS:**  No, no.

20            **THE COURT:**  Wait.  Wait.  I need to hear the lawyers,

21  and I need to make a decision, so wait until I tell you that

22  it's your turn to testify.

23            **THE WITNESS:**  Okay.

24            **THE COURT:**  Finish.

25            **MR. KEALEY:**  And I provided the witness with all of

1   the foundation information to verify the accuracy of this

2   demonstrative.

3           THE COURT:  It's still not clear to me where the

4   information came or where is it in the record what is contained

5   in Z.

6           MR. KEALEY:  Certainly.  This information comes from

7   Dr. Sizyuk's publication list, which appears in her tenure

8   dossier, which is Plaintiff's P-3, Plaintiff's Exhibit 3.

9           THE COURT:  And this is demonstrative of what is

10  contained in what other exhibits?

11          MR. KEALEY:  In Plaintiff's Exhibit 3, which is the

12  tenure dossier under the lists of publications and so forth.

13          THE COURT:  All right.  And, Counsel, did you review

14  to see whether or not there's any issues between this proposed

15  Exhibit 2?

16          MR. SINK:  I don't have 88 publications memorized in

17  my head, so there's no way I could do that right now.  But I

18  believe the witness testified it was not accurate.

19          THE COURT:  Well, the comparison is whether or not

20  this proposed Defendant's Z represents Plaintiff's 3; am I

21  following the bouncing ball on this?

22          MR. KEALEY:  It's Defendant's W, but yes.

23          THE COURT:  Plaintiff's W?

24          MR. KEALEY:  Yes -- Defendant's W.

25          MR. SINK:  It's marked Z in my book.

1          **THE COURT:**  Defendant's Z is what we're looking at

2    right now.

3          **MR. KEALEY:**  Yes.

4          **THE COURT:**  The question is:  What is it a

5    composition of, what other exhibits?  And what I've heard --

6    Well, what is it?  Because it's not clear from my notes.

7          **MR. KEALEY:**  So Defendant's Z is the spreadsheet.

8          **THE COURT:**  Yes.

9          **MR. KEALEY:**  Taken from Plaintiff's 3.

10         **THE COURT:**  Plaintiff's 3.

11         **MR. KEALEY:**  And compiled into the demonstrative that

12   is Defendant's W.

13         **MR. KEALEY:**  And we provided all of this to counsel

14   last week, Your Honor.

15         **THE COURT:**  All right.  Let me just crosscheck to see

16   what these are.

17         **MR. KEALEY:**  Certainly.

18         **THE COURT:**  And Plaintiff's 3 includes the full list

19   of their writings; correct?

20         **MR. KEALEY:**  Yes.

21         **THE COURT:**  Publications?

22         **MR. KEALEY:**  Yes.

23         **THE COURT:**  All right.  All right.  Is there any

24   issue with regard to this proposed Defendant's Exhibit Z being

25   incorrect or wrong with regard to reference to Defendant's W

1   and Z, and Plaintiff's 3?

2        **MR. SINK:**  I guess I would need some clarification,

3   because her dossier, Exhibit 3, has different categories of

4   publications.  So, for example, the referee journal papers,

5   referee conference or symposium papers, books, chapters, other

6   publications.  So my question is, does Exhibit Z include all of

7   them or just a part of those?

8        **THE COURT:**  And it is ordered in order of years what

9   publications were made in years.  Well, before -- Let's come

10   back to it and give counsel the opportunity to crosscheck to

11   see whether or not Z is inaccurate in any way with regard to

12   Plaintiff's 3, because that's 2 and 3, correct?  Is that the

13   crosscheck?

14        **MR. KEALEY:**  Plaintiff's 3.

15        **THE COURT:**  Plaintiff's 3 and only 3?

16        **MR. KEALEY:**  Yes.

17        **THE COURT:**  As well as Defendant's W; is that

18   correct?

19        **MR. KEALEY:**  W is the demonstrative, Your Honor, the

20   chart.  And Z is the accompanying spreadsheet that's used for

21   the compilation that's in the chart.

22        **THE COURT:**  All right.  So what we're looking at is

23   Plaintiff's 3 and Defendant's Z; correct?

24        **MR. KEALEY:**  Yes.

25        **THE COURT:**  Okay.  All right.  It's just put in

 1  another way?

 2      **MR. KEALEY:**  I'm happy to cover a few other questions

 3  and then --

 4      **THE COURT:**  Let's do that.  That's what I'm saying

 5  is, I'll withhold ruling on it, come back to ask me, give

 6  Plaintiff's counsel an opportunity to crosscheck to see if

 7  there's anything that is incorrect.

 8      Next question.

 9      **MR. KEALEY:**  Thank you.

10      **THE COURT:**  Wait.  It's three minutes until 4:00.

11  Maybe this would be a good stopping point, and then we can do

12  this crosscheck after the jury has been released.

13      But before I release the jury, let me just ask:  Are there

14  any issues we need to address before I let them go for the

15  evening?

16      Plaintiff?

17      **MR. SINK:**  None for the Plaintiff.

18      **THE COURT:**  For university?

19      **MR. KEALEY:**  No, Your Honor.

20      **THE COURT:**  For Mr. Ishii?

21      **MS. KLUTZKE:**  No, Your Honor.  Thank you.

22      **THE COURT:**  Ladies and gentlemen of the jury, we are

23  going to recess now for the rest of the evening for you, your

24  involvement.  And I just need to go through the same direction

25  to the same instruction just to remind you that, during this

1   evening -- hold on; let me find it -- that during this evening

2   recess, I have to remind you that you cannot discuss this case

3   with anyone as we've gone along.  This includes your family,

4   other jurors, and anyone involved in the trial.  You're not to

5   watch or listen to any news reports, if any there might be,

6   concerning this case, whether it's on television, radio, news

7   accounts, newspaper, internet, or any form of media within the

8   community that discusses or analyzes this case.

9        You are required to keep an open mind throughout this

10  matter until you've heard all of the evidence to be presented

11  in the case and have heard the closing arguments of counsel as

12  well as receiving and reviewing the final instructions of law

13  that will apply to this case as given to you by the Court at

14  the end of the presentation.

15       Right now, I anticipate that we'll have a full day

16  tomorrow.  So let's stay with the same schedule that we're on.

17  If there are any changes, I will advise you tomorrow of a

18  change, but I'm still looking at going through a full day

19  tomorrow and Friday as well, so that you know.

20       So, with that said, have a good evening, remember to leave

21  your books in the jury room and we'll be concluded for today.

22  Thank you very much.

23       (Jury out at 4:02 p.m.)

24       **THE COURT:**  All right.  You may sit down.

25       You may step down and go back to counsel table.

1       So any other matters we need to take up this evening other

2  than this crosscheck involving Defendant's Exhibit W -- I'm

3  sorry -- Z?

4           **MR. SINK:**  Yes, Your Honor.  I would like to get an

5  update from Purdue on Dr. Garner.

6           **THE COURT:**  Okay.  What is the status there?

7           **MR. KEALEY:**  Attorney Humble spoke directly to

8  Dr. Garner.  I would be happy to have him report.

9           **MR. HUMBLE:**  Yeah, just kind of brief, back and

10 forth.  He was available this afternoon by Zoom once he

11 returned home to Lafayette, he would be available if we need

12 him.  We'll have to work around his academic schedule a little

13 bit, so if we could plan a window for him to be available.

14          **THE COURT:**  Tomorrow?

15          **MR. HUMBLE:**  By Zoom, yeah, tomorrow.  Yes.

16          **THE COURT:**  And do we know -- because you're waiting

17 to hear what he's doing tomorrow, so but we can get it done

18 tomorrow at some point, anticipating at some point he will have

19 a break?

20          **MR. HUMBLE:**  Yes.

21          **THE COURT:**  Any questions in that regard?  We'll set

22 up a Zoom; right?  Where's my IT people?

23          **COURTROOM DEPUTY:**  Judge, we will need to have

24 advance notice of when that's going to be because it will take

25 a few minutes to set the Zoom up, and I'll need contact

1    information, because we will have to send him a link.

2        **THE COURT:**  They're on call though.  They're on call.

3    We can let them know this is coming up tomorrow, and as soon as

4    we know, they'll know.

5        But I want them to be on hold, ready -- They're here in

6    Hammond?

7        **COURTROOM DEPUTY:**  Yeah, IT is ready, and they're

8    aware of the need for a Zoom, but we'll need a few minutes to

9    get everything together.

10       **THE COURT:**  That's not so bad, a few minutes.  Our IT

11   guys, they're here, things will be set up.  It will be a very

12   limited wait to getting this done whenever he's available.  All

13   right.

14       **MR. SINK:**  So just logistically, how does that work

15   for the lawyers?  Do I go to the podium, or I guess we'll talk

16   to Jay about that.

17       **THE COURT:**  He'll let me know.  I'll let you --

18   Defense will let you know when Professor Garner is available

19   and then advise you, and then when we're back on the record,

20   you can let me know, also let Jay know.  And in the meantime,

21   we'll get our IT guys ready to go.  But we'll see where we're

22   at in terms of the presentation at the time as to where we're

23   going to actually connect it in.

24       **MR. SINK:**  But I guess my questions was more so:

25   Will the witness show up on the video in front of the jury?

1          THE COURT:  Yeah, it's a Zoom.

2          MR. SINK:  Okay.  All right.  I've never done

3     depositions or Zoom in court.

4          THE COURT:  I'm thinking he's going to be up there.

5     Right?

6          COURTROOM DEPUTY:  That's correct, all screens.

7          THE COURT:  They can see him a mile away.

8          MR. SINK:  Perfect.

9          THE COURT:  Anything else, then, Plaintiff, tonight?

10         MR. SINK:  Not from Plaintiff.

11         THE COURT:  Anything else for the university?

12         MR. KEALEY:  No, Your Honor.

13         THE COURT:  Anything else for the professor?

14         MR. BOWLING:  Yes, Your Honor.  Logistical matter.

15    Dr. Garner is on our witness list.  One issue in particular we

16    want to go -- I want to go into with him is -- with him is, the

17    testimony by Dr. Taleyarkhan about statements made in the NEPC

18    committee, ordinarily, if he were going to be around, just

19    recall him to the stand.  But obviously have logistical issues.

20    We could do that questioning as part of an omitted question on

21    cross, or we could proceed immediately to our direct.  But we

22    want to make sure, while he's available, we have opportunity to

23    examine him on that topic.

24         THE COURT:  Well, what's your preference?  We might

25    all be in agreement with it.  Go ahead.  What's

1   your preference?

2        **MR. BOWLING:**  I would be fine, Your Honor, just

3   asking as an omitted question on cross at the same time

4   Mr. Sink does his direct examination that he didn't do before.

5        **THE COURT:**  Mr. Sink.

6        **MR. SINK:**  I guess I'm trying to figure out why this

7   was not originally part of the cross.

8        **MR. BOWLING:**  Well, I can certainly answer that.

9   This was the first time today that Mr. Taleyarkhan, who has

10   been deposed, has made the allegation that Dr. Ishii made

11   racist or sexist comments in a NEPC meeting.  That is

12   contradicted by his deposition testimony and by the testimony

13   of anybody else that's been deposed.  It's quite a bomb to

14   drop.  That's why he was not asked when he was on the stand

15   before Dr. Taleyarkhan was on the stand.

16        **MR. SINK:**  There was plenty of time, though, to ask

17   him whether he heard Dr. Ishii make any kind of inappropriate

18   statements.  Counsel had the opportunity.  He didn't do it.

19        **THE COURT:**  Response on that.

20        **MR. BOWLING:**  Yes, Your Honor, he already -- the --

21   he talked about the statements apart from the context of the

22   NEPC meetings.  That was what was very new.

23        **MR. KEALEY:**  Your Honor, if I may also.

24        **THE COURT:**  Jump in.

25        **MR. KEALEY:**  Of course, we could call Dr. Garner back

 1  in our case-in-chief and cover that topic.

 2      **MR. BOWLING:**  I'm just proposing this as a logistical

 3  solution.

 4      **MR. KEALEY:**  It seems unnecessary, if we're going to

 5  have him twice, to have twice by Zoom when we can cover both

 6  these things all at once.

 7      **THE COURT:**  And for the effect of how it's going to

 8  be presented, it might extend the time period for this trial as

 9  well.  At least potentially it can.

10      So do we want to have the jury go through that another day

11  going into next week possibly for, what, a minute and a half or

12  so of testimony?

13      **MR. SINK:**  That's fine.  I'm fine.

14      **THE COURT:**  That's a good idea.  So anything else we

15  need to discuss today on how this is going to go tomorrow?

16      (No response.)

17      **THE COURT:**  Good.  Anything else I need to be

18  aware of?

19      **MR. KEALEY:**  Your Honor, just a question which isn't

20  quite right, but since we're talking about Zoom testimony, we

21  had our first case-in-chief witness here this afternoon in the

22  hall.  Of course, we didn't get to him.  He has to teach

23  tomorrow in West Lafayette.  We could talk to him about his

24  availability to testify by Zoom.  This is Dr. Tsoukalas.  His

25  testimony is not lengthy.  He's an NEPC member.

1      If necessary, we'll bring him back in person on Friday.

2   But I put that thought out there for efficiency for the reasons

3   the Court just noted.

4          **THE COURT:**  That's something you can discuss with

5   Plaintiff's counsel.  If you can agree on it.  We can do that,

6   and we can set it up here.  But I don't want to put either side

7   in the presentation of witnesses of what's already been

8   agreed to.

9      The only blip in the presentation so far has been with

10  regard to Professor Garner, so that's why we're going into a

11  Zoom situation.

12     If you all can agree to take any other witnesses in that

13  way, I'm fine with that, and we can manage it.  But I'm not

14  mandating it.

15         **MR. KEALEY:**  Very well.  Thank you.

16         **THE COURT:**  See what we can actually agree to.

17  Anything else?

18         **MR. KEALEY:**  Not from Purdue.

19         **THE COURT:**  Anything else for your client?

20         **MR. BOWLING:**  No, Your Honor.

21         **THE COURT:**  Anything else for your client?

22         **MR. SINK:**  No, Your Honor.

23         **THE COURT:**  Thank you very much.  Have a good

24  evening.  We'll see you tomorrow, same time.

25         (Court adjourned at 4:10 p.m.)

```
 1                    CERTIFICATE OF REPORTER

 2            I, Angela Phipps, RMR, CRR, FCRR, certify that the

 3    foregoing is a true, complete, and accurate transcript of the

 4    record of proceedings in the above-entitled matter before the

 5    Honorable Theresa L. Springmann, on January 24, 2024.

 6

 7    Date:  January 25, 2024        S/Angela Phipps, RMR, CRR, FCRR
                                     Official Court Reporter
 8                                   for the U.S. District Court

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```